**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | |
| Plaintiff, | |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | **NON-CONFIDENTIAL** Proprietary Information Removed from Pages 19, 23, 24 and 26 |
| and | |
| DONGKUK STEEL MILL CO., LTD., | |
| Plaintiff-Intervenors | Consol. Ct. No. 24-00190 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

**PLAINTIFF HYUNDAI STEEL COMPANY'S
<u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Hyundai Steel Company hereby moves for judgment on the agency record in this action. Hyundai Steel Company challenges the *Final Results* issued by the U.S. Department of Commerce ("Commerce") in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) ("*Final Results*") in the following respects: (1) Commerce's determination in the *Final Results* that the Government of Korea's ("GOK") provision of electricity for less than adequate

remuneration was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) of the Tariff Act of 1930 is unsupported by substantial evidence and otherwise not in accordance with law; (2) Commerce's determination to rely on the original electricity consumption data, and not the revised and more accurate consumption data, is unsupported by substantial evidence and otherwise not in accordance with law; and, (3) its decision to calculate the benefit from the provision of electricity for LTAR program pursuant to 19 U.S.C. § 1677(5)(E) is unsupported by substantial evidence and is otherwise not in accordance with law.  The legal and factual grounds for Plaintiff's motion are set forth in the brief accompanying this motion.  A proposed order is also attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and (1) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (2) remand the case to Commerce with instructions to correct the errors identified by the Court; and (3) grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>               Plaintiff,<br><br>   and<br><br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>    and<br><br>DONGKUK STEEL MILL CO., LTD.,<br><br>        Plaintiff-Intervenors<br><br>   v.<br><br>UNITED STATES,<br><br>         Defendant,<br><br>   and<br><br>NUCOR CORPORATION,<br><br>        Defendant-Intervenor. | Consol. Ct. No. 24-00190 |

## <u>ORDER</u>

Upon consideration of Plaintiff Hyundai Steel Company's Rule 56.2 Motion for

Judgment on the Agency Record, and all other pertinent papers, it is hereby:

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that the *Final Results* that the U.S. Department of Commerce ("Commerce")

issued in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:  Final

Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't

1

Commerce Sept. 11, 2024) ("*Final Results*") are unsupported by substantial evidence and

otherwise not in accordance with law; and it is further

     **ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration

in accordance with the Court's opinion in this matter.

     **SO ORDERED**.


                                        _____

                                        Claire R. Kelly, Judge

Dated: _____
       New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>       Plaintiff,<br><br>   and<br><br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>    and<br><br>DONGKUK STEEL MILL CO., LTD.,<br><br>      Plaintiff-Intervenors<br><br>   v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>   and<br><br>NUCOR CORPORATION,<br><br>     Defendant-Intervenor. | **NON-CONFIDENTIAL**<br>Proprietary Information Removed<br>from Pages 19, 23, 24 and 26<br><br><br>Consol. Ct. No. 24-00190 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

April 24, 2025

# TABLE OF CONTENTS

I.    Statement Pursuant to Rule 56.2 ........................................................................... 2

II.   Issues Of Law Presented and Reasons for Contesting the Administrative Determination . 2

III.  Statement of Facts ............................................................................................... 3

IV.   Summary Of Argument ......................................................................................... 9

V.    Standard of Review ............................................................................................ 10

VI.   Argument ......................................................................................................... 10

    A.    Commerce's Determination That KEPCO's Provision of Electricity for LTAR Is De Facto Specific Is Unsupported by Substantial Evidence And Is Otherwise Contrary to Law. .................................................................................... 11

    B.    Commerce's Reliance on the Original Electricity Consumption Data Is Not Supported By Substantial Evidence and is Otherwise Not in Accordance with Law. ............................................................................................................. 19

    C.    Commerce's Calculation of the Benefit from the Electricity for LTAR Program Overstates the Benefit by Including Certain Pass-Through Amounts  in its Cost Recovery Analysis that Had Already Been Included in the Prior Review's Costs. ............................................................................................................. 22

VII.  Conclusion And Relief Requested ....................................................................... 27

Certificate Of Compliance ............................................................................................ 28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bethlehem Steel Corp. v. United States*,
    140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ...................................................15, 16

*Canadian Solar Inc. v. United States*,
    537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ...................................................22, 25

*Carlisle Rubber & Tire Co. v. United States*,
    564 F. Supp. 834 (Ct. Int'l Trade 1983) ...........................................................12, 13

*Changzhou Trina Solar Energy Co. v. United States*,
    352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ...........................................................17

*Hyundai Steel Co. v. United States*,
    745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ........................................................9, 14

*Linyi Chengen Import and Export Co. v. United States*,
    391 F.Supp.3d 1283 (Ct. Int'l Trade 2019) ...........................................................17

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008).............................................................................22

*Mosaic Co. v. United States*,
    2025 WL 974056 (Ct. Int'l Trade Apr. 1, 2025) ..................................12, 13, 14, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983)........................................................................17

*Samsung Electronics Co., Ltd. v. United States*,
    973 F. Supp. 2d 1321(Ct. Int'l Trade 2014) ...................................................15, 16

*Samsung Electronics Co., Ltd. v. United States*,
    37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) ...........................................................16

*Uttam Galva Steels Ltd. v. United States*,
    374 F. Supp. 3d 1360 (Mar. 12, 2019).....................................................................26

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*,
    256 F. Supp. 3d 1346 (Sept. 6, 2017) ......................................................................26

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................................10

19 U.S.C. § 1677(5) ................................................................................................ 2, 10, 24

19 U.S.C. § 1677(5A)(D) ................................................................................................ *passim*

19 U.S.C. § 1677m(d) ................................................................................................ 21

**Regulations**

19 C.F.R. § 351.301(c)(1) ................................................................................................ 21

19 C.F.R. § 351.302(d)(1)(ii) ................................................................................................ 21

19 C.F.R. § 351.502(b) ................................................................................................ 18

19 C.F.R. § 351.511(b) ................................................................................................ 24

**Other Authorities**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88
    Fed. Reg. 21,609 (Dep't Commerce Apr. 11, 2023) ............................................... 3

*Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea:*
    *Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed.
    Reg. 61,509 (Dep't Commerce Sept. 7, 2023) ................................................... 25

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:*
    *Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed.
    Reg. 73,626 (Dep't Commerce Sept. 11, 2024) ........................................... *passim*

