UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |   |
|---|---|---|
| HYUNDAI STEEL COMPANY, | ) | |
| Plaintiff, | ) | |
| and | ) | |
| DONGKUK STEEL MILL CO., LTD., | ) | |
| Consolidated Plaintiff, | ) | |
| and | ) | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) | Before: Hon. Claire R. Kelly, Judge |
| Plaintiff-Intervenor, | ) | Consol. Court No. 24-00190 |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| NUCOR CORPORATION, | ) | |
| Defendant-Intervenor. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF
CONSOLIDATED PLAINTIFF, DONGKUK STEEL MILL CO., LTD.,
FOR JUDGMENT UPON THE AGENCY RECORD**

Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

*Counsel to Dongkuk Steel Mill Co., Ltd.*
Dated: April 24, 2025           *Consolidated Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I. STATEMENT PURSUANT TO RULE 56.2(c) ............................................... 1

    A. Administrative Determination under Review .......................................... 1

    B. Issue Presented .......................................................................................... 2

    C. Standard of Review ................................................................................... 2

II. STATEMENT OF FACTS ................................................................................. 3

III. SUMMARY OF ARGUMENT ......................................................................... 6

IV. ARGUMENT ...................................................................................................... 7

    A. Substantial Record Evidence Confirmed That the Remuneration That DSM Received from KEPCO for Its Electricity Tariffs Was Adequate to Provide a Reasonable Rate of Return to KEPCO Over Time ................................. 7

    B. Commerce's Determination That the Provision of Electricity in Korea Is "Specific" to an Industry or Group of Industries Was Not Supported by Substantial Record Evidence and Was Not in Accordance with Law .................... 8

    C. Commerce's Determination That the Provision of Electricity in Korea Confers a Benefit Is Contrary to Agency Practice and Principles ......................................... 11

V. CONCLUSION ................................................................................................. 14

# TABLE OF AUTHORITIES

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................................................................. 2

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................................ 2

19 U.S.C. § 1677(5A)(D)(iii)(III) ....................................................................................... 5, 10

28 U.S.C. § 1581(c) ............................................................................................................... 2

**Judicial Decisions**

Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT 173,
6 F. Supp. 2d 865 (1998) ....................................................................................................... 3

Bethlehem Steel v. United States, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ............... 9-10

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ..................................... 3

Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 636 F. Supp. 961 (1986) ... 2-3

Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197 (1938) ........................ 3

Consolo v. Fed. Maritime Comm'n, 383 U.S. 607 (1966) .................................................... 3

Hyundai Steel Co. v. United States, 745 F.Supp.3d 1345 (Ct. Int'l Trade 2024) ............ 10-11

Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244 (2024) ............................................ 2

Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) .......................... 3

PAM, S.p.A. v. United States, 582 F.3d 1336 (Fed. Cir. 2009) ............................................ 3

POSCO v. United States, 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ................................. 8

Rhone-Poulenc, Inc. United States, 20 CIT 573, 927 F. Supp. 451 (1996) .......................... 3

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ...................................................... 3

**Administrative Determinations**

Certain Cold-Rolled Steel Flat Products from the Republic of Korea, 81 Fed. Reg. 49,946 (Dep't Commerce July 29, 2016) (final determ. of CVD invest.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 20, 2016).......................................................11

Certain Corrosion-Resistant Steel Products from the Republic of Korea, 85 Fed. Reg. 15,112 (Dep't Commerce Mar. 17, 2020) (final results of CVD admin. rev.; 2017), and accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 10, 2020).................12

Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) (final results of CVD admin. rev.; 2022), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 5, 2024) .......... *passim*

Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 89 Fed. Reg. 15,825 (Dep't Commerce Mar. 5, 2024) (prelim. results of countervailing duty admin. rev.; 2022), and accompanying Preliminary Decision Memorandum (Dep't Commerce Feb. 28, 2024) ....................................................................................................................... 4-5

Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 85 Fed. Reg. 84,296 (Dep't Commerce Dec. 28, 2020) (final results of CVD admin. rev.; 2018), and accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 28, 2020)........... 11-13

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 21,609 (Dep't Commerce Apr. 11, 2023) .................................................................................... 3-4

Large Diameter Welded Pipe from the Republic of Korea, 87 Fed. Reg. 5,780 (Dep't Commerce Feb. 2, 2022) (final results of CVD admin. rev.; 2018-2019), and accompanying Issues and Decision Memorandum (Dep't Commerce Jan. 2, 2022) .............................................................12

Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea, 86 Fed. Reg. 35,274 (Dep't Commerce July 2, 2021) (final determ. of CVD invest.), and accompanying Issues and Decision Memorandum (Dep't Commerce June 25, 2021) .................12

**Consol. Court No. 24-00190**
*DSM's Rule 56.2 Memorandum*

## MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

**I.     STATEMENT PURSUANT TO RULE 56.2(c)**

Consolidated Plaintiff, Dongkuk Steel Mill Co., Ltd. (hereinafter, "DSM" or "Consolidated Plaintiff"), a foreign producer and exporter of certain cut-to-length carbon-quality steel plate ("CTL Plate") from Korea, hereby submits this Memorandum in Support of its Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of this Court. For the reasons set forth below, Consolidated Plaintiff respectfully requests that the Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce"), and remand with instructions consistent with this Memorandum and the Court's findings.

**A.     Administrative Determination under Review**

This action is an appeal from Commerce's final results of the 2022 administrative review of the countervailing duty ("CVD") order in <u>Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea</u>, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) (final results of CVD admin. rev.; 2022) ("<u>Final Results</u>"), PD 325.[1]  The challenged findings and conclusions of fact and law are set out primarily in Commerce's accompanying unpublished Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "Decision Memorandum for the Final Results of the Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022" (Dep't Commerce Sept. 5, 2024) ("<u>Final Decision Memo</u>"), P.R. 319.

---

[1] Citations to the administrative record are to the public record document number ("PD") followed by the page or exhibit number assigned to these documents based on the administrative index list that Commerce filed with this Court.  <u>See</u> ECF No. 25 (Dec. 20, 2024).

B. **Issue Presented**

Consolidated Plaintiff seeks judgment on the agency record with respect to the following issue:

1. Whether Commerce's determination in the Final Results that electricity was provided for less than adequate remuneration was unsupported by substantial evidence on the record and was otherwise not in accordance with law

C. **Standard of Review**

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c). In reviewing final results in countervailing ("CVD") duty administrative reviews, the Court holds as unlawful agency determinations that are not supported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

Under Section 706 of the Administrative Procedures Act ("APA"), a reviewing Court will set aside any agency action that is inconsistent with the law. 5 U.S.C. § 706(2)(A). When applying this standard, the APA provides that "the reviewing court shall decide all relevant questions of law {and} interpret constitutional and statutory provisions." Id. Courts, not agencies, decide "all relevant questions of law" arising on review of agency action." Id.; see also Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244, 2273 (2024) (holding that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . . {C}ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous").

The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." Ceramica

Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

The Court has found Commerce's determinations unsupported by substantial evidence "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." Rhone-Poulenc, Inc. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); see also Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT 173, 184, 6 F. Supp. 2d 865, 880 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence).

Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 619-20 (1966) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)); see also PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008). Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

## II.   STATEMENT OF FACTS

On April 11, 2023, Commerce initiated a CVD duty administrative review covering all Korean producers and exporters of the subject merchandise, CTL Plate, for which it received timely-filed review requests, including DSM. See Initiation of Antidumping and Countervailing

Duty Administrative Reviews, 88 Fed. Reg. 21,609, 21,624 (Dep't Commerce Apr. 11, 2023) ("Initiation Notice"), PD 15. The Initiation Notice indicated that, in the event Commerce limited the respondents selected for individual examination in accordance with section 777A(c)(2) of the Act, Commerce would select mandatory respondents for individual examination based upon U.S. Customs and Border Protection entry data. Id. at 21,609-10.

On June 14, 2023, Commerce issued a memorandum in which it determined to select DSM and Hyundai Steel Company ("Hyundai Steel") as mandatory respondents for individual examination. See Commerce Memorandum to Erin Begnal, Director, AD/CVD Operations, Office III, re: "Respondent Selection" (June 14, 2023), PD 27. DSM fully participated in the proceeding as a mandatory respondent and cooperated with Commerce in all aspects of the administrative review, including through the submission of comprehensive initial and supplemental questionnaire responses and participation in a five-day on-site verification that Commerce officials conducted in Seoul, Korea. See Commerce File Memorandum, re: "Verification of the Questionnaire Responses of Dongkuk Steel Mill Co. Ltd." (July 5, 2024 ("DSM Verification Report"), PD 302.

