## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| Plaintiff, | ) |
| and | ) |
| DONGKUK STEEL MILL CO., LTD., | ) |
| Consolidated Plaintiff, | ) |
| and | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) **Consol. Court No. 24-00190** |
| Plaintiff-Intervenor, | ) **NONCONFIDENTIAL** |
| v. | ) Business Proprietary Information Removed from Pages 4, 8-12, and 17-18. |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| NUCOR CORPORATION, | ) |
| Defendant-Intervenor. | ) |

## PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: May 29, 2025

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED .......................... 2

STATEMENT OF ISSUES ............................................................................................. 2

STATEMENT OF FACTS .............................................................................................. 2

STANDARD OF REVIEW ............................................................................................. 2

SUMMARY ARGUMENT ............................................................................................. 3

ARGUMENT ................................................................................................................. 4

I.    Commerce's Finding of *De Facto* Specificity for the GOK's Provision of
      Electricity Is Not Supported by Substantial Evidence on the Record or Otherwise
      in Accordance with Law ...................................................................................... 4

      A.    Commerce Did Not Conduct the Requisite Analysis for a *De Facto*
            Specificity Finding ...................................................................................... 4

            1.    Commerce Unlawfully Conflated Disparate with Disproportionate ........... 5

            2.    Commerce Must Consider the Industry Makeup of the Country at
                  Issue as a Whole ............................................................................... 7

            3.    Commerce Arbitrarily Grouped Three Disparate Industries
                  Together for the Purposes of Its Specificity Analysis .......................... 10

      B.    The Steel Industry Did Not Consume a Disproportionately Large Amount
            of Electricity .............................................................................................. 11

            1.    Electricity in Korea Is Broadly Available and Widely Used by
                  Virtually Everyone ............................................................................ 11

            2.    The GOK Provided Electricity Under a Standard Pricing
                  Mechanism Without Any Exercise of Discretion or Favorable
                  Treatment to the Steel Industry .......................................................... 12

      C.    Commerce Erred in Using Overly Broad Electricity Consumption Data
            When Revised, More Accurate Consumption Data Were Available ................. 14

II.   Commerce's Benefit Determination Is Not Supported by Substantial Evidence on
      the Record or Otherwise in Accordance with Law .............................................. 16

CONCLUSION ........................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) .................................................. 6

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ......... passim

*Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ................... 14

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ....................................................................................................................................... 7, 8

*Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024)............... 5, 7, 10

*Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023)................................. 12

*Mosaic Co. v. United States*, No. 23-00246, slip op. (Ct. Int'l Trade Apr. 1, 2025)..................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29 (1983)........ 15

*Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) .. 6, 7

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................................ 2

19 U.S.C. § 1677(5A)(D)(iii)(III) ............................................................................................. 4, 13

28 U.S.C. § 1581(c) ........................................................................................................................ 2

**ADMINISTRATIVE DECISIONS**

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum ...... 13

## <u>INTRODUCTION</u>

This brief is submitted on behalf of Plaintiff-Intervenor the Government of the Republic of Korea ("GOK") in support of the Rule 56.2 Motions for Judgment on the Agency Record filed by Plaintiff Hyundai Steel Company ("Hyundai Steel") and Consolidated Plaintiff Dongkuk Steel Mill Co., Ltd. ("DSM") challenging the U.S. Department of Commerce's ("Commerce's") final results in the 2022 administrative review of the countervailing duty ("CVD") order on Certain Cut-to-Length Carbon-Quality Steel Plate ("CTL plate") from the Republic of Korea. *See* Pl. Hyundai Steel's Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 31 ("Pl. Br."); Consol. Pl. DSM's Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 33-1 ("Consol. Pl. Br.").

