## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| Plaintiff, | ) |
| and | ) |
| DONGKUK STEEL MILL CO., LTD., | ) |
| Consolidated Plaintiff, | ) |
| and | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) |
| Plaintiff-Intervenors, | ) |
| v. | ) Consol. Court No. 24-00190 |
| UNITED STATES, | ) |
| Defendant, | ) **PUBLIC REDACTED VERSION** |
| | ) BPI on pp. 8, 12-13, 20-27, 30 |
| and | ) |
| NUCOR CORPORATION, | ) |
| Defendant-Intervenor. | ) |

---

### DEFENDANT'S RESPONSE TO PLAINTIFF'S, CONSOLIDATED PLAINTIFF'S, AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

---

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

Of Counsel:

| JACK DUNKELMAN | AUGUSTUS GOLDEN |
|---|---|
| Attorney | Trial Attorney |
| Office of the Chief Counsel | Department of Justice, Civil Division |
| For Trade Enforcement & Compliance | Commercial Litigation Branch |
| U.S. Department of Commerce | Civil Division |
| | U.S. Department of Justice |
| | P.O. Box 480 |
| | Ben Franklin Station |
| | Washington, D.C.  20044 |
| | Telephone:     (202) 305-5915 |
| | Augustus.J.Golden@usdoj.gov |

Date: October 1, 2025                    *Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.    Administrative Determination Under Review ........................................................2

    II.    Issues Presented for Review ..................................................................................2

STATEMENT OF FACTS ........................................................................................3

SUMMARY OF ARGUMENT..................................................................................5

ARGUMENT .............................................................................................................7

    I.    Standard of Review................................................................................................7

    II.    Commerce Reasonably Determined That The Electricity For LTAR Subsidy
          Program Was *De Facto* Specific .........................................................................7

          A.    A Subsidy Is *De Facto* Specific If A Group Of Industries Receives A
                Disproportionately Large Amount Of The Subsidy .............................................8

          B.    Commerce Reasonably Determined That The Steel Industry And Two Other
                Industries Consumed A Disproportionately Large Amount of the Subsidy........9

          C.    Plaintiffs' Challenges Are Unpersuasive.........................................................14

               1.    Commerce Reasonably Grouped Industries To Assess Specificity ...........14

               2.    *Bethlehem Steel* Is Distinguishable On The Nature Of The Program.........16

               3.    Commerce Appropriately Relied On Electricity Consumption Data
                     Provided In Response To A Questionnaire Instead Of An Unrequested
                     Revised Data Set .......................................................................................20

               4.    Plaintiffs' Factual Challenge Fails to Disturb The Substantial Evidence
                     Supporting Commerce's Specificity Finding.............................................25

          D.    Commerce Correctly Calculated The Electricity For LTAR Program's
                 Benefit ...........................................................................................................27

CONCLUSION.........................................................................................................31

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*AK Steel Corp. v. United States*,
   192 F.3d 1367 (Fed. Cir. 1999) ............................................................................ 10

*Am. Alloys, Inc. v. United States*,
   30 F.3d 1469 (Fed. Cir. 1994) .............................................................................. 23

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
   589 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2022), *aff'd*, 102 F.4th 1252 (Fed. Cir. 2023)  8, 19

*Bethlehem Steel Corp. v. United States*,
   140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001), *amended*, 155 F. Supp. 2d 7071 (Ct. Int'l Trade
   2001) ............................................................................................................. 16, 17, 18

*Bonney Forge Corp. v. United States*,
   No. 20-CV-03837, Slip Op. No. 25-56, 2025 WL 1304590 (Ct. Int'l Trade May 6, 2025) ..... 24

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
   195 F. Supp. 3d 1334 (Ct. Intl. Trade 2016) ...................................................... 14, 15

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007) ............................................................................... 7

*Consol. Edison Co. of N.Y. v. NLRB*,
   305 U.S. 197 (1938) .......................................................................................... 7, 25

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) .......................................................................................... 7, 26

*Dalian Meisen Woodworking Co. v. United States*,
   719 F. Supp. 3d 1322 (Ct. Int'l Trade 2024) .......................................................... 24

*Hercules, Inc. v. United States*,
   673 F. Supp. 454 (Ct. Int'l Trade 1987) ................................................................ 23

*Hyundai Steel Co. v. United States*,
   745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) .......................................................... 10

*Hyundai Steel Co. v. United States*,
   No. 23-00211, Slip Op. 25-102, 2025 WL 2400442 (Ct. Int'l Trade Aug. 12, 2025) ............... 10

*Kerr-McGee Chem. Corp. v. United States*,
   739 F. Supp. 613 (Ct. Int'l Trade 1990) ................................................................ 23

*Monsanto Co. v. United States*,
   698 F. Supp. 275 (Ct. Int'l Trade 1988) .................................................................. 24

*Monsanto Co. v. United States*,
   698 F. Supp. 285 (Ct. Int'l Trade 1988) .................................................................. 24

*Mosaic Co. v. United States*,
   589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022), *appeals filed*, Fed. Cir.  Nos. 24-1593, 24-1595
   ...................................................................................................................... *passim*

*Ningbo Dafa Chem. Fiber Co. v. United States*,
   580 F.3d 1247 (Fed. Cir. 2009) ......................................................................... 7, 24

*PMC Specialties Grp., Inc. v. United States*,
   20 C.I.T. 1130 (1996) ..................................................................................... 23, 24

*Royal Thai Government v. United States*,
   436 F.3d 1330 (Fed. Cir. 2006) .............................................................................. 15

*Tehnoimportexport, UCF. Am. Inc. v. United States*,
   783 F. Supp. 1401 (Ct. Int'l Trade 1992) ................................................................ 22

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ................................................................................................ 7


**Statutes**

19 U.S.C. § 1516a(b) .................................................................................................. 7

19 U.S.C. § 1677(5) .................................................................................................... 8

19 U.S.C. § 1677(5A) ....................................................................................... *passim*

19 U.S.C. § 1677m(i) ................................................................................................ 24


**Rules**

U.S. Ct. Int'l Trade R. 56.2 ....................................................................................... 1


**Regulations**

19 C.F.R. § 351.307 .................................................................................................. 24

19 C.F.R. § 351.502(a)...........................................................................................9

19 C.F.R. § 351.502(b) .....................................................................................14, 15

19 C.F.R. § 351.511(a)....................................................................................19, 28


**Administrative Determinations**

*Brass Rod from the Republic of Korea: Final Affirmative Countervailing Duty Determination*,
    89 Fed. Reg. 29,290 (Dep't of Commerce Apr. 22, 2024)..........................................13, 18, 19

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*,
    89 Fed. Reg. 15,825 (Dep't of Commerce March 5, 2024).........................................................4

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:  Final Results of
    Countervailing Duty Administrative Review; 2022*,
    89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) ............................................................2

*Countervailing Duties*,
    63 Fed. Reg. 65,348, 65,355 (Dep't of Commerce Nov. 25, 1998) .....................................9, 15

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    88 Fed. Reg. 21,609 (Dep't of Commerce, Apr. 11, 2023).........................................................3

*Large Diameter Welded Pipe From the Republic of Korea: Final Results of Countervailing Duty
    Administrative Review*,
    88 Fed. Reg. 85,236 (Dep't of Commerce, Dec. 7, 2023)..........................................13, 16, 18

*Notice of Countervailing Duty Orders*,
    65 Fed. Reg. 6,587 (Dep't of Commerce, Feb. 10, 2020). .........................................................3

