NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>                       **Plaintiff,**<br><br>       **and**<br><br>DONGKUK STEEL MILL CO., LTD.,<br><br>               **Consolidated Plaintiff,**<br><br>       **and**<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>               **Plaintiff-Intervenor,**<br><br>       **v.**<br><br>UNITED STATES,<br><br>              **Defendant,**<br><br>       **and**<br><br>NUCOR CORPORATION,<br><br>            **Defendant-Intervenor.** | Before: Hon. Claire R. Kelly,<br>      Judge<br><br>Court No. 24-00190<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>Business Proprietary Information Removed from Pages: 2-3, 9-12, 15-17, 21, 29 |

### DEFENDANT-INTERVENOR NUCOR CORPORATION RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Corporation*

Dated: October 23, 2025

Ct. No. 24-00190                                NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................. 1

II.     RULE 56.2 STATEMENT ................................................................... 2

        A.      Administrative Decision Under Review ...................................2

        B.      Issues Presented ......................................................................2

                1.      Whether Commerce Correctly Found That the GOK's Provision of Electricity for LTAR was *De Facto* Specific Given that the Steel Industry Received a Disproportionate Amount of the Subsidy?........................................... 2

                2.      Whether Commerce Correctly Determined That the Provision of Electricity in Korea Confers a Benefit? ................................................................ 3

                3.      Whether Commerce Relied on the Correct Dataset When Calculating a Benefit 4

III.    STATEMENT OF FACTS ................................................................... 4

        A.      Introduction ..............................................................................4

IV.     STANDARD OF REVIEW ................................................................. 7

V.      ARGUMENT ...................................................................................... 9

        A.      The GOK's Provision of Electricity for LTAR Is Specific ....................................9

                1.      Plaintiffs' Reliance On Bethlehem Steel Is Not Persuasive .................... 10

                2.      Commerce's Grouping of Industries for Purposes of Its *De Facto* Specificity Analysis Was Lawful and Reasonable ............................................. 12

                3.      Commerce Adequately Explained Its Disproportionality Finding Which Is Supported By Substantial Evidence ........................................................ 15

                4.      The Court Should Reject Plaintiffs' Arguments Concerning the Disproportionality Standard ...................................................................... 17

                5.      The Provision of Electricity is Not General Infrastructure As Demonstrated By Decades of Agency and Court Precedent ................................. 22

        B.      The GOK's Provision of Electricity for LTAR Confers a Benefit ....................26

                1.      The Department Now has an Established Practice That the GOK Has Defended and the Court of International Trade Sustained................................... 27

                2.      There Is No Justification for Departing from the "Well-Established Methodology" ..................................................................................... 29

Ct. No. 24-00190                                      **NON-CONFIDENTIAL VERSION**

3.     Commerce Properly Included KEPCO'S Fuel Costs When Calculating KEPCO's COST Recovery Rate........................................................................ 30

C.     Commerce Relied on the Correct Dataset When Evaluating Electricity for LTAR..............................................................................................31

Ct. No. 24-00190

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999)..............................................................11, 20, 21, 22

*Bethlehem Steel Corp. v. United States*,
25 CIT 307, 140 F.Supp.2d 1354 (2001).........................................................11, 23

*Bethlehem Steel Corp. v. United States*,
26 CIT 1003, 223 F.Supp.2d 1372 (2002).................................................................24

*Carlisle Tire & Rubber Co. v. United States*
5 CIT 229, 564 F. Supp. 834 (1983)..........................................................24, 25, 26

*Ceramica Regiomontana, S.A. v. United States*,
810 F.2d 1137 (Fed. Cir. 1987)..................................................................................9

*Changzhou Trina Solar Energy Co. v. United States*,
466 F.Supp.3d 1287 (Ct. Int'l Trade 2020) ............................................................27

*Consol. Fibers, Inc. v. United States*,
32 CIT 24, 535 F.Supp.2d 1345 (2008) ....................................................................9

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 86 S. Ct. 1018 (1966) ..........................................................................8

*Dongtai Peak Honey Indus. Co. v. United States*,
38 CIT 334, 971 F.Supp.2d 1234 (2014), *aff'd*, 777 F.3d 1343 (Fed. Cir.
2015) ..........................................................................................................................9

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996).....................................................................................8

*INS v. Elias-Zacarias*,
502 U.S. 478, 112 S. Ct. 812 (1992)...........................................................................9

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
38 CIT 1632, 28 F.Supp.3d 1317 (2014)....................................................................9

*Matsushita Elec. Indus. Co. v United States*,
750 F.2d 927 (Fed. Cir. 1984)...................................................................................9

*Mosaic Co. v. United States*,
589 F.Supp.3d 1298 (Ct. Int'l Trade 2022) ...........................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983) ................................................................9

*Nucor Corporation v. United States*,
    927 F.3d 1243 (Fed. Cir. 2019) .....................................................................20

*Royal Thai Government v. United States*,
    30 C.I.T. 1072, 441 F.Supp.2d 1350 (2006) ..................................................25

*Royal Thai Government v. United States.*,
    436 F.3d 1330 (Fed. Cir. 2006) .....................................................................21

*Tehnoimportexport, UCF. Am. Inc. v. United States*,
    16 CIT 13, 783 F. Supp. 1401 (1992) ..............................................................4

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474, 71 S. Ct. 456 (1951) ..................................................................8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................8

19 U.S.C. § 1677(5A)(D) ......................................................................10, 13, 28

19 U.S.C. § 1677(5A)(D)(iii) ..........................................................................10, 14

1994 Uruguay Round Agreements Act ....................................................................26

**Regulations**

19 C.F.R. § 351.502(a) ..........................................................................................14

19 C.F.R. § 351.502(b) ....................................................................................14, 16

19 CFR § 351.511(d) ............................................................................................24

**Administrative Materials**

*Certain Aluminum Foil from the Sultanate of Oman*,
    86 Fed. Reg. 52,888 ......................................................................................27

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,
    88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ..................................26

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) ....................................26

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
   89 Fed. Reg. 6,500 (Dep't Commerce Feb. 1, 2024)................................................26

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*,
   89 Fed. Reg. 73,626 (Dep't Commerce Sep. 11, 2024)............................................2

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*,
   89 Fed. Reg. 15,825 (Dep't of Commerce Mar. 5, 2024).........................................4

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*,
   89 Fed. Reg. 15,825 (Dep't Commerce Mar. 5, 2024)............................................5

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*,
   87 Fed. Reg. 79 (Dep't Commerce Jan. 3, 2022) ..................................................5

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*,
   87 Fed. Reg. 53,728 (Dep't Commerce Sept. 1, 2022)...........................................5

*Certain Epoxy Resins from Taiwan*,
   90 Fed. Reg. 14,618 (Dep't Commerce Apr. 3, 2025)............................................15

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
   89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) .........................................26

*Certain Steel Nails from Thailand*,
   87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022).........................................27

*Countervailing Duties*,
   62 Fed. Reg. 8,818, 8,825 (Dep't Commerce Feb. 26, 1997)...................................14

*Countervailing Duties*,
   63 Fed. Reg. 65,348, 65,357 (Dep't Commerce Nov. 25, 1998)..............................14

*Forged Steel Fluid End Blocks from Italy*,
   85 Fed. Reg. 80,022 (Dep't Commerce Dec. 11, 2020) .........................................15

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   87 Fed. Reg. 21,619 (Dep't Commerce Apr. 19, 2023)...........................................4

*Large Diameter Welded Pipe from the Republic of Korea*,
   88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) ..........................................27

