## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | |
| Plaintiff, | |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | **NON-CONFIDENTIAL** <br> Proprietary Information Removed from Pages 10, 11, 12, and 18 |
| and | |
| DONGKUK STEEL MILL CO., LTD., | Consol. Ct. No. 24-00190 |
| Plaintiff-Intervenors | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

## PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

November 20, 2025

## TABLE OF CONTENTS

I.    ARGUMENT ................................................................................................. 2

    A.    Commerce's Determination That The Electricity for LTAR Program Is De Facto Specific Is Unsupported By Substantial Evidence And Is Otherwise Unlawful .... 2

        1.    Commerce's Random Grouping of the Top Three Consumers of Industrial Electricity Is Unsupported by Substantial Evidence and is Otherwise Not in Accordance with Law ................................................................................. 3

        2.    Commerce's Disproportionate Usage Finding Is Unsupported by Substantial Evidence and is Otherwise Not In Accordance With Law ..... 6

    B.    Commerce's Use of the Original Electricity Consumption Data Is Not Supported By Substantial Evidence and is Otherwise Not in Accordance with Law. ........... 14

    C.    Commerce's Calculation of the Benefit from the Electricity for LTAR Program Overstates the Benefit by Including Certain Pass-Through Amounts in its Cost Recovery Analysis that Had Already Been Included in the Prior Review's Costs. .................................................................................................................... 16

II.    CONCLUSION ........................................................................................... 21

Certificate Of Compliance ........................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)............................................................................12, 14

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    102 F.4th 1252 (Fed. Cir. 2023) ........................................................................9

*Bethlehem Steel Corp. v. United States*,
    140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ....................................................6, 7, 8

*Canadian Solar Inc. v. United States,*
    537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ....................................................19

*Changzhou Trina Solar Energy Co. v. United States*,
    352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ....................................................5, 6

*Hyundai Steel Co. v. United States*,
    745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ................................................ *passim*

*Hyundai Steel v. United States*,
    Ct. No. 23-00211, 2025 WL 2400442 (Ct. Int'l Trade Aug. 12, 2025)......................... *passim*

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................................9, 10

*Mosaic Co. v. United States*,
    2025 WL 974056 (Ct. Int'l Trade Apr. 1, 2025) ................................................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................4

*Oman Fasteners LLC v. United States*,
    125 F.4th 1068 (Fed. Cir. 2025) ........................................................................4

*POSCO v. United States*,
    No. 24-cv-00006-JSR, 2025 WL 2269772 (Ct. Int'l Trade Aug. 8, 2025)..................... *passim*

*Royal Thai Government v. United States*,
    436 F.3d 1330 (Fed. Cir. 2006)............................................................................12

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)............................................................................10, 12

*Uttam Galva Steel Ltd. v. United States*,
374 F. Supp. 3d 1360 (Ct. Int'l Trade 2019) ..........................................................19

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*,
256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017) ..........................................................19

**Statutes**

19 U.S.C. § 1677(5)(E) ...........................................................................................16, 18

19 U.S.C. § 1677(5A)(D).......................................................................................... *passim*

19 U.S.C. § 1677m(d) ....................................................................................................15

**Regulations**

19 C.F.R. § 351.301(c)(1) ..............................................................................................15

19 C.F.R. § 351.302(d)(1)(ii)........................................................................................15

19 C.F.R. § 351.502(b) ........................................................................................3, 4, 5, 6

**Other Authorities**

*Brass Rod From the Republic of Korea: Final Affirmative Determination of Sales
at Less Than Fair Value*, 89 Fed. Reg. 29,298 (Dep't Commerce Apr. 22,
2024) ....................................................................................................................8

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:
Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed.
Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ...............................................19, 20

*Certain Corrosion Resistant Steel Products from the Republic of Korea: Final
Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg.
6,501 (Dep't Commerce Feb. 1, 2024) ................................................................20

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results
of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,380
(Dep't Commerce May 13, 2024).........................................................................20

*Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea:
Final Results and Rescission, in Part, of Countervailing Duty Administrative
Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023)...................19

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:
Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed.
Reg. 73,626 (Dep't Commerce Sept. 11, 2024)............................................. *passim*

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) .......................4, 5

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.
No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 ............................................................11

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | |
| Plaintiff, | |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | **NON-CONFIDENTIAL** Proprietary Information Removed from Pages 10, 11, 12, and 18 |
| and | |
| DONGKUK STEEL MILL CO., LTD., | Consol. Ct. No. 24-00190 |
| Plaintiff-Intervenors | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

**PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with U.S. Court of International Trade ("USCIT") Rule 56.2, Plaintiff Hyundai Steel Company ("Hyundai Steel") hereby replies to the briefs filed by Defendant, the United States, and Defendant-Intervenor, Nucor Corporation ("Petitioner" or "Defendant-Intervenor"). Defendant's Response Brief, *Hyundai Steel Co. v. United States*, No. 24-00190 (Ct. Int'l Trade October 1, 2025), ECF No. 43 ("Def. Br."); Defendant-Intervenor's Response Brief, *Hyundai Steel Co., v. United States*, No. 24-00190 (Ct. Int'l Trade October 23, 2025), ECF

1

No. 46 ("Pet'r Br."). For the following reasons, Defendant's and Defendant-Intervenor's arguments are without merit and should be rejected.

I.     **ARGUMENT**

    A.     *Commerce's Determination That The Electricity for LTAR Program Is De Facto Specific Is Unsupported By Substantial Evidence And Is Otherwise Unlawful*

In the *Final Results*, the U.S. Department of Commerce ("Commerce") found that the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III), which provides that a domestic subsidy is *de facto* specific if "{a}n enterprise or industry receives a disproportionately large amount of the subsidy." *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) ("*Final Results*"), PR 325,[1] and accompanying Decision Mem. ("Final Decision Mem."), PR 319. As support, Commerce relied upon electricity consumption data submitted by the GOK that it claimed showed "the steel industry and two other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported." Final Decision Mem. at 19; *see also* Mem. from Kristen Johnson, International Trade Compliance Analyst, Dep't Commerce, to The File, "Final Specificity Analysis of Industrial Electricity Consumption" (Sept. 5, 2024), CR 378-79, PR 320.

Hyundai Steel argued in its Rule 56.2 brief that Commerce's determination is unsupported by substantial evidence and is otherwise not in accordance with law. *See* Hyundai Steel's Rule 56.2 Brief at 14, *Hyundai Steel v. United States*, No. 24-00190 (Ct. Int'l Trade April

---

[1] The administrative record is contained in a confidential record ("CR") and a public record ("PR"). Administrative Record Index, ECF No. 25-1.

25, 2025), ECF No. 31 ("Hyundai Br."). Specifically, Hyundai Steel argued that Commerce

erred by simply aggregating the total electricity consumption of the top three largest industries

and comparing that consumption to a group of the next seven smaller users to support the

conclusion that this group of three including the steel industry consumed a disproportionately

large amount of electricity in Korea. Hyundai Steel argued that this analysis failed to give

meaning to the statutory term "disproportionate" because it did not explain how this random

grouping of the top three industries consumption was out of proportion in comparison to the

group of the next seven smaller industries. This comparison just makes the obvious point that

the largest consumers consume more industrial electricity than the smaller consumers. Hyundai

Steel also argued that it was arbitrary and capricious for Commerce not to explain why it lumped

together the top three industries in making its specificity determination.

        1.     *Commerce's Random Grouping of the Top Three Consumers of Industrial Electricity Is Unsupported by Substantial Evidence and Is Otherwise Not in Accordance with Law*

As discussed, Hyundai Steel argued that Commerce's *de facto* specificity determination

was arbitrary and capricious because Commerce randomly grouped together the three largest

industries to support its conclusion that this group, including the steel industry, received a

disproportionate amount of the alleged electricity for LTAR subsidy. *See* Hyundai Br. at 16-18.

Defendant argues in response that Commerce's grouping was reasonable because the statute

permits Commerce to group enterprises or industries together and its regulations do not require

grouped recipients to share "similar characteristics." Def. Br. at 14-15 (citing 19 U.S.C.

§ 1677(5A(D) and 19 C.F.R. § 351.502(b)). Defendant's arguments are misplaced.

While the statute may provide that Commerce can group industries or enterprises

together, that grouping must still be reasonable and Commerce must describe the basis for the

grouping. As the court explained in *Hyundai Steel I*, "{e}ven where an agency has discretion to

act it must act reasonably and explain itself." *Hyundai Steel v. United States*, 745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024) ("*Hyundai Steel I*") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 48 (1983)). The court went on to hold that "{w}here a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping." *Hyundai Steel I*, 745 F. Supp. 3d at 1353; *Hyundai Steel v. United States*, Ct. No. 23-cv-00211-CRK, 2025 WL 2400442 at *7 (Ct. Int'l Trade Aug. 12, 2025) ("*Hyundai Steel II*"). The same conclusion was reached in *POSCO* where the court held that "Commerce cannot use its discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice." *POSCO v. United States*, No. 24-cv-00006-JSR, 2025 WL 2269772 at *6 (Ct. Int'l Trade Aug. 8, 2025) (citing *Oman Fasteners LLC v. United States*, 125 F.4th 1068, 1086-87 (Fed. Cir. 2025)).

Defendant seeks to characterize Hyundai Steel as arguing that Commerce must show "shared characteristics' among the group, but that is not what Hyundai Steel argued. *See* Def. Br. at 15 (citing 19 C.F.R. § 351.502(b)). Hyundai Steel never used the words "shared characteristics" and the thrust of its argument was that Commerce never explained the basis for its grouping that appeared to be arbitrary and results-oriented, as it just grouped the largest three industries together to show this group consumed a large percentage of industrial electricity. *See* Hyundai Br. at 16-17. Moreover, 19 C.F.R. § 351.502(b) does not insulate Commerce from having to provide a reasonable explanation for its grouping in this case that involves a widely available program like electricity. As the court noted in the *Hyundai Steel I* decision, the *CVD Preamble* explained that 19 C.F.R. § 351.502(b) obviates the need for Commerce to determine whether there are shared characteristics among the enterprises or industries grouped together for

4

the specificity analysis "only when the subsidies are not widely available." *Hyundai Steel I*, 745

F. Supp. 3d at 1353 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,357 (Dep't

Commerce Nov. 25, 1998) ("*CVD Preamble*")).  This is not the case here because electricity is

widely available and used in Korea and the same standard pricing is available to all industrial

consumers of electricity.  *See* Final Decision Mem. at 18 (acknowledging that "consumers of

industrial class electricity in Korea are not limited in number"); Letter from Yoon & Yang LLC

to Sec'y Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel

Plate from the Republic of Korea: Response to the Initial Questionnaire" at Ex. E-10 (Aug. 11,

2023), CR 105-142, PR 104-125 (showing that electricity prices were based on standard pricing)

("GOK IQR").  Defendant's reliance on 19 C.F.R. § 351.502(b) to defend Commerce's random

grouping of the top three industries is thus off the mark.  *See* Def. Br. at 14-15.

 Defendant also cites *Changzhou Trina Solar* as support for its random grouping of

industries used in its disproportionality analysis.  *See* Def. Br. at 14-15 (citing *Changzhou Trina*

*Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1352 (Ct. Int'l Trade 2016)).  However,

that case is inapposite.  As Defendant acknowledges, that case dealt with another *de facto*

specificity provision of the statute, 19 U.S.C. § 1677(5A)(D)(iii)(I), that relates to whether the

subsidy recipients are limited in number.  *See* Def. Br. at 14, n. 4.  In that case the plaintiff was

arguing that the wide variety of sectors that used the subsidy program undermined any finding of

specificity.  *Changzhou Trina Solar*, 195 F. Supp. 3d at 1352.  The court rejected that argument

because "{r}egardless of the variety of recipient industries,… when those recipient industries are

'limited in number,' specificity is established."  *Id.*  Here, not only is the *de facto* specificity

determination under a different statutory provision than in *Changzhou Trina Solar*, the argument

addressed by the court was completely different.  In its challenge to the grouping of the top three

5

industries, Hyundai Steel is not arguing that the variety of industries or enterprises undercuts the disproportionality finding. Instead, Hyundai Steel is arguing that Commerce has not provided a rational explanation for why it grouped the largest three industries together for purposes of its disproportionality analysis. Finally, the program at issue in *Changzhou Trina Solar* was the provision of aluminum extrusions for LTAR and thus was *not* a widely available or used program like the electricity for LTAR program at issue here. As discussed above, the Court already addressed the non-applicability of 19 C.F.R. § 351.502(b) here because of the widely available nature of electricity in Korea.

2.     *Commerce's Disproportionate Usage Finding Is Unsupported by Substantial Evidence and Is Otherwise Not in Accordance with Law*

Hyundai Steel argued in its opening brief that Commerce's disproportionality determination is unlawful because that analysis does not show disproportionate usage but instead just shows disparity between the largest and smaller consumers of industrial electricity. *See* Hyundai Br. at 11-16. Defendant and Defendant-Intervenor make several responsive arguments, none of which are persuasive.

Defendant devotes several pages to distinguishing the court's decision in *Bethlehem Steel* and citing to other decisions that it claims support the disproportionality determination. Def. Br. at 16-20 (citing *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001)). Although Hyundai Steel believes that *Bethlehem Steel* is on point and supports its arguments, it also cited to the court's decision in *Hyundai Steel I*, which is directly on point as it deals with the exact same electricity for LTAR program. Defendant relegates the court's directly applicable decision to a footnote where the case is acknowledged but no attempt is made to distinguish it. Defendant similarly acknowledges the court's subsequent decision in *Hyundai Steel II* where it found that Commerce's remand determination was still unlawful. *Hyundai Steel*

6

*II,* 2025 WL 2400442.  Defendant also fails to acknowledge the *POSCO* decision where the

court also found Commerce's *de facto* specificity determination for the same electricity for

LTAR program to be unlawful.  *POSCO,* 2025 WL 2269772.  Defendant-Intervenor completely

ignores this entire line of directly applicable cases.

Nevertheless, Defendant and Defendant-Intervenor's attempt to distinguish *Bethlehem*

*Steel* is unpersuasive.  *See* Def. Br. at 16-20; Pet'r Br. at 10-12.  The distinguishing factor,

according to Defendant, is "the differing nature of the program."  Def. Br. at 17.  This is a

distinction without a difference.  In *Bethlehem Steel*, the program involved electricity discounts

for companies that agreed to lower their electricity usage during certain designated times of high

electricity demand.  *Bethlehem Steel,* 140 F. Supp. 2d at 1367.  In the instant case, the program

involves the provision of electricity for LTAR.  But this difference in the nature of the program

does not render *Bethlehem Steel* inapposite.  That case stands for the proposition that disparity in

the amount of benefits received based on usage levels alone is not a sufficient basis to find that a

subsidy is *de facto* specific based on disproportionate receipt of the subsidy.  That aspect of the

holding is not contingent upon the nature of the program; it applies for any program where

benefits are based on usage levels.  Here, the amount of the benefit from the electricity for LTAR

program is tied to usage, just as the benefit from the electricity discount program at issue in

*Bethlehem Steel* was tied to usage.  Commerce calculated a percentage adjustment to increase the

per-unit price of electricity to determine the benefit.  *See* Mem. from Kristen Johnson,

International Trade Compliance Analyst, Dep't Commerce, to the File, "Administrative Review

of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the

Republic of Korea; 2022: Preliminary Calculations for Hyundai Steel Company" (Feb. 28,

2024), CR 320-21, PR 246 ("Preliminary Calculations Mem.") *unchanged in* Mem. from Kristen

Johnson, International Trade Compliance Analyst, Dep't Commerce, to The File, "Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Final Calculations for Hyundai Steel Company" (Sept. 5, 2024), PR 321 ("Final Calculations Mem."). So, the more units of electricity a party consumes, the higher the benefit. The benefit is therefore tied to usage, just as in *Bethlehem Steel*, where a larger company with high usage would receive a larger benefit as the program links the benefit to reduction in usage levels.

Defendant also seeks to distinguish *Bethlehem Steel* by citing to the court's decision in *Mosaic Co. v. United States*.[2] Def. Br. at 18-19. However, Defendant's reliance on *Mosaic* is misplaced because the *de facto* specificity determination in that case was limited to "predominant use" under 19 U.S.C. § 1677(5A)(D)(iii)(II), not disproportionality under 19 U.S.C. § 1677(5A)(D)(iii)(III). *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1309-10 (Ct. Int'l Trade 2022).[3] To the extent the court in *Mosaic* distinguished *Bethlehem Steel*, it was the predominant use determination and not the disproportionate specificity determination. *Id.* at 1310. While the court relied on differences in the nature of the programs, it did not expound on why this was a distinguishing factor for the predominate use specificity finding. *Id.* The case has little relevance here.

In response to Hyundai Steel's argument that the term "disproportionate" requires Commerce to consider whether the benefit received is out of proportion to what would otherwise

---

[2] Defendant also cites to *Brass Rod from Korea* as a case where Commerce distinguished the reasoning in *Bethlehem Steel*. *See* Def. Br. at 18-19 (citing *Brass Rod From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,298 (Dep't of Commerce Apr. 22, 2024) and accompanying Decision Mem. at 30-31. However, that case involves the same electricity for LTAR program in Korea and thus the benefit in that case is tied to usage just as it is here.

[3] *Mosaic* has been appealed to the Federal Circuit, was argued in August 2025 and is currently *sub judice*. *See Mosaic Co. v. United States*, Ct. No. 2024-1593 (Fed. Cir.).

be fair or expected, Defendant argues that Congress' use of a statutory term that is "general in nature" – allegedly like disproportionate – "indicat{es} that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce.'" Def. Br. at 19 (quoting *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2023)). But merely asserting that the term "disproportionate" is general in nature does not mean that Commerce can ignore the definition of that term and interpret it however it wants. *See Hyundai Steel II*, 2025 WL 2400442 at *4, n.5 ("The Court gives meaning to the words of the statute.") (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)). The court has already explained the meaning of disproportionate by reference to dictionary definitions, including Merriam-Webster. *See Hyundai Steel I*, 745 F. Supp. 3d at 1351 ("The term disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected….'").

Although not responding directly to the arguments made in Hyundai Steel's Rule 56.2 brief, Defendant also includes an entire section in its brief seeking to affirmatively support Commerce's disproportionality determination. *See* Def Br. at 9-14. These arguments are not convincing.

First, Defendant cites several sources for the proposition that the statute does not mandate a particular method for a *de facto* specificity analysis and thus Commerce has discretion to apply a reasonable methodology. *See* Def. Br. at 10. While the statute may not mandate a particular method for analyzing *de facto* specificity, this does not mean that Commerce is free to ignore the plain meaning of the term disproportionate or that the Court has to defer to Commerce's method if it is inconsistent with the plain meaning of the statute. *See Hyundai Steel II*, 2025 WL 2400442 at *4, n. 5 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)). Rather

9

than deferring to agency interpretations of arguably ambiguous statutes, courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. 369 at 412.  No longer may a court accept an agency's "reasonable" or "permissible" interpretation of the law where it is not what the court concludes is the relevant statute's "best meaning." *Id.* at 400.

Second, Defendant observes that Korea has a well-diversified economy to support the conclusion that the group of three industries received a disproportionate amount of benefits.  Def. Br. at 10-12 (citing 19 U.S.C. § 1677(5A)(D)(iii)); *see* Def. Br. at 25-27.  But Defendant fails to link the fact that the economy of Korea is diverse with Commerce's finding that the group of three industries received a disproportionately large amount of the subsidy.[4]  The fact that there are 19 industry groupings may show that, overall, the Korean economy is diverse, but most of the industry groups such as wholesale and retail trade, accommodation and food service, education, and membership organizations do not consume *industrial* electricity.[5]  They are thus not relevant to the question of whether this group of three industries consumed a disproportionate

---

[4] It appears that Defendant may be trying to offer the missing linkage on pages 11-12 of its brief, but Defendant's explanation is unclear.  For example, Defendant discusses Classification 1 and Classification 2 industries on pages 11-12 and tries to link this to Commerce's disproportionality analysis.  However, this discussion does not appear in the *Final Results* and instead comes from an exhibit in the GOK's response.  *See* Def. Br. at 11 (citing GOK IQR at Exhibit L1); Final Decision Mem. at 18-19 (discussing economic diversification).  Nor does Commerce's Economic Diversification Memo reference this information from the GOK's response.  *See* Mem. from David Lindgren, Program Manager, Dep't Commerce, to The File, "Placement of Korea Economic Diversification Memorandum on the Record" (June 14, 2023), PR 30 ("Economic Diversification Mem.").  This entire discussion thus appears to be a *post-hoc* argument that should not be considered.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

[5] Defendant-Intervenor also argues that "[                                    ] accounted for [      ] of total industrial electricity consumption during the POR" and the fact that "[                              ] amounted to [                ] of total industrial consumption in an economy of more than 400,000 manufacturing establishments is additional evidence of disproportionate benefit."  Pet'r Br. at 11-12.  This was not relied upon by Commerce as the basis for its *de facto* specificity determination and is thus just a *post-hoc* argument that should not be considered.  *See SEC v. Chenery Corp.*, 332 U.S. at 196.

amount of *industrial* electricity, which was Commerce's chosen method for analyzing

disproportionality.  Furthermore, while Commerce must consider the extent of economic

diversification, this criterion should "serve to inform the application of, rather than supersede or

substitute for, the enumerated specificity factors."  *See* Statement of Administrative Action

Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, Vol. 1 at 931

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4243.

Third, Defendant argues that due to the economic diversification in Korea substantial

evidence supports Commerce's determination that "the GOK's data showed that the steel

industry and two other industries were using a disproportionate amount of industrial class

electricity compared to other industrial electricity consumers."  Def. Br. at 12 (citing Final

Decision Mem. at 19).  As support, Defendant cites to the GOK consumption data that "showed

that the steel, [                    ], and [              ] industries used [          ] percent of industrial

class electricity" and compares that to the next seven highest electricity-consuming industries

that "accounted for a significantly smaller share of the total industrial class electricity consumed

during the POR…."  Def. Br. at 12; *see also* Def. Br. at 8 ("No other grouping of three industries

accounted for more than [          ] percent of the electricity consumed by industrial class

entities…").  Defendant also points to the average percentage of industrial electricity consumed

by the three largest industries and contrasts that with the lower average percentage for the

remaining seven of the largest ten industrial users.[6]  *See id.* at 13.  However, these same analyses

have already been considered and rejected by the court.

---

[6] Hyundai Steel notes that Commerce in the *Final Results* did not rely on the average
percentage usage comparisons between the largest three and the smaller seven industries.  *See*
Final Decision Mem. at 19; Specificity Analysis Mem. at 1 & Attachment.  It appears that
Defendant has done this additional analysis using data from the GOK's IQR.  *See* Def. Br. at 13
(citing GOK IQR at 42-43).  This is thus a *post-hoc* analysis that should not be considered.  *See*

In *Hyundai Steel I*, the court held that "when analyzing whether an industry or group of industries receives a disproportionate amount of the benefit conferred by the subsidy pursuant to 19 U.S.C. § 1677(5A)(D)(iii), receipt of a greater monetary benefit from the program than others is not determinative of disproportionality." *Hyundai Steel I*, 745 F. Supp. 3d at 1351 (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)). In response to the court's remand in *Hyundai Steel I*, Commerce offered several analyses that are almost identical to the ones discussed by Defendant in its brief to support Commerce's disproportionality analysis. *See Hyundai Steel II*, 2025 WL 2400442 at *4. The court rejected these analyses, which it aptly characterized as "more equates with disproportionate" type analyses. *See id.* In doing so, the court reaffirmed the fundamental point from *Hyundai Steel I* that disproportionality "requires a comparison of the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries." 745 F. Supp. 3d at 1351-52 (citing *AK Steel Corp.*, 192 F. 3d at 1385; *Royal Thai Government v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006)). In *POSCO*, the court similarly held that Commerce "was required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits {received by} others.'" *POSCO*, 2025 WL 2269772, at *4 (citing *Hyundai Steel I*, 745 F. Supp. 3d at 1351).

For its part, Defendant-Intervenor argues that "Commerce's finding that the steel industry is the [          ] consumer of electricity in Korea relative to [          ] other Korean industries is prima facie evidence of disproportionality." Pet'r Br. at 15. But Commerce did not specifically compare the steel industry or the group of three industries consumption to [          ] industries in the *Final Results*. Instead, Commerce simply "concluded that a wide

---

*SEC v. Chenery Corp.*, 332 U.S. at 196. However, as discussed in text, the Court in *Hyundai Steel II* has already considered and rejected this alternative analysis.

diversification of economic activities exists in Korea, including 19 industry groupings with a broad range of distinctly different types of economic activities within these groupings." Final Decision Mem. at 18-19. This *post-hoc* argument should not be considered.

Defendant-Intervenor also takes issue with the so-called "disproportionality standard" and claims that Hyundai Steel is "inventing a requirement where none exists." Pet'r Br. at 18 (citing Hyundai Steel Br. at 17-18). However, nowhere on pages 17-18 of its brief did Hyundai Steel propose a disproportionality standard or impose any new requirements. Instead, Hyundai Steel argued that Commerce had to provide an explanation for grouping the largest three industries together for purposes of its disproportionality analysis. *See* Hyundai Br. at 17-18. To the extent Defendant-Intervenor is referring to the argument that Commerce must compare the group of industries consuming electricity against something other than other industries' consumption of electricity, that argument is not novel and has already been decided by the court. *See Hyundai Steel I*, 745 F. Supp. 3d at 1351-52 (finding that disproportionality "requires a comparison of the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries."); *see POSCO*, 2025 WL 2269772, at *4 (holding that Commerce "was required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits {received by} others.'"). Defendant-Intervenor does not bother to distinguish or even mention these other directly applicable cases.

Finally, Defendant-Intervenor characterizes Hyundai Steel's argument about electricity being broadly available and widely used as an argument that the provision of electricity cannot be specific as general infrastructure. Pet'r Br. at 22-26. Hyundai Steel never argued that the provision of electricity was general infrastructure. Instead, Hyundai Steel argued that the broad

availability of electricity meant that any specificity finding is suspect. *See* Hyundai Br. at 12-14.

This is particularly true given that the electricity rates for industrial users are set based on a

standard pricing mechanism and thus no enterprise or industry receives a more preferential rate

than other companies or industrial users. GOK IQR at Ex. E-10 (showing that electricity prices

were based on standard pricing); *see also* Hyundai Steel Br. at 13-14. The *POSCO* court agreed

with this concern. *See POSCO*, 2025 WL 2269772 at \*14 (citing *AK Steel*, 192 F.3d at 1385)

("Commerce's 'untenable' logic would lead to almost every generally available subsidy being *de*

*facto* specific to every 'large company… merely because of the size of the company.'").

>    B.    *Commerce's Use of the Original Electricity Consumption Data Is Not Supported*
>          *By Substantial Evidence and Is Otherwise Not in Accordance with Law.*

Hyundai Steel argued in its Rule 56.2 brief that Commerce unlawfully relied upon

unverified and outdated electricity consumption data as reported in the GOK's initial

questionnaire response for its *de facto* specificity determination. *See* Hyundai Br. at 19-22. That

reliance was unlawful because the GOK later supplemented its response with more complete and

accurate data, and Commerce verified that data. *See* Final Decision Mem. at 22-25; Letter from

Yoon & Yang LLC to Sec'y Commerce, "Countervailing Duty Administrative Review of

Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Response

to the Supplemental Questionnaire" (Nov. 1, 2023) ("GOK 2SQR"), CR 285-286, PR 207-208 at

1-2. Commerce failed to provide any credible explanation as to why, despite the existence of

updated data on the record that it verified, it continued to rely on incomplete and unverified

information for its specificity analysis.

Defendant argues in response that Commerce did not need to use the revised

consumption data because it did not request it. Def. Br. at 21. While it is true that the GOK

voluntarily made this revision to its consumption data and not in response to a specific request

from Commerce, that does not justify Commerce disregarding it. If Commerce felt that the revised data was unsolicited and unnecessary then the remedy under its regulations was to reject it as untimely submitted new factual information. *See* 19 C.F.R. §§ 351.301(c)(1), 351.302(d)(1)(ii). But Commerce did not reject the revised consumption data, and so it is part of the administrative record.

Defendant also claims that the revised data was "not usable" because it was reported at a lower level of industrial classification than what Commerce requested. Def. Br. at 21. However, if there were questions about the revised data then Commerce should have raised any possible deficiencies in a supplemental questionnaire. *See* 19 U.S.C. § 1677m(d). The revised data could have also been probed at verification where Commerce could have established whether the data was at a lower level of industrial classification or otherwise usable. After all, Commerce made the decision to verify this "not usable" data and did not bother to verify the original data it relied upon in its specificity analysis. It is not credible for Commerce to disavow the very consumption data that it chose to verify.

Defendant also points to an alleged conflict between the revised data and other record evidence. *See* Def. Br. at 22-23. However, this alleged conflict was not provided as justification in the *Final Results* for not using the data. It is thus a *post-hoc* explanation that should not be considered.

Finally, Defendant argues that Commerce is not required to verify all data on the record even if Commerce relies on such data. *See* Def. Br. at 23. However, Hyundai Steel is not arguing that Commerce was required to verify the consumption data. Instead, Hyundai Steel is arguing that the reasons provided by Commerce for not using the revised consumption data are speculative and are undermined by Commerce's decision to verify the allegedly unusable revised

15

data while not verifying the data it used in its specificity analysis.  *See* Hyundai Br. at 21-22.

Arguing about Commerce's authority and discretion regarding verification is a red herring.

> C.    *Commerce's Calculation of the Benefit from the Electricity for LTAR Program Overstates the Benefit by Including Certain Pass-Through Amounts in its Cost Recovery Analysis that Had Already Been Included in the Prior Review's Costs.*

When analyzing whether Hyundai Steel benefitted from electricity for LTAR in the *Final Results*, Commerce unreasonably declined to remove from its benefit calculation amounts that were fuel costs in 2021 that the GOK "carried forward" to 2022 even though Commerce already used the fuel costs to calculate Hyundai Steel's cost recovery rate for the 2021 POR.  Final Decision Mem. at 23-25.  In its Rule 56.2 Brief, Hyundai Steel argued that Commerce should have excluded the amounts from 2021 because they do not represent costs of electricity during the 2022 POR and because Commerce may not "double count" the fuel costs (once in the cost recovery rate for the 2021 review period and a second time in the cost recovery rate for 2022).  *See* Hyundai Steel Br. at 22-26.  As Hyundai Steel argued, 19 U.S.C. § 1677(5)(E) requires that the benefit from the provision of electricity must relate to adequate remuneration during the 2022 POR, not 2021.  In response, Defendant argues that the 2021 amounts may be included in the benefit calculation because they are part of the GOK's tariff schedule for the POR and therefore allegedly relevant to the price of electricity charged to consumers.  Def. Br. at 27-31.  However, Defendant is incorrect.  The 2021 amounts are not relevant to the cost of production and sale of electricity during the 2022 POR and thus not pertinent to the adequacy of remuneration pursuant to 19 U.S.C. § 1677(5)(E).

The GOK's cost pass-through tariff system allows it to account for quarterly fluctuations in its fuel costs by increasing or decreasing the price it charges customers for electricity through a mechanism called the "fuel cost adjustment charge" (or "FCAC") but limits the amount by which the FCAC may change from one quarter to the next to +/-5 Korean won ("KRW") per

kilowatt hour ("Kwh").  GOK IQR at Exhibit E-2 at 6.  If the GOK is unable to charge the full

amount by which fuel costs have risen between periods due to the limitation on the FCAC, then

the cost pass-through system allows the GOK to accumulate unrecovered costs and reflect those

amounts in the "total comprehensive cost" for the subsequent periods.  GOK IQR at Exhibit E-2

at 6.  The "total comprehensive cost," which includes the unrecovered amounts from prior

periods that had been carried forward, is then included in the calculation of the electricity tariffs

for *subsequent* periods.  GOK IQR at Exhibit E-2 at 6; *see also* Letter from Yoon & Yang LLC

to Sec'y of Commerce, "Countervailing Duty Administrative Review of Certain Cut-to-Length

Carbon-Quality Steel Plate from the Republic of Korea; 2022: Response to the GOK

Supplemental Questionnaire" at Exhibit E-9.1 (Jan. 25, 2024), CR 303-08, PR 222-223 ("GOK

Third Supplemental Response").

        In the *Final Results*, Commerce used the "total comprehensive cost" to calculate the

adequate remuneration for electricity in the 2022 POR without deducting from it the unrecovered

amounts from 2021, even though the amounts that had been carried forward were unrelated to

the cost of producing and selling electricity during the 2022 POR.  *See* Preliminary Calculations

Mem. (citing GOK Third Supplemental Response at Exhibit E-9.1).  Failure to deduct the 2021

amounts that had been carried forward overstates the cost recovery rate during the POR because

they are unrelated to whether the GOK recovered the cost of electricity in 2022.

        Defendant argues that Commerce based its benefit calculation on the methodology that

the GOK itself uses and that, because the GOK carried forward the 2021 amounts to 2022, they

are "part of the tariff price consumers paid for the purchase of electricity."  Def. Br. at 29-31.

Defendant claims that, if Commerce were to exclude the 2021 amounts from its benefit

calculation, its analysis would allegedly not represent the costs, formula, or methodology that the

GOK uses for establishing electricity tariff prices.  Def. Br. at 31.  Contrary to Defendant's

argument, whether the 2021 amounts are part of the price that the GOK charged consumers does

not mean that the cost recovery rate that Commerce calculated is relevant to the adequacy of

remuneration during the POR.  Pursuant to 19 U.S.C. § 1677(5)(E)(iv) a benefit is conferred to

the extent "goods or services are provided for less than adequate remuneration."  The 2021

amounts are not relevant to the adequacy of remuneration for electricity produced and sold

during the 2022 POR regardless of whether the GOK sought to recoup prior period amounts by

carrying them forward.  *See, e.g.*, GOK Third Supplemental Response at Exhibit 9.1 (listing the

2021 amounts separately from the 2022 cost of goods sold ("COGS") as its own line item called

"[                                                    ]" under total "[                          ]").

        The fact that the GOK carried forward unrecovered amounts from 2021 and included

them in the price it charged during the POR fails to demonstrate whether the GOK provided

electricity at a price that resulted in cost recovery and profit during the POR, *i.e.*, the metric by

which Commerce conducts its "Tier 3" adequacy of remuneration analysis.  Commerce's

analysis in the *Final Results* compares the electricity tariff that the GOK charges against its costs

to determine whether it had "the ability… to be profitable *during the POR*."  Final Decision

Mem. at 25 (emphasis added).  By including amounts that the GOK incurred prior to the POR in

the costs that have to be recovered, the benefit that Commerce calculates pursuant to that

comparison overstates whether the prices charged covered the GOK's cost of producing and

selling electricity during the POR.  Defendant's argument does not justify distorting the

adequacy of remuneration during the 2022 POR with unrecovered amounts from 2021,

especially given that Commerce included the same amounts in its calculation of Hyundai Steel's

cost recovery rate for the 2021 POR.

Notably, Defendant neglects to respond to Hyundai Steel's argument that the inclusion of the 2021 amounts results in double counting. *See generally* Def. Br. at 27-31. Like it has done in the *Final Results*, Commerce calculated Hyundai Steel's subsidy rate for the electricity for LTAR program during the 2021 POR by determining the GOK's cost recovery rate plus a rate of return for profit. *See Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) and accompanying Decision Mem. at 14 (determining that KEPCO's 2021 electricity pricing "conferred a benefit because it did not cover its costs plus a reasonable rate of return" during the 2021 POR). Commerce double-counted the 2021 amounts by including them in Hyundai Steel's costs for its cost recovery rate in 2021 and again in its cost recovery rate for 2022. The court has found similar determinations by Commerce to be unsupported by substantial evidence where they result in double counting. *See Uttam Galva Steel Ltd. v. United States*, 374 F. Supp. 3d 1360, 1364 (Ct. Int'l Trade 2019); *Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 256 F. Supp. 3d 1346, 1358 (Ct. Int'l Trade 2017). The *Final Results* here likewise double count the 2021 amounts by including them in Hyundai Steel's subsidy rates for both the 2021 and the 2022 PORs, contrary to Commerce's obligation to calculate subsidy rates accurately. *Canadian Solar Inc. v. United States,* 537 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) ("Commerce has a duty to determine CVD rates as accurately as possible.").

Defendant-Intervenor contends that Commerce has rejected Hyundai Steel's argument for the exclusion of prior period amounts in other cases, but the cases it cites are inapposite. Pet'r Br. at 30-31 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318

(Dep't Commerce Dec. 13, 2023) and accompanying Decision Mem. at comment 1(d) ("*CTL Plate from Korea 2021*"); *Certain Corrosion Resistant Steel Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 6,501 (Dep't Commerce Feb. 1, 2024) and accompanying Decision Mem. at comment 1(c) ("*CORE from Korea 2021*"); *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) and accompanying Decision Mem. at comment 5(b) ("*Hot-Rolled from Korea 2021*")).  In each case that Defendant-Intervenor cites, Commerce addressed whether the FCAC should be included in Commerce's benefit calculation, not whether amounts which could not be recovered in the prior POR due to the limitation on changes to the FCAC may be included in Commerce's cost recovery analysis in the subsequent review.  *See CTL Plate from Korea 2021* at comment 1(d) (determining that the FCAC must "be adjusted for any percentage shortfall in cost recovery" during the POR but not addressing amounts carried forward from prior periods); *CORE from Korea 2021* (same); *Hot-Rolled from Korea 2021* (same).  The cases do not stand for the proposition that amounts from prior periods that are irrelevant to the cost of fuel during the POR and that were already countervailed by Commerce must be included in the cost recovery calculation during the POR.  The Court should reject Defendant-Intervenor's argument.

II.     **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its motion

for judgment on the agency record and reject the arguments of Defendant and Defendant-

Intervenor.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,904 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  November 20, 2025