UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Hyundai Steel Company, | ) ) ) |
| Plaintiff, | ) ) ) |
| and | ) ) ) |
| Dongkuk Steel Mill Co., Ltd., | ) ) ) |
| Consolidated Plaintiff, | ) ) ) |
| and | ) ) ) |
| Government of the Republic of Korea, | ) Before: Hon. Claire R. Kelly, Judge ) |
| Plaintiff-Intervenor, | ) Consol. Court No. 24-00190 ) |
| v. | ) ) |
| United States, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| Nucor Corporation, | ) ) |
| Defendant-Intervenor. | ) ) |

**REPLY OF CONSOLIDATED PLAINTIFF,
DONGKUK STEEL MILL CO., LTD.,
TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSE BRIEFS**

                      Jarrod M. Goldfeder
                      Kenneth N. Hammer
                      Trade Pacific PLLC
                      700 Pennsylvania Avenue, SE
                      Suite 500
                      Washington, D.C. 20003
                      (202) 223-3760

                      *Counsel to Dongkuk Steel Mill Co., Ltd.*
**Dated: November 20, 2025**          *Consolidated Plaintiff*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... ii

I. INTRODUCTION ........................................................................................................ 1

II. DEFENDANT CANNOT SUPPORT COMMERCE'S GROUPING OF UNRELATED INDUSTRIES WHEN ASSESSING SPECIFICITY ......................................................... 3

III. THE HOLDING IN *BETHLEHEM STEEL* AS APPLIED IN THIS CASE SUPPORTS REMAND OF COMMERCE'S SPECIFICITY FINDING ................................................ 6

IV. DEFENDANT-INTERVENOR CANNOT SHOW THAT COMMERCE'S BENEFIT FINDING FOR THE PROVISION OF ELECTRICITY WAS CONSISTENT WITH AGENCY PRACTICE AND PRINCIPLES ......................................................................... 9

V. CONCLUSION ........................................................................................................... 11

# TABLE OF AUTHORITIES

**Statutes and Regulations**

19 U.S.C. § 1677(5A)(D)..................................................................................................3, 8

19 C.F.R. § 351.502(b) ....................................................................................................3, 5

**Judicial Decisions**

Bethlehem Steel v. United States, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001).......................... 6-9

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ...............................................4

Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316
(Ct. Int'l Trade 2018)........................................................................................................................5

Changzhou Trina Solar Energy Co., Ltd. v. United States, 195 F. Supp. 3d 1334
(Ct. Int'l Trade 2016)....................................................................................................................... 5

Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197 (1938).................................4

Consolo v. Fed. Maritime Comm'n, 383 U.S. 607 (1966) ..............................................................4

Hyundai Steel Co. v. United States, 745 F.Supp.3d 1345 (Ct. Int'l Trade 2024)........................ 8-9

Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008).................................... 4

Rhone-Poulenc, Inc. United States, 20 CIT 573, 927 F. Supp. 451 (1996).................................... 4

**Administrative Determinations**

Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) (final results of CVD admin. rev.; 2022), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 5, 2024) ............1, 3, 9

Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 85 Fed. Reg. 84,296 (Dep't Commerce Dec. 28, 2020) (final results of CVD admin. rev.; 2018), and accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 28, 2020).................10

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

I. **INTRODUCTION**

Consolidated Plaintiff, Dongkuk Steel Mill Co., Ltd. (hereinafter, "DSM" or "Consolidated Plaintiff"), a foreign producer and exporter of certain cut-to-length carbon-quality steel plate from Korea, hereby submits this reply to the October 1, 2025, response of Defendant, the United States, and the October 23, 2025, response of Defendant-Intervenor, Nucor Corporation, to the challenges that Consolidated Plaintiff DSM made in its Rule 56.2 motion for judgment on the agency record. See Def.'s Resp. Br. (Oct. 1, 2025), ECF Nos. 43, 44 ("Def. Resp."), Nucor Corp.'s Resp. Br. (Oct. 23, 2025), ECF Nos. 45-47 ("Def.-Intv. Resp."); see also Consol. Pl.'s Rule 56.2 Mot. for Judgment on the Agency Record (Apr. 24, 2025), ECF No. 33 ("DSM Br.").

Consolidated Plaintiff DSM contests various aspects of the U.S. Department of Commerce's ("Commerce") final results in Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024) (final results of CVD admin. rev.; 2022) ("Final Results"), PD 325, and Commerce's accompanying unpublished Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "Decision Memorandum for the Final Results of the Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022" (Dep't Commerce Sept. 5, 2024) ("Final Decision Memo"), PD 319.[1]

For the reasons described below and in Consolidated Plaintiff DSM's Rule 56.2 brief, the Court should remand Commerce's Final Results for reconsideration with respect to the provision

---

[1] Citations to the administrative record are to the public record document number ("PD") followed by the page or exhibit number assigned to these documents based on the administrative index list that Commerce filed with this Court. See ECF No. 25 (Dec. 20, 2024).

1

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

of electricity for less than adequate remuneration ("LTAR") that contributed to the vast majority of DSM's calculated net subsidy rate.

Defendant's and Defendant-Intervenor's response briefs also address the arguments raised by Plaintiff Hyundai Steel Company ("Hyundai Steel") in its separate Rule 56.2 motion for judgment on the agency record and by Plaintiff-Intervenor, the Government of the Republic of Korea ("GOK"), in its memorandum in support of the Rule 56.2 motions for judgment on the agency record.  <u>See generally</u> Def. Resp. and Def.-Intv. Resp.  DSM understands that Plaintiff Hyundai Steel and Plaintiff-Intervenor GOK will submit their own replies by the applicable deadlines.  To that end, in the interest of efficiency, DSM addresses Defendant's and Defendant-Intervenors' responses only to the extent that they specifically referred to arguments from DSM's Rule 56.2 brief.  Otherwise, DSM adopts and incorporates by reference the arguments raised in the replies to be filed by Plaintiff Hyundai Steel and Plaintiff-Intervenor GOK to the extent they do not conflict with the arguments raised in this reply or in DSM's Rule 56.2 brief.

In their respective response briefs, Defendant and Defendant-Intervenor fail to meaningfully address the fact that Commerce erred when it concluded that Korea Electric Power Corporation ("KEPCO") charged electricity rates to DSM at LTAR because no industrial tariff rate recovered costs and a rate of return during the period of review (i.e., calendar year 2022).  With regard to the issues on appeal, Defendant and Defendant-Intervenor ignore relevant portions of the administrative record and agency practice that undermine Commerce's determination and demonstrate that Commerce's determination was unreasonable and unsupported by substantial record evidence.  For the reasons below and in DSM's Rule 56.2 brief, remand is warranted.

2

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

II. **DEFENDANT CANNOT SUPPORT COMMERCE'S GROUPING OF UNRELATED INDUSTRIES WHEN ASSESSING SPECIFICITY**

In Korea, the national electricity supplier, KEPCO, supplies all users at tariffs that do not discriminate against any region or industry. This non-preferential supply of electricity to all users is, in all respects, the very definition of a "generally available" program that is not "specific," and thus not countervailable. Yet, Commerce concluded that KEPCO's provision of electricity was *de facto* specific because, when the steel industry is aggregated with two other Korean industries, the resulting "group" uses a comparatively large share of electricity in Korea. See Final Decision Memo, at 19 ("For these final results, we therefore find that a group of three industries, inclusive of the steel industry, received a disproportionately large amount of the subsidy conferred by the purchasing of industrial class electricity from KEPCO within the meaning of section 771(5A)(D)(iii)(III) of the Act"). Consolidated Plaintiff DSM argued that, even if this Court determines that Commerce correctly found that KEPCO provided electricity for LTAR, no factual or legal basis existed to find that any resulting subsidy related to the provision of electricity in Korea was *de facto* "specific"—i.e., to an industry or group of industries—within the meaning of the CVD statute. See DSM Br., at 8-11.

Defendant disputes the plaintiffs' contentions that "Commerce arbitrarily grouped unrelated industries to receive a desired result," claiming that Commerce is authorized under the statute "to consider recipients of a subsidy 'on an enterprise or industry basis'" and that the CVD statute "expressly provides that 'any reference to an enterprise or industry … includes a *group* of such enterprises or industries.'" Def. Resp., at 14 (citing 19 U.S.C. § 1677(5A)(D)). Defendant claims that the CVD statute and regulations do not require Commerce to find that industries have any "shared characteristics" in order to consider them as a "group" for specificity assessment purposes. Id. (citing 19 U.S.C. § 1677(5A)(D) and 19 C.F.R. § 351.502(b)). From Defendant's

3

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

perspective, "Commerce determined that each of the three members of the group was using a disproportionate amount of industrial electricity—and therefore receiving a disproportionate benefit—when compared to other industrial consumers of electricity," so that was enough to determine that they comprised a "group of industries." Id., at 16.

Consolidated Plaintiff DSM recognizes that while Commerce's regulations do not require it to determine if the grouped industries (or enterprises) have "shared characteristics," Commerce nevertheless is required to provide an adequate explanation of how it determined that a disparate set of industrial consumers received a disproportionate amount of electricity compared to other industrial users. See Rhone-Poulenc, Inc. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996) (finding Commerce's determinations unsupported by substantial evidence "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions").[2] In fact, Commerce did not provide adequate reasoning to support its conclusion in the specificity analysis, instead resorting to an arbitrary grouping of industries to achieve the result it desired by aggregating the largest industries and concluding—without any further analysis of how it created this group or what this group represented—that this grouping signified that the steel industry received a disproportionate amount of electricity.

In its Final Results, Commerce correctly concluded that the electricity prices that KEPCO charged to DSM were set according to market principles and that KEPCO has a pricing mechanism in place that is based upon laws, regulations, and processes to fully recover costs and

---

[2] Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 619-20 (1966) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008).

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

a rate of return. Given substantial record evidence showed that all industrial consumers paid for electricity according to the same pricing mechanisms, with no preference demonstrated for the steel industry or, for that matter, any other industry (or enterprise), Commerce was obligated to "provide an adequate basis for its conclusions" that electricity consumption by this arbitrarily-created grouping of industries was disproportionate or otherwise inconsistent with the largest industrial users of electricity. Commerce failed to do so and, consequently, remand is warranted.

Defendant cites Changzhou Trina Solar Energy Co., Ltd. v. United States to support its proposition that "variety between the industries—even a total lack of relationship—in the group does not necessarily undermine the specificity analysis." Def. Resp., at 14-15 (citing 195 F. Supp. 3d 1334, 1352 (Ct. Int'l Trade 2016) and 19 C.F.R. § 351.502(b)). Yet, Defendant ignores a subsequent decision where this Court found that under the "limited number" *de facto* analysis, Commerce needed to explain how subsidizing broad industries amounts to a specific rather than a generally available subsidy. See Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018).

Moreover, under Defendant's rationale, all Commerce ever would have to do is get a listing of the largest industrial users of electricity ranked from highest to lowest, determine the cut-off that comprises a majority or whatever threshold it arbitrarily sets, and conclude that this "group" consumed a disproportionate amount. Any analysis that combines the particular industry under consideration with other, more electricity-intensive industries, provides no logical or substantial basis for finding that the electricity usage by the industry under consideration was "disproportionate." And nothing in the law suggests Congress contemplated such absurd results.

In summary, Commerce failed to provide any explanation as to why it is reasonable to "group" the steel industry with these other two industries. By grouping the most electricity-

5

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

intensive industries together for purposes of a specificity analysis, Commerce gerrymandered an outcome that always will find a "group" used more electricity than other industries. In the absence of an adequate explanation, Commerce's analysis and determination was meaningless because, of course, different industries necessarily differ in the intensity of electricity usage. Commerce's reasoning is inherently unreasonable and unsupportable and must be remanded.

### III.   THE HOLDING IN BETHLEHEM STEEL AS APPLIED IN THIS CASE SUPPORTS REMAND OF COMMERCE'S SPECIFICITY FINDING

Consolidated Plaintiff DSM observed that KEPCO supplies electricity to all users at tariffs that do not discriminate between different industries and argued that, as a matter of law, the fact that some industries may consume more electricity than others does not demonstrate "disproportionate" use that the CVD statute requires to establish "specificity." DSM Br., at 9. DSM cited this Court's observation in Bethlehem Steel v. United States that "{i}n virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group," and subsequent holding that "{t}o impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws." Id. at 9-10, citing 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001).

Defendant-Intervenor disputes reliance on Bethlehem Steel because that case involved an "voluntary curtailment" electricity discount program, whereas the current issue on appeal involves an "adequacy of remuneration" program regarding the provision of electricity. See Def.-Intv. Resp., at 10-12.[3] Defendant-Intervenor relies on a distinction without a difference.

---

[3] Defendant provides similar responses with respect to the briefs of Plaintiff Hyundai Steel and Plaintiff-Intervenor GOK. See Def. Resp., at 16-19.

6

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

The Court in Bethlehem Steel emphasized the differences between "disparity" vs. "disproportionality" and observe that a perceived "disparity" is not sufficient to establish "specificity" within the meaning of the CVD statute, regardless of the program in question. The Court held that the "mere fact that the {Korean} steel industry received a greater monetary benefit from the program than did other participants is not determinative of whether that industry was 'dominant' or receiving 'disproportionate' benefits." Bethlehem Steel, 140 F. Supp. 2d at 1369. The Court reasoned that:

> Although the steel industry received over 51% of the financial benefits afforded by the VCA {electricity discount} program during the period of investigation, there is nothing in the record to indicate this percentage was disproportionately higher than would be expected. Commerce, consistent with its prior practice, examined the Korean steel industry and concluded that one of its inherent characteristics was the large consumption of electricity. Thus, when Commerce examined the Korean steel industry's electricity usage, and the attendant benefits derived from the VCA program, it found them to be neither "dominant" nor "disproportionate."

Id. Thus, the Court sustained Commerce's decision that the Korean steel industry received neither a "dominant" nor "disproportionate" amount of subsidies under the electricity discount program in question. Id.

The Court's holding was not dependent on the program in question, but rather, extends to any program where benefits are determined according to usage. When considering the provision of electricity for LTAR, the fact that the steel industry may be a comparatively large user of electricity—when grouped with two other, electricity-intensive industries—does not establish that KEPCO's electricity prices disproportionately benefited the steel industry. For these reasons, consistent with the Court's holding in Bethlehem Steel, this Court should remand for reconsideration Commerce's specificity finding with respect to KEPCO's provision of electricity.

7

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

    Furthermore, this Court has considered virtually the same issue in an appeal arising out of the 2021 CVD administrative review of the same proceeding. See Court No. 23-00211. The Court remanded Commerce's determination after concluding that, "Commerce's determination that the Electricity Program subsidy is de facto specific because the steel industry and three other industries received a 'disproportionately large amount of the subsidy' within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III) is not supported by substantial evidence." Hyundai Steel Co. v. United States, 745 F.Supp.3d 1345, 1352 (Ct. Int'l Trade 2024). Among other things, this Court observed that "{n}owhere does Commerce identify to what the benefit is disproportionate," id., and explained that "{d}isproportionality requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share)" and, thus, "Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." Id., at 1353. The Court further held that "the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances." Id., at 1351. The Court cited Bethlehem Steel as persuasive for guiding its decision:

> Although prior CIT cases do not bind this Court, they can be persuasive based upon their reasoning where they confront similar records. In Bethlehem Steel, the Court reviewed a program that granted discounts based on electricity usage, resulting in high discounts for steel companies. Bethlehem Steel, 25 CIT at 320. Commerce determined the program was not specific and the Court was asked to determine whether that decision was reasonable while also noting its obligation to give deference to Commerce's reasonable interpretation of "disproportionate". Id. at 308–09, 322–23. The Court took note of the steel industry's large consumption of electricity and concluded that although the steel industry's benefit was "disparate," it was not "disproportionate" to what other industries or entities received based on their usage. Id. at 322. In holding that disparity alone was insufficient to support a finding of disproportionality, the Court noted that a program designed to confer benefits based on usage levels will necessarily result

8

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

> in one or more groups receiving a greater share than another group, simply because of differences in usage. Id.

Id., at 1351-52, n.11.

Ultimately, the Court held that Commerce's explanations as to why it grouped together certain industries for purposes of the electricity program subsidy analysis was "insufficient." Id., at 1353. Although the appeal of the 2021 administrative review is ongoing, the overlap of the substantive issue involving Commerce's same flawed and insufficient reasoning provides a compelling basis to remand Commerce's determination in the present appeal as well.

**IV.    DEFENDANT-INTERVENOR CANNOT SHOW THAT COMMERCE'S BENEFIT FINDING FOR THE PROVISION OF ELECTRICITY WAS CONSISTENT WITH AGENCY PRACTICE AND PRINCIPLES**

Consolidated Plaintiff DSM argued that Commerce's determination that the provision of electricity in Korea confers a benefit contradicted longstanding agency practice and principles. See Def. Resp., at 11-14. Referring to these arguments and other challenges raised by Plaintiff Hyundai Steel and Plaintiff-Intervenor GOK, Defendant-Intervenor contends that "Plaintiffs' arguments have no basis in law, are undermined by the record, and should be rejected. The court should sustain Commerce's finding that the provision of electricity was for LTAR and thus conferred a benefit during the POR." Def.-Intv. Resp., at 26-27.

Defendant-Intervenor has no answer for the fact that the administrative record contained KEPCO cost recovery data calculated on a tariff-specific basis, which Commerce has considered, among other information, in conducting its Tier 3 analysis in prior cases. See Final Decision Memo, at 13 ("we examined KEPCO's cost recovery rates by tariff classification during the POR, which are submitted to the MOTIE each year"). KEPCO's electricity rate-setting regime is designed to adhere to market principles, and it did so in practice during the period of review.

9

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

Substantial evidence confirmed that KEPCO's electricity price-setting regime reflects market principles by adhering to established standards of cost recovery. Cost recovery was embedded by law in the electricity pricing structure in Korea in effect during calendar year 2022 by requiring KEPCO to cover the costs of electricity generation. Thus, substantial record evidence supported the conclusion that KEPCO's electricity tariff setting regime was in accordance with market principles based on the most contemporaneous tariff-specific cost recovery data.

Indeed, establishing a specific required rate of return to consider whether a pricing mechanism is in accordance with market principles is not reasonable when it comes to assessing cost recovery in a regulated utility market. Utilities are capital-intensive businesses that incur high fixed costs. Thus, costs may not increase or decrease in exact proportion to sales, as costs in a given year are tied to expenses, which can include items such as losses on disposal or impairment of equipment, or losses related to the construction of new assets. A utility's future operation, therefore, does not depend strictly on its financial performance in a single year as measured by a rate of return, as the rate of return could be disproportionately impacted in any given year by one or more unanticipated expenses. For these reasons, Commerce has declined to set a rate of return that is "sufficient to ensure future operations," but rather, evaluates several different factors. See, e.g., <u>Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea</u>, 85 Fed. Reg. 84,296 (Dep't Commerce Dec. 28, 2020) (final results of CVD admin. rev.; 2018), and accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 28, 2020), at cmt. 7.

Commerce's final determination as to this issue was not supported by substantial record evidence, and its final calculations were not based on a reasonable selection of facts related to the market principles analysis. Remand is warranted for all these reasons.

**Consol. Court No. 24-00190**
**DSM's Reply Brief**

## V.     CONCLUSION

For the reasons set forth above and in DSM's Rule 56.2 brief, the <u>Final Results</u> that Commerce issued in the 2022 administrative review of the CVD order involving <u>Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea</u> were not supported by substantial evidence.  Therefore, Consolidated Plaintiff DSM respectfully requests that the Court remand this case to Commerce with instructions to recalculate DSM's *ad valorem* net subsidy rate in a manner consistent with the Court's opinion in this action.

        Respectfully submitted,

        <u>/s/ Jarrod M. Goldfeder</u>
        Jarrod M. Goldfeder
        Kenneth N. Hammer
        TRADE PACIFIC PLLC
        700 Pennsylvania Avenue, SE
        Suite 500
        Washington, D.C.  20003
        (202) 223-3760

Dated:  November 20, 2025        *Counsel to Dongkuk Steel Mill Co., Ltd.*
        *Consolidated Plaintiff*

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> and ) <br> ) <br> DONGKUK STEEL MILL CO., LTD., ) <br> ) <br> Consolidated Plaintiff, ) <br> ) <br> and ) <br> ) <br> GOVERNMENT OF THE REPUBLIC OF KOREA, ) <br> ) <br> Plaintiff-Intervenor, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> ) <br> and ) <br> ) <br> NUCOR CORPORATION, ) <br> ) <br> Defendant-Intervenor. ) <br> ) | Before:  Hon. Claire R. Kelly, Judge <br><br> Consol. Court No. 24-00190 |

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC hereby certifies that the accompanying Reply of Consolidated Plaintiff, Dongkuk Steel Mill Co., Ltd., dated November 20, 2025, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 3,207 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and undersigned counsel's signature block.

**Consol. Court No. 24-00190**             **Page 2**
**Certificate of Compliance**

           Respectfully submitted,

           <u>/s/ Jarrod M. Goldfeder</u>
           Jarrod M. Goldfeder
           Kenneth N. Hammer
           TRADE PACIFIC PLLC
           700 Pennsylvania Avenue, SE
           Suite 500
           Washington, D.C. 20003
           (202) 223-3760

Dated: November 20, 2025         *Counsel to Dongkuk Steel Mill Co., Ltd.*
           *Consolidated Plaintiff*

2