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:*
    *Preliminary Results and Partial Rescission of Countervailing Duty*
    *Administrative Review; 2022,* 89 Fed. Reg. 15,825 (Mar. 5, 2024) .............................. *passim*

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ......................... 18

*Final Results of Countervailing Duty Administrative Review: Certain Hot-Rolled*
    *Carbon Steel Flat Products from India*, 69 Fed. Reg. 26,549
    (Dep't Commerce May 13, 2004) ........................................................... 25

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.
    No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 ...................................... 12, 13, 18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>       Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>       and<br><br>DONGKUK STEEL MILL CO., LTD.,<br><br>       Plaintiff-Intervenors<br><br>v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>       Defendant-Intervenor. | **NON-CONFIDENTIAL**<br>Proprietary Information Removed from Pages 19, 23, 24 and 26<br><br>Consol. Ct. No. 24-00190 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF
ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with U.S. Court of International Trade ("USCIT") Rule 56.2, and the January 21, 2025, scheduling order, Plaintiff Hyundai Steel Company ("Hyundai Steel") files this brief in support of its Rule 56.2 motion for judgment upon the agency record. Scheduling Order, ECF No. 28. The U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.

I.       *Statement Pursuant to Rule 56.2*

The administrative determination under review is Commerce's *Final Results* in the

countervailing duty ("CVD") administrative review of certain cut-to-length carbon-quality steel

plate ("CTL plate") from the Republic of Korea ("Korea"), which covered entries of subject

merchandise into the United States between January 1, 2022 and December 31, 2022 ("POR").

*See Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:  Final*

*Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't

Commerce Sept. 11, 2024) ("*Final Results*"), PR 325,[1] and accompanying Issues and Decision

Mem. ("Final Decision Mem."), PR 319.

II.      *Issues Of Law Presented and Reasons for Contesting the Administrative Determination*

1.       Whether Commerce's determination that the provision of electricity for less than

adequate remuneration ("LTAR") was *de facto* specific pursuant to 19 U.S.C.

§ 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance

with law.

2.       Whether Commerce's determination to rely on the original electricity

consumption data, and not the later submitted and more accurate electricity consumption data,

for purposes of its *de facto* specificity determination, is unsupported by substantial evidence and

is otherwise not in accordance with law.

3.       Whether Commerce's calculation of the benefit from the provision of electricity

for LTAR program pursuant to 19 U.S.C. § 1677(5)(E), using cost data that had been carried

forward from the prior review period but had already been used in the cost recovery test to

calculate the benefit in the prior review, is unsupported by substantial evidence and is otherwise

---

[1] The administrative record is contained in a confidential record ("CR") and a public record
("PR").  Administrative Record Index, ECF No. 25-1.

not in accordance with law.

III.    *Statement of Facts*

On April 11, 2023, Commerce initiated an administrative review of the CVD order on

CTL plate for the 2022 period of review ("POR").  *Initiation of Antidumping and Countervailing*

*Duty Administrative Reviews*, 88 Fed. Reg. 21,609 (Dep't Commerce Apr. 11, 2023), PR 15.  On

June 14, 2023, Commerce selected Hyundai Steel as a mandatory respondent and issued an

Initial Questionnaire.  *See* Memorandum from Kyle Clahane, International Trade Compliance

Analyst, Office III, AD/CVD Operations to Erin Begnal, Director, AD/CVD Operations Office

III, "Countervailing Duty Administrative Review of the Countervailing Duty Order on Certain

Cut-to-Length Carbon-Quality Steel from the Republic of Korea; 2022:  Respondent Selection"

(June 14, 2023), CR 9, PR 27; Letter from David Lindgren, Program Manager, Office III,

AD/CVD Operations, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel

Plate from the Republic of Korea:  Countervailing Duty Questionnaire" (June 14, 2024) ("Initial

Questionnaire"), PR 28.  On August 11, 2023, Hyundai Steel filed its Initial Questionnaire

response.  *See* Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Cut-

to-Lenth Carbon-Quality Steel Plate from the Republic of Korea, Case No. C-580-837:  Hyundai

Steel's Initial Questionnaire Response" (Aug. 11, 2023) ("Hyundai Steel's IQR"), CR 143-254,

PR 126-163.  The Government of Korea ("GOK") filed its response to the Initial Questionnaire

on August 11, 2023.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative

Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:

Response to the Initial Questionnaire" (Aug. 11, 2023) ("GOK IQR"), CR 105-142, PR 104-125.

On November 1, 2023, the GOK filed its response to the Second Supplemental

Questionnaire.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Countervailing Duty

Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic

of Korea; 2022: Response to the Supplemental Questionnaire" (Nov. 1, 2023) ("GOK 2SQR"),

CR 285-286, PR 207-208. On January 25, 2024, the GOK filed its response to the Third

Supplemental Questionnaire. *See* Letter from Yoon & Yang LLC to Sec'y Commerce,

"Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel

Plate from the Republic of Korea; 2022: Response to the GOK Supplemental Questionnaire"

(Jan. 25, 2024) ("GOK 3SQR") CR 303-308, PR 222-223.

       One of the programs being reviewed by Commerce was the alleged provision of

electricity for LTAR. *See* Initial Questionnaire at 17-22. Although Commerce's analysis is

complex and focuses upon whether the Korea Electric Power Corporation's ("KEPCO")

electricity prices are "consistent with market principles," the primary focus of the analysis is

whether KEPCO fully recovers its cost and profit. Final Decision Mem. at 11-13. Commerce

thus required the GOK to submit KEPCO's cost data as part of its questionnaire response.

       In its Initial Questionnaire, the GOK provided the KEPCO data for calendar year 2021

because at the time that it submitted its response the 2022 cost data was not available. *See* GOK

IQR at Exhibit E-9. The GOK subsequently submitted the KEPCO 2022 cost data in response to

a supplemental questionnaire. GOK 3SQR at Exhibit E-9.1.

       In its Initial Questionnaire, the GOK also provided confidential usage data during 2022

for the steel industry and the ten largest electricity consuming industries. *See* GOK IQR at 42-

43. This data was requested by Commerce for purposes of its *de facto* specificity analysis. In its

response to a supplemental questionnaire, the GOK subsequently submitted a revised version of

the ten largest industries consuming electricity in 2022, with the difference being that in the

revised data the industries were classified in accordance with the Korea Standard Industrial

Classification ("KSIC"). *See* GOK 2SQR at 1-3. The GOK explained that the data originally

submitted in the GOK IQR are "inaccurate in the sense that each category covers industries that do not match with their names.  For example, the 'Steel' category covers not only steel but also copper and non-ferrous metal, aluminum, etc.  The same is true for the 'semi-conductor' category.  It does not only cover semi-conductors but also electricity components, communication and broadcasting apparatuses, etc."  GOK 2SQR at 2.  The GOK also confirmed that the revised data submitted in the 2SQR use the KSIC, which is the "{o}fficial industry classification scheme in Korea" and is "used by various public and private entities within the GOK."  *Id.*  The revised data in the GOK 2SQR showed that the steel industry's consumption of industrial electricity was a lower percentage than using the original data from the GOK IQR.  *Id.*

The GOK also explained that KEPCO introduced a Fuel Cost Adjusted Charge ("FCAC") and the cost pass-through tariff system in January 2021 to better account for fluctuations in fuel prices.  GOK IQR at Exhibit E-2 at 5.  The FCAC reflects changes in fuel prices every quarter to the prices that KEPCO charges to its customers.  If KEPCO is unable to charge the entire fluctuations in fuel prices to its customers in a given quarter due to certain built-in limits on the amount prices can be increased each quarter, the cost pass-through system allows KEPCO to "accumulate such portions and reflect them in what is called the total comprehensive cost." GOK IQR at Exhibit E-2 at 6.  The total comprehensive cost is then used to calculate the cost recovery rate going forward and to establish the Base Charge and Usage Charge of KEPCO's electricity tariff in order to permit recovery of these increased fuel costs in later quarters.  *Id.*

The GOK also explained that KEPCO accumulated portions of the fuel costs that were not charged to its customers through the FCAC in 2021 and carried them forward to 2022.  The accumulated amount carry forward ensures the long-term recovery of fuel costs that had not been fully passed on to its customers in 2021.  This unrecovered amount, however, had already been

included in KEPCO's 2021 cost data and was used by Commerce to determine the subsidy rate for this program in the prior administrative review. Both the 2021 and 2022 KEPCO cost data were on the record, as the GOK had submitted the 2021 cost data in its IQR but then later provided the 2022 cost data in its third supplemental questionnaire. *See* GOK IQR at Exhibit E-9; GOK 3SQR at Exhibit E-9.1.

On March 5, 2024, Commerce issued its *Preliminary Results*. *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022,* 89 Fed. Reg. 15,825 (Mar. 5, 2024) ("*Preliminary Results*"), PR 248, and accompanying Preliminary Decision Memorandum ("Preliminary Decision Mem."), PR 243. In the *Preliminary Results*, Commerce determined that the provision of electricity by the GOK to Hyundai Steel provided a financial contribution and benefit. *Id.* at 26-34. Commerce also preliminarily determined that the provision of electricity was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) because the steel industry allegedly "received a disproportionately large amount of the subsidy." *Id.* at 35. In making its *de facto* specificity determination, Commerce relied upon the electricity consumption data that had been submitted in the GOK's IQR, and not the revised consumption data from the GOK's 2SQR. *See* Memorandum from Kristen Johnson, International Trade Compliance Analyst, AD/CVD Operations, Office III to The File, "Administrative Review of the Countervailing Duty Order on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea (Korea); 2022: Specificity Analysis of Industrial Electricity Consumption" (Feb. 28, 2024), CR 318-319, PR 245, at Attachment ("Preliminary Specificity Mem."). The electricity consumption data relied upon by Commerce showed that the steel industry and three other industries combined

consumed a disproportionate amount of industrial electricity.  *See id.*  Commerce also noted that the next four largest industries consumed a smaller percentage of industrial electricity.  *See id.*

From June 3, 2024, through June 5, 2024, Commerce conducted verification of the GOK, which included verification of the electricity for LTAR program.  *See* Memorandum from Laura Griffith & Patrick Barton, International Trade Compliance Analysts, AD/CVD Operations, Office III to The File, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Verification of the Questionnaire Responses of the Government of Korea" (July 8, 2024) ("GOK Verification Report"), CR 373, PR 303.  As part of the GOK verification, Commerce verified the electricity consumption data that had been revised in the GOK's 2SQR.  *See id.* at 9-10 (citing Letter from Yoon & Yang LLC to Sec'y Commerce, " Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Verification Exhibits" at Exhibit VE-10 (June 7, 2024), CR 368-370, PR 295 ("Verification Exhibits")).

The parties then submitted case briefs on July 18, 2024, including the GOK and Hyundai Steel.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Case Brief of the Government of the Republic of Korea" (July 18, 2024) ("GOK's Case Brief"); CR 374, PR 307; Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, Case No. C-580-837:  Hyundai Steel's Case Brief" (July 18, 2024) ("Hyundai Steel's Case Brief"), CR 375, PR 308.  In its case brief, the GOK argued that Commerce's determination that the provision of electricity program was *de facto* specific was unlawful.  *See* GOK's Case Brief at 16-23.  The GOK also argued that for its *de facto* specificity analysis Commerce should have relied on the revised electricity consumption data that it had verified.  *See id.* at 23-24.  The GOK also argued that Commerce's benefit

determination was unlawful because it included the fuel-cost pass-through amount that was incurred in 2021 as part of its cost recovery test for the 2022 period of review. *See id.* at 15-16. These amounts should only have been included one time in 2021 when they were incurred, and thus excluded from the 2022 costs. In its case brief, Hyundai Steel also argued that the electricity for LTAR program is not *de facto* specific, and that Commerce erred in not using the revised industrial electricity consumption data that was submitted by the GOK and verified by Commerce. *See* Hyundai Steel's Case Brief at 22-33.

Commerce published the *Final Results* on September 11, 2024. In the *Final Results,* Commerce continued to determine that the provision of electricity in Korea was *de facto* specific pursuant to pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III). Final Decision Mem. at 16-21. To support its *de facto* specificity determination, Commerce relied on usage data provided by the GOK for the steel industry and the top ten largest electricity consuming industries that reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification. *See* Memorandum from Kristen Johnson, International Trade Compliance Analyst, AD/CVD Operations, Office III To The File, "Administrative Review of the Countervailing Duty Order on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea (Korea); 2022: Final Specificity Analysis of Industrial Electricity Consumption" (Sep. 5, 2024) ("Final Specificity Mem."), CR 378-379, PR 320. The GOK data was proprietary, but Commerce found that it demonstrated that the steel industry and *two* other industries combined consumed a disproportionately large amount of electricity in Korea compared to the remaining seven industries on the top ten industrial consumers list. *See id.* In its *de facto* specificity analysis, Commerce relied on the original electricity consumption data that had been submitted in the GOK's IQR and not the revised electricity consumption data it

had verified.  *See id.*; Final Decision Mem. at 22.  Commerce also rejected the GOK's argument

that the accumulated fuel costs incurred in 2021 should have been excluded from the 2022 cost

recovery test.  *See* Final Decision Mem. at 24-25.  This appeal followed.

IV.     *Summary Of Argument*

Commerce's determination that the GOK's provision of electricity for LTAR was *de*

*facto* specific is unsupported by substantial evidence and is otherwise not in accordance with

law.  Pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III), a subsidy is *de facto* specific if the record

shows that "an enterprise or industry receives a disproportionately large amount of the subsidy."

In the *Final Results*, Commerce simply aggregated the total electricity use of three unrelated

industries and compared that usage to a group of seven smaller users to support the conclusion

that this group of three including the steel industry consumed a disproportionately large amount

of electricity in Korea during the period of review.  In doing so, Commerce failed to give

meaning to the statutory term "disproportionate" by explaining how this random grouping of

industries consumption was out of proportion in comparison to the random grouping of seven

smaller industries that consume industrial electricity.  This comparison just makes the obvious

point that the largest consumers used more industrial electricity than the smaller consumers.

This is disparity and not disproportionality.  Furthermore, Commerce did not even bother to

explain why it lumped together these three unrelated industries for its specificity determination.

As this court recently found in the *Hyundai Steel* decision, these failures render the *de facto*

specificity determination unsupported by substantial evidence and otherwise not in accordance

with law.  *See Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1351-53 (Ct. Int'l Trade

2024).

Commerce's *de facto* specificity determination is also unsupported by substantial

evidence because it was based on electricity consumption data that was superseded by more

precise data that was verified by Commerce.  In the *Final Results*, Commerce failed to adequately explain the basis for disregarding this updated and more accurate electricity consumption data.

Finally, Commerce has overstated the benefit for the electricity for LTAR program by including certain fuel cost pass-through amounts in its cost recovery analysis that were not relevant to KEPCO's cost recovery during the period of review.  This failure to exclude these amounts from the cost used to calculate the benefit for the electricity for LTAR program renders the *Final Results* unsupported by substantial evidence and otherwise not in accordance with law.

V.    *Standard of Review*

In reviewing a challenge to Commerce's determination in a CVD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

VI.    *Argument*

To find that a countervailable subsidy exists, Commerce must determine that a government authority has provided (i) a financial contribution, that (ii) confers a benefit that is (iii) specific.  19 U.S.C. § 1677(5)(B) & (5A).  This appeal challenges two aspects of Commerce's subsidy determination for the electricity for LTAR program.  The first challenge relates to Commerce's determination that the provision of electricity for LTAR to Hyundai Steel was *de facto* specific.  The second challenge is to Commerce's calculation of the benefit from the electricity for LTAR program.  As discussed below, Commerce's decision on both issues is not supported by substantial evidence and is otherwise not in accordance with law.

A.    *Commerce's Determination That KEPCO's Provision of Electricity for LTAR Is De Facto Specific Is Unsupported by Substantial Evidence And Is Otherwise Contrary to Law.*

In the *Final Results*, Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) because "a small group of industries, including the steel industry, received a disproportionately large amount of the subsidy." Final Decision Mem. at 21. As support, Commerce relied on confidential GOK data that showed the amount of industrial class electricity consumed by the top ten industries, including the steel industry. *See* Final Decision Mem. at 20; *see also* GOK IQR at 42–43. Commerce compared the consumption of the top three industries consuming industrial electricity against the consumption of the remaining seven industries consuming industrial electricity. Final Decision Mem. at 19; Final Specificity Mem. at Attachment. Commerce also noted that the statute "instructs Commerce that, when evaluating the factors for *de facto* specificity, to take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy." *Id.* at 18. Commerce thus also sought to support its decision by noting that "a wide diversification of economic activities exists in Korea, including 19 industry groupings with a broad range of distinctly different types of economic activities within these groupings." *Id* at 18-19 (citing to Mem. from David Lindgren, AD/CVD Operations Office III Program Manager to The File, "Placement of Korea Economic Diversification Mem. on the Record" (June 14, 2023), PR 30 ("Economic Diversification Mem.")). This decision is unsupported by substantial evidence and is otherwise not in accordance with law.

A subsidy can be found to be specific on a *de jure* or *de facto* basis. *See* 19 U.S.C. §§ 1677(5A)(D)(i) (*de jure*) & (5A)(D)((iii)(I)-(IV) (*de facto*). This case involves a *de facto* specificity determination. Final Decision Mem. at 20-21. The statute provides that a domestic subsidy is *de facto* specific if:

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II) An enterprise or industry is a predominant user of the subsidy.
*(III) An enterprise or industry receives a disproportionately large amount of the subsidy.*
(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV) (emphasis added). The statute also provides that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D). In evaluating whether a subsidy is *de facto* specific Commerce must also consider the extent of diversification of economic activities in the country providing the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii).

The Uruguay Round Agreements Act Statement of Administrative Action ("SAA") distinguishes between subsidies that are "provided to or used by discrete segments of the economy" versus those that spread a benefit throughout the economy via widespread availability and use. Uruguay Round Agreements Act Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316 at 930, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242. The SAA cites *Carlisle Tire & Rubber* where the court explained that "all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results." SAA, 1994 U.S.C.C.A.N. at 4242 (citing *Carlisle Rubber & Tire Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983) ("*Carlisle Rubber & Tire*")). The court has also explained that the SAA "cautions against overreaching and indiscriminate" specificity determinations. *Mosaic Co. v. United States*, 2025 WL 974056 at *14 (Ct. Int'l Trade Apr. 1, 2025) ("*Mosaic*"). In *Mosaic*, the court found Commerce's *de facto* specificity determination regarding a tax penalty relief program was not in accordance with 19 U.S.C. § 1677(5A)(D)(iii)(III) and the SAA because the program was

"broad-based and nationwide," like the provision of electricity here, and Commerce disregarded evidence regarding the respondent's relative size and the fact that the tax penalties were assessed as a portion of the taxes and fees owed. *Mosaic*, 2025 WL 974056 at *14.

The GOK's provision of electricity is exactly the type of widely used public program that is *not* intended to be countervailed because electricity is broadly available and used and the same tariff applies to all users of industrial class electricity throughout the economy. *See* SAA, 1994 U.S.C.C.A.N. at 4242 (citing to *Carlisle Rubber & Tire*, 564 F. Supp. at 838 (stating that countervailing generally available government benefits such as "public highways and bridges, as well as tax credits for expenditures on capital investment even if available to all industries and sectors… simply defies reason.")); *Mosaic*, 2025 WL 974056 at *14 ("Under the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those… that distribute the benefit throughout the entire economy.").

In citing favorably to *Carlisle Rubber & Tire*, the SAA recognizes that finding widely used programs such as these to be "specific" would produce absurd results. SAA, 1994 U.S.C.C.A.N. at 4242. This is particularly true here where electricity is broadly available and widely used and the electricity rates for industrial users such as the steel industry and the other sectors relied upon by Commerce to support its disproportionality decision are based on a standard pricing mechanism whereby no one company or industrial user receives a more preferential rate for electricity than other companies or industrial users. *See* GOK IQR at Ex. E-10. As demonstrated in the Electricity Tariff Table submitted by the GOK, the industrial electricity tariff rate is applicable to all electricity users involved in mining, manufacturing, and other business. *Id*. Thus, like the tax penalties relief program in *Mosaic*, the electricity program

here is broad-based and Commerce has failed to demonstrate that Hyundai Steel received a disproportionate amount of the alleged subsidy. *See Mosaic*, 2025 WL 974056 at *14 ("Commerce did not make any attempt to demonstrate that {the respondent} got some preferential treatment or other atypical benefit from the Moroccan government.").

Instead, Commerce simply lumped together three disparate industries within the narrower industrial classification of electricity consumers in Korea and contrasted their consumption of electricity against the next seven largest consumers of industrial electricity. Final Specificity Mem. at 1. But the fact that a random grouping of three industries consumed more electricity than a group of smaller consumers does not demonstrate that the "group" received a disproportionate amount of the alleged subsidy. The "group" is not the steel industry but is rather some undefined group of unrelated industries.

To find a program specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III), Commerce must determine that an enterprise or industry "receives a disproportionately large amount of the subsidy, and "disproportionate" is defined as "being out of proportion." "Disproportionate," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/disproportionate (last visited April 21, 2025) (attached as Exhibit A).[2] The Court agreed with this definition in *Hyundai Steel Co. v. United States*, where it noted that "disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected, and disproportionality exists when something is 'too large or too small in relation to something else.'" 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024). Commerce has failed to explain the basis on which it found that the percentage of electricity consumed by the steel industry, or the random group of three largest industries, is out of proportion to what would otherwise be fair or expected. This is an important

---

[2] Pursuant to the practice comment in Rule 81 of the Rules of the U.S. Court of International Trade, Hyundai Steel attaches hereto printouts of the cited internet-based definitions.

omission because, as discussed in *Bethlehem Steel Corp. v. United States*, steel production is an inherently energy intensive process and so the percentage of total industrial electricity consumption by the steel industry would be expected to be large.  140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ("*Bethlehem Steel*").

In *Bethlehem Steel*, Commerce found that a greater percentage of countervailable benefits received by the Korean steel industry did not support a finding of *de facto* specificity under 19 U.S.C. § 1677(5A)(D)(iii).  In that case, the court sustained Commerce's determination that an electricity program pursuant to which the steel industry had received over 51 percent of the benefits was not *de facto* specific.  *Bethlehem Steel*, 140 F. Supp. 2d at 1369.  Commerce found that despite the majority of the benefits going to a single industry, the benefits received were not disproportionate because high electricity usage was an inherent characteristic of the steel industry, all recipients received an identical rate reduction based on a standard mechanism, and the subsidy was not designed to benefit any one industry.  *Id*. at 1368–70.  In sustaining this determination, the court reasoned:

> In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group.  To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws.

*Id*. at 1369.

Likewise, in *Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321, 1326 (Ct. Int'l Trade 2014) ("*Samsung Electronics I*"), the court held that Commerce failed to adequately address how a tax credit program provided by the GOK to Samsung Electronics

15

Company was disproportionately large based on the facts of the case.[3]  In that case, it was undisputed that respondent Samsung received a larger share of tax credits than the average beneficiary.  *Id*.  However, the court admonished Commerce for failing to consider the aspects of the program relevant to disproportionality, namely that the GOK conferred tax credits based on usage and pursuant to a standard pricing mechanism.  *Id*.  In other words, the GOK conferred tax credits relative to eligible expenditures.

As in *Bethlehem Steel* and *Samsung Electronics I*, the electricity for LTAR program is not specific because it is based on usage and electricity prices are set based on a standard pricing mechanism.  *See* GOK IQR at 30-31, Ex. E-10 (showing that electricity prices were based on standard pricing).  Here the record demonstrates only that the steel industry overall allegedly receives a higher relative percentage of electricity consumed, which is attributable to the fact that high electricity use is an inherent characteristic of the steel industry and does not evidence that the steel industry received a disproportionately large amount of the subsidy.  *See Bethlehem Steel*, 140 F. Supp. 3d at 1369; *see also Mosaic*, 2025 WL 974056 at *14 (noting that Commerce disregarded evidence regarding the respondent's relative size and the fact that the benefit from the tax relief program was relative to the taxes and fees owed).  While the record demonstrates that the steel industry may consume a larger amount of electricity relative to other market participants, the record does not demonstrate that the amount of the subsidy is disproportionately large as required by 19 U.S.C. § 1677(5A)(D)(iii)(III).

Additionally, Commerce's reliance on an arbitrary grouping of the top three consumers of industrial electricity to support its conclusion that this group including the steel industry

---

[3] *Cf. Samsung Electronics Co., Ltd. v. United States*, 37 F. Supp. 3d 1320, 1324-26 (Ct. Int'l Trade 2014) ("*Samsung Electronics II*") (sustaining Commerce's revised disproportionate *de facto* specificity determination based on revised analysis).

consumed a disproportionate amount of industrial electricity is arbitrary and capricious.
Commerce fails to explain why it selected the top three industries—all of which are unrelated to
each other—to determine that a "group" of industries received a disproportionately large amount
of the subsidy. It appears that Commerce simply chose to aggregate the largest industrial
industries together: Commerce determined that "the steel industry and two other industries
consumed a disproportionately larger amount of industrial class electricity in Korea in
comparison to the . . . remaining seven industries" who "accounted for a significantly smaller
share of the total industrial class electricity." Final Decision Mem. at 19 (citing *generally* Final
Specificity Mem.). But such an explanation fails to explain Commerce's choice to group these
industries together or how this artificially assembled "group" consumed a disproportionate
amount of industrial electricity. *See Changzhou Trina Solar Energy Co. v. United States*, 352 F.
Supp. 3d 1316, 1331 (Ct. Int'l Trade 2018) (finding that under "limited number" *de facto*
analysis Commerce needed to explain how subsidizing broad industries amounts to a specific
rather than a generally available subsidy). Commerce's results-oriented aggregation of the
electricity use by these unrelated industries is the definition of arbitrary, capricious and an abuse
of discretion. *See Linyi Chengen Import and Export Co. v. United States*, 391 F.Supp.3d 1283,
1292 (Ct. Int'l Trade 2019) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29, 43, 103 S. Ct. 2856, 2866-67 (1983)) ("An agency acted in an arbitrary and
capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an
explanation for its decision that runs counter to the evidence before the agency, or is so
implausible that it could not be ascribed to a difference in view or the product of agency
expertise.'").

17

In the *Final Results*, Commerce attempts to justify its arbitrary grouping of unrelated industries by citing to 19 C.F.R. § 351.502(b), which provides that Commerce is not required to determine whether there are shared characteristics among the enterprises or industries that receive a subsidy. Final Decision Mem. at 19-20. However, subsection 502(b) does not permit Commerce to group industries or enterprises without reason. As this Court noted in the *Hyundai Steel* decision, Commerce explained in the *CVD Preamble* that 19 C.F.R. § 351.502(b) obviates the need for Commerce to determine whether there are shared characteristics among the enterprises or industries grouped together for the specificity analysis "*only when the subsidies are not widely available.*" *Hyundai Steel*, 745 F. Supp. 3d at 1353 (emphasis added). This is not the case here because electricity is widely available in Korea and the same standard pricing is available to all industrial consumers of electricity, Final Decision Mem. at 18 (acknowledging that "consumers of industrial class electricity in Korea are not limited in number"); GOK IQR at Ex. E-10. The *CVD Preamble* explains that "there is no basis for adding the further requirement that subsidies that are *not widely distributed* are also confided to a group of enterprises or industries that share similar characteristics." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,357 (Dep't Commerce Nov. 25, 1998) (emphasis added). Accordingly, Commerce cannot simply tally up the largest three industrial consumers, note that it is not required to find shared characteristics, and call it a day like it did in the *Final Results*. Final Decision Mem. at 19-20.

To the extent that Commerce relies on Korea's economic diversification to determine that the provision of electricity for LTAR is disproportionately used, this reliance is misplaced. Final Decision Mem. at 18-19. While Commerce must take into account the extent of economic diversification, this criterion should "serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors." *See* SAA, 1994 U.S.C.C.A.N. at 4243. Here,

Commerce fails to link its finding that the economy of Korea is diverse with its finding that a random group of industries consumes a disproportionately large amount of electricity.[4]

Finally, when viewing the steel industry's total electricity consumption (or for that matter, the electricity consumption of the three largest industrial users) in comparison to the total electricity consumption in Korea by all users, it is abundantly clear that the steel industry does not receive a disproportionate amount of the subsidy. The data relied on by Commerce shows that the steel industry consumed [                    ] of the total industrial electricity consumption in Korea, and only [                ] of the total electricity consumption in Korea. GOK IQR at 42-43; Final Specificity Mem. at Attachment. The three industries Commerce has decided to arbitrarily lump together account for only [                ] of all consumption. *Id.* These low percentages indicate that neither the steel industry nor the group of industries Commerce analyzed consume a disproportionately large percentage of electricity in the Korean market.

Accordingly, this Court should find as it did in the *Hyundai Steel* decision that Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific is not supported by substantial evidence and is otherwise not in accordance with law.

B.    *Commerce's Reliance on the Original Electricity Consumption Data Is Not Supported By Substantial Evidence and is Otherwise Not in Accordance with Law.*

In the *Final Results*, Commerce improperly relied upon unverified and outdated electricity consumption data as reported in the GOK's initial questionnaire response for its *de facto* specificity determination. *See* Final Decision Mem. at 21-22; GOK IQR at 42-43. The

---

[4] While the Korean economy may span 19 different industry groupings, the data upon which Commerce relies also shows that the number of establishments in each of these industries is not equal. For example, the number of manufacturing establishments (413,849) far outnumbers the number of establishments in 14 of these 19 industry groupings. Economic Diversification Mem. at 3-4.

GOK later supplemented its response with more complete and accurate data, and Commerce verified that data.  *See* Final Decision Mem. at 22; GOK 2SQR at 1-2.  Commerce does not offer any credible explanation as to why, despite the existence of updated data on the record, it continued to rely on incomplete and unverified information in its specificity analysis. Commerce's decision is thus unsupported by substantial evidence.

Commerce's initial questionnaire requested the GOK provide the amount of electricity provided to the steel industry and the 10 largest industries consuming electricity during the period of review.  GOK IQR at 42.  However, in response to a later supplemental questionnaire the GOK submitted "a more detailed and accurate response regarding the amount of electricity consumed by the 10 largest industries during the POR."  GOK 2SQR at 1.  The GOK explained that the data submitted in its initial questionnaire response were "inaccurate in the sense that each category covers industries that do not match with their names.  For example, the 'Steel' category covers not only steel but also copper and non-ferrous metal, aluminum, etc.  The same is true for the 'semi-conductor' category.  It does not only cover semi-conductors but also electricity components, communication and broadcasting apparatuses, etc."  GOK 2SQR at 2. Moreover, the GOK confirmed that the revised data use the Korea Standard Industrial Classification ("KSIC"), which is the "{o}fficial industry classification scheme in Korea" and is "used by various public and private entities within the GOK."  GOK 2SQR at 1-2.

Neither Commerce nor any party objected to the GOK's submission of this revised and more accurate electricity consumption data, and Commerce asked no additional questions about this data.  In the *Preliminary Results*, Commerce addressed for the first time the revised electricity consumption data and stated that it "reviewed the revised data and preliminarily find that the data appear to be a lower level of industrial classification than we requested for our

electricity consumption analysis."  Preliminary Decision Mem. at 34-35.  Notwithstanding,

Commerce later conducted verification of the GOK and verified the revised and more accurate

data that had been submitted by the GOK in the supplemental questionnaire.  *See* GOK

Verification Report at 9-10 & Verification Exhibit VE-10.  Commerce did not verify the original

electricity consumption data the GOK submitted.

In the *Final Results*, Commerce explained that it did not use the revised data because the

GOK had voluntarily submitted revised consumption data and that Commerce had not requested

it.  Final Decision Mem.at 21.  Furthermore, Commerce found that the GOK had not submitted

supporting documentation to substantiate that the original data was not accurate.  *Id*. at 21-22.

Finally, Commerce reiterated its explanation from the *Preliminary Results* that the revised data

was at a lower level of industrial classification than it had requested and thus was not usable

data.  *Id*. at 22.

However, none of these explanations justify Commerce failing to use data that the GOK

notified Commerce was not accurate and that Commerce verified without issue.  The fact that the

GOK made this revision voluntarily and without being asked to do so by Commerce does not

justify Commerce disregarding it.  Rather, if Commerce considered this to be unsolicited new

factual information the remedy was to reject it.  *See* 19 C.F.R. §§ 351.301(c)(1) & 302(d)(1)(ii).

Furthermore, it is non-sensical for Commerce to claim that the GOK did not provide supporting

documentation since Commerce chose to verify the revised electricity consumption data and did

not even examine the original consumption data at verification.  Finally, if Commerce was

concerned that the revised data was at a lower level of industrial classification than what it

needed for its specificity analysis, it should have issued supplemental questions or asked about

this or the originally submitted data at verification.  *See* 19 U.S.C. § 1677m(d).  Yet, Commerce

did none of these things and thus there is no support in the record to substantiate Commerce's speculation that the revised data was at a lower level of industrial classification.

In sum, Commerce was presented with revised data that the GOK, as the keeper of this data, explained to Commerce was more accurate and consistent with the GOK's official industry classification system. The explanations provided by Commerce for not using this data are nonsensical and speculative since Commerce never explored whether its assumption that the revised data was at a lower level of industrial classification was accurate. Accordingly, Commerce's decision not to use this revised and more accurate electricity consumption data is unsupported by substantial evidence and runs afoul of Commerce's duty to calculate margins as accurately as possible. *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) ("*Canadian Solar Inc.*") ("Commerce has a duty to determine CVD rates as accurately as possible."). Additionally, at a minimum Commerce was required to consider contradictory evidence that detracts from its determination. *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ("'The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight,' including 'contradictory evidence or evidence from which conflicting inferences could be drawn.'"). This Court should thus find that Commerce's arbitrary dismissal of the revised electricity consumption data is not supported by substantial evidence and is otherwise not in accordance with law.

C.    *Commerce's Calculation of the Benefit from the Electricity for LTAR Program Overstates the Benefit by Including Certain Pass-Through Amounts in its Cost Recovery Analysis that Had Already Been Included in the Prior Review's Costs.*

In the *Final Results*, Commerce did not adequately support its decision to not isolate and remove the effect of KEPCO's cost pass-through tariff system when calculating the benefit conferred to Hyundai Steel. Final Decision Mem. at 23-25. These amounts at issue do not represent costs incurred by KEPCO in supplying electricity; rather, they are merely amounts that

NON-CONFIDENTIAL

KEPCO could have charged as electricity tariffs in the prior year (2021) had there been no limitation on the FCAC.[5]  Because KEPCO was limited from charging these amounts in 2021, they were carried forward so that KEPCO could recover those amounts in future years.  They do not represent actual costs incurred during the 2022 period of review for supplying electricity, and their inclusion overstates the costs used to determine KEPCO's cost recovery during the period of review.  This renders the benefit calculation unsupported by substantial evidence and otherwise not in accordance with law.

In 2022, the GOK carried a portion of its 2021 costs forward to 2022 because it was unable to recover them through the collection of tariffs in 2021.  GOK 3SQR at Exhibit E-9.1. The FCAC charged to customers cannot change by more than 5 KRW/kWh (increase or decrease) compared to the immediately preceding quarter.  The cost pass-through tariff system allows KEPCO to carry forward the amounts not charged via the FCAC (due to the maximum allowed range) to subsequent years for purposes of calculating the cost recovery rate and to establish the base charge and usage charge.  GOK IQR at 15 and Exhibit E-2.  In 2021, KEPCO incurred the fuel costs at issue and reported them to Commerce as a component of the [

] line under KEPCO's [                    ] in Exhibit E-9.  *See* GOK IQR at Exhibit E-9 (showing the [

] as an element of KEPCO's 2021 [                              ]); GOK Case Br. at 15-16.  In 2022, the line [                                        ] of Exhibit E-9.1, equaling [                        ] represents the amount that was not charged via the FCAC (due to the maximum allowed range) by the end of 2021 and which KEPCO thus carried forward to 2022 for its purposes of calculating the base charge and usage charge (even though the

---

[5] In 2021, the maximum allowed range of the FCAC was plus or minus 3 KRW/kWh.  In July 2022, this maximum range became plus or minus 5 KRW/kWh.  GOK IQR at 15.

amounts are not related to supplying electricity in 2022).  GOK 3SQR at Exhibit 9.1.  That

[                 ] amount is unrelated to whether the prices that KEPCO charged allowed it to

recover the costs of electricity in 2022.

     The GOK explained to Commerce that this item is irrelevant to Commerce's calculations

for the 2022 period of review and that it was already accounted for in KEPCO's cost data for the

prior year (*i.e.*, 2021).  *See* Final Decision Mem. at 24; GOK Case Br. at 15-16.  Yet, Commerce

calculated the benefit that Hyundai Steel allegedly received from the provision of electricity for

LTAR including the [                 ] amount in KEPCO's costs.  Memorandum from Kristen

Johnson, International Trade Analyst, AD/CVD Operations Office III, to The File,

"Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-

Quality Steel Plate from the Republic of Korea; 2022: Preliminary Calculations for Hyundai

Steel Company" at Attachment II (Feb. 28, 2024), CR 320-21, PR 246 ("Preliminary Calculation

Mem.").

     The inclusion of the amounts from 2021 in the calculation of KEPCO's cost recovery rate

*for 2022* is unsupported by substantial evidence and contrary to law because the amounts are

unrelated to the cost of electricity produced and sold in 2022 and overstate the cost recovery rate

for electricity produced in 2022.  19 U.S.C. § 1677(5)(E) provides that there is a benefit from the

provision of goods or services "if such goods or services are provided for less than adequate

remuneration."  19 C.F.R. § 351.511(b) provides that "in the case of the provision of a good or

service, the Secretary normally will consider a benefit has having been received as of the date on

which the firm pays… for the good or service."  Pursuant to 19 U.S.C. § 1677(5)(E) and 19

C.F.R. § 351.511, the benefit for the provision of electricity must relate to the adequate

remuneration for electricity during the 2022 period of review, not 2021.  Inclusion of the

amounts carried forward from 2021 overstates the costs that KEPCO needed to recoup from electricity it produced and sold during the period of review. *See Canadian Solar Inc.*, 537 F. Supp. 3d at 1395 ("Commerce has a duty to determine CVD rates as accurately as possible."); *Final Results of Countervailing Duty Administrative Review: Certain Hot-Rolled Carbon Steel Flat Products from India*, 69 Fed. Reg. 26,549 (Dep't Commerce May 13, 2004) and accompanying Decision Mem. at Comment 1 (explaining Commerce does not calculate a benefit for a loan received on June 1 as if the loan was outstanding from January 1 to May 31 of a given year because it would "overstate the benefit").

In the immediately preceding administrative review, Commerce countervailed the provision of electricity for LTAR by calculating the amount that KEPCO would have had to increase its electricity tariff prices in order for KEPCO to recover 2021 costs. *See Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) and accompanying Decision Mem. at Comment 2. Commerce calculated the costs that KEPCO needed to recover in 2021 by comparing KEPCO's costs of goods sold with its sales of goods. *See* Hyundai Steel IQR at 5, Exhibit 35 (showing Commerce preliminarily calculating the 2021 subsidy rate for Hyundai Steel using KEPCO's cost of sales of goods and sales of goods). In other words, Commerce calculated the 2021 subsidy rate for Hyundai Steel to equal the amount that the GOK should have charged to recover its 2021 costs. Yet Commerce included the portion of the 2021 costs that were carried forward, a second time, as part of KEPCO's 2022 costs for purposes of determining the cost recovery rate for the period of review, despite the fact that it had already countervailed the costs in the 2021 administrative review. *See* Preliminary Calculation Mem. at Attachment II (showing the cost recovery rate used for the

benefit calculation); GOK IQR at Exhibit E-9 (showing that the [

                    ] (*i.e.* a portion of which were carried forward to 2022) are a component

of costs of goods sold, which Commerce had used for its cost recovery analysis in the 2021

administrative review); GOK 3SQR at Exhibit E-9.1 (showing the [

                    ] that was carried forward to 2022).

Commerce may not double count the fuel costs from 2021 (once in the subsidy rate for

the 2021 review period and a second time in this administrative review for 2022). *See Uttam

Galva Steels Ltd. v. United States*, 374 F. Supp. 3d 1360, 1364 (Ct. Int'l Trade 2019) (finding

Commerce's redetermination unsupported by substantial evidence because "Commerce's

circumstance of sale adjustment in this case double-counts Uttam Galva's import duties within

normal value because Commerce's original calculation incorporated already the import duties

incurred for the merchandise sold in the home market."); *Xi'an Metals & Minerals Imp. & Exp.

Co. v. United States*, 256 F. Supp. 3d 1346, 1358 & n.9 (Ct. Int'l Trade 2017) ("The 'mixed

method' adopted by ITA here double counts the respondent's labor cost by saddling production

labor with a rate embedded with administrative and executive labor and then charging for that

administrative and executive labor a second time by leaving those costs in the factory overhead

and SG & A ratio numerators.").  The inclusion of the costs in the *Final Results* of the 2021

administrative review further demonstrates that the amounts carried forward are irrelevant to

2022 and overstate the benefit for the period of review.  This court should thus find that

Commerce's benefit calculation for this program is not supported by substantial evidence and is

otherwise not in accordance with law.

VII.    *Conclusion And Relief Requested*

Based on the foregoing, Hyundai Steel respectfully requests that this Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 8,024 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  April 24, 2025

28

**Exhibit A**

 disproportionate

**Definition**    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄

# disproportionate adjective

dis·pro·por·tion·ate    ˌdis-prə-ˈpȯr-sh(ə-)nət 🔊

Synonyms of *disproportionate* ›

**:** being out of proportion

   a *disproportionate* share

**adverb**

He believes that middle-class people bear a ***disproportionate*** share of the tax burden.

A ***disproportionate*** number of the students are poor.

## Recent Examples on the Web

ⓘ **Examples are automatically compiled from online sources to show current usage.** [Read More](#)

But Kennedy didn't appear to publicly address a Native health program using traditional medicine and foods to tackle ***disproportionate*** rates of conditions such as diabetes and liver disease.
— Devna Bose, *Los Angeles Times*, 12 Apr. 2025



**Definition**   Example Sentences   Word History   Rhymes   Entries Near   Show More ⌄

That has gotten a little bit of ***disproportionate*** attention.

— Mike Fleming Jr, *Deadline*, 11 Apr. 2025

Advocacy groups and immigration lawyers noted at the time a ***disproportionate*** impact on applicants from African nations and Muslim-majority countries.

— Alex Ashley, *Rolling Stone*, 9 Apr. 2025

See All Example Sentences for *disproportionate*

## Etymology

borrowed from Medieval Latin *disprōportiōnātus,* past participle of *disprōportiōnāre* "to make out of proportion," from Latin *dis-* DIS- + Medieval Latin *prōportiōnāre* "to compose according to proportions" — more at PROPORTION entry 2

## First Known Use

1555, in the meaning defined above

## Time Traveler

**The first known use of *disproportionate* was in 1555**

See more words from the same year

extortionate                              proportionate