On February 28, 2024, Commerce issued its preliminary results of the 2022 administrative review. See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 89 Fed. Reg. 15,825 (Dep't Commerce Mar. 5, 2024) (prelim. results of countervailing duty admin. rev.; 2022) ("Preliminary Results"), PD 248, and accompanying unpublished Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "Decision Memorandum for the Preliminary Results of the Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the

Republic of Korea; 2022" (Dep't Commerce Feb. 28, 2024) ("Preliminary Decision Memo"), PD 243.

In its Preliminary Results, Commerce calculated a net countervailable subsidy rate of 1.93 percent *ad valorem* for DSM. See Preliminary Results, 89 Fed. Reg. at 15,826. Of this total, 1.61 percent related to Commerce's determination that DSM purchased electricity from Korea Electric Power Corporation ("KEPCO") for less than adequate remuneration ("LTAR") and that the provision of electricity for LTAR is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) "because the steel industry received a disproportionately large amount of the subsidy." See Preliminary Decision Memo, at 35-36; see also Commerce File Memorandum, re: "Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Preliminary Calculations for Dongkuk Steel Mill Co., Ltd." (Feb. 28, 2024) ("Preliminary Calc Memo"), at pp. 1-4 and Attachments I and II, PD 249.

On May 15, 2024, Commerce issued a post-preliminary decision in which it found additional countervailable subsidies provided to DSM totaling 0.03 percent *ad valorem*, which raised DSM's combined CVD rate to 1.96 percent *ad valorem*. See Commerce Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "Post-Preliminary Decision Memorandum for the Countervailing Duty Administrative Review of Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022" (Dep't Commerce May 15, 2024) ("Post-Preliminary Decision Memo"), PD 279; see also Commerce File Memorandum, re: "Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Post-Preliminary Calculations for Dongkuk Steel Mill Co., Ltd." (May 15, 2024), at 1 and Attachment I, PD 280.

On July 18, 2024, and July 29, 2024, interested parties—including DSM—submitted case and/or rebuttal briefs addressing issues in the Preliminary Results and post-preliminary decision. Among other related arguments, DSM argued that Commerce should reverse its finding that KEPCO charged electricity rates to DSM for LTAR or, alternatively, should reverse its finding that the provision of electricity for LTAR program is "specific" within the meaning of the CVD statute. See DSM's Case Brief (July 18, 2024), at pp. 1-3 and 5-9, PD 309.

On September 5, 2024, Commerce issued its Final Results in which it affirmed its preliminary decision that the provision of electricity for LTAR is "specific" and constitutes a countervailable subsidy. See Final Decision Memo, at pp. 10-25. Commerce calculated a final net countervailable subsidy rate of 2.01 percent *ad valorem* for DSM, of which the electricity for LTAR component (1.61 percent) remained the same as in the Preliminary Results. See Final Results, 89 Fed. Reg. at 73,627; see also Commerce File Memorandum, re: "Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Final Calculations for Dongkuk Steel Mill Co., Ltd." (Sept. 5, 2024), at pp. 1 and 3 and Attachments I and II, PD 323.

This appeal followed.

### III.  SUMMARY OF ARGUMENT

In its Final Results, Commerce correctly concluded that the electricity prices that KEPCO charged to DSM were set according to market principles and that KEPCO has a pricing mechanism in place that is based upon laws, regulations, and processes to fully recover costs and a rate of return. However, Commerce erred when it concluded that because no industrial tariff rate recovered costs and a rate of return during the period of review (i.e., calendar year 2022), the electricity rates that KEPCO charged to DSM were provided at LTAR. The fact that a provider

Consol. Court No. 24-00190
DSM's Rule 56.2 Memorandum


experienced a loss in a single year cannot and does not justify a finding that the pricing scheme failed to provide "adequate remuneration" when, as here, substantial record evidence demonstrated that the pricing scheme was intended to generate a reasonable return over time.

Furthermore, even if this Court determines that Commerce correctly found that KEPCO provided electricity for LTAR, no factual or legal basis existed to find that any resulting subsidy was "specific" within the meaning of the CVD statute. Rather, substantial record evidence demonstrated that KEPCO supplies electricity to all users at tariffs that do not discriminate between different industries. And as a matter of law, the fact that some industries may use more electricity than others does not demonstrate "disproportionate" use that the CVD statute requires to establish "specificity," as this Court has held.

For these reasons, Consolidated Plaintiff respectfully request that this Court remand Commerce's Final Results for reconsideration with respect to the provision of electricity for LTAR that contributed to the vast majority of DSM's calculated CVD rate.

IV.  **ARGUMENT**

    A.   **Substantial Record Evidence Confirmed That the Remuneration That DSM Received from KEPCO for Its Electricity Tariffs Was Adequate to Provide a Reasonable Rate of Return to KEPCO Over Time**

In the underlying review, Commerce correctly concluded that the electricity prices that KEPCO charged were set according to market principles. See Final Decision Memo, at 12 ("As we stated in the *Preliminary Results*, this process and underlying methodology are unchanged from the GOK's prior revisions to the electricity tariffs in 2013, which we found to be set in accordance with market principles.") Commerce also found that KEPCO has a pricing mechanism in place that "is based upon laws, regulations, and processes to fully recover costs and a rate of return." Id., at 13. However, Commerce erred when it concluded that because no

industrial tariff rate recovered costs and a rate of return during the POR (i.e., calendar year 2022), the electricity rates that KEPCO charged to DSM were provided at LTAR. Id., at 13, 14.

Commerce's conclusion not only is unreasonable and contrary to court precedent, but it defies logic. Commerce can point to nothing in economic theory that requires a company operating in accordance with market principles to earn a profit every single year. And the courts have held that Commerce's analysis of the adequacy of remuneration is not limited to a single year. See, e.g., POSCO v. United States, 556 F. Supp. 3d 1364, 1373 (Ct. Int'l Trade 2022), aff'd, Case No. 2022-1525 (Fed. Cir. Oct. 23, 2023) ("The court concludes that Commerce's reliance on data from outside the POI was reasonable . . ."). The fact that a provider experienced a loss in a single year cannot and does not justify a finding that the pricing scheme failed to provide "adequate remuneration" when, as here, substantial record evidence demonstrated that the pricing scheme was intended to generate a reasonable return over time. Accordingly, Commerce's determination is unreasonable and unsupported by substantial evidence.

    **B.**     **Commerce's Determination That the Provision of Electricity in Korea Is "Specific" to an Industry or Group of Industries Was Not Supported by Substantial Record Evidence and Was Not in Accordance with Law**

Even if this Court determines that Commerce correctly found that KEPCO provided electricity for LTAR, no factual or legal basis existed to find that any resulting subsidy was *de facto* "specific" within the meaning of the CVD statute.

In particular, Commerce concluded that KEPCO's provision of electricity was *de facto* specific because, when the steel industry is aggregated with two other Korean industries, the resulting "group" uses a comparatively large share of electricity in Korea. See Final Decision Memo, at 19 ("For these final results, we therefore find that a group of three industries, inclusive of the steel industry, received a disproportionately large amount of the subsidy conferred by the

purchasing of industrial class electricity from KEPCO within the meaning of section 771(5A)(D)(iii)(III) of the Act"). Quite notably, Commerce failed to provide any explanation as to why it is reasonable to "group" the steel industry with these other two industries. In the absence of such an explanation, Commerce's analysis is utterly pointless because, of course, different industries necessarily differ in the intensity of electricity usage.

To that end, electricity is one of the most widely used services by businesses and households throughout the world. In Korea, the national electricity supplier, KEPCO, supplies all users at tariffs that do not discriminate against any region or industry. This non-preferential supply of electricity to all users would appear to be the very definition of a "generally available" program that is not "specific," and thus not countervailable. Yet, by grouping the most electricity-intensive industries together for purposes of a specificity analysis, Commerce gerrymandered an outcome that always will find a "group" used more electricity than other industries. Any analysis that combines the particular industry under consideration with other, more electricity-intensive industries, provides no logical or substantial basis for finding that the electricity usage by the industry under consideration was "disproportionate." Commerce's adopted reasoning is inherently unreliable and unsupportable.

In short, substantial record evidence demonstrated that KEPCO supplies electricity to all users at tariffs that do not discriminate between different industries. And as a matter of law, the fact that some industries may consume more electricity than others does not demonstrate "disproportionate" use that the CVD statute requires to establish "specificity." This Court has observed that, "{i}n virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group." Bethlehem Steel v. United States, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001). But the Court was clear that

9

such disparity is not sufficient to establish "specificity" within the meaning of the countervailing duty statute, explaining that, "{t}o impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws." Id.

In these circumstances, the fact that the steel industry may be a comparatively large user of electricity—when grouped with two other, electricity-intensive industries—does not establish that KEPCO's electricity prices disproportionately benefited the steel industry. Accordingly, this Court should reverse and/or remand for reconsideration Commerce's specificity finding with respect to KEPCO's provision of electricity.

Importantly, this Court has considered virtually the same issue in an appeal arising out of the 2021 CVD administrative review of the same proceeding. See Court No. 23-00211. This Court remanded Commerce's final determination for further explanation or reconsideration after concluding that, "Commerce's determination that the Electricity Program subsidy is de facto specific because the steel industry and three other industries received a 'disproportionately large amount of the subsidy' within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III) is not supported by substantial evidence." Hyundai Steel Co. v. United States, 745 F.Supp.3d 1345, 1352 (Ct. Int'l Trade 2024). Among other things, this Court observed that "{n}owhere does Commerce identify to what the benefit is disproportionate," id., and explained that "{d}isproportionality requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share)" and, thus, "Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." Id., at 1353. The Court also held that Commerce's explanations as to why it grouped together certain industries

was "insufficient." Id. Although the appeal of the 2021 administrative review is ongoing, the overlap of the substantive issue involving Commerce's same flawed and insufficient reasoning provides a compelling basis to remand Commerce's determination in the present appeal as well.

### C. Commerce's Determination That the Provision of Electricity in Korea Confers a Benefit Is Contrary to Agency Practice and Principles

Commerce made the critical, yet erroneous, decisions that "we disagree with the GOK and DSM position that a single year's loss should not indicate that the prices are out of line with market principles, and find that KEPCO's pricing confers a benefit to industrial users when costs are not fully recovered," Final Decision Memo, at 14, and that "based on our Tier 3 analysis, we continue to determine that the GOK provided a benefit to the respondents through the provision of electricity for LTAR for industrial tariff classifications, the prices of which were insufficient to recover costs plus a reasonable rate of return during the POR." Id., at 15. In reaching this conclusion, Commerce ignores established agency practice regarding the Tier 3 analysis, thus rendering its decision unsupported by substantial evidence and contrary to law.

In particular, Commerce is required under its own prevailing practice to analyze whether the price-setting methodology ensures that the sellers—including, among others, KEPCO, which sells electricity directly to consumers—recover their costs, including rates of return sufficient to ensure future operations. See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 85 Fed. Reg. 84,296 (Dep't Commerce Dec. 28, 2020) (final results of CVD admin. rev.; 2018), and accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 28, 2020), at cmt. 7 ("CTL Carbon-Quality Plate from Korea 2018 IDM"); Certain Cold-Rolled Steel Flat Products from the Republic of Korea, 81 Fed. Reg. 49,946 (Dep't Commerce July 29, 2016) (final determ. of CVD invest.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 20, 2016), at cmt. 2.

Moreover, Commerce has stated that it may rely on one or more factors in any particular case when evaluating this issue. See, e.g., CTL Carbon-Quality Plate from Korea 2018 IDM, at cmt. 7; Certain Corrosion-Resistant Steel Products from the Republic of Korea, 85 Fed. Reg. 15,112 (Dep't Commerce Mar. 17, 2020) (final results of CVD admin. rev.; 2017), and accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 10, 2020), at cmt. 1; Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea, 86 Fed. Reg. 35,274 (Dep't Commerce July 2, 2021) (final determ. of CVD invest.), and accompanying Issues and Decision Memorandum (Dep't Commerce June 25, 2021), at cmt. 1 ("SSLPP Inv. IDM") (finding that the electricity pricing mechanism places cost recovery as one of the primary factors in impacting pricing decisions and finding no benefit based on an evaluation of 2019 submitted tariff-rate-specific cost data on the record).

Commerce has routinely preferred to conduct its Tier 3 cost recovery analysis based on tariff-rate specific cost recovery data. See, e.g., SSLPP Inv. IDM, at cmt. 1 (examining cost recovery of each tariff classification to evaluate whether KEPCO's price setting mechanism recovered costs (including a reasonable rate of return)), Large Diameter Welded Pipe from the Republic of Korea, 87 Fed. Reg. 5,780 (Dep't Commerce Feb. 2, 2022) (final results of CVD admin. rev.; 2018-2019), and accompanying Issues and Decision Memorandum (Dep't Commerce Jan. 2, 2022), at cmt. 1 (noting that Commerce's Tier 3 analysis in the Preliminary Results, which noted Commerce's review of tariff-specific cost recovery date, reviewed KEPCO's electricity tariffs covered both cost recovery and a rate of return). Commerce's practice does not call for its Tier 3 analysis "to be a strict comparison of rates of returns or to require an entity absolutely to maximize its returns; rather the regulations state that such rate of return ought to be 'sufficient to ensure future operations.'" CTL Carbon-Quality Plate 2018

IDM, at cmt. 7. The specific rate of return is only one of many factors considered in Commerce's analysis. Id. Enjoying profits or suffering losses is something that utilities in all market economies experience, and overall profitability is not required under Commerce's practice to find that an electricity rate-setting regime is set in accordance with market principles.

Indeed, establishing a specific required rate of return to consider whether a pricing mechanism is in accordance with market principles is not reasonable when it comes to assessing cost recovery in a regulated utility market. Utilities are capital-intensive businesses that incur high fixed costs. Thus, costs may not increase or decrease in exact proportion to sales, as costs in a given year are tied to expenses, which can include items such as losses on disposal or impairment of equipment, or losses related to the construction of new assets. A utility's future operation, therefore, does not depend strictly on its financial performance in a single year as measured by a rate of return, as the rate of return could be disproportionately impacted in any given year by one or more unanticipated expenses. For these reasons, Commerce has declined to set a rate of return that is "sufficient to ensure future operations," but rather, evaluates several different factors. See CTL Carbon-Quality Plate from Korea 2018 IDM, at cmt. 7.

Commerce acknowledged that the record contained KEPCO cost recovery data calculated on a tariff-specific basis, which Commerce has considered, among other information, in conducting its Tier 3 analysis. See Final Decision Memo, at 13 ("we examined KEPCO's cost recovery rates by tariff classification during the POR, which are submitted to the MOTIE each year"). KEPCO's electricity rate-setting regime is designed to adhere to market principles, and it did so in practice during the POR. Substantial record evidence reflected the fact that KEPCO's electricity price-setting regime reflects market principles by adhering to established standards of cost recovery. Cost recovery is embedded by law in the electricity pricing structure in Korea in

effect during the POR by requiring KEPCO to cover the costs of electricity generation. Thus, substantial record evidence supported the conclusion that KEPCO's electricity tariff setting regime was in accordance with market principles based on the most contemporaneous tariff-specific cost recovery data. Commerce's final determination as to this issue was not supported by substantial record evidence, and its final calculations were not based on a reasonable selection of facts related to the market principles analysis. Remand is warranted for all these reasons.

Finally, DSM adopts and incorporates by reference the arguments raised in the memorandum of law filed concurrently by Plaintiff Hyundai Steel to the extent they do not conflict with the arguments raised in this Rule 56.2 Memorandum.

### V. CONCLUSION

For the reasons set forth above, the Final Results issued by Commerce in the 2022 administrative review of the CVD order involving Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea were not supported by substantial evidence and/or were not otherwise in accordance with law. Therefore, Consolidated Plaintiff DSM respectfully requests that the Court remand this case to Commerce with instructions to recalculate DSM's *ad valorem* net subsidy rate in a manner consistent with the Court's opinion in this action.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

*Counsel to Dongkuk Steel Mill Co., Ltd.*
Dated: April 24, 2025                              *Consolidated Plaintiff*

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Hyundai Steel Company, <br><br> Plaintiff, <br><br> and <br><br> Dongkuk Steel Mill Co., Ltd., <br><br> Consolidated Plaintiff, <br><br> and <br><br> Government of the Republic of Korea, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> United States, <br><br> Defendant, <br><br> and <br><br> Nucor Corporation, <br><br> Defendant-Intervenor. | Before: Hon. Claire R. Kelly, Judge <br><br> Consol. Court No. 24-00190 |

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Memorandum of Law in Support of Consolidated Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, dated April 24, 2025, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 4,122 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and undersigned counsel's signature block.

                        Respectfully submitted,

                        <u>/s/ Jarrod M. Goldfeder</u>
                        Jarrod M. Goldfeder
                        Kenneth N. Hammer
                        TRADE PACIFIC PLLC
                        700 Pennsylvania Avenue, SE
                        Suite 500
                        Washington, D.C.  20003
                        (202) 223-3760

Dated:  April 24, 2025          *Counsel to Dongkuk Steel Mill Co., Ltd.*
                        *Consolidated Plaintiff*