For the reasons explained by Hyundai Steel and DSM and those set forth in this brief, Commerce's specificity and benefit determinations regarding the GOK's provision of electricity are unsupported by substantial evidence and not in accordance with law.  First, in determining that the GOK's provision of electricity was *de facto* specific, Commerce misinterpreted the statute, relied on unsupported assumptions and faulty logic, overlooked undisputed evidence of widespread use of the program across enterprises and industries, and unreasonably departed from its practice.  Further, Commerce erred when it used the original electricity consumption data submitted by the GOK instead of the revised, more accurate electricity consumption data verified by Commerce.  Second, Commerce erred when it did not exclude the effects from the Korean Electric Power Corporation's ("KEPCO") cost pass-through tariff system in 2021, the year prior to the POR, in calculating the price of electricity that would have been sufficient for KEPCO to recover its costs and a rate of return.  The Court should hold that Commerce's *Final Results* lack legal and factual support and remand to Commerce.

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

The GOK challenges certain aspects of Commerce's final results in the 2022 administrative review of the CVD order on CTL plate from Korea, published as *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Sept. 11, 2024) ("*Final Results*") (P.R.325), and accompanying Issues and Decision Memorandum ("*Final Results IDM*") (P.R.319).

## STATEMENT OF ISSUES

1.      Whether Commerce's determination that the GOK's alleged provision of electricity for LTAR was *de facto* specific is supported by substantial evidence on the record and is otherwise in accordance with law.

2.      Whether Commerce's inclusion of the effects from KEPCO's cost pass-through tariff system in 2021 within the benefit calculation for the electricity for LTAR program is supported by substantial evidence on the record and is otherwise in accordance with law.

## STATEMENT OF FACTS

The GOK adopts Hyundai Steel's and DSM's statements of facts.  To the extent that additional facts not mentioned by Hyundai Steel and DSM are relevant to the GOK's arguments, they are discussed within the context of the arguments set forth in this brief.

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## SUMMARY ARGUMENT

In proceedings related to several CVD orders on products from Korea (including the CVD order on CTL plate), Commerce has repeatedly declined to countervail the GOK's provision of electricity. Commerce should have reached the same conclusion in this review, but instead erroneously concluded that the program is *de facto* specific and confers a benefit.

Commerce's *de facto* specificity determination is unsupported by substantial evidence and otherwise not in accordance with law. In reaching its *de facto* specificity determination, Commerce improperly equated disparate electricity consumption with disproportionate electricity consumption. Commerce ignored the fact that electricity is broadly available and widely used in Korea. Commerce further neglected to consider that electricity prices in Korea are determined by a standard pricing mechanism and that industrial customers are not treated differently from other customers. Rather, record evidence demonstrates that neither the mandatory respondents nor the steel industry consumed disproportionately large amounts of electricity.

Similarly, Commerce's determination of the supposed benefit from the GOK's provision of electricity is faulty as Commerce should have excluded the effects from KEPCO's cost pass-through tariff system in 2021 because they were not related to KEPCO's cost of production and distribution of electricity during the POR and were already accounted for in Commerce's prior administrative review.

## ARGUMENT

I.    **COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY FOR THE GOK'S PROVISION OF ELECTRICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW**

In its *Final Results*, Commerce determined that the GOK's provision of electricity was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III).  *Final Results IDM* at 17-21 (P.R.319).  Commerce reasoned that the electricity consumption data Commerce relied on "demonstrate that the steel industry and two other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported."  *Id.* at 19.  Commerce identified the **[                              ]** industries as the two other industries at issue.  Memorandum from Kristen Johnson to The File, "Final Specificity Analysis of Industrial Electricity Consumption" (Sept. 5, 2024) at 1 (C.R.378/P.R.320).  Commerce's finding of *de facto* specificity is unsupported by substantial evidence and otherwise not in accordance with law.

### A.    Commerce Did Not Conduct the Requisite Analysis for a *De Facto* Specificity Finding

"Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist: . . . (III) An enterprise or industry receives a disproportionately large amount of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii)(III).  Under this provision, Commerce cannot determine that the GOK's provision of electricity to certain industrial users is *de facto* specific simply because some users consume higher levels of electricity.  As explained below, Commerce's *de facto* specificity finding is unlawful because Commerce misinterpreted "disproportionate" to mean merely "disparate" and completely failed to account for differences in characteristics and size across industries that explain the disparity in electricity consumption.

1.  <u>Commerce Unlawfully Conflated Disparate with Disproportionate</u>

The word "disparity" is defined as "a noticeable and usually significant difference or dissimilarity," while the term "disproportionately" refers to "being out of proportion" or being "too large or too small in relation to something else." *Disparity and Disproportionately Definitions*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/; *Disproportionately Definition*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disproportionately.  In other words, "disparity" may occur even if a subsidy is not industry-specific due to the fundamental differences across different groups.  On the other hand, an analysis of "disproportionately" requires some sort of comparison and consideration of context, and Commerce therefore must consider whether certain enterprises or industries (or groups thereof) receive an outsized benefit from the program at issue that is out of proportion.  This court in *Hyundai Steel Co. v. United States* recently confirmed this distinction when it explained that "{d}isproportionality requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share)" and a showing that a group of industries "benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator."  745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024).  Accordingly, "the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances."  *Id.* at 1351.

The court's recent holding in *Hyundai Steel* accords with prior court decisions.  In *Bethlehem Steel Corp. v. United States*, this court confirmed that "disproportionate" is not synonymous with "disparity."  *See* 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001).  Instead, *Bethlehem Steel* held that imposing "countervailing duties on an industry where disparity alone is

demonstrated, but no evidence is produced indicating that the benefit was industry specific, is

anathema to the purpose of the countervailing duty laws." *Id.* For that reason, the court held that

the "mere fact that the {Korean} steel industry received a greater monetary benefit from the

program than did other participants is not determinative of whether that industry was 'dominant'

or receiving 'disproportionate' benefits." *Id.* On this basis, the court sustained Commerce's

decision that the Korean steel industry received neither a "dominant" nor "disproportionate"

amount of subsidies under an electricity discount program, given that the "inherent

characteristics" of the Korean steel industry was the "large consumption of electricity":

> Although the steel industry received over 51% of the financial benefits afforded by
> the VCA program during the period of investigation, there is nothing in the record
> to indicate this percentage was disproportionately higher than would be expected.
> Commerce, consistent with its prior practice, examined the Korean steel industry
> and concluded that one of its inherent characteristics was the large consumption of
> electricity. Thus, when Commerce examined the Korean steel industry's electricity
> usage, and the attendant benefits derived from the VCA program, it found them to
> be neither "dominant" nor "disproportionate."

*Id.*

The Federal Circuit in *AK Steel Corp. v. United States* also rejected an argument that

Commerce should determine disproportionality simply "by looking at the percentage of the total

benefit of a subsidy program accruing to a particular company or industry." 192 F.3d 1367, 1385

(Fed. Cir. 1999). The Federal Circuit explained that such a methodology could produce an

"untenable result" where a "benefit conferred on a large company might be disproportionate

merely because of the size of the company." *Id.*

Similarly, this court in *Samsung Electronics Co., Ltd. v. United States* cited to *AK Steel* to

further support the proposition that using just the relative share of the total benefit to determine

disproportionality could produce an untenable result. *Samsung Electronics Co., Ltd. v. United

States*, 973 F. Supp. 2d 1321, 1326-27 (Ct. Int'l Trade 2014). The court in *Samsung* concluded

that more is required by Commerce to support a finding of disproportionality than simply showing that the respondent received a large benefit. *Id.* at 1328.

Commerce undertook no such comparison in its specificity analysis regarding the GOK's alleged provision of electricity for LTAR. *See Final Results IDM* at 17-21 (P.R.319). Its determination consisted entirely of a bald and unreasoned finding that the steel industry and two other industries together consumed a "disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported" during the POR. *Id.* at 19. The sole basis for this conclusion was the fact that the next "seven industries, after the three top electricity consumers, accounted for a significantly smaller share of the total industrial class electricity consumed during the POR." *Id.* Commerce provided no explanation as to how the amount of electricity consumed by certain industries, by itself, showed that those industries "receive{d} a disproportionately large amount of the subsidy" as required under 19 U.S.C. § 1677(5A)(D)(iii)(III). Rather, Commerce's finding only demonstrates that there was a disparity in electricity consumption between three industries (including the steel industry), on the one hand, and the remaining top seven industries on the other. In other words, Commerce conducted its disproportionality analysis by merely assessing the benefit amount "in relation to the benefits of others," which is insufficient to demonstrate that the benefit amount is disproportionate. *Hyundai Steel*, 745 F. Supp. 3d at 1351.

2. <u>Commerce Must Consider the Industry Makeup of the Country at Issue as a Whole</u>

This court in *Changzhou Trina Solar Energy Co. v. United States* held that Commerce is "under an obligation to compare the industries receiving the subsidy to the industry makeup of the country at issue as a whole" when determining *de facto* specificity. 352 F. Supp. 3d 1316, 1330 (Ct. Int'l Trade 2018). The court held that Commerce needs to "explain how

subsidizing . . . broad industries amounts to a specific rather than a generally available subsidy"
when "a large swath of industries . .  could be further broken down into numerous sub-
industries." *Id.* at 1331.  Commerce failed that test in this case.

In simply concluding that three industries "disproportionately" consumed electricity,
Commerce completely failed to account for the differences in characteristics across industries
that explain the disparity in electricity consumption.  The difference in the actual size of
enterprises and industries plays a substantial role in creating a disparity in electricity
consumption.  Some enterprises and industries are much larger than others.  It is to be expected
that large industries like the [                                        ], and steel industries—the three industries
identified by Commerce as supposedly consuming a disproportionate amount of electricity—
would consume more electricity than relatively smaller industries.  *See* Letter from Yoon & Yang
LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality
Steel Plate from the Republic of Korea: Response to the Initial Questionnaire" (Aug. 11, 2023)
("GOK IQR") at 42-43 (C.R.105/P.R.104).  As large enterprises and industries have significantly
larger scales of operations than those of other smaller enterprises and industries, their usage of
electricity will naturally create a significant disparity in electricity consumption notwithstanding
the fact that their consumption may in fact be proportionate to their size.  But such disparity
should not and cannot be equated to disproportionality.  *See Bethlehem Steel*, 140 F. Supp. 2d at
1369.  Moreover, as Hyundai Steel points out, certain industries consume more electricity than
others solely due to the nature of their business, and this disparity does not indicate that the GOK
provided a disproportionately large amount of electricity to certain industries.  Pl. Br. 16.  For
example, manufacturing industries, such as the steel industry, naturally tend to consume more

electricity than other industries, such as retail, because they are required to operate large machines and equipment to manufacture their products.

Commerce specifically refused to incorporate this context into its analysis, claiming that "{t}he statute does not require Commerce to compare those unique industries within the group to others and their individual energy consumption or relative size, as the respondent parties suggest." *Final Results IDM* at 20 (P.R.319).  As explained above, the statute does in fact require Commerce to undertake such an analysis instead of relying solely on disparities in benefit amounts.  Commerce's determination therefore rests on an incorrect interpretation of the statute.

Furthermore, Commerce relied upon data that were broad and covered more than just the three named industries—steel, [                                    ].  In its response to Commerce's second supplemental questionnaire, the GOK provided revised, more accurate consumption data because the original data grouped different industries together.  Letter from Yoon & Yang LLC to Sec'y Commerce, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Response to the Supplemental Questionnaire" (Nov. 1, 2023) ("GOK SQR2") at 1-3 (C.R.285/P.R.207).  The GOK explained that its original consumption data was "inaccurate in the sense that each category covers industries that do not match with their names.  For example, the 'Steel' category covers not only steel but also copper and non-ferrous metal, aluminum, etc." *Id.* at 2.  By relying on the original industrial categorization, Commerce based its analysis on inflated electricity consumption amounts for three groups of industries not reflective of the actual electricity consumption by only the steel, [                    ] industries.

Commerce is required to support its disproportionality determination with substantial evidence.  However, Commerce has only shown disparity among industries that naturally have

different levels of electricity consumption, and that disparity has been inflated by the use of data for broad industries that can be broken down into numerous subindustries, including the grouping that was identified originally as "steel." Commerce failed to point to any evidence that would support its conclusion that the GOK provided a disproportionately large amount of the alleged subsidy to the three broad industries it identified, including the "steel" industry. Rather, Commerce based its determination on the unreasonable and unsupported assumption that all industries and enterprises are of the same nature and size and thus would normally consume the same amount of electricity. Thus, Commerce's finding that certain industries, including the steel industry, consume a disproportionate amount of electricity is unsupported by substantial evidence.

3. Commerce Arbitrarily Grouped Three Disparate Industries Together for the Purposes of Its Specificity Analysis

Using the original, overly broad consumption data, Commerce simply grouped the top three industries to reach the conclusion that together they consumed an allegedly disproportionately large amount of electricity. But Commerce never provided an explanation as to why it focused solely on the top three industries, or why those industries in particular were the relevant industries for its *de facto* specificity analysis. This court in *Hyundai Steel Co. v. United States* has confirmed that "{w}here a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping." 745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024). Even using the original consumption data, Commerce's decision to group these industries appears to be arbitrary, especially when considering that there are other industries which shared similar characteristics and output as the steel industry and the other two industries aggregated by Commerce, such as the **[            ]** industry. *See* GOK IQR at 42-43 (C.R.105/P.R.104);

GOK SQR2 at 1-2 (C.R.285/P.R.207).  Yet, Commerce decided to group three industries that have nothing in common other than the fact that they were among the largest electricity consuming industries.  Nor did Commerce explain why it was reasonable to compare their electricity usage to the total usage by only industrial customers, rather than the electricity usage by all customer classes.

Besides, even if Commerce were allowed to arbitrarily group the top three industries—which it cannot—the combined consumption of **[        ]** percent does not warrant a finding of *de facto* specificity.  Commerce has previously determined that a program pursuant to which the steel industry *by itself* had received over 51 percent of the benefits was not *de facto* specific, Pl. Br. 15, a decision that the court sustained in *Bethlehem Steel*, 140 F. Supp. 2d at 1369-70. Moreover, when considering the revised, more accurate consumption data, the flaw in Commerce's reasoning is amplified as the combined consumption of the top three industries—**[                                                              ]**—amounts to only **[       ]** percent.  *See* GOK SQR2 at 2.

### B.     The Steel Industry Did Not Consume a Disproportionately Large Amount of Electricity

In its *de facto* specificity determination, Commerce failed to account for the fact that electricity in Korea is broadly available and widely used throughout the economy and that the GOK provides electricity under a standard pricing mechanism regardless of company and industry.

#### 1.     Electricity in Korea Is Broadly Available and Widely Used by Virtually Everyone

Commerce must apply the specificity test to "winnow out" subsidies that are broadly available and widely used throughout an economy.  Pl. Br. 12-13.  In applying that test, this court has warned Commerce that it must not make an "overreaching and indiscriminate type of

specificity finding." *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1316 (Ct. Int'l Trade 2023).

Commerce's misapplication of the specificity test in the *Final Results* yielded precisely the sort of "overreaching and indiscriminate type of specificity finding" that *Mosaic* forecloses. 659 F. Supp. 3d at 1316.  Contrary to Commerce's finding, record evidence demonstrates that electricity in Korea is available to any person upon request, such that it is widely available and used.  *See* GOK IQR at Exhibit E-10 (C.R.129/P.R.120).  Recently, this court reiterated that such a "broad-based, nationwide program … is not the type of program that satisfies the specificity requirement."  *Mosaic Co. v. United States*, No. 23-00246, slip op. at 38-39 (Ct. Int'l Trade Apr. 1, 2025).  Despite the clear directions by Congress and this court, however, Commerce bluntly ignored that electricity was widely used by virtually everyone in the country and determined that the GOK's provision of electricity is *de facto* specific.

Further, the record does not support a finding that the mandatory respondents, the steel industry, or any group of industries were predominant users of this program or used a disproportionately large amount of electricity.  As mentioned, this is more apparent when considering the revised, more accurate consumption data: the basic iron and steel industry consumed only [     ] percent of the total amount of electricity consumed in Korea, whereas the top industry in terms of electricity consumption (i.e., the [                    ]) consumed only [     ] percent.  GOK SQR2 at 2 (C.R.285/P.R.207).  On this basis alone, Commerce should not have found the program to be *de facto* specific.

2. The GOK Provided Electricity Under a Standard Pricing Mechanism Without Any Exercise of Discretion or Favorable Treatment to the Steel Industry

Commerce practice establishes that there is no *de facto* specificity when industrial users are "treated in a manner consistent or even less favorable than other consumers with respect to

the electricity tariff schedule." *Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum at 13. This court has sanctioned that practice, holding that a program is not *de facto* specific "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers." *Bethlehem Steel*, 140 F. Supp. 2d at 1369-70 (upholding Commerce's finding of no specificity under 19 U.S.C. § 1677(5A)(D)(iii)(III) because there is "no exercise of discretion and no favorable treatment afforded to any one industry"). Commerce failed to adhere to that practice in the *Final Results*.

The record demonstrates that KEPCO provided electricity to all enterprises and industries in Korea that use electricity and that electricity was provided under a standard pricing mechanism, i.e., KEPCO's electricity tariff schedule. *See* GOK IQR at 14-17 and 30-31 (C.R.105/P.R.104) and Exhibit E-10 (C.R.129/P.R.120). Nothing in the record demonstrates that the steel industry or the mandatory respondents were treated favorably. To the contrary, record evidence indicates that KEPCO enforced a standard pricing mechanism and provided electricity to customers in other classifications, such as residential, educational, and agricultural, at lower rates than industrial customers. *Id.* at Exhibit E-10.

For all of these reasons, Commerce could not have concluded that the mandatory respondents, the steel industry, or even the top three electricity-consuming industries combined received a "disproportionately" large amount of the subsidy. *See Final Results IDM* at 17-21 (P.R.319). The Court should therefore hold that Commerce's finding of *de facto* specificity is not supported by substantial evidence on the record or otherwise in accordance with law.

**C.    Commerce Erred in Using Overly Broad Electricity Consumption Data When Revised, More Accurate Consumption Data Were Available**

In its *Final Results*, Commerce erroneously rejected the revised, more accurate consumption data for its *de facto* specificity analysis, simply stating that it did not request the data and thus was not obligated to accept them. *Final Results IDM* at 21-22. Instead, Commerce relied upon overly broad consumption data which it never verified. *Id.* As a result, Commerce's *de facto* specificity determination is unsupported by substantial evidence.

As Hyundai Steel pointed out, Commerce did not object to the GOK's submission of the revised and more accurate electricity consumption data, and Commerce did not ask any follow up questions. Pl. Br. 20. Moreover, Commerce later verified the revised and more accurate data, not the original overly broad data. *See* Memorandum from Laura Griffith and Patrick Barton to The File, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Verification of the Questionnaire Responses of the Government of Korea" (July 8, 2024) ("GOK Verification Report") at 9-10 (C.R.373/P.R.303); Letter from Yoon & Yang LLC to Sec'y Commerce, " Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Verification Exhibits" (June 7, 2024) ("Verification Exhibits") at Exhibit VE-10 (C.R.369/P.R.295). Despite these facts and the ample time it had to review the revised data, Commerce simply held that the revised data reflected "a lower level of industrial classification than we requested for our electricity consumption analysis." *Final Results IDM* at 22.

Commerce abuses its discretion in refusing to accept new or corrective information when the interests of accuracy outweigh the burden on Commerce in accepting that information and the interests in finality. *See Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021). The GOK explained that the revised consumption data are more accurate

as they are based on the widely used official industry classification scheme in Korea, the Korea Standards Industrial Classification, which provides a "more detailed industry categorization" and "does not include any irrelevant industry." *See* GOK SQR2 at 2 (C.R.285/P.R.207). As mentioned above, Commerce did not object to the GOK's submission or indicate that the revised consumption data should not be used in listing the top ten industries. Commerce even verified the revised data. Commerce points to nothing in its questionnaires to the GOK that suggests that the GOK should have reported electricity consumption based on industry classifications that differ from Korea's widely used official classification scheme. Thus, Commerce's explanation for why it did not use the revised data lacks record support.

More importantly, when the GOK submitted the revised consumption data, Commerce became aware that the original data was overly broad because the original industry categorization for "steel" also included industries that were unrelated to the steel industry, such as copper and non-ferrous metal. *Id.* In light of that fact, Commerce should have used the revised consumption data when it focused its analysis on whether the steel industry consumed a disproportionate amount of electricity as the revised industry classification more closely corresponded to that industry. Alternatively, Commerce was at least required to grapple with the fact that the consumption data it ultimately relied upon covered additional industries beyond the three specifically identified by name—for example, that the consumption data for the "steel" industry reflected not just the steel industry but other industries like the copper and non-ferrous metal industries. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary when agency fails to "consider an important aspect of the problem"). Commerce failed to do either.

The Court should hold that Commerce's arbitrary rejection of the revised, more accurate electricity consumption data in lieu of the original, less precise data is not supported by substantial evidence on the record or otherwise in accordance with law.

## II.   COMMERCE'S BENEFIT DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

When calculating the benefits from the GOK's provision of electricity, Commerce failed to remove the effects from KEPCO's cost pass-through tariff system and erroneously included amounts irrelevant to KEPCO's cost for supplying electricity in its benefit calculation. *Final Results IDM* at 23-25 (P.R.319). As Hyundai Steel explained, these amounts are not actual costs incurred by KEPCO during the POR and are unrelated to KEPCO's cost for supplying electricity, but amounts that it could have charged in a prior year absent the limitations of the Fuel Cost Adjusted Charge ("FCAC"). Pl. Br. 22-23.

Prior to the cost pass-through tariff system, which was implemented on January 1, 2021, KEPCO's electricity tariff consisted of two main components: (i) the base charge and (ii) the usage charge based on the amount of electricity consumed. GOK IQR at Exhibit E-2, pp. 64-65 (C.R.124/P.R.119). These two components are calculated from an annual "Total Comprehensive Cost" (i.e., KEPCO's cost data) which is composed of KEPCO's costs for supplying electricity in any given year—i.e., operating expenses attributable to electricity supply, income taxes, non-operational profit or loss, *plus* a fair investment return on capital used in operations. *Id.* at pp. 6, 63. The purpose of the "Total Comprehensive Cost" is to adjust the level of electricity tariffs on a prospective basis, enabling KEPCO to recover fair operating costs plus a rate of return. *Id.*

Under the new cost pass-through tariff system, KEPCO has more flexibility to charge (i.e., pass-through) certain costs to its customers (in the short term) without having to adjust the base charge and usage charge components of the electricity tariffs (in the long term). In

**NONCONFIDENTIAL**

particular, KEPCO began to separately charge its customers the FCAC and the Climate/Environment Related Charges ("CERC").  *Id.* at Exhibit E-2, pp. 64-68.  These charges have built-in caps that would limit how much KEPCO could charge its customers.  *Id.*  Charges that KEPCO was unable to charge its customers in 2021 (i.e., **[           ]** for the cost pass-through tariff system) were carried over and included in the "Total Comprehensive Cost" for 2022, allowing KEPCO to reflect those deferred charges when setting the base charge and usage charge components of the tariff rates going forward.  *Id.*  As such, this amount did not represent the costs incurred by KEPCO during the POR to supply electricity.  This amount does not actually reflect a cost at all.  Rather, this amount reflects the additional amounts that KEPCO would have charged in prior years but for the limitations of the FCAC and CERC.  Even Commerce determined that the FCAC is "integral to part of the sales revenue of electricity," underscoring that any amounts KEPCO was not able to charge through the FCAC do not constitute costs incurred in supplying electricity.  *Final Results IDM* at 24 (P.R.319).  Moreover, to the extent that these deferred charges reflect KEPCO's inability to fully pass along its costs in the prior year, those costs were already accounted for in KEPCO's cost data for the prior year (i.e., 2021).  *Id.*

Still, Commerce included these charges in its benefits calculation for the current review. Memorandum from Kristen Johnson to The File, "Preliminary Calculations for Hyundai Steel Company" (Feb. 28, 2024) at Attachment II (C.R.320-21/P.R.246).  Commerce's inclusion of these deferred charges as a cost in the benefit determination suffered from two fatal shortcomings.

First, Commerce determined that a benefit to industrial users is conferred when costs are not fully recovered during the POR, stating that "anticipated future profits are not factors that

**NONCONFIDENTIAL**

Commerce considers when conducting a Tier 3 analysis to determine whether the provision of a good was for LTAR during the review period." *Final Results IDM* at 14-15.  In other words, Commerce's position is that its cost recovery analysis should solely focus on the POR, not on data outside of the POR.  Yet, Commerce reversed itself when it included the [        ] for the pass-through tariff system from the prior year (i.e., outside of the POR) in its benefit calculation for the current review period.  The purpose of that [        ] is to ensure that KEPCO ultimately earns revenue for the costs that it could not immediately pass on in prior years because of the limitations of the FCAC and CERC.  If Commerce's position is that the cost-recovery analysis should focus solely on whether revenue during the POR was sufficient to cover the cost of electricity generation and distribution and a rate of return during the POR, then it was arbitrary for Commerce to include in that analysis an amount carried over from prior to the POR that is intended to ensure long-term profitability.

Second, Commerce erred in including an amount that was already accounted for in the prior year's review.  The costs associated with the [        ] for the cost pass-through tariff system (i.e., the costs that necessitated the imposition of the FCAC in 2021) were already reflected in KEPCO's 2021 cost recovery rates, even though KEPCO was unable to fully pass those costs to its customers in 2021.  By including the [        ] amount in the cost-recovery calculation for 2022, Commerce countervailed the amount twice—once during the 2021 review period when those costs were not fully recovered and once during the 2022 review period by erroneously including the [        ] as an in-period cost.

Based on the aforementioned, Commerce's inclusion of the effects of the cost pass-through tariff system is not supported by substantial evidence on the record or otherwise in accordance with law.

## CONCLUSION

For the reasons discussed above, Commerce's *Final Results* are not supported by

substantial evidence or otherwise in accordance with law.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
Dated: May 29, 2025                *Counsel for the Government of the Republic of Korea*

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel hereby certifies that the foregoing Memorandum in Support of Rule 56.2 Motions for Judgment on the Agency Record complies with paragraph 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 5,348 words including text, headings, footnotes, and quotations and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing software used to prepare this submission.

<div style="margin-left:50%">

Respectfully submitted,
/s/Yujin K. McNamara
Yujin K. McNamara
Daniel M. Witkowski
Devin S. Sikes
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

</div>

Dated: May 29, 2025