*Pure Magnesium and Alloy Magnesium from Canada*,
    57 Fed. Reg. 30,946 (Dep't of Commerce, July 14, 1992) ......................................................17

iv

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| ——————————————————— )<br>HYUNDAI STEEL COMPANY, )<br> )<br>   Plaintiff, )<br> )<br>  and )<br> )<br>DONGKUK STEEL MILL CO., LTD., )<br> )<br>   Consolidated Plaintiff, )<br> )<br>  and )<br> )<br>GOVERNMENT OF THE REPUBLIC OF )<br>KOREA, )<br> )<br>   Plaintiff-Intervenors, )<br> )<br>  v. )<br> )<br>UNITED STATES, )<br> )<br>   Defendant, )<br> )<br>  and )<br> )<br>NUCOR CORPORATION, )<br> )<br>   Defendant-Intervenor. )<br>——————————————————— ) | Consol. Court No. 24-00190<br><br>**PUBLIC REDACTED VERSION**<br>BPI on pp. 8, 12-13, 20-27, 30 |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S, CONSOLIDATED PLAINTIFF'S, AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Hyundai Steel Company (Hyundai), consolidated-plaintiff, Dongkuk Steel Mill Co., Ltd. (DSM), and plaintiff-intervenor, the government of the Republic of Korea (GOK)

(collectively, plaintiffs).  Plaintiffs challenge the final results of the Department of Commerce's 2022 administrative review of the countervailing duty order covering certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea).  Specifically, plaintiffs challenge Commerce's determinations regarding the government of Korea's provision of electricity for less than adequate remuneration (LTAR) subsidy program.

Commerce reasonably determined that the provision of electricity for LTAR subsidy program provided a benefit to consumers of electricity in Korea.  Commerce further reasonably determined that the LTAR subsidy program was specific to a group of industries, as data provided by the GOK showed those industries utilized a disproportionate amount of energy and, therefore received a disproportionate benefit.  Because Commerce's determinations are supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court reject plaintiffs' challenges, sustain the final results, and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) (Final Results) (P.R. 325), and accompanying Issues and Decision Memorandum (IDM) (P.R. 319).  The period of review (POR) covered by the final results is January 1, 2022 through December 31, 2022.  *Id.*

### II.    Issues Presented for Review

1.    Whether Commerce's determination that the provision of electricity for LTAR was *de facto* specific is supported by substantial evidence and in accordance with law.

2.       Whether Commerce's decision to rely on electricity consumption data submitted in response to a request for information, rather than a later revised data set that was not requested and which did not meet Commerce's need for information, is supported by substantial evidence and in accordance with law.

3.       Whether Commerce's inclusion of a fuel cost adjustment charge in calculating the benefit from the provision of electricity for LTAR program is supported by substantial evidence and is otherwise in accordance with law.

## STATEMENT OF FACTS

Commerce has published a countervailing duty order on CTL plate from Korea.  *See Notice of Countervailing Duty Orders*, 65 Fed. Reg. 6,587 (Dep't of Commerce, Feb. 10, 2020).  On April 11, 2023, Commerce initiated an administrative review of the order for the POR of January 1, 2022 to December 31, 2022.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 21,609 (Dep't of Commerce, Apr. 11, 2023), P.R. 15.

Commerce selected DSM and Hyundai as mandatory respondents and issued an initial questionnaire to the GOK.  *See* Respondent Selection Memorandum (June 14, 2023) (C.R. 9, P.R. 27); *see also* Dep't of Commerce Letter re: Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Countervailing Duty Questionnaire (Initial Questionnaire) (P.R. 28).  The initial questionnaire requested that the GOK "{p}rovide the amount of electricity provided to the steel industry during the POR and to the largest 10 industries consuming electricity during the POR."  Initial Questionnaire at 20.

On August 11, 2023, the GOK filed its initial questionnaire responses.  *See* GOK Initial Questionnaire Response (GOK IQR) (C.R. 105-142, P.R. 104-125).  On November 1, 2023, the GOK filed its response to a second supplemental questionnaire.  *See* GOK Response to the

Supplemental Questionnaire (GOK 2SQR) (C.R 285-286, P.R. 207-208).  The GOK's response

to the second supplemental questionnaire included an unsolicited revised version of a dataset

provided in response to the initial questionnaire.  *See id*. at 1-3.  The revised dataset was not

responsive to the second supplemental questionnaire.  *See id*.  Furthermore, because the data in

the GOK's revised dataset was provided at a lower level of industrial classification than

Commerce required for its electricity consumption analysis, Commerce determined the revised

dataset was "not usable data" and continued to rely on the GOK's initial dataset.  *See* IDM at 22.

On January 25, 2024, the GOK filed its response to the third supplemental questionnaire.  *See*

Response to the GOK Supplemental Questionnaire (C.R. 303-308, P.R. 222-223).

On March 5, 2024, Commerce published its preliminary results, preliminarily assigning

Hyundai a net countervailing duty rate of 2.21 percent and DSM a rate of 1.93 percent.  *Certain*

*Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 89 Fed. Reg. 15,825

(Dep't of Commerce March 5, 2024) (Preliminary Results) (P.R. 248), and accompanying

Preliminary Decision Memorandum (PDM) (P.R. 243).  Commerce preliminarily determined

that Hyundai and DSM benefitted from fifteen subsidy programs, including the provision of

electricity for LTAR subsidy program.  *See* PDM at 26-36.  Commerce preliminarily determined

that the provision for electricity for LTAR subsidy program was *de facto* specific pursuant to 19

U.S.C. § 1677(5A)(D)(iii)(III), because "the steel industry received a disproportionately large

amount of the subsidy."  PDM at 35.

DSM, Hyundai, and the GOK filed administrative case briefs.  *See* DSM's Letter, "Case

Brief" (C.R. 376, P.R.  309); Hyundai's Letter, "Hyundai Steel's Case Brief" (C.R. 375, P.R.

308.); GOK's Letter, "Case Brief of the Government of the Republic of Korea" (C.R. 374, P.R.

4

307).  On July 30, 2024, Commerce received a rebuttal brief from Nucor Corporation.  *See*
Rebuttal Brief in Response to the Government of Korea (C.R. 377, P.R. 315).

On September 11, 2024, Commerce published the final results.  Commerce continued to
determine that the provision of electricity in Korea was *de facto* specific pursuant to 19 U.S.C. §
1677(5A)(D)(iii)(III).  Commerce explained that its *de facto* specificity analysis was "based on
the disproportionate consumption of industrial class electricity by the steel industry and others."
IDM at 19.  Commerce explained that, pursuant to 19 U.S.C. § 1677(5A), "the term "'enterprise
or industry' includes a group of enterprises or industries."  IDM at 18.  Further, when assessing
*de facto* specificity, Commerce must "take into the extent of diversification of economic
activities within the jurisdiction of the authority providing the subsidy."  *Id.* (citing 19 U.S.C. §
1677(5A)(D)(iii)).

Applying these standards, Commerce determined that "wide diversification of economic
activities exists in Korea, including 19 industry groupings with a broad range of distinctly
different types of economic activities within these groupings."  IDM at 18-19.  Commerce found
that a group of three industries, including the steel industry, received a disproportionately large
amount of the subsidy conferred by the purchasing of industrial class electricity from the Korea
Electric Power Corporation (KEPCO).  *See* IDM at 19.  Accordingly, Commerce found that the
provision of electricity for LTAR to the steel industry was *de facto* specific pursuant to 19
U.S.C. § 1677(5A)(D)(iii)(III).  *Id.*

## SUMMARY OF ARGUMENT

Commerce reasonably determined that the electricity for LTAR program was *de facto*
specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III).  In the context of a well-diversified
economy with many different industries, Commerce determined that the steel industry was part

of a group of three industries that consumed a disproportionate amount of electricity during the period of review.

In challenging this finding, plaintiffs misstate the applicable standard for assessing *de facto* specificity. For example, plaintiffs argue that Commerce failed to find similarities between the three industries receiving a disproportionate share of the benefit from the provision of electricity for LTAR program. Yet, Commerce is not statutorily required to find shared characteristics among the industries or enterprises making up a group of subsidy recipients. Similarly, plaintiffs' argument that electricity is widely used does not defeat a disproportionality finding. Because Commerce applies a sequential analysis when assessing *de facto* specificity, Commerce will only consider disproportionality if other bases for *de facto* specificity—including a limited number of subsidy recipients—do not apply. Thus, Commerce's specificity determination was supported by substantial evidence and in accordance with law.

Additionally, Commerce reasonably relied on the electricity consumption data provided in the GOK's initial questionnaire responses. The plaintiffs' preferred—but unsupported—dataset provided in the GOK's response to the second supplemental questionnaire was not requested by Commerce, was not responsive to the questionnaire's questions, and its data was determined to be unhelpful. Therefore, Commerce reasonably determined not to use such data.

Furthermore, Commerce correctly included certain fuel cost pass-through amounts in its cost recovery analysis. These amounts were integral factors included in KEPCO's own formula for calculating electricity tariffs during the period of review. These amounts therefore had to be included to accurately determine whether the price paid by consumers for electricity covered KEPCO's cost plus a reasonable rate of return, *i.e.* what benefit was received from the provision of electricity for LTAR subsidy program.

**ARGUMENT**

I.     Standard of Review

The Court upholds Commerce determinations that are supported "by substantial evidence

on the record" and otherwise "in accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's factual findings "are conclusive unless unsupported by substantial evidence."

*United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)).  "Substantial

evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938); *Ningbo*

*Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009).  Even if the Court

may draw two inconsistent conclusions from the evidence contained in the record, doing so

"does not prevent an administrative agency's finding from being supported by substantial

evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).

Commerce's decision may not be overturned "simply because the reviewing court would have

reached a different conclusion based on the same record."  *Cleo Inc. v. United States*, 501 F.3d

1291, 1296 (Fed. Cir. 2007) (citations omitted).

II.    Commerce Reasonably Determined That The Electricity For LTAR Subsidy Program
       Was *De Facto* Specific

The Court should sustain Commerce's determination that the subsidy conferred by the

electricity for LTAR subsidy program was *de facto* specific to an enterprise or industry, or a

group of such enterprises or industries.  *See* IDM at 17-19.  Commerce reasonably determined

that the subsidy from the provision of electricity for LTAR program was specific because the

steel industry and two other industries combined consumed a disproportionately large amount of

the subsidy.  IDM at 19.

7

These three industries—operating in the context of a well-diversified economy with 19 industry groupings—accounted for more than [      ] percent of the electricity consumed by industrial class entities.  *See* GOK IQR at 42-43 (C.R. 105, P.R. 104); Republic of Korea Economic Diversification Memorandum at 2-3 (June 14, 2022) (P.R. 30).  No other grouping of three industries accounted for more than [      ] percent of the electricity consumed by industrial class entities, *i.e.* less than [      ] of the electricity consumed by the three industries identified by Commerce.  *See id.*  Indeed, the other seven industries identified by the GOK as part of the 10 largest industrial class consumers of electricity each consumed on average only [      ] percent of the electricity consumed by industrial class entities.  *See id.*; *see also* Final Specificity Analysis of Industrial Electricity Consumption (Sept.5, 2024) (C.R. 378-379, P.R. 320) (Final Specificity Analysis).  By comparison, the three industries identified by Commerce consumed a disproportionate amount of electricity and, thus, received a disproportionate benefit from the electricity for LTAR subsidy program.

Thus, Commerce's specificity determination is lawful and supported by substantial evidence.  Plaintiffs' arguments to the contrary should be rejected.

A.    A Subsidy Is *De Facto* Specific If A Group Of Industries Receives A Disproportionately Large Amount Of The Subsidy

A countervailable subsidy exists when: (1) "a government or public authority has provided a financial contribution"; (2) "a benefit is thereby conferred upon the recipient of the financial contribution"; and (3) "the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries."  *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2022), *aff'd*, 102 F.4th 1252 (Fed. Cir. 2023) (citing 19 U.S.C. § 1677(5)).

A domestic subsidy is *de facto* specific if:  (1) the actual recipients "are limited in number"; (2) "{a}n enterprise or industry is a predominant user of the subsidy;" (3) "{a}n enterprise or industry *receives a disproportionately large amount of the subsidy*;" or (4) the authority's discretion in granting the subsidy "indicates that an enterprise or industry is favored over others."  19 U.S.C. § 1677(5A)(D)(iii) (emphasis added).  Commerce examines these factors "in sequence," and "may find a domestic subsidy to be specific based on the presence of a single *de facto* specificity factor."  *See* 19 C.F.R. § 351.502(a); *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,355 (Dep't of Commerce Nov. 25, 1998) (CVD Preamble).  "{T}he weight accorded to particular {*de facto*} factors will vary from case to case."  SAA at 931.  "For example, where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity{.}"  *Id.*  "On the other hand, where the number of users of a subsidy is very large, the predominant use and disproportionality factors would have to be assessed."  *Id.*

In evaluating the *de facto* factors, Commerce "shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation."  19 U.S.C. § 1677(5A)(D)(iii).  "{A}ny reference to an enterprise or industry"—including whether an enterprise or industry receives a disproportionately large amount of the subsidy—"includes a group of such enterprises or industries."  19 U.S.C. § 1677(5A)(D).

B.    Commerce Reasonably Determined That The Steel Industry And Two Other
      Industries Consumed A Disproportionately Large Amount of the Subsidy

Commerce found that the Korean economy was widely diversified—with 19 industry groupings—and that a group of industries—the steel industry and two other industries—received

a disproportionately large amount of the subsidy provided by the electricity for LTAR subsidy

program.  IDM at 18-19.  This determination was lawful and supported by substantial evidence.[1]

As an initial matter, the statute does not mandate any specific methodology in conducting

a *de facto* specificity analysis, and Commerce has discretion to apply a reasonable methodology.

*See* SAA at 931 (stating the "factors will vary from case to case").  For example, "Commerce has

discretion to determine what predominant means in the context of § 1677(5A)(D)(iii)." *Mosaic*

*Co. v. United States*, 589 F. Supp. 3d 1298, 1309 (Ct. Int'l Trade 2022), *appeals filed*, Fed. Cir.

Nos. 24-1593, 24-1595.  The same is true when assessing disproportionality pursuant to

§1677(5A)(D)(iii)(III).  As the Federal Circuit has explained, "{d}eterminations of

disproportionality and dominant use are not subject to rigid rules, but rather must be determined

on a case-by-case basis taking into account all facts and circumstances of a particular case." *AK*

*Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed. Cir. 1999) (citation omitted).

In this case, Commerce reasonably considered "the extent of diversification of economic

activities" in Korea, 19 U.S.C. § 1677(5A)(D)(iii), and data regarding the consumption of

electricity in Korea.  *See* IDM at 17-19.  Commerce noted that no party had disputed its findings

in a June 14, 2023 Economic Diversification Memorandum that "a wide diversification of

economic activities exists in Korea, including 19 industry groupings with a broad range of

distinctly different types of economic activities within these groupings." *Id*. at 18-19 (noting that

GOK "similarly reported a diverse economy") (citing Memorandum, *Placement of Korea*

---

[1]  We recognize that this Court remanded Commerce's *de facto* specificity analysis under
1677(5A)(D)(iii)(III) with regard to Korea's electricity for LTAR program with respect to the
2021 period of review.  *See Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l
Trade 2024); *Hyundai Steel Co. v. United States*, No. 23-00211, Slip Op. 25-102, 2025 WL
2400442 (Ct. Int'l Trade Aug. 12, 2025).  Nonetheless, we respectfully maintain that
Commerce's determination on this record is supported by substantial evidence and otherwise in
accordance with law.

*Economic Diversification Memorandum on the Record* (June 14, 2023) (P.R. 30) (Economic Diversification Memorandum).[2]  The Economic Diversification Memorandum relied on data published by the Korean Statistical Information Service, which showed 3,874,167 establishments across the 19 industry groupings, including 413,849 establishments—10.7%—in the Manufacturing group.  *See* Economic Diversification Memorandum at 2.

The GOK's response to Commerce's initial questionnaire provided a list of industries.  *See* GOK IQR Exhibit LI (P.R. 116 at 647-50; C.R. 116 at 647-50) (Exhibit LI).  That list identified 17 "Classification 1" industries, which were further sub-divided into 78 "Classification 2" industries.  *See id.*[3]  The Korean steel manufacturing industry is not listed as either a Classification 1 or Classification 2 industry, but is a sub-part of the Classification 2 industry "Manufacture of basic metals."  *Cf. id.*

In light of such diversification, Commerce examined the electricity consumption data provided by the GOK to determine whether the steel industry—a sub-part of one of the 78

---

[2] Substantial evidence also supports Commerce's finding that the Korean economy was widely diversified among 19 industry groupings.  IDM at 18-19.  The Korea Economic Diversification Memorandum lists 19 industry groupings based on data published by the Korean Statistical Information Service and provides the extent of diversification of economic activities in Korea. IDM at 15-16; *see also* Republic of Korea Economic Diversification Memorandum at 2-3. Commerce found that this data suggests "a significant diversification of economic activities" among the 19 industry groupings because of the "broad range of distinctly different types of economic activities" among these industry groupings and that each industry grouping was active. *Id.*  Accordingly, Commerce reasoned that the Korean economy is widely diverse as contemplated by the statute.  IDM at 18-19; *see also* 19 U.S.C. § 1677(5A)(D)(iii).   Plaintiffs do not contest this finding.  *See generally* Hyundai Br; GOK Br.; DSM Br.

[3] The GOK provided this list in response to Commerce's question seeking "a complete listing of the industries that operate in {Korea}" and asking the GOK to "use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry."  *See, e.g.*, GOK IQR at 95, 137, 156.  The GOK identified the list at Exhibit LI in response, referring to it as "the Standard Industry Classification List."  *See id.*; *see also id.* at 240 (identifying the Standard Industry Classification List as "a general industry classification code"), 256 (same).

Classification 2 industries—was consuming a proportional amount of industrial class electricity and therefore receiving a proportional benefit from the electricity for LTAR program. *See* IDM at 19-20. Commerce ultimately determined that the GOK's data showed that the steel industry and two other industries were using a disproportionate amount of industrial class electricity compared to other industrial electricity consumers. *See id*. at 19 ("the GOK's electricity consumption data demonstrate that the steel industry and two other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported."); *see also* Final Specificity Analysis at 3 (showing Commerce's calculation of comparative use).

Substantial evidence supports this finding. Korea has a widely diversified economy with either 17 or 19 industry groupings, and 78 industry sub-groupings. *See* Economic Diversification Memorandum; Exhibit LI. Yet a "disproportionately larger amount of industrial class electricity" was consumed by a group of industries—including the steel industry—both in light of this number of industries and in comparison to other industries that were reported as top-10 consumers of industrial class electricity. IDM at 19. The data showed that the steel, [          ], and [          ] industries used [          ] percent of industrial class electricity. *See id*. Each of these industries represents a sub-part of one of the 78 Classification 2 industry groupings, meaning that they do not represent 75 of the 78 groupings. While some variation in electricity use between industries is to be expected, Commerce reasonably determined that this data showed that this group of three industries was consuming "a disproportionately larger amount of industrial class electricity in Korea{.}" *Id*. Similarly, the data showed that the next seven highest electricity-consuming industries "accounted for a significantly smaller share of the total industrial class electricity consumed during the POR" than the three identified industries.

*Id*. This approach is consistent with Commerce's approach in previous cases involving the
provision of electricity for LTAR program, in which Commerce determined that the subsidy was
*de facto* specific. *Large Diameter Welded Pipe From the Republic of Korea: Final Results of
Countervailing Duty Administrative Review*, 88 Fed. Reg. 85,236 (Dep't of Commerce, Dec. 7,
2023), and accompanying IDM at 33; *see also Brass Rod from the Republic of Korea: Final
Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 29,290 (Dep't of Commerce Apr.
22, 2024) (*Brass Rod from Korea*) and accompanying IDM at 30.

   In addition, the GOK's electricity usage data, which reflected the percentage of electricity
consumed by the top ten users of electricity among those classified as industrial consumers,
further showed the disproportionate use of electricity by the three grouped industries. *See* IDM
at 19. According to the GOK's data, the steel industry consumed [  ] percent of all
electricity consumed by industrial consumers in Korea during the period of review. *See* GOK
IQR at 42-43. When combined, the steel, [    ], and [   ] industries
accounted for [  ] percent of the total amount of electricity consumed by industrial class
entities, or approximately [  ] percent each on average. *Id*. The remaining identified top 10
consuming industries each consumed [  ] percent or less of the total electricity consumed by
industrial consumers, with the lowest of the top ten industrial consumers of electricity only
consuming [  ] percent of industrial electricity. *Id*. Indeed, the other seven industries
identified by the GOK as the top 10 highest consumers of industrial electricity accounted for
only [  ] percent of the total consumption by industrial consumers during the POR—or
approximately only [  ] percent each on average—a significantly smaller share than the
grouped industries. *See id*.

Commerce, therefore, reasonably determined that the top three consumers of industrial class electricity constituted a group of industries that received a disproportionately large amount of the subsidy conferred by the electricity for LTAR subsidy program, because their use of industrial class electricity was disproportionate compared to both the other top-consuming industries and the total number of industries consuming electricity.  IDM at 19.

C.    Plaintiffs' Challenges Are Unpersuasive

Plaintiffs raise several challenges to Commerce's *de facto* specificity finding, all of which are unpersuasive.

1.    Commerce Reasonably Grouped Industries To Assess Specificity

First, plaintiffs argue that Commerce arbitrarily grouped unrelated industries to receive a desired result.  Hyundai Br. at 14, 16-18; GOK Br. at 10-11; DSM Br. at 8-11.  However, the statute authorizes Commerce to consider recipients of a subsidy "on an enterprise or industry basis," and expressly provides that "any reference to an enterprise or industry … includes a *group* of such enterprises or industries."  19 U.S.C. § 1677(5A)(D).  The statute does not require industries to have any shared characteristics to be considered as a "group" for purposes of assessing specificity.  *See id.*  As the regulations clarify, Commerce "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy."  19 C.F.R. § 351.502(b) (emphasis added).

In *Changzhou Trina Solar Energy Co., Ltd. v. United States*, for example, the Court sustained Commerce's specificity finding based on a group of subsidy recipients, rejecting the plaintiff's argument that the "variety" of sectors in the group considered "undermine{d} any finding of specificity."  195 F. Supp. 3d 1334, 1352 (Ct. Intl. Trade 2016).[4]  By statute, "any

---

[4] Although *Changzhou Trina* involved a specificity finding based on another provision of section 1677(5A)(D)(iii)—whether the subsidy recipients were limited in number—the meaning

reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries." *Id.*; *see also* 19 C.F.R. § 351.502(b). Thus, variety between the industries—even a total lack of relationship—in the group does not necessarily undermine the specificity analysis. *Id.* Plaintiffs are wrong, therefore, to claim that Commerce was required to identify some kind of relationship between the industries that are receiving a disproportionate benefit. *See, e.g.,* Hyundai Br. at 9 (complaining that the three grouped industries are "unrelated"), 14 (same), 17 (same); GOK Br. at 11 (complaining that the grouped industries have "nothing in common"). Commerce was not required to identify shared characteristics among the different industries to justify treating them as a group. *See* 19 U.S.C. § 1677(5A)(D)(iii); 19 C.F.R. § 351.502(b); *Changzhou Trina*, 195 F. Supp. 3d 1334.

Further, when a subsidy is disproportionately distributed, there is no requirement that the recipients of the disproportionate amount of subsidy share similar characteristics. Instead, the level of benefits provided is the normally focus of Commerce's analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under a subsidy program. *See CVD Preamble*, 63 Fed. Reg. at 65,359; *see also Royal Thai Government v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006). As Commerce has explained, "the analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program *should normally focus on the level of benefits provided* rather than on the number of subsidies given to different industries." *CVD Preamble*, 63 Fed. Reg. at 65,359 (emphasis added).

---

of "group" is identical when applying the "disproportionately large" subsidy use factor. *See* 19 U.S.C. § 1677(5A)(D). Thus, *Changzhou Trina* instructs that "Commerce is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receiving, a subsidy, but only whether they are, in fact," receiving a disproportionately large amount of the subsidy. *See Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1352 (Ct. Int'l Trade 2016) (cleaned up, citations omitted).

For example, in *LDWP from Korea*, Commerce determined that "{a}s the majority consumers of industrial class electricity in Korea during the {period of review}, the group of three industries, including the steel industry, plainly received a disproportionate amount of the subsidy conferred by the purchasing of industrial class electricity within the meaning of {19 U.S.C. § 1677(5A)(D)(iii)(III)}." *Large Diameter Welded Pipe From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 88 Fed. Reg. 85,236 (Dep't of Commerce, Dec. 7, 2023) (*LDWP from Korea*), accompanying IDM at 34. Consistent with this emphasis on the level of benefits, Commerce's analysis in this review focused on the disproportionate consumption of industrial electricity by the steel industry and other industries. *See* IDM at 15-16.

Put another way, Commerce determined that each of the three members of the group was using a disproportionate amount of industrial electricity—and therefore receiving a disproportionate benefit—when compared to other industrial consumers of electricity. Pursuant to 19 U.S.C. § 1677(5A)(D)(iii), Commerce therefore reasonably determined that a "group of industries" was "receiv{ing} a disproportionately large amount of the subsidy," which satisfied the subsidy requirement.

### 2. *Bethlehem Steel* Is Distinguishable On The Nature Of The Program

Plaintiffs also rely on *Bethlehem Steel*, in which the Court sustained Commerce's finding that an electricity discount—known as the Voluntary Curtailment Adjustment program—was not *de facto* specific despite record evidence that the steel industry received more than 51 percent of the subsidy program benefits. Hyundai Br. at 14-16, GOK Br. at 5-6, 8, 11; *see Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001), *amended*, 155 F.

Supp. 2d 7071 (Ct. Int'l Trade 2001). *Bethlehem Steel* is distinguishable based on the differing nature of the program.

In *Bethlehem Steel*, this Court sustained Commerce's finding that an alleged subsidy program providing "discounted electricity to large users that curtailed their usage by at least 20 percent during designated times" was not specific. *See Mosaic*, 589 F. Supp. 3d at 1309 (citing *Bethlehem Steel*, 140 F. Supp. 3d at 1367-1369). The subsidy program at issue was designed to "encourage{} . . . off-hours electricity usage." *Id.* at 1309-1310 (citing *Bethlehem Steel*, 140 F. Supp. 3d at 1367-1369). The Court sustained Commerce's finding that the program was not specific, stating that although the Korean steel industry received over 51 percent of the discounts from the alleged subsidy program, "there {was} nothing in the record to indicate this percentage was disproportionately higher than would be expected." *Bethlehem Steel*, 140 F. Supp. at 1369, *amended*, 155 F. Supp. 2d 7071. In sustaining Commerce's finding, the Court also relied on a prior decision in which Commerce stated that it would "probably not find a countervailable subsidy" if the rate charged was consistent with a "standard pricing mechanism" and the respondent was "in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity." *Id.* at 1368 (quoting *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946, 30,950 (Dep't of Commerce, July 14, 1992) (final countervailing duty determ.)).

Plaintiffs argue that the same reasoning should apply in this case because the challenged program is "based on usage and electricity prices are set based on a standard pricing mechanism." *See, e.g.*, *Hyundai Br.* at 16; GOK Br. at 12-13. Despite plaintiffs' effort to assign the broadest possible interpretation to the reasoning in *Bethlehem Steel*, however, both Commerce and this Court have consistently distinguished *Bethlehem Steel* in later cases

involving *de facto* specificity, based on the nature of the benefit involved. *See, e.g., Mosaic*, 589 F. Supp. 3d at 1309; *Brass Rod from Korea* IDM at 30.

In *Mosaic*, for example, this Court sustained Commerce's finding that the Russian Federation's provision of natural gas for LTAR program was de facto specific. *Mosaic*, 589 F. Supp. 3d at 1309-1310. Commerce found that "the agrochemical industry was 'a predominant user of the subsidy,'" *id.* (citing 19 U.S.C. § 1677(5A)(D)(iii)(II)). The Court sustained that determination when "the record reflect{ed} that the agrochemical industry purchased a far greater amount than any other industrial user." *Id.* The Court distinguished *Bethlehem Steel* based on the different "kind of program at issue there (encouragement of off-hours electricity usage) and how increased consumption was part of the inherent nature of the program." *Id.* at 1310 (citing *Bethlehem Steel*, 140 F. Supp. 2d at 1367).

Commerce has similarly distinguished the reasoning in *Bethlehem Steel* based on the nature of the program—including in another case involving Korea's provision of electricity for LTAR program. In *Brass Rod from Korea*, Commerce explained that the program considered in *Bethlehem Steel* involved "identical price discounts offered to certain electricity users that agreed to voluntarily limit their electricity consumption." *Brass Rod from Korea*, 89 Fed. Reg. 29,290 and IDM at 20 (citation omitted) ("{i}n contrast, for an LTAR subsidy program, consumption volumes are directly tied to the amount of subsidy conferred through the pricing of the good in question{}"). In other words, the benefit in the electricity for LTAR program "is conferred through the respondents' purchases of electricity." *Id.* Thus, "it is unnecessary to demonstrate the amount of subsidy conferred was disproportionate *to the consumption of electricity.*" *Id.* (emphasis added); *see also LDWP from Korea* IDM at cmt. 2 (discussing *Bethlehem Steel*). Here, by contrast, Commerce demonstrated that the amount of the subsidy flowing to a group of

industries that included the steel industry was disproportionate to the amount of subsidy received by all other users of industrial class electricity.  IDM at 19.

As in *Mosaic* and *Brass Rod from Korea*, this case involves the provision of a good or service for LTAR.  Under a domestic subsidy program such as electricity for LTAR, "a benefit exists to the extent that such goods or services are provided for less than adequate remuneration." 19 C.F.R. § 351.511(a)(1).  As in *Brass Rod from Korea*, moreover, the consumption of electricity is "directly tied to the amount of subsidy conferred through the pricing of the good in question."  *See Brass Rod from Korea* IDM at 30.  Commerce reasonably determined that the steel industry was part of a group of industries that received a disproportionately large amount of the electricity for LTAR subsidy.  IDM at 17-19.  Commerce's prior decision reviewed in *Bethlehem Steel* does not require a different outcome.

Plaintiffs further argue that the meaning of the term "disproportionately" requires that Commerce consider whether the relevant enterprise or industry (or groups thereof) receives a percentage of electricity that is out of proportion to what otherwise would be fair or expected. Hyundai Br. at 14; GOK Br. at 5.   But Congress' use of a statutory term that is "general in nature"—like disproportionate— "indicat{es} that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce."  *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2023).  Applying this general term to the facts of this case, Commerce reasonably found that a group of three industries—out of 19 industries in a well-diversified economy—received a disproportionately large amount of the electricity for LTAR subsidy because the facts showed their use of industrial electricity—and therefore the benefit they received—was significantly

higher than even the other top users of industrial electricity..  IDM at 17-19; *see also* Economic

Diversification Memorandum at 2-3.

>    3.    Commerce Appropriately Relied On Electricity Consumption Data Provided In
>           Response To A Questionnaire Instead Of An Unrequested Revised Data Set

Plaintiffs next challenge Commerce's reliance on the electricity consumption data

reported by the GOK in its initial questionnaire response.  Hyundai Br. at 19-22; GOK Br. at 14-

16.  As shown below, Commerce reasonably relied upon data provided by the GOK that was

responsive to Commerce's questionnaire and was certified by the GOK as accurate and

complete, rather than unsolicited data that Commerce found provided an unhelpful level of detail

and which lacked supporting documentation.

The GOK submitted on the record two different data sets for industrial electricity

consumption during the POR.  IDM at 21; GOK IQR at 42-43; GOK 2SQR at 1-3.  Commerce's

initial questionnaire requested that the GOK "Provide the amount of electricity provided to the

steel industry during the POR and to the largest 10 industries consuming electricity during the

POR."  *See* GOK IQR at 42-43.  On August 11, 2023, the GOK provided the requested usage

data.  *Id*.  The data stated that the consumption reported was for the [        ] industry.  *See id*.

The data was certified as accurate and complete by the Deputy Director for Trade Legal Affairs

and Planning Division of the Republic of Korea's Ministry of Trade, Industry and Energy, as

well as by the Republic of Korea's counsel.  *See id*. at Government Certification, Representative

Certification.

In October 2023, Commerce issued a supplemental questionnaire that requested

"KEPCO's unconsolidated financial statements for 2022."  *See* GOK 2SQR at 1.  This

questionnaire did not request updated or revised data regarding industrial electricity

consumption.  *See id*.  On November 1, 2023, after responding to the question presented, the

GOK—unprompted—provided a different industrial electrical consumption data set. *See id.* at 1-3.  The GOK asserted that the new data was "a more detailed and accurate response," claiming that the original dataset was "inaccurate in the sense that each category covers industries that do not match with their names." *Id.* at 2.  While the GOK stated that the new data set was "a revised table of the 10 largest industries consuming electricity during the POR," it did not state that the table showed the amount of electricity provided to the steel industry during the POR, as Commerce's initial questionnaire had requested. *Compare id.*, *with* GOK IQR at 42.[5]

Commerce did not request that the GOK provide a second set of data or revise the data it had already provided for electricity consumption.  IDM at 21.  The second set of data was not responsive to Commerce's pending requests for information. *See* GOK 2SQR at 2*.*  Specifically, the GOK submitted this revised dataset in response to a request for KEPCO's unconsolidated financial statements. *Id.*  The question did not reference industrial electricity consumption data in any way. *See id.*  Furthermore, as Commerce explained, the GOK's revised electricity consumption data was reported at "a lower level of industrial classification" than Commerce requested, and was, therefore "not usable data."  IDM at 22.

Therefore, even accepting plaintiffs' contentions that the revised dataset is "more accurate," *see* Hyundai Br. at 22; GOK Br. at 14-15, Commerce reasonably determined that the data was not usable for the purposes of its analysis. *See id.* (noting that "{i}t is only Commerce, and not an interested party, that determines the data that are necessary to perform a specificity analysis under section 771(5A)(D)(iii) of the Act.").  It is well established that "{w}hen Commerce is faced with the decision to choose between two reasonable alternatives and one

---

[5] One of the 10 industries identified in the new data was the [      ] industry. *See* GOK 2QR at 2.  However, the GOK did not state whether this entry reflected the entire steel industry. *See id.*

alternative is favored over the other in their eyes, then they have the discretion to choose accordingly." *Tehnoimportexport, UCF. Am. Inc. v. United States*, 783 F. Supp. 1401, 1406 (Ct. Int'l Trade 1992). However, here, Commerce determined it was faced with the decision between a useable dataset and an *unusable* dataset that provided information on the wrong level of industrial classification. *See* IDM at 21-22. Therefore, Commerce was not faced with two reasonable alternatives, but only one reasonable option: the GOK's initial dataset. *See id*. at 22; *see also*

Plaintiffs refer to the fact that Commerce only verified the revised electricity consumption data submitted and not the original electricity data. Hyundai Br. at 20-21; GOK Br. at 14-15. Commerce acknowledges that it did not verify the original dataset. Nevertheless, while Commerce did not verify the originally submitted data, nothing in the record supports plaintiffs' claims that their own initial data was unreliable. As Commerce noted, the GOK claimed that the categories in the initial data "cover industries that do not match with their names," but the GOK provided no evidentiary support for this assertion. *See* IDM at 21-22.[6]

GOK's new data also appears to conflict with other record evidence. GOK's new data set provides data for an industry called [                                                    ], based on the Korea Standard Industrial Classification (KSIC). *See* GOK 2SQR at 3. No such industry exists in the "the Standard Industry Classification List" provided by the GOK to Commerce in its initial

---

[6] Hyundai argues this is a "non-sensical" claim, but does not identify any record evidence that would support GOK's claim of overly broad categories. *See* Hyundai Br. at 21. The GOK, meanwhile, does not address Commerce's determination that there was no supporting documentation for the GOK's claims of overly broad categories. *See* GOK Br. at 14-15 (arguing only that Commerce did not object to and verified the revised data, and asserting that Commerce's actions were arbitrary, but presenting no argument on supporting documentation). Because the GOK's opening brief did not present any arguments regarding the lack of supporting documentation for its claims of overly broad categories, it has forfeited and waived this issue. Similarly, DSM presents no argument on this issue. *See generally* DSM Br.

questionnaire response.  *See* Exhibit LI.  The GOK did not provide any reason why it was now providing data based on the KSIC, why it was not using the Standard Industry Classification List, or why its previous response providing data for the steel industry was inaccurate and supposedly included consumption by industries other than the steel industry.  *See generally* GOK 2SQR.  The GOK also did not explain why—if Commerce was to examine industrial electrical use based on the KSIC—the new data was sufficient; while the GOK claimed it was providing data for "the 10 largest industries consuming electricity during the POR," which included data for [                                             ], the GOK did not make any representation that any of the new data accurately represented "the amount of electricity provided to the steel industry" as requested by Commerce.  *Compare id.*, *with* GOK IQR at 42.  Furthermore, while the GOK claimed that the data it had previously titled as [        ] "covers not only steel but also copper and non-ferrous metal, aluminum, etc.," it provided no explanation for why this data had been identified as solely related to the steel industry and certified as such, or why its new data did not use the general industry classifications on the Standard Industry Classification List.  *Compare* GOK 2SQR at 2, *with* GOK IQR at 42-43, Exhibit LI.

As for plaintiffs' arguments concerning verification, it is well established Commerce is not required to verify all information on the record of this proceeding, even if Commerce relies on such data.  "{T}he statute gives Commerce wide latitude in its verification procedures."  *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) (citing *Hercules, Inc. v. United States,* 673 F. Supp. 454, 469 (Ct. Int'l Trade 1987); *Kerr-McGee Chem. Corp. v. United States,* 739 F. Supp. 613, 628 (Ct. Int'l Trade 1990)).  "{V}erification is a spot check" in which Commerce "has considerable latitude in picking and choosing which items it will examine in detail."  *PMC Specialties Grp., Inc. v. United States*, 20 C.I.T. 1130, 1134 (1996) (quoting

*Monsanto Co. v. United States*, 698 F. Supp. 275, 281 (Ct. Int'l Trade 1988)).  As such, "the law

does not require Commerce to turn over every stone."  *Bonney Forge Corp. v. United States*, No.

20-CV-03837, Slip Op. No. 25-56, 2025 WL 1304590, at *5 (Ct. Int'l Trade May 6, 2025)

(citing *PMC Specialties*, 20 C.I.T. at 1134 ("Commerce is not required to examine in detail every

aspect of a respondent's questionnaire.")).

While the plaintiffs may disagree with Commerce's decision to not verify the GOK's

initial data, there is no authority that mandates such verification in an administrative review.  *See*

*Dalian Meisen Woodworking Co. v. United States*, 719 F. Supp. 3d 1322, 1335 (Ct. Int'l Trade

2024) (noting that while Commerce is statutorily required to verified information relied upon in

making determinations in *investigations*, no such requirement applies in an administrative

review).  Indeed, Congress *removed* a statutory requirement that Commerce verify all factual

information in administrative reviews.  *See Monsanto Co. v. United States*, 698 F. Supp. 285,

288 (Ct. Int'l Trade 1988) (noting that the Trade and Tariff Act of 1984 "relieves … the burden

of conducting verification").  Congress replaced mandatory verification with instructions to

verify only when verification "is timely requested by an interested party" and either no

verification was made during the two preceding reviews of the same order or good cause is

shown.  19 U.S.C. § 1677m(i); 19 C.F.R. § 351.307).  In this review, there was no timely request

for verification of GOK's initial questionnaire responses.  19 U.S.C. § 1677m(i).  Thus, no

verification was required.  *Id*.  Therefore, Commerce was not required to conduct a verification

and appropriately relied on the GOK's original dataset.[7]

_____

[7] Even if Commerce had been required to accept the GOK's revised data—which it was
not—its determination of disproportionality would still be supported by substantial evidence.
The GOK's revised data asserts that [                    ], with KSIC code [
], consumed [        ] percent of total industrial class electricity.  GOK
2SQR at 3.  The KSIC has [      ] entries at the [                        ].  *See* Statistics Korea,
*Korean Statistical Classification* (available at

24

4.     Plaintiffs' Factual Challenge Fails to Disturb The Substantial Evidence
Supporting Commerce's Specificity Finding

Plaintiffs' factual arguments fail to undermine the substantial evidence supporting

Commerce's specificity finding.  For example, Hyundai argues that although "the Korean

economy may span 19 different industry groupings, . . . the number of establishments in each of

these industries is not equal."  Hyundai Br. at 19 n.4.  Hyundai contends that "the number of

manufacturing establishments (413,849) far outnumbers the number of establishments in 14 of

these 19 industry groupings," and that economic diversity does not "account for differences in

electricity use between industries." *Id.*  The GOK, similarly, argues that "manufacturing

industries naturally tend to consume more electricity than other industries, such as retail," and

that "some enterprises and industries are much larger than others."  GOK Br. at 6.

These factual challenges are unpersuasive.  "Substantial evidence" connotes "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. of N.Y.*, 305 U.S. at 229; *Ningbo Dafa Chem. Fiber Co.*, 580 F.3d at 1253.

In this case, a reasonable mind could conclude that the steel industry was part of a group of three

industries that consumed a disproportionately large amount of the subsidy from the provision of

electricity for LTAR program.  *See* IDM at 15-16.  These three industries—operating in the

context of a well-diversified economy with 19 industry groupings—accounted for more than

[    ] percent of the electricity consumed by *all* industrial class entities.  *See* GOK IQR at 42-43;

IDM at 19; Economic Diversification Memorandum at 2-3.  Even if plaintiffs' arguments had

---

http://kssc.kostat.go.kr/ksscNew_web/ekssc/main/main.do#).  Given that no party contested
Commerce's finding that "a wide diversification of economic activities exists in Korea," *see*
IDM at 18, it is disproportionate for one out of [      ] categories of industries—*i.e.* [      ]
percent of the total number of [        ] level industries—to receive [     ] percent of
the benefit of a subsidy.  *See* Hyundai Br. at 5 (defining "disproportionately" as "being out of
proportion" or being "too large or too small in relation to something else") (cleaned up).

some support in the record, that would not prevent Commerce's finding "from being supported by substantial evidence." *Consolo*, 383 U.S. at 620 (citation omitted).

In addition, plaintiffs' arguments mischaracterize the data Commerce analyzed. Hyundai claims that the steel industry's consumption of [          ] of the total industrial electricity consumption in Korea, and "only" [          ] of the *total* electricity consumption in Korea are "low percentages," asserting that "{w}hile the Korean economy may span 19 different industry groupings … the number of manufacturing establishments (413,849) far outnumbers the number of establishments in 14 of these 19 industry groupings." Hyundai Br. at 19. But Commerce is evaluating the electricity use by the steel industry, not all Korean manufacturing. *See* IDM at 18-20. As Commerce noted, the GOK confirmed that the manufacturing industry has 25 sub-categories of industries. *See id*. at 19 (citing Exhibit LI). The GOK's data shows that the steel industry is a sub-part of just one of the 25 sub-categories of the manufacturing industry, and just one of the 78 total industrial sub-categories. *See* Exhibit LI. Therefore the 413,849 "number of manufacturing establishments" is irrelevant, as the steel industry is only a sub-part of a sub-part of the manufacturing industry. *See id*.

Indeed, [

]. *Compare* GOK IQR at 42-43, *with* Exhibit LI.  This fact, in turn, makes it all the clearer the disproportionate benefit received by the group of industries identified by Commerce: the three identified industries are not three of the 19 industry groupings identified by Commerce (or the 17 Classification 1 industry categories identified by the GOK), but are each [

].  *See* Exhibit LI.  This, in turn, means that the three grouped industries represent, at most, only [        ] percent of the Classification 2 categories of industries in Korea, and yet they consume [        ] percent of all industrial electricity.  *See* GOK IQR at 42.  *Ipso facto*, the other [      ] Classification 2 categories of industry only consume no more than [        ] percent of all industrial electricity, an average of just [        ] percent each.  Thus, plaintiffs' arguments merely highlight even further record support for Commerce's conclusion that the group of industries identified by Commerce were consuming a disproportionate amount of industrial electricity.

D.    Commerce Correctly Calculated The Electricity For LTAR Program's Benefit

Hyundai and the GOK allege that Commerce did not isolate and remove the effect of KEPCO's cost pass-through tariff system when calculating the benefit conferred.  Hyundai Br. at 22; GOK Br. at 16.  Specifically, both parties claim that these costs were not actually costs incurred during the 2022 period of review, and therefore, including them overstates the costs used to determine KEPCO's cost recovery during the period of review.  Hyundai Br. at 23; GOK Br. at 17.  However, Commerce correctly determined that the fuel cost adjustment charge (FCAC) should be included in the benefit calculation because the FCAC was part of the GOK's electricity tariff scheduling during the POR, and thus was relevant to the price of electricity charged to industrial consumers.  IDM at 23-25.

Commerce determines whether electricity is provided for LTAR by comparing, in order of preference: (i) the government price to a market determined price for actual transactions within the country such as electricity tariffs from private parties (Tier 1 benchmark); (ii) the government price to a world market price where it would be reasonable to conclude that such a world market price is available to electricity consumers in the country in question (Tier 2 benchmark); or (iii) if no world market price is available, then Commerce will measure the adequacy of remuneration by assessing whether the government price is consistent with market principles (Tier 3 benchmark).  19 C.F.R. § 351.511(a)(2); PDM at 30.

Commerce found that Tier 1 and Tier 2 benchmarks were not available.  IDM at 12 (citing PDM at 30-31).  Therefore, to determine whether respondents received a countervailable benefit from the provision of electricity for LTAR by KEPCO, Commerce used a Tier 3 analysis. *Id*.  Commerce assessed whether the prices the prices charged by KEPCO are set in accordance with market principles by considering factors such as KEPCOs price-setting philosophy and costs (including rates of return sufficient to ensure future operations).  *Id*. at 12-13.  Commerce determined that Korea's electricity tariff system was set according to market principles.  *Id*. at 12.

Commerce further analyzed KEPCO's cost recovery rates by comparing the reported industrial tariff rates to KEPCO's cost data.  *Id*. at 13.  Commerce determined that "no industrial tariff rate in fact recovered costs (inclusive of a rate of return) during the period of review.  *Id*. Commerce noted that KEPCO's pricing methodology was based upon "*laws, regulations, and processes* to fully recover costs and a rate of return," *id*. (emphasis in original), but that the data nevertheless ultimately showed the implementation of this pricing methodology "conferred a benefit to the purchasers of industrial categories of electricity."  *Id*.

28

Commerce explained that its calculation of the benefit under the electricity for LTAR program applied a percentage increase to purchases of electricity by consumers of industrial tariff electricity rates if those rates did not recover costs plus a reasonable rate of return. *Id*. at 24. Commerce noted it was using the system that the GOK itself "employs to ensure cost recovery plus a reasonable profit{.}" *Id*. Commerce determined that the FCAC was "a part of the electricity tariff structure in place during the POR," and therefore was "a part of the tariff price consumers paid for the purchase of electricity." *Id*.

Accordingly, the FCAC was crucial for Commerce's benefit analysis. For context, in its Form 20-F filing with the U.S. Securities Exchange Commission, KEPCO explained that a new electricity tariff system, introduced on January 1, 2021, implemented a new cost pass-through mechanism by which increases in KEPCO's costs are reflected in the electricity rates charged to consumers. GOK IQR at Exhibit E-2. Such costs are reflected in two new components to the electricity tariff: a "Climate/Environment Related Charge" and the FCAC. *Id.* at 64. The GOK explained that "the Fuel Cost Adjusted Charge is calculated on a quarterly basis and the formula for calculating the amount of the Fuel Cost Adjusted Charge is multiplying (i) the unit price of the Fuel Cost Adjusted Charge (the "Unit Price of the Fuel Cost Adjusted Charge"), which is the difference between a base fuel cost (the 'Base Fuel Cost') and an actual fuel cost (the 'Actual Fuel Cost') and (ii) the amount of electricity consumed." Further, the GOK explained that "The Base Fuel Cost is the past twelve-month average fuel price of bituminous coal, LNG and Bunker C oil as posted by the Korea Customs Service. The twelve-month average fuel price is measured by taking the average of monthly fuel prices from twelve months in between thirteen and one month prior to the time a new Base Fuel Cost becomes effective."[8] *Id.* at 64-65.

---

[8] The GOK reported that the following formula was applied for the POR in calculating electricity bills in Korea: Demand Charge * Contract Power Volume + (Energy Charge + Unit

However, the quarterly adjusted FCAC has built-in limits "in view of price stability and other public policy considerations." *Id.* at 65. The maximum adjustment that can be incorporated into the Unit Price of the Fuel Cost Adjusted Charge is equal to Won ±5 per kilowatt-hour from the Base Fuel Cost that is in effect. To illustrate, the GOK explained that while the unit price of the FCAC was Won 6.8 per kilowatt-hour in 2023, the Unit Price of the FCAC nonetheless came out to 5.0 per kilowatt hour, the maximum limit. *Id.* In sum, if the cost represented by the FCAC exceeds Won ±5 per kilowatt-hour, it will not be reflected in the electricity tariff due to the built-in limits. *Id.*

Because the Actual Fuel Cost may exceed the built-in limits of the tariff system, there may be certain costs that cannot be immediately charged to customers. *Id.* at 66. Such portions are instead reflected in calculating the "Total Comprehensive Cost," which is used to calculate the base charge and the usage charge of the tariff for the next year. *Id.* In sum, because of the maximum limits with respect to the FCAC, costs that the GOK is unable to recover in its electricity tariffs in 2021 are "carried over" into 2022 and reflected in the line item [

]. IQR at Exhibit E-9.1.

Despite the contentions of Hyundai and the GOK, this item is wholly relevant to Commerce's calculations for the 2022 period of review. Hyundai Br. at 24; GOK Br. at 17. During the 2022 period of review, the GOK carried forward a portion of its 2021 costs to 2022 because it was unable to recover them through the collection of tariffs in 2021. GOK 3SQR at Exhibit E-9.1; *see also* Hyundai Br. at 23; GOK Br. at 17. The FCAC is a part of the tariff price

---

Price of **Fuel Cost Adjusted Charge** + Unit Price of Climate/Environment Related Charge) * Amount of Electricity Used. GOK IQR at 14. Additionally, the GOK explained that the Fuel Cost Adjusted Charge = Unit Price of the Fuel Cost Adjusted Charge *Amount of Electricity Consumed (kWh). *Id.* Further, the GOK explained that the Unit Price of the Fuel Cost Adjusted Charge = { Actual Fuel Cost (KRW/kg) – Base Fuel Cost (KRW/kg) } * Conversion Coefficient. *Id.*

consumers paid for the purchase of electricity during the period of review.  IDM at 24.  This is the case because, as Hyundai and the GOK acknowledge, the Total Comprehensive Cost is a component in the calculation of the Base Charge and the Unit Charge of the electricity tariff. Exhibit E-2 at 66; Hyundai Br. at 5; GOK Br. at 17.  Therefore, the 2021 fuel costs, which were not passed along to electricity consumers in 2021, became the Total Comprehensive Cost in KEPCO's 2022 costs and were accordingly an important factor in establishing the 2022 tariff rates.  IDM at 25.

KEPCO's pricing structure, therefore, incorporates the prior year's unrecovered fuel costs into the calculation for determining the current year's electricity prices.  If Commerce were to exclude these unrecovered fuel costs from its benefit calculation, Commerce's analysis would not accurately represent KEPCO's costs, KEPCO's pricing formula, or KEPCO's methodology for establishing tariff classification prices.  To properly carry out an analysis of whether KEPCO actually recovered its costs plus a reasonable return, Commerce must base its analysis on the pricing formula actually implemented by KEPCO within the system that Commerce has found, in theory, consistent with market principles.  To remove elements from this calculation without proper justification would warp the analysis and would not determine the actual benefit received by companies as a result of electricity prices too low to allow KEPCO to recover costs plus profit.  Thus, the arguments of Hyundai and the GOK that Commerce should remove the unrecovered 2021 fuel costs from its benefit analysis is inconsistent with information on the record demonstrating that these fuel costs are an integral part of KEPCO's pricing mechanism.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain Commerce's final results and enter judgment in favor of the United States.

Dated: October 1, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

By: /s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

Of Counsel:
JACK DUNKELMAN
Attorney
Office of the Chief Counsel
     For Trade Enforcement & Compliance
U.S. Department of Commerce

/s/ Augustus Golden
AUGUSTUS GOLDEN
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone:    (202) 305-5915
Augustus.J.Golden@usdoj.gov

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the

Standard Chambers Procedures of the U.S. Court of International Trade in that it contains

9,699 words including text, footnotes, and headings and excluding the table of contents,

table of authorities and counsel's signature block, according to the word count function of

Microsoft Word used to prepare this brief.

/s/ *Augustus Golden*
Augustus Golden

Dated: October 1, 2025