*Multilayered Wood Flooring from the People's Republic of China*,
   79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014)...........................................27

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*,
   86 Fed. Reg. 28,559 (Dep't Commerce May 27, 2021) .........................................15

# I.     <u>INTRODUCTION</u>

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we hereby submit the following response to the April 24, 2025 briefs in support of the motion for judgment on the agency record filed by Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff"), Pl.'s Br. in Supp. of Pl.'s Mot. for J. on the Agency R. (Apr. 24, 2025), ECF No. 31 ("Pl. Br.") and Dongkuk Steel Mill Co., Ltd. ("DSM" or "Consolidated Plaintiff"), Consol. Pl.'s Br. in Supp. of Consol. Pl.'s Mot. for J. on the Agency R. (Apr. 24, 2025), ECF No. 33 ("Consol. Pl. Br.") and the May 29, 2025 brief in support of the motion for judgment on the agency record filed by the Government of Korea ("GOK" or "Plaintiff-Intervenor"), Pl.-Intervenor's Br. in Supp. of Pl.'s Mot. for J. on the Agency R. (May 29, 2025), ECF No. 38 ("Plaintiff-Intervenor Br."). For the reasons discussed in this brief, in conjunction with the arguments presented by Defendant United States, Defendant-Intervenor respectfully requests that this Court reject the arguments raised by Hyundai Steel, DSM, and the GOK (collectively, the "Plaintiffs"), and affirm aspects of the Final Results of the U.S. Department of Commerce ("Commerce") in the 2022 administrative review of the countervailing duty ("CVD") order on *Certain Cut-to-Length Carbon Quality Steel Plate from the Republic of Korea* ("*CTL from Korea*").

Defendant-Intervenor does not intend to repeat arguments raised by Defendant in its October 1, 2025 brief with respect to Plaintiffs' arguments on Commerce's determination that the electricity for less than adequate remuneration ("LTAR") program is *de facto* specific, Commerce's calculation of a benefit derived from the provision of electricity for LTAR program, and Commerce's decision to rely on electricity consumption data submitted in response to a request for information unsolicited and less probative data provided later in the underlying proceeding. Def.'s Resp. to Pls.' Mots. for J. on the Agency R. (Oct. 1, 2025), ECF No. 43 ("Def.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                                          NON-CONFIDENTIAL VERSION

Br."). Nucor concurs with and adopts by reference the arguments made by Defendant with regard to each issue.

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

The administrative determination challenged in this appeal is Commerce's Final Results in the 2022 administrative review of the CVD order on *CTL from Korea*. Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 89 Fed. Reg. 73,626 (Dep't Commerce Sep. 11, 2024) (final results of countervailing duty admin. rev.; 2022), P.R. 319 ("IDM").[1] *See also Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 89 Fed. Reg. 73,626 (Dep't Commerce Sep. 11, 2024) (final results of countervailing duty admin. rev.; 2022), P.R. 325 ("Final Results").

### B.    Issues Presented

#### 1.    Whether Commerce Correctly Found That the GOK's Provision of Electricity for LTAR was *De Facto* Specific Given that the Steel Industry Received a Disproportionate Amount of the Subsidy?

Yes. Commerce correctly found that the GOK's provision of electricity for LTAR was *de facto* specific and conferred a countervailable benefit. In an economy with 19 diversified economic industry sectors, Commerce found that the steel industry was the [     ] largest consumer of electricity in Korea. IDM at 15-17. The top 10 industries consuming electricity in the same industrial class represented [        ] of total consumption, and the steel industry represented [       ] of that figure. *Id.*; Letter from Yoon & Yang LLP, to Sec'y Commerce, re:

---

[1]    Documents on the public record of the underlying administrative review are identified here as "P.R.," followed by the number assigned to the relevant document in the administrative record index filed with the Court on December 13, 2023. Documents in the confidential administrative record are identified by name, followed by "C.R." and the corresponding record number.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                                    NON-CONFIDENTIAL VERSION

*Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire* (Aug. 11, 2023), C.R. 105-142, P.R. 104-125 at 35-36 ("GOK Questionnaire Response"). Commerce properly found that the steel industry was among the top four electricity consuming industries, which consumed more than [    ] (*i.e.*, a disproportionate amount) of the subsidized electricity under this tariff category. IDM at 15-16. Thus, the GOK's provision of electricity for LTAR is plainly *de facto* specific and Commerce's path may reasonably be discerned from its final results.

### 2.    Whether Commerce Correctly Determined That the Provision of Electricity in Korea Confers a Benefit?

Yes. Commerce properly found that the GOK's provision of electricity for less than adequate remuneration ("LTAR") conferred a measurable benefit during the POR. Commerce applied its now-established practice in precisely the same manner that it has been applied in numerous recent administrative reviews, including the two prior reviews of the underlying order. In each of those prior applications of the methodology, Commerce determined that a benefit was conferred but that the amounts were non-measurable. Plaintiffs have previously defended this methodology, which has now been sustained by both this Court and the Court of Appeals for the Federal Circuit (the "CAFC" or "Federal Circuit"). The Plaintiffs provided no sufficient justification for departing from that methodology now, beyond the fact that fluctuations in market values result in a measurable benefit in the relevant POR. Commerce's practice is to revisit benefit amounts in each review period, and it properly did so in the underlying review. Furthermore, Commerce properly accounted for KEPCO's fuel costs in a manner consistent with its established practice.

### 3.    Whether Commerce Relied on the Correct Dataset When Calculating a Benefit

Yes. Commerce reasonably relied on the original dataset which was "directly respons{ive} to {Commerce's} data request and reflects the ten largest industries' consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification" over the revised dataset which was unsolicited, lacked supporting documentation, and was reported at a "lower level of industrial classification analysis, and thus, not usable data." IDM at 22. Commerce acted within its discretion in choosing this dataset. *See Tehnoimportexport, UCF. Am. Inc. v. United States,* 16 CIT 13, 17, 783 F. Supp. 1401, 1406 (1992). And there is no record evidence supporting Plaintiffs' claim that the revised dataset is superior in any way – let alone so superior as to override Commerce's discretion.

## III.    STATEMENT OF FACTS

### A.    Introduction

Commerce initiated an administrative review of the countervailing duty order on CTL Plate from Korea covering the 2022 period of review on April 19, 2023 and selected Hyundai Steel and DSM as the mandatory respondents. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 21,619 (Dep't Commerce Apr. 19, 2023), P.R. 15; Letter from Stephanie Berger, Int'l Trade Compliance Analyst, Off. III, AD/CVD Operations, through Peter Zukowski, Program Manager, Off. III, AD/CVD Operations, to Erin Begnal, Dir. Off III, AD/ CVD Operations, re: *Administrative Review of the Countervailing Duty Order of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Respondent Selection* (June 14, 2023), C.R. 9, P.R. 27. Commerce evaluated the provision of electricity for LTAR subsidy program, as the agency had done for the administrative reviews covering the three prior periods of review, *i.e.*, 2019, 2020, and 2021. *Certain Cut-to-Length Carbon-Quality Steel Plate from the*

*Republic of Korea*, 89 Fed. Reg. 15,825 (Dep't of Commerce Mar. 5, 2024) (prelim. results and partial recission of countervailing duty admin. rev.; 2022), P.R. 248 ("Preliminary Results"); Preliminary Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*, 89 Fed. Reg. 15,825 (Dep't Commerce Mar. 5, 2024) (prelim. results and partial recission of countervailing duty admin. rev.; 2022) at 24-30, P.R. 243 ("PDM"). *See also* Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*, 87 Fed. Reg. 79 (Dep't Commerce Jan. 3, 2022) (final results of countervailing duty admin. rev.; 2019) at 6; Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*, 87 Fed. Reg. 53,728 (Dep't Commerce Sept. 1, 2022) (final results, and rescission, in part, of countervailing duty admin. rev.; 2020) at 6. Consistent with its practice, Commerce issued the initial questionnaire to the GOK on June 14, 2023. Letter from Peter Zukowski, Program Manager, AD/CVD Operations, Off. III to Government of Korea, re: *Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Countervailing Duty Questionnaire* (June 14, 2023), P.R. 28 ("Initial Questionnaire").

In the June 14, 2023 initial questionnaire to the GOK, Commerce requested standard information regarding the provision of electricity for LTAR program. *Id.* The exclusive supplier of electricity in Korea is the Korea Electric Power Corporation ("KEPCO"). KEPCO owns six government-operated generators of electricity and has a majority ownership stake in the Korea Power Exchange where electricity is traded and the price for electricity is set. *Id.* at 18. In order to evaluate the relative use of industrial electricity by various industries including the Korean steelmaking industry, Commerce's request for information to the GOK included requests for "the total amount of electricity provided at the industrial tariff during the POR," the "amount of

electricity provided to the steel industry during the POR and to the largest 10 industries consuming electricity during the POR," the "percentage of the steel industry and largest 10 industries consuming electricity for the POR based on total electricity consumed and the total industrial classification consumed," and the amount and percentage of electricity that is provided to each of the largest 100 industrial users of electricity during the POR." *Id.* at 20.

On August 11, 2023 the GOK responded to Commerce's initial questionnaire and provided the electricity usage data requested above. *See* GOK Questionnaire Response. And on November 1, 2023, the GOK responded to Commerce's supplemental questionnaire. Letter from Yoon & Yang LLP, to Sec'y Commerce, re: *Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea; 2022: Response to Supplemental Questionnaire* (Nov. 1, 2023) C.R 285-286, P.R. 207-208. Included in the GOK's supplemental response was a revised dataset that Commerce did not request. Commerce declined to use this unsolicited dataset. IDM at 21-22. The GOK's revised and unsolicited data used a different classification system than what Commerce typically uses for its analysis. IDM at 21-22. Instead, Commerce continued to use the data that the GOK initially provided. *Id.* On January 25, 2024, the GOK responded to Commerce's third supplemental questionnaire. *See* Letter from Yoon & Yang LLP, to Sec'y Commerce, re: *Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea; 2022: Response to the GOK Supplemental Questionnaire* (Jan. 25, 2024) C.R. 303-308, P.R. 222-223.

Commerce published its preliminary results on March 5, 2024, calculating subsidy rates of 2.21 percent for Hyundai Steel and 1.93 for DSM. Preliminary Results; PDM. Commerce preliminarily determined that Hyundai and DSM benefitted from fifteen subsidy programs, including the provision of electricity for LTAR subsidy program. See PDM at 35. Commerce

preliminarily determined that Hyundai Steel and DSM received countervailable subsidies, including the provision for electricity for LTAR, and determined that that program was *de facto* specific because a disproportionately large amount of the subsidy was received by the steel industry. *Id.*

DSM, Hyundai, and the GOK filed administrative case briefs, and Nucor filed a rebuttal brief. *See* Pl. Br.; Consol. Pl. Br.; Plaintiff-Intervenor Br.

On September 11, 2024, Commerce published the final results, continuing to find (i) that the provision of electricity in Korea was *de facto* specific because a disproportionate amount of the subsidy was received by a group of three industries, including the steel industry, (ii) that the program conferred a countervailable benefit, and (iii) that the initial dataset that the GOK provided remained the appropriate dataset to rely on when calculating the benefit. IDM at 19.

## IV.    **STANDARD OF REVIEW**

This Court reviews Commerce's decisions in CVD proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). *See also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 71 S. Ct. 456, 459 (1951) (citation omitted). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 86 S. Ct. 1018, 1026 (1966). *See also Dongtai Peak Honey Indus. Co. v. United States*, 38 CIT 334, 336, 971 F.Supp.2d 1234, 1239 (2014), *aff'd*, 777 F.3d 1343, 1349 (Fed. Cir. 2015).

A plaintiff cannot ask the court to re-weigh the evidence on the record and decide the case for Commerce. *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Factual findings by Commerce are afforded considerable deference. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84, 112 S. Ct. 812, 816-17 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). In addition, the court "uphold{s} a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983) (citation omitted); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted).

Moreover, in determining whether Commerce's decisions in CVD proceedings are "unsupported by substantial evidence on the record, or otherwise not in accordance with law," this Court reviews the agency's conduct under the abuse of discretion standard. *See Dongtai Peak*, 38 CIT at 336, 971 F.Supp.2d at 1239; *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT 1632, 1634-35, 28 F.Supp.3d 1317, 1323 (2014). Accordingly, the Court has recognized that it "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 32 CIT 24, 35-36, 535 F.Supp.2d 1345, 1354 (2008).

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                                    NON-CONFIDENTIAL VERSION

## V.    ARGUMENT

### A.    The GOK's Provision of Electricity for LTAR Is Specific

Commerce properly found that the provision of electricity for LTAR is *de facto* specific in this administrative review. The statute provides that a subsidy is *de facto* specific when: (i) the actual recipients are limited in number; (ii) and enterprise or industry is a predominant user of the subsidy; (iii) an enterprise or industry receives a disproportionate amount of the subsidy; or (iv) the subsidizing authority favors an enterprise or industry over others in granting the subsidy. 19 U.S.C. § 1677(5A)(D)(iii). For the *de facto* specificity analysis, the term "enterprise or industry" includes a group of enterprises or industries. *Id.* § 1677(5A)(D). The statute also requires Commerce to consider "the extent of diversification of economic activities within the jurisdiction . . . ." *Id.* § 1677(5A)(D).

In its final results, Commerce found that the provision of electricity for LTAR is *de facto* specific because "the steel industry and two other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported" who accounted for a significantly smaller share of the total industrial class electricity. IDM at 19. By the GOK's own admission, the steel industry in Korea [

]. *See* GOK Questionnaire Response at 42-43. That is, in an economy with at least [          ] economic industry sectors, Commerce found that the steel industry was the [     ] largest consumer of electricity in Korea. *See id.;* Memorandum from David Lindgren, Program Manager, AD/CVD Operation, Off. III, to The File, re: *Administrative Review of Certain Cut-To-Length Carbon Quality Steel Plate from Korea – Placement of Korea Economic Diversification Memorandum on the Record,* (June 14, 2023) at 2-3, P.R. 30 ("Korea Economic

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                              NON-CONFIDENTIAL VERSION

Diversification Memorandum"). Commerce properly found that the steel industry was among the

[          ] electricity consuming industries (all of which were manufacturing industries), which

consumed more than [          ] percent (*i.e.*, a disproportionate amount) of the subsidized electricity

under this tariff category. As such, Commerce's path may reasonably be discerned from its final

results.

### 1.    Plaintiffs' Reliance On Bethlehem Steel Is Not Persuasive

In arguing that Commerce's *de facto* specificity analysis was unlawful, the Plaintiffs rely

heavily on the Court of International Trade's decision in *Bethlehem Steel Corp. v. United States*,

but that case is inapplicable here. *Bethlehem Steel Corp. v. United States*, 25 CIT 307, 140

F.Supp.2d 1354, (2001); *See* Hyundai Steel Br. at 15-16; DSM Br. at 2-3; GOK Br. at 5-13. As

the Federal Circuit has explained, "{d}eterminations of disproportionality and dominant use are

not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account

all the facts and circumstances of a particular case." *AK Steel Corp. v. United States*, 192 F.3d

1367, 1385 (Fed. Cir. 1999). The determination at issue in *Bethlehem Steel* did not involve an

adequacy of remuneration subsidy. Instead, it addressed a "voluntary curtailment" program in

which the GOK automatically provided identical price discounts to general, educational, or

industrial users that voluntarily agreed to curtail electricity consumption by at least 20%.[2]

*Bethlehem Steel Corp. v. United States*, 25 CIT at 319-20, 140 F.Supp.2d at 1367. Here, in contrast,

the issue is an LTAR subsidy in which the benefit amounts are necessarily tied to the individual

pricing and consumption patterns of individual companies and the type of electricity consumed.

---

[2]    Nucor notes that the program *in Bethlehem Steel* is similar to the subsidy program reviewed
in this proceeding named the "Electricity Discounts under Trading of Demand Response
Resources Program," where Commerce routinely finds that the program is countervailable, and
the respondents do not challenge the specificity analysis there. *See* IDM at 7.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                           NON-CONFIDENTIAL VERSION

Benefits will vary, for example, depending on which industrial tariff classification applies to a certain enterprise or industry or what times of day or times of year the enterprise or industry consumes electricity. *See* GOK Questionnaire Response at Exhibit E-10. Indeed, that is why Commerce's benchmark analysis focuses on industrial tariff rates and compares the rates to when Hyundai Steel and DSM actually consume the electricity.

In this context, it is unreasonable to say that the consumption volumes of a beneficiary industry or enterprise are necessarily or inherently greater than that of other industries or enterprises. That is because consumption volumes are directly tied to prices paid – *i.e.*, an industry or enterprise benefitting from an LTAR subsidy is likely to consume more of the subsidized input than it otherwise would in large part because it is being subsidized. Accepting the argument that a determination of *de facto* specificity based on disproportionate or predominant use may not be based on relative consumption volumes would effectively nullify those provisions for the purpose of adequate remuneration programs.

For the purpose of an adequate remuneration program in a highly diversified economy, the fact that [                                                        ] of industrial electricity consumption is compelling evidence of disproportionate benefit. GOK Questionnaire Response at 42-43. There is also evidence on the record that certain individual steel producers alone benefitted disproportionately from the provision of electricity for LTAR. In its initial questionnaire response, the GOK provided a list of the top 100 industrial consumers of electricity by facility. *Id.* at Exhibit E-11. While the GOK did not identify any companies on the list other than the respondents or the industries in which they operate, the list shows that [                                    ] accounted for [                    ] of total industrial electricity consumption during the POR. *Id.* According to the Commerce's economic diversification memo, there were more than 400,000

11

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                              NON-CONFIDENTIAL VERSION

manufacturing establishments operating in Korea during the POR. Korea Economic

Diversification Memorandum at 2. That [                                    ] amounted to [

        ] of total industrial consumption in an economy of more than 400,000 manufacturing

establishments is additional evidence of disproportionate benefit.

### 2.    Commerce's Grouping of Industries for Purposes of Its *De Facto* Specificity Analysis Was Lawful and Reasonable

The Plaintiffs also suggest that it is unlawful for Commerce to base a disproportionality

finding on the combined consumption of a small group of industries or enterprises. Hyundai Steel

Br. at 16-19; GOK Br. at 10-11. This argument is contrary to the plain language of the statute and

should be rejected. The statute states explicitly that "any reference to an enterprise or industry . . .

includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D) (emphasis added).

Plaintiffs accuse Commerce of arbitrary and capricious "results-oriented aggregation" and

argue that, even based on this purportedly "arbitrary grouping" of industries, the record does not

support a finding of disproportionality. Hyundai Steel Br. at 17-19. Neither argument is persuasive.

First, there is nothing arbitrary or capricious about Commerce's conclusion. Commerce

found that three industries in a highly diversified economy is a small enough group to constitute a

relevant group of industries or enterprises within the meaning of the statute, and that [

        ] by such a small number of industries constitutes disproportionate receipt of the total

benefits provided under this subsidy. IDM at 17-19. These are both reasonable factual

determinations that Commerce is required to make in conducting its sequential specificity analysis.

19 C.F.R. § 351.502(a). *See also id.* § 351.502(b) (explaining that Commerce's analysis of

specificity based on a "group" of industries or enterprises does not depend on "whether there are

shared characteristics among the enterprises or industries . . ."). Under Plaintiff's reasoning,

effectively any finding of disproportionate use by a group of industries or enterprises would be arbitrary and capricious and "results-oriented."

The statute provides explicitly that, notwithstanding the "general availability" of a subsidy, the subsidy nevertheless "may be specific as a matter of fact" if any of four conditions are satisfied. 19 U.SC. § 1677(5A)(D)(iii). Each of these conditions provides a basis for finding that a subsidy is *de facto* specific to "an enterprise or industry," which "includes a group of such enterprises or industries." *Id*. Commerce's rules regarding specificity, in turn, provide that the agency "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy." 19 C.F.R. § 351.502(b). In proposing and promulgating this rule, the Department explained that "{i}n determining whether a subsidy is de jure or *de facto* specific, the Department is not required to evaluate the actual make-up of those firms that are eligible for, or actually receive, a subsidy." *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,825 (Dep't Commerce Feb. 26, 1997) (proposed rule). *See also, Countervailing Duties*, 63 Fed. Reg. 65,348, 65,357 (Dep't Commerce Nov. 25, 1998) (final rule) ("There is no requirement that the members of a group share similar characteristics. The purpose of the specificity test is simply to ensure that subsidies that are distributed very widely throughout an economy are not countervailed. *There is no basis for adding the further requirement that subsidies that are not widely distributed are also confined to a group of enterprises or industries that share similar characteristics.*") (emphasis added).

The Department has repeatedly rejected arguments that it must consider the makeup of the industries that constitute a group and has found that "{t}he recipients of a subsidy . . . can be limited in number within the meaning of the Act even when they come from a diverse set of industries and even when they share no common characteristics." *See, e.g.*, Issues and Decision

Memorandum accompanying *Forged Steel Fluid End Blocks from Italy*, 85 Fed. Reg. 80,022 (Dep't Commerce Dec. 11, 2020) (final affirmative deter.) at 18. *See also*, Issues and Decision Memorandum accompanying *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,559 (Dep't Commerce May 27, 2021) (final deter. of sales at less than fair value) at 19-20 ("Because there need not be shared characteristics among the enterprises that comprise a 'group,' it does not matter if these enterprises represent unrelated industries."); Issues and Decision Memorandum accompanying *Certain Epoxy Resins from Taiwan*, 90 Fed. Reg. 14,618 (Dep't Commerce Apr. 3, 2025) (final affirmative countervailing duty deter.) at 20-21 ("{T}here is no requirement under section 771(5A)(D) of the Act that requires Commerce to analyze whether the industries within a group are related in the manner Nan Ya claims.") No party in this case has questioned either the legality of the Department's rule or the consistency of the Department's longstanding practice with the statute or regulations. Likewise, no party in this case has suggested that three industries, including the steel industry and two others, is too large a number to constitute a relevant group.

In light of Commerce's explicit rule and longstanding practice, Plaintiffs' arguments that Commerce's grouping is "results-oriented" and "random" are not persuasive. As noted above, Commerce's rules provide that the agency "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy," and Commerce has explained that it codified this rule because the agency "is not required to evaluate the actual make-up of those firms that are eligible for, or actually receive, a subsidy." 19 C.F.R. § 351.502(b); *Countervailing Duties*, 62 Fed. Reg. 8,825. *See also*, *Countervailing Duties*, 63 Fed. Reg. 65,357. The Department's longstanding practice is to treat a small enough number of industries or enterprises as a specific "group" thereof, whether or not there are any

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                                    NON-CONFIDENTIAL VERSION

conceptual similarities among them. Plaintiffs' argument that some sort of evidence is required to establish some sort of relationship or similarity among the three industries at issue here is diametrically opposed to both rule and practice; in effect, should Plaintiffs' arguments concerning grouping be adopted, the agency may no longer apply 19 C.F.R. § 351.502(b) in accordance with its plain meaning and longstanding interpretation.

To the extent that any explanation or evidence regarding the "make-up" of the industries or enterprises in a group is necessary, it should be sufficient for the purpose of an energy subsidy that the predominant or disproportionate beneficiaries thereof are a small group of energy-intensive manufacturing industries.

### 3.    Commerce Adequately Explained Its Disproportionality Finding Which Is Supported By Substantial Evidence

Commerce's disproportionality finding has to be relative to something else and Commerce clearly defined what that "something else" is in its final results. Specifically, Commerce found that "the steel industry and two other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported." IDM at 19 (emphasis added). Indeed, on its face, Commerce's finding that the steel industry is the [

] consumer of electricity in Korea relative to [          ] other Korean industries is prima facie evidence of disproportionality. IDM at 19. That three of those 10 industries consume [

] of Korean industrial electricity is further evidence of disproportionate receipt of the subsidy. GOK Questionnaire Response at 42-43. Citing to the GOK's initial questionnaire listing the top ten consumers of total electricity and industrial electricity, Commerce's finding of disproportionality is reasonably discerned from the chart showing that the steel industry consumed [    ] more electricity than the [              ] industry, and between [    ]% and [    ]% more electricity than the [                        ] in Korea. *Id.*; IDM at 15-16. By itself,

Ct. No. 24-00190                                          NON-CONFIDENTIAL VERSION

the steel industry consumes a disproportionate amount of subsidized electricity relative to other

Korean manufacturing industries. By appropriately combining the top three industries and

referencing the [          ] on page 42-43 of its initial questionnaire response, Commerce

demonstrates that no other combination of industries comes close to receiving a similar amount of

subsidized industrial energy as these three large manufacturing industries. *See* GOK Questionnaire

Response at 42-43; *see also* IDM at 15.

As Commerce explained in its final results,

for an LTAR subsidy program, consumption volumes are directly tied to the amount
of the subsidy conferred through the pricing of the good in question. In other words,
because in the provision of electricity for LTAR a benefit is conferred through the
respondent's purchases of electricity, it is unnecessary to demonstrate the amount
of the subsidy conferred was disproportionate to the consumption of electricity.

IDM at 20. In other words, because there is a one-to-one correlation between usage (*i.e.*,

consumption) of electricity and the amount of the subsidy conferred, all Commerce needed to do

was assess the relative usage per industry compared to the total amount consumed. That is precisely

what Commerce did, citing to the GOK's questionnaire response which demonstrates that the steel

making industry alone used [      ] percent of all industrial electricity consumed during the POR

and that the top-three industries used [      ] percent of all industrial electricity consumed during

the POR. *See* IDM at 19 (citing GOK IQR at 42-43). Since there are 19 industry grouping (*see*

IDM at 18), one could expect that each industry would consume 5.26% of industrial electricity.

Any more than the mean of 5.26% is disproportionate; therefore, the steel industry, both when

considered alone and when considered as part of the group of top-three industrial electricity users,

used disproportionate amount and received a disproportionate amount of the subsidy compared to

other industries. Given that [      ] percent of all industrial electricity is significantly greater than

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                    NON-CONFIDENTIAL VERSION

the mean of industrial electricity usage for three industries, Commerce's decision and path is reasonably discernable and supported by substantial evidence.

Hyundai Steel argues that "neither the steel industry nor the group of industries Commerce analyzed consume a disproportionately large percentage of electricity in the Korean market." Hyundai Steel Br. at 19. In other words, Hyundai Steel argues that no industry receives too much or too little of subsidized electricity benefits in the Korean economy. This is demonstrably false. The tenth largest industrial user of electricity in Korea consumed only [      ] percent of industrial electricity, compared to [      ] percent for the steel industry alone. GOK Questionnaire Response at 42-43. The other industries that are not in the top ten presumably consumed less than [      ] percent of the subsidized industrial electricity provided by the Korean government. *Id.* Comparing these figures to each other as well as to the 5.26% expected average if industrial electricity was consumed evenly among the 19 industries in Korea demonstrates that some producers consumed disproportionately less electricity and some, like steelmakers, consumed disproportionately more.[3] Since the amount of the subsidy is tied directly to usage, the amounts of the subsidies received among industries was likewise disproportionate.

### 4. The Court Should Reject Plaintiffs' Arguments Concerning the Disproportionality Standard

The Court should reject Plaintiffs' arguments that some other extra-statutory benchmark analysis is required and that semantic differences between the words "disparity" and

---

[3]     Defendant-Intervenor notes that there appears to be more than 19 industries in the Korean economy. Assuming that the information the GOK provided and certified to be accurate is true, then the eleventh through nineteenth largest users of industrial electricity should account for less than [      ] percent of industrial electricity usage, *i.e.,* the share of the tenth largest user. *See* GOK Questionnaire Response at 42-43. However, when dividing the remaining electricity consumption of [      ] percent by 9 industries not reported, and assuming those 9 industries consumed an equal amount of electricity, the share of the total subsidy received by those 9 industries would be [      ] percent. If 12 of the 19 Korean industries received between [      ] – [      ] percent of the amount of the benefit from subsidized electricity, and the steel industry received essentially [      ] as much, this too is clear evidence of disproportionate receipt of the amount of the subsidy. *Id.*

"disproportionate" preclude Commerce from making a disproportionality finding this case for purposes of determining *de facto* specificity. Neither argument is persuasive, and both run contrary to the statute, Commerce's regulations, the overwhelming weight of agency and court precedent, and common sense.

First, Plaintiffs argue that Commerce's disproportionality finding requires the agency to measure certain industries' use of electricity against something other than other industries' use of electricity. Hyundai Steel Br. at 17-18; GOK Br. at 5-7. But Plaintiffs are inventing a requirement where none exists. Rejecting Plaintiffs arguments along these lines in the underlying review, Commerce rightly explained in its final results that "{t}he statute does not require Commerce to compare those unique industries within the group to others and individual energy consumption or relative size." IDM at 20. To impose such a requirement would be to effectively require Commerce to conduct a second benchmark analysis in addition to the benchmark analysis that the agency already conducts when calculating a benefit. Essentially, Plaintiffs arguments would require Commerce to conduct an "in-country" and electricity-class specific benchmark analysis to determine whether the Korean steel industry received electricity subsidies at a greater rate than other active Korean industries consuming industrialized electricity. According to the Plaintiffs, this type of benchmark analysis would have to be done even if Commerce already found that no domestic (*i.e.*, tier-1) benchmark exists for the calculation of the benefit, as is the case here. Indeed, accepting Plaintiffs would unduly impose a preferential-rate test, which the Federal Circuit has already rejected for Commerce's benefit analysis, into the agency's disproportionality test for specificity. *See Nucor Corporation v. United States*, 927 F.3d 1243, 1251 (Fed. Cir. 2019). Plaintiffs cannot point to anywhere in the statute or Commerce's implementing regulations where such analysis is required when determining *de facto* specificity.

The incongruity caused by Plaintiffs' arguments is easily illustrated in the context of the provision of a "good" like steel for less than adequate renumeration. In that context, Commerce is still permitted to make a *de facto* specificity finding for enterprises or industries (or groups of enterprises or industries) that receive a disproportionate amount of the subsidy. But what would purchasers of government-subsidized glass "deserve" to receive? How much is "too much"? No such benchmark requirement exists in the statute because no such benchmark exists in practice. Commerce can and would assess whether a company receives a disproportionate amount of the subsidy based on the relative shares of the subsidy received by the enterprises and/or industries.

Second, Plaintiffs selectively quote *AK Steel* – claiming that the Federal Circuit rejected an argument that Commerce should determine disproportionality "by looking at the percentage of the total benefit of a subsidy program accruing to a particular company or industry" because that would lead to an "untenable result wherein a 'large company might be disproportionate merely because of the size of the company.'" GOK Br. at 6-7 (internal citations omitted). These selective quotes are misleading. As the Federal Circuit explained in *Royal Thai Government v. U.S.,*

> In AK Steel, this court recognized that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules." *Id.* In particular, this court found that Commerce did not err by comparing relative percentage benefits rather than absolute benefits, as requiring a comparison of absolute benefits "could produce an untenable result, *i.e.*, that a benefit conferred on a large company might be disproportionate merely because of the size of the company." *Id.* Thus, this court determined that Commerce had properly exercised the latitude afforded it in determining the appropriate method by which to determine the specificity of benefits conferred by subsidies. Of course, that latitude does not excuse Commerce from choosing a reasonable method for determining the specificity of benefits. Indeed, Commerce itself has recognized that "the analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program should normally focus on the level of benefits provided," even if sometimes "it may be impracticable or impossible to determine the relative level of benefits." Countervailing Duties: Final Rule, 63 Fed.Reg. 65,348, 65,359 (Nov. 25, 1998).

*Royal Thai Government v. United States.*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (emphasis added). Indeed, in *AK Steel,* what the Federal Circuit actually rejected was the argument that "when analyzing disproportionality, Commerce must compare the industry's benefit to some reasonable benchmark of a non-specific distribution of government benefits, *e.g.*, comparing an industry's share of benefits to its contribution to the gross domestic product (GDP) of the economy as a whole." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed. Cir. 1999).[4] Instead, the Federal Circuit emphasized that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case," and that "the specificity test cannot be reduced to a precise mathematical formula. Instead, the Department must exercise judgment and balance various factors in analyzing the facts of a particular case." *AK Steel Corp.*, 192 F.3d at 1385 (internal quotation marks omitted) (internal citation omitted).

In this case, Commerce "focused on the level of benefits provided." Since there is a one-to-one correlation between electricity usage and the amount of the subsidy received, it was "impracticable or impossible to determine the relative level of benefits," *i.e.*, to "compare the industry's benefit to some reasonable benchmark of a non-specific distribution of government benefits," but the agency was not required to do so. Instead, Commerce assessed the "relative percentage benefit" of the steelmaking industry as part of a permissible group of industries. The Federal Circuit sustained Commerce's analysis pursuant to this practice in *AK Steel*, and this Court should sustain the agency's analysis pursuant to this same practice in this case.

---

[4]    In *AK Steel*, the domestic producers were calling for this additional benchmark analysis, which the Federal Circuit rejected as unnecessary. The Court found that Commerce's methodology of relying on the relative percentage benefit to find no disproportionality was reasonable.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                         NON-CONFIDENTIAL VERSION

By way of simple analogy, a soccer team has eleven players on the field, which includes a goalie. An additional 15 players are on the bench and can be substituted into the game. The ten starting field players have positions in a formation, *e.g.*, there are often four defensive players, three midfield players, and three offensive players. The players' positions roughly predict – but do not prescribe – their behavior during the game, as there is no rule distinguishing between the permissible activities (*i.e.*, defending, scoring, etc.) of players in a given position. Within that context, imagine the coach institutes a program whereby each player receives $100 for every goal they score. If 100 total goals are scored during the season, it would come as little surprise if the three starting offensive players scored the predominant share of the goals. and therefore, received the predominant amount of the total $10,000 disbursement even though any player (including a substitute) was permitted to score. While the three starting midfield players, who typically play both offense and defense, may not score a predominant share of the goals, they may still receive a disproportionate amount of the $10,000 if they scored a significant numbers of goals compared to twenty three other players. These are the players who predictably – though not prescriptively – received a disproportionate amount of the subsidy in comparison to the amount received by the other players.

This setup is analogous to the GOK's provision of industrial electricity in Korea. Just three industries are predictably – but not prescriptively – accounting for [           ] of all industrial electricity usage, and the drop off from the [                              ]. Grouping the [                              ] is not arbitrary since they are receiving a disproportionate amount of the GOK's provision of electricity for LTAR.

Third, relying on *Bethlehem Steel,* Plaintiffs seek to draw a semantic distinction between "disparate" and "disproportionate," arguing that steelmaker's relative share of industrial electricity

21

(or even the top three users of industrial electricity combined) is only the former and not the latter. *See* GOK Br. at 5-6. Tellingly, to make this distinction, the Plaintiffs use Mirriam-Webster to define "disparate" but switch dictionaries to define "disproportionate." While Mirriam-Webster defines "disproportionate" simply as "being out of proportion," the dictionary also defines "disproportion," *i.e.*, the nominalization of the adjective form, as "lack of proportion, symmetry, or proper relation; also, an instance of such <u>disparity</u>." *See Disproportionate and Disproportion Definitions,* Mirriam-Webster Dictionary, https://www.merriam-webster.com/dictionary (emphasis added). The use of the word "disparity" to define "disproportion" illustrates that Plaintiffs' argument here is a mere distinction without a difference. The fact remains that the statute itself does not define "disproportionately" and certainly does not require a separate and second benchmark analysis for a finding of disproportionality in the context of a LTAR subsidy. Furthermore, as described further below, the agency's regulations as well as decades of precedent confirm that Commerce reasonably applied the disproportionality standard when determining that electricity for LTAR is *de facto* specific.

> **5.    The Provision of Electricity is Not General Infrastructure As Demonstrated By Decades of Agency and Court Precedent**

Plaintiffs also argue that "{t}he GOK's provision of electricity is exactly the type of widely used public program that is not intended to be countervailed. . . ." Hyundai Steel Br. at 13. Relying on the SAA and this court's 1983 decision in *Carlisle Tire & Rubber Co. v. United States,* Plaintiffs seek to characterize the provision of electricity as general infrastructure akin to a public highway or bridge, which cannot be countervailed pursuant to Commerce's regulations under 19 CFR § 351.511(d). *Carlisle Tire & Rubber Co. v. United States* 5 CIT 229, 564 F. Supp. 834 (1983).

Plaintiffs' attempt to drive a truck through the narrow exception for general infrastructure in unavailing. Commerce's regulations define "general infrastructure" as "infrastructure that is

created for the broad societal welfare of a country, region, state or municipality." *Id.* The provision

of electricity does not fall within this category, and the court has already dealt with this exact

question. In *Royal Thai Government v. U.S.* this court found that the governmental provision of

electricity is not general infrastructure noting that

> {t}he alleged infrastructure at issue here was the electricity itself and "not the physical plant associated with the generation, transmission and distribution of the electricity." This is an important distinction. <u>Commerce generally views electricity facilities—but not their issue—as constituting general infrastructure</u>. *See Bethlehem Steel Corp. v. United States*, 26 CIT 1003, 1011, 223 F.Supp.2d 1372, 1379 (2002) (upholding Commerce's finding of no financial contribution from electricity facilities constituting general infrastructure). This is because an electric power facility or distribution grid is used repeatedly by the entire consuming public; in contrast, once used by a single consumer, a kilowatt of electricity is gone forever.

*Royal Thai Government v. United States*, 30 C.I.T. 1072, 1077, 441 F.Supp.2d 1350, 1356–

57, (2006) (internal citations omitted).

In addition to the repeated-use distinction between public infrastructure like highways and

bridges and the provision of electricity, the two categories are logically dissimilar in that use of

public infrastructure like highways and bridges is free, which presents unique challenges for

determining the relative benefit received by users of public infrastructure. By contrast, electricity

is sold, albeit at subsidized rates, and it is relatively easy to determine who is enjoying a

predominant or disproportionate share of subsidized electricity since the use of electricity is

tracked on an enterprise and industry level. In that way, electricity in Korea is more akin to a non-

public road, like a subsidized toll road, where a benefit is both conferred and calculable.

The evolution of the general infrastructure exception further illustrates that the provision

of electricity is <u>not</u> "exactly the type of widely used public program that is not intended to be

countervailed" as Plaintiffs claim. *Trade Agreements Act of 1979* (Pub. L. 96-39, § 771(5), 93 Stat.

144) first distinguished between broadly available and specific programs. The legislative history

noted that "{t}he Committee does not intend that general infrastructure programs, such as provisions of roads, bridges, and ports, be considered subsidies for purposes of countervailing duties." S. Rep. No. 96-249, at 85–86 (1979). In 1983, this court decided in *Carlisle Tire & Rubber Co. v. United States,* that to countervail "such things as public highways and bridges as well as a tax credit for expenditures on capital investment even if available to all industries and sectors" would lead to absurd results. *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 564 F. Supp. 834 (1983). The SAA accompanying the 1994 Uruguay Round Agreements Act (URAA) quoted this language from *Carlisle.* In 1998, Commerce amended its regulations, added a definition of "general infrastructure" and explained in the Preamble that "{t}he Department will not countervail the provision of general infrastructure—roads, bridges, and similar facilities that benefit society as a whole." *Countervailing Duties,* 63 Fed. Reg. 65,348, 65,372 (Dep't Commerce Nov. 25, 1998) (final rule). The archetype for the general infrastructure exception has therefore always been roads, bridges, and other capital expenditures / public infrastructure. At no point in the forty-five year history of this provision and its predecessors has the provision been understood to preclude countervailing a government's provision of electricity for less than adequate renumeration. And for the reasons discussed above, the court should not now permit the Plaintiffs to massively expand the scope of what was meant to be a narrow exception.

Furthermore, as noted above, decades of agency and court precedent confirm that the general infrastructure exception does not apply to the provision of electricity. Commerce has found that the provision of electricity for LTAR, as well as other energy inputs, to be countervailable, and thus specific, in numerous cases, including proceedings involving Korea. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) (final results of countervailing duty admin.

rev.; 2021) at cmt. 4; Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 4; Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 89 Fed. Reg. 6,500 (Dep't Commerce Feb. 1, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 1; Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 1; Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe from the Republic of Korea*, 88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 2. Commerce has also found the provision of electricity for LTAR to be specific in proceedings involving other countries. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Steel Nails from Thailand*, 87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022) (final deter. of countervailing duty inv.) at cmt. 2; Issues and Decision Memorandum accompanying *Certain Aluminum Foil from the Sultanate of Oman*, 86 Fed. Reg. 52,888 (Dep't Commerce Sep. 23, 2021) (final deter. of countervailing duty inv.) at cmt. 4; Issues and Decision Memorandum accompanying *Multilayered Wood Flooring from the People's Republic of China*, 79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014) (final deter. of countervailing duty admin. rev.) at cmt. 3.

Furthermore, the courts have sustained Commerce's findings that electricity and other energy inputs have been found to be specific. *See, e.g.*, *Canadian Solar Inc. v. United States*, Consol. Ct. No. 19-00178, Slip Op. 22-49, at 5 (Ct. Int'l Trade May 19, 2022) (upholding Commerce's finding that the subsidization of electricity for LTAR from the Government of China was specific);

*Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1287, 1303 (Ct. Int'l Trade 2020) (sustaining Commerce's finding that the provision of electricity for LTAR is a specific subsidy); *Mosaic Co. v. United States*, 589 F.Supp.3d 1298, 1309 (Ct. Int'l Trade 2022) (finding that substantial evidence supports Commerce's determination that the provision of natural gas was *de facto* specific).

In each and every one of these cases, Commerce and this Court implicitly affirmed that the provision of electricity and other energy inputs did not meet the definition of general infrastructure because, if they did, they would not have been countervailable. In short, this is settled law and need not be revisited.

Thus, the Court should sustain Commerce's final results determining that the GOK's provision of electricity for LTAR to the "group of . . . industries" for which Hyundai Steel belongs is *de facto* specific. 19 U.S.C. § 1677(5A)(D).

### B. The GOK's Provision of Electricity for LTAR Confers a Benefit

Commerce properly found that the provision of electricity for LTAR confers a benefit. Plaintiffs argue that the Department erred in determining that the GOK's provision of electricity during the POR was for LTAR and conferred a benefit to Hyundai. Specifically, Plaintiffs argue that "establishing a specific required rate of return to consider whether a pricing mechanism is in accordance with market principles is not reasonable when it comes to assessing cost recovery in a regulated utility market." DSM Br. at 13. Further, the Plaintiffs argue that failure to recover cost in any given year "should not indicate that the prices are out of line with market principles." DSM Br. at 11. The Plaintiffs also argue that the Department did not adequately consider the cost pass-through tariff system that KEPCO introduced in 2021. Hyundai Steel Br. at 22-26; GOK Br. at 16-18. The Plaintiffs' arguments have no basis in law, are undermined by the record, and should be

rejected. The court should sustain Commerce's finding that the provision of electricity was for LTAR and thus conferred a benefit during the POR.

### 1.    The Department Now has an Established Practice That the GOK Has Defended and the Court of International Trade Sustained

Commerce now has an established practice with respect to the provision of electricity for LTAR under its "tier three" benchmark rule. The tier three rule provides that, when neither domestic market prices nor world market prices are available for use as a benchmark, the Department will "measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).

In numerous recent proceedings, including the two administrative reviews of this countervailing duty order prior to the review on appeal here, Commerce has determined whether electricity prices are consistent with market principles based on the government supplier's cost recovery rates on sales to all similarly situated industrial electricity consumers. *See* Issues and Decision Memorandum accompanying *Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea*, 88 Fed. Reg. 61,509 (Dep't Commerce Sep. 7, 2023) (final results and rescission, in part, of countervailing duty admin. rev.; 2021) at cmt. 2 ("CTL Plate Korea 2021 IDM"); Issues and Decision Memorandum accompanying *Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea*, 87 Fed. Reg. 53,728 (Dep't Commerce Sep. 1, 2022) (final results, and rescission, in part, of countervailing duty admin. rev.; 2020) at cmt. 4 ("CTL Plate Korea 2020 IDM"); Issues and Decision Memorandum accompanying *Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea*, 87 Fed. Reg. 79 (Dep't Commerce Jan. 3, 2022) (final results of countervailing duty admin. rev.; 2019) at cmt. 3 ("CTL Plate Korea 2019 IDM"); see also Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13,

2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 1 ("CTL Carbon and Alloy Plate Korea 2021 IDM"); Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 87 Fed. Reg. 74,597 (Dep't Commerce Dec. 6, 2022) (final results of countervailing duty admin. rev.; 2020) at cmt. 1 ("CTL Carbon and Alloy Plate Korea 2020 IDM"); Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 87 Fed. Reg. 6,842 (Dep't Commerce Feb. 7, 2022) (final results and partial rescission of countervailing duty admin. rev.; 2019) at cmt. 1 ("CTL Carbon and Alloy Plate Korea 2019 IDM").

Commerce has explained that this well-established "tier-three methodology" determines "whether the electricity prices charged by KEPCO are consistent with market principles by evaluating the electricity prices to see if they allow for the recovery of costs, plus a rate of {return} or profit." *See, e.g.*, CTL Carbon and Alloy Plate Korea 2020 IDM at cmt. 1. For those prices that did not satisfy this cost-plus-profit standard, Commerce "determined a percentage amount that would enable cost recovery and a rate of return" and used that value to calculate a benchmark price that reflects adequate remuneration. *See id*. Using this methodology, the Department has consistently found that KEPCO's prices conferred a benefit to the respondents, but in reviews prior to *CTL Plate Korea 2021*, the amount was non-measurable and thus zero pursuant to Department practice. CTL Carbon and Alloy Plate Korea 2020 IDM at cmt. 1; CTL Carbon and Alloy Plate Korea 2019 IDM at cmt. 1. The Korean government has defended this methodology, and both the Court and the CAFC have sustained it on appeal. *See, e.g.*, CTL Carbon and Alloy Plate Korea 2020 IDM at 16-20; *Nucor Corp. v. United States*, 633 F.Supp.3d 1302 (Ct. Int'l Trade 2023); *Nucor Corp. v. United States*, 633 F.Supp.3d 1216 (Ct. Int'l Trade 2023); Opinion, *POSCO v. United States*, No. 22-1525 (Fed. Circ. Oct. 23, 2023). Commerce applied the same well-

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00190                                            NON-CONFIDENTIAL VERSION

established methodology in the underlying review; the only distinction is that for this POR as was

the case in the most recent prior review, the result is a measurable benefit to Hyundai and DSM.

### 2.    There Is No Justification for Departing from the "Well-Established Methodology"

The Plaintiffs have failed to articulate any sound basis for departing from the established

methodology in this review. Plaintiffs suggest that as long as KEPCO's tariff rates are structured

to yield profits to KEPCO over time, "a single year's loss should not automatically indicate that

the price is not in line with market principles." DSM Br. at 11. But as the GOK's questionnaire

responses in the underlying review make clear, KEPCO's [

      ]. GOK Case Br. at 9. To the contrary, it is [

                              ], which [

                         ]. *Id.* at 11. Because of [                              ],

when energy market costs increase, KEPCO (*i.e.*, the Korean government) absorbs losses on behalf

of its energy intensive industries, [

      ]

During periods of elevated energy costs, the government's willingness to absorb losses

associated with market fluctuations is an enormous benefit for producers in highly competitive,

energy-intensive, and price-sensitive industries like steel. Commerce has previously treated similar

static or fixed-rate pricing structures as evidence of inconsistency with market principles. Issues

and Decision Memorandum accompanying *Certain Polyethylene Terephthalate Resin from the*

*Sultanate of Oman*, 81 Fed. Reg. 13,321 (Dep't Commerce Mar. 14, 2016) (final neg.

countervailing duty deter.) at cmt. 9. The Department's practice also recognizes that benefit

amounts may change from period to period. In the case of an adequate remuneration analysis,

changes in the benefit amount are determined with reference to market values for the input under

consideration – in this case as represented by the government supplier's cost of supply. The notion that the Department should disregard POR fluctuations in market values anytime they result in a measurable benefit is thus nonsensical. The results of any changes in KEPCO's prices in subsequent PORs are an issue for Commerce to consider in its administrative reviews for the periods in which those changes went into effect and the results are evident.

### 3.    Commerce Properly Included KEPCO'S Fuel Costs When Calculating KEPCO's COST Recovery Rate

The Plaintiffs argue that the Commerce should have excluded "the effects from the Korean Electric Power Corporation's ("KEPCO") cost pass-through tariff system in 2021, the year prior to the POR, in calculating the price of electricity that would have been sufficient for KEPCO to recover its costs and a rate of return." GOK Br. at 1. The Plaintiffs claim that these fuel costs were part of KEPCO's 2021 operating costs and were already included in the calculation of KEPCO's 2021 cost recovery rates. Hyundai Steel Br. at 24. Commerce has consistently rejected similar arguments in other cases involving KEPCO's fuel costs including administrative reviews prior to the review at issue here. *See* Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 1; Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel products From the Republic of Korea,* 89 Fed. Reg. 6,501 (Dep't Commerce Feb. 1, 2024) (final results and partial rescission of countervailing duty admin. rev.; 2021) at cmt. 1(c); *see also* Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 5. The fuel cost adjustment charge is not a new or additional charge but was included in the electricity tariff in the past and was "part of a new cost pass-through tariff system

to reinforce the correlation between the costs we incur and the tariff we charge to our customers"

as a way "to enhance transparency." *See* GOK IQR at Exhibit E-1 (Part I, p. 5). In other words,

Commerce's methodology has consistently accounted for this electricity price component when

applying the benchmark value to the energy charge. There is no more basis for removing it from

the benefit calculation than there would be for removing the energy charge itself simply because

it is a price paid rather than a discount bestowed.

 For the reasons above, the court should sustain Commerce's benefit calculation as

supported by substantial evidence and otherwise in accordance with law.

  **C.** **Commerce Relied on the Correct Dataset When Evaluating Electricity for LTAR**

 Plaintiffs argue that Commerce used the wrong dataset when assessing industrial electricity

consumption. Hyundai Br. at 19-22; GOK Br. at 14-16. Nucor agrees with and adopts by reference

the Defendant's arguments concerning Commerce's reasonable use of the dataset it chose which

was "directly respons{ive} to {Commerce's} data request and reflects the ten largest industries'

consumption as a proportion of the total amount of electricity consumed in Korea and within the

industrial classification." IDM at 22. Commerce reasonably relied on this dataset finding it

superior to the revised dataset which was unsolicited, lacked supporting documentation, and was

reported at a "lower level of industrial classification analysis, and thus, not usable data." *Id. See*

*also* Defendant Br. at 20. Commerce acted within its discretion in choosing this dataset. *See*

*Tehnoimportexport, UCF. Am. Inc. v. United States,* 716 CIT at 17. And there is no record evidence

supporting Plaintiffs' claim that the revised dataset is superior in any way – let alone so superior

as to override Commerce's discretion. Furthermore, as the Defendant notes in its Response Brief,

the GOK's revised data "appears to conflict with other record evidence," and the GOK provided

no new evidence to support its revised dataset or to demonstrate that the original dataset was

inaccurate and/or inadequate. Accordingly, the court should sustain Commerce's use the original dataset.

Respectfully submitted,

*/s/ Derick G. Holt*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Corporation*

Dated: October 23, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Nucor Corporation's Response to Motions for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 10,854 words.

*/s/ Derick G. Holt*
(Signature of Attorney)

Derick G. Holt
(Name of Attorney)

Nucor Corporation
(Representative Of)

October 23, 2025
(Date)