## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>    Plaintiff,<br><br>    and<br><br>DONGKUK STEEL MILL CO., LTD.,<br><br>    Consolidated Plaintiff,<br><br>    and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>    Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>    Defendant-Intervenor. | **Consol. Court No. 24-00190**<br><br>**NONCONFIDENTIAL**<br><br>Business Proprietary Information Removed from Pages 2, 4, and 12-14. |

### PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: December 19, 2025

## **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................1

I. COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW ...........................................................................................2

   A. Defendant and Defendant-Intervenor Continue to Incorrectly Conflate Disproportionality with Disparity ..............................................................................2

   B. Electricity in Korea Is Not Countervailable Because It Is Widely Available and Broadly Used and Provided Through a Standard Pricing Mechanism ..............5

   C. Defendant and Defendant-Intervenor Fail to Provide a Reasonable Explanation for Commerce's Grouping of the Three Industries ..............................9

II. COMMERCE ABUSED ITS DISCRETION WHEN CHOOSING OVERLY BROAD ELECTRICITY CONSUMPTION DATA OVER THE REVISED, MORE ACCURATE DATA ..............................................................................................10

III. COMMERCE'S BENEFIT DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW ........................................................................................12

CONCLUSION ..............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) .................................................. 2

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ............... 4, 6

*Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .................... 10

*Canadian Solar Inc. v. United States*, Consol. Ct. No. 19-00178, Slip Op. 22-49 (Ct. Int'l Trade May 19, 2022) .......................................................................................................................... 8

*Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) .................. 7

*Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ................................................................................................................................................... 8

*Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ............ 3, 5, 9, 10

*Hyundai Steel Co. v. United States*, No. 23-00211, slip op. 25-102 (Ct. Int'l Trade Aug. 12, 2025) .............................................................................................................................. 3, 5, 9, 10

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ..................................................................................................................... 10

*Mosaic Co. v. United States*, 774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025) .................................... 7

*POSCO v. United States*, No. 24-00006, slip op. 25-100 (Ct. Int'l Trade Aug. 8, 2025) . 3, 5, 9, 10

*Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ...... 3

**OTHER AUTHORITIES**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ................................................................. 5, 7

**RULES**

19 C.F.R. § 351.102(b)(21) ........................................................................................................... 12

**ADMINISTRATIVE DECISIONS**

*Certain Aluminum Foil From the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 52,888 (Sept. 23, 2021), and accompanying Issues and Decision Memorandum ............................................................................................................................ 8

*Certain Steel Nails From Thailand: Final Negative Countervailing Duty Determination*, 87 Fed. Reg. 51,343 (Aug. 22, 2022), and accompanying Issues and Decision Memorandum .............. 8

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum ........ 6

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2011*, 79 Fed. Reg. 45178 (Aug. 4, 2014), and accompanying Issues and Decision Memorandum .................................................... 8

**INTRODUCTION**

Pursuant to Rule 56.2(d) of the Court's Rules, Plaintiff-Intervenor the Government of the Republic of Korea ("GOK") replies to the response briefs filed by Defendant United States and Defendant-Intervenor Nucor Corporation. Def.'s Resp. Br., ECF No. 43 ("Def. Br."); Def.-Intervenor's Resp. Br., ECF No. 46 ("Pet'r Br."). For the reasons explained by Plaintiff Hyundai Steel Company ("Hyundai Steel") in its Reply Brief, ECF No. 48 ("Hyundai Steel Reply"), and Consolidated Plaintiff Dongkuk Steel Mill Co., Ltd. ("DSM") in its Reply Brief, ECF Nos. 50 ("DSM Reply"), and the additional reasons provided below, Defendant's and Defendant-Intervenor's arguments are without merit and should be rejected.

**ARGUMENT**

As Hyundai Steel and DSM explained in their Replies, Defendant and Defendant-Intervenor in their respective response briefs fail to demonstrate that Commerce's finding of *de facto* specificity with respect to the alleged provision of electricity for less than adequate remuneration ("LTAR") is supported by substantial evidence and otherwise in accordance with law. Similarly, as Hyundai Steel explained in its Reply, Defendant's and Defendant-Intervenor's arguments underscore that Commerce abused its discretion in using overly broad electricity consumption data when revised, disregarding more accurate consumption data that was readily available. The GOK supports the arguments made by Hyundai Steel and DSM. Rather than repeat all of Hyundai Steel's and DSM's arguments, the GOK wishes to emphasize a handful of points in this Reply Brief, which further establish that Commerce's decision to impose additional countervailing duties based on the alleged provision of electricity for LTAR is unsupported by substantial evidence and otherwise not in accordance with law.

I. **COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW**

   A. **Defendant and Defendant-Intervenor Continue to Incorrectly Conflate Disproportionality with Disparity**

Because the steel, [          ], and [         ] industries used [        ] percent of industrial class electricity, both Defendant and Defendant-Intervenor continue to argue that the three industries combined were consuming "a disproportionately larger amount of industrial class electricity in Korea{.}" Def. Br. at 12; Pet'r Br. at 15-17, 21. Defendant-Intervenor goes even further, asserting that disproportionality is nothing more than disparity and that "Plaintiffs are inventing a requirement where none exists." Pet'r Br. at 18. These arguments willfully ignore court precedent and record evidence and thus should be rejected as entirely unfounded in law and fact.

As Hyundai Steel responded in its Reply and the GOK explained in its opening brief, disproportionality must not be confused with disparity. Hyundai Steel Reply at 6-14; Pl.-Intervenor's Br., ECF No. 38 ("GOK Br.") at 5-7. The Federal Circuit specifically rejected the argument that Commerce should determine disproportionality simply "by looking at the percentage of the total benefit of a subsidy program accruing to a particular company or industry." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)**Error! Bookmark not defined.**. The Federal Circuit explained that such a methodology could produce an "untenable result" where a "benefit conferred on a large company might be disproportionate merely because of the size of the company." *Id.* For that reason, "disproportionality" determinations must "tak{e} into account all the facts and circumstances of a particular case." *Id.* The court in *Samsung Electronics Co., Ltd. v. United States* cited to *AK Steel* to further support the proposition that using just the relative share of the total benefit to determine

disproportionality could produce an untenable result, concluding that more is required from Commerce to support a finding of disproportionality than simply showing that the respondent received a large benefit.  973 F. Supp. 2d 1321, 1326-28 (Ct. Int'l Trade 2014).

In rejecting similar reasoning by Commerce for finding Korea's provision of industrial electricity to be specific based solely upon the relative amounts of electricity that certain industries consume, this Court repeatedly has confirmed that "disproportionality" is distinct from "disparity."  *See Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024) (*Hyundai I*); *Hyundai Steel Co. v. United States*, No. 23-00211, slip op. 25-102 at 9-14 (Ct. Int'l Trade Aug. 12, 2025) (*Hyundai II*); *POSCO v. United States*, No. 24-00006, slip op. 25-100 at 6-10 (Ct. Int'l Trade Aug. 8, 2025).  This Court in *POSCO* held that Commerce was "required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits {received by} others.'"  *POSCO*, No. 24-00006, slip op. 25-100 at 9.  And after Commerce continued to argue that "disproportionate" usage could be established just by disparities in usage among industries or enterprises in its remand redetermination following *Hyundai I*, this Court in *Hyundai II* reiterated that the "Court has already rejected this position."  *Hyundai II*, No. 23-00211, slip op. 25-102 at 11.  Noting that Commerce "simply reject{ed} this Court's instruction on disproportionality," the Court criticized Commerce for again misinterpreting the meaning of disproportionality.  *Id.* at 9.  There is no ambiguity in the court rulings.  This Court and the Federal Circuit have specifically warned against the error of confusing disparity in benefit amounts arising from the size or nature of particular companies or industries with disproportionality in the benefit conferred.  Commerce made that same error here.

3

Further, Defendant's and Defendant-Intervenor's erroneous fixation on the number of industries and subindustries active in the Korean economy as the basis to conclude that the steel industry and two other industries disproportionately consumed electricity fails to account for the inherent differences in the nature and size of the industries. Record evidence shows that certain industries, such as the [                    ], and steel industries, are significantly larger than other industries. *See* Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire" (Aug. 11, 2023) at 42-43 (C.R.105/P.R.104). These large manufacturing industries naturally tend to consume more electricity than other smaller, non-manufacturing industries, such as retail or travel industries. Given the differences in size and nature of the various industries operating in Korea, a difference in electricity consumption only means that there is a disparity, not disproportionality. As Hyundai Steel pointed out, Defendant and Defendant-Intervenor failed to link Commerce's observation that the Korean economy includes a wide variety of industries—an observation that provides no insight into the relative size of those industries—to its conclusion of disproportionate aggregate consumption of electricity by the steel industry and two other industries. Hyundai Steel Reply at 10. Without such a link, Commerce fails to demonstrate a disproportionate consumption of electricity by specific industries. It merely proves what would already be obvious – there is a disparity of electricity consumption across different industries.

This Court and Commerce itself, in its determination giving rise to *Bethlehem Steel*, have previously emphasized that disparate usage is not alone sufficient to establish disproportionate usage. *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001). That interpretation of the statute aligns with the dictionary definitions of "disparity" and

4

"disproportionality" cited in the GOK's opening brief. *See* GOK Br. at 5. The plain meaning of the statute requires Commerce to find more than mere disparate usage to conclude that a subsidy is *de facto* specific. Thus, Commerce's stubborn insistence that these terms have the same meaning is nothing more than a blank refusal of the clear directive of the statute as confirmed by the courts.

### B. Electricity in Korea Is Not Countervailable Because It Is Widely Available and Broadly Used and Provided Through a Standard Pricing Mechanism

"The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 at 930 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 ("SAA").[1] As the GOK explained in its opening brief, the provision of electricity is a clear example of a broadly available and widely used program that is not intended to be countervailed. GOK Br. at 11-12.

This Court has made clear multiple times that *de facto* specificity based on disproportionality "requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share)." *Hyundai I*, 745 F. Supp. 3d at 1353; *see also Hyundai II*, No. 23-00211, slip op. 25-102 at 11-14; *POSCO*, No. 24-00006, slip op. 25-100 at 9-10. The Department's own practice establishes that there is no *de facto* specificity when industrial users of electricity are "treated in a manner consistent or even less favorable than other consumers with respect to the electricity tariff schedule." *Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and

---

[1] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

5

accompanying Issues and Decision Memorandum at 13. The court in *Bethlehem Steel* sanctioned that practice, holding that a program is not *de facto* specific "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers." *Bethlehem Steel*, 140 F. Supp. 2d at 1369-70 (upholding Commerce's finding of no *de facto* specificity because there is "no exercise of discretion and no favorable treatment afforded to any one industry").

Defendant conveniently ignores the material and undisputed facts that electricity is widely available and used in Korea and that electricity is provided pursuant to a standard pricing mechanism. Instead, Defendant asserts that the program at issue in *Bethlehem Steel* was not actually electricity for LTAR, such that *Bethlehem* is inapt here. Def. Br. 17-19. As explained in the Replies of Hyundai Steel and DSM, the principles articulated in *Bethlehem Steel*, which involved a different, but materially similar, electricity-related program, apply just as strongly in this context as it did in *Bethlehem Steel*. Hyundai Steel Reply at 6-8; DSM Reply at 6-9. The court in *Bethlehem Steel* confirmed that disparity in benefit amounts based on usage level alone is insufficient to justify a *de facto* specificity finding based on disproportionality. *Bethlehem Steel*, 140 F. Supp. 2d at 1369. More importantly, by upholding Commerce's finding that the program at issue (i.e., electricity discounts for companies lowering their electricity consumption) was not specific when taking into account the inherent characteristics of the Korean steel industry (i.e., large consumption of electricity), the court suggests that disparities in usage of programs are to be expected based on the different nature of industries. *Id.* Lastly, the court clarified that a program is not *de facto* specific "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers." *Id.* at 1369-70. None of those

6

principles depend upon whether the program at issue technically deals with electricity rates versus electricity discounts, when the benefit varies based upon usage.

Defendant-Intervenor, meanwhile, argues that electricity is not general infrastructure, and thus electricity programs can be countervailed.  Neither Hyundai Steel nor the GOK argue that electricity is infrastructure and therefore cannot be countervailed pursuant to 19 U.S.C. § 1677(5)(D).  Rather, Hyundai Steel and the GOK contend that when electricity is widely available, broadly used, and provided pursuant to a standard pricing mechanism (as is the electricity program at issue here), it is like the non-specific programs identified in *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983), which the SAA favorably cites.  SAA at 873.  This includes not only programs like bridges and highways, but also tax credits for expenditures on capital investment available to all industries in sectors.  *Carlisle Tire*, 564 F. Supp. at 838.  Those programs are not specific, even though not every industry or company would benefit from the program to the same extent.

For example, manufacturers in capital-intensive industries would be bigger users of tax credits for expenditures on capital investments than insurance companies, but that does not make the program specific, because it is still generally available and widely used.  The same principle applies here, when electricity is generally available in Korea, is provided pursuant to a standard pricing mechanism, and is used by essentially every economic actor, even if usage varies.  As this Court recently explained, "{u}nder the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those . . . that distribute a benefit throughout the entire economy."  *Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1382 (Ct. Int'l Trade 2025).  Electricity in Korea falls into the latter category.

7

Finally, Defendant-Intervenor cites several cases to claim that the provision of electricity is often found to be specific. Pet'r Br. at 24-26. None of them, however, support Commerce's determination in this case. In particular, the reasoning Commerce used for its *de facto* specificity findings in other proceedings involving Korea is the same reasoning currently being challenged in this case. One of these cited determinations—*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*—is also the subject of another appeal before this Court (i.e., *POSCO*, Court No. 24-00006) and has been remanded to Commerce. The other Commerce decisions cited by Defendant-Intervenor are similarly inapt. In those cases, Commerce found that the provision of electricity was either regionally specific because electricity prices were set based on provincial areas or *de jure* specific because certain rates were expressly limited to large government, commercial, and industrial consumers whose electricity consumption exceeded certain thresholds. *Certain Steel Nails From Thailand: Final Negative Countervailing Duty Determination*, 87 Fed. Reg. 51,343 (Aug. 22, 2022), and accompanying Issues and Decision Memorandum at Comment 2; *Certain Aluminum Foil From the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 52,888 (Sept. 23, 2021), and accompanying Issues and Decision Memorandum at Comment 4; *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2011*, 79 Fed. Reg. 45178 (Aug. 4, 2014), and accompanying Issues and Decision Memorandum at Comment 3. The court decisions cited by Defendant-Intervenor likewise involved specificity determinations that were based on AFA or regional specificity. *Canadian Solar Inc. v. United States*, Consol. Ct. No. 19-00178, Slip Op. 22-49, at 5 (Ct. Int'l Trade May 19, 2022); *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1302-03 (Ct. Int'l Trade 2020). Lastly, as Hyundai Steel explained, Defendant-Intervenor's

reliance on *Mosaic Co. v. United States* is also misplaced because Commerce's *de facto* specificity determination in that case was limited to "predominant use." Hyundai Steel Reply at 8-9. None of the non-Korea cases cited by Defendant-Intervenor involved electricity provided via a standard pricing mechanism or even a disproportionality finding.

      **C.**      **Defendant and Defendant-Intervenor Fail to Provide a Reasonable Explanation for Commerce's Grouping of the Three Industries**

At minimum, any determination of *de facto* specificity must be carefully scrutinized to demonstrate that the provision of a public good like electricity is specific, despite its widespread availability and use. This Court has repeatedly stated that "{w}here a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping." *Hyundai I*, 745 F. Supp. 3d at 1353; *see also Hyundai II*, No. 23-00211, slip op. 25-102 at 14-16; *POSCO*, No. 24-00006, slip op. 25-100 at 7.

Defendant and Defendant-Intervenor continue to duck these on-point, material decisions and instead focus on the argument that Commerce was not required to determine whether a "group" of enterprises or industries shared characteristics under the statute. Def. Br. at 14-16; Pet'r Br. at 12-15. Moreover, Defendant insists that the grouping of the three industries was reasonable because each industry was using "a disproportionate amount of industrial electricity—and therefore receiving a disproportionate benefit." Def. Br. at 16. These arguments completely miss the point.

Commerce's error in grouping the three industries lies not in its failure to consider "shared characteristics" of the industries, but rather within its failure to explain the basis for its grouping to determine *de facto* specificity. Hyundai Steel Reply at 4; DSM Reply at 4-5. By failing to do so, Commerce's grouping was unreasonable, unprincipled, and results-oriented,

9

especially because Commerce simply grouped the top three industries in terms of electricity usage to find that they received "disproportionate" benefit.

Further, Defendant confuses the specificity analysis with the benefit analysis when it claims that Commerce's grouping of the three industries was reasonable because each industry received a disproportionate benefit. Def. Br. at 16. This Court has already rejected this line of argument. *Hyundai II*, No. 23-00211, slip op. 25-102 at 13; *see also Hyundai I*, 745 F. Supp. 3d. at 1352; *POSCO*, No. 24-00006, slip op. 25-100 at 7-8. Reiterating that the "benefit analysis is distinct from the specificity analysis," this Court in *Hyundai II* explained that "to say that the industries under consideration received more benefit than other industries is only to say that those industries received more subsidies that {sic} other industries. Greater benefit alone does not equate with disproportionality." *Hyundai II*, No. 23-00211, slip op. 25-102 at 14. Thus, contrary to Defendant's contention, Commerce's explanation of its grouping was deficient, and the arbitrary grouping of disparate industries does not satisfy Commerce's burden to issue reasoned decisions that are supported by substantial evidence.

II. **COMMERCE ABUSED ITS DISCRETION WHEN CHOOSING OVERLY BROAD ELECTRICITY CONSUMPTION DATA OVER THE REVISED, MORE ACCURATE DATA**

Commerce's discretion to select the data necessary to perform a specificity analysis is not without limits. In fact, Commerce is bound by its obligation to accept new or corrective information when the interests of accuracy outweigh the burden on Commerce in accepting that information and the interest of finality. *See Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021); *see also Içdaş Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2021).

The GOK explained that the revised consumption data were more accurate as they excluded irrelevant industries from each industry categorization and were based on the widely

10

used official industry classification scheme in Korea.  Letter from Yoon & Yang LLC to Sec'y Commerce, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Response to the Supplemental Questionnaire" (Nov. 1, 2023) at 2 ("GOK 2nd SQR") (C.R.285/P.R.207).  At that point, Commerce became aware that the original consumption data were overly broad and could distort its analysis.  However, Commerce simply disregarded the data, considering them unusable because the data were at "a lower level of industrial classification than {Commerce} requested." *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Sept. 11, 2024) (P.R.325), and accompanying Issues and Decision Memorandum (P.R.319) at 22.  Yet, as the GOK explained in its opening brief, there is absolutely no record evidence supporting this assertion by Commerce, GOK Br. at 15, and neither Defendant nor Defendant-Intervenor point to anything in the record that substantiates this assertion.  To the extent that Defendant and Defendant-Intervenor offer other reasons for not relying on the revised data, Hyundai Steel persuasively explains why those *post hoc* rationalizations are contradicted by Commerce's verification of the revised data instead of the original data and otherwise do not withstand scrutiny.  Hyundai Steel Reply at 14-16.

      Furthermore, the revised data, which Commerce verified, put Commerce on notice that the original consumption data for the "steel" industry were overly broad because they included non-steel industries within the "steel" industry classification.  Defendant asserts that the GOK did not provide supporting documentation for this fact, Def. Br. at 22, but Commerce never requested such documentation in a subsequent supplemental questionnaire or during verification, and under Commerce's own regulations, "factual information" includes "statements of fact."  19

11

C.F.R. § 351.102(b)(21).  Setting aside the Commerce-invented distraction of whether the GOK provided additional supporting documentation, the record *does* contain factual information showing that the original data were overly broad and that the data for the "steel" industry were not limited to just that industry.  The GOK submitted the revised consumption data in its second supplemental questionnaire response, explaining to Commerce that the revised data provides a "more detailed industry categorization," excluding "any irrelevant industry" such as copper and non-ferrous metal.  GOK 2nd SQR at 2 (C.R.285/P.R.207).  Commerce was required to address that fact in analyzing whether the original data showed that the steel industry (rather than the broader metals industry) received a disproportionate amount of the subsidy, but it failed to do so. GOK Br. at 15.

In sum, Commerce abused its discretion by arbitrarily rejecting the revised, more accurate electricity consumption data, and by failing to take into account the fact that the data it did use for its specificity determination were overly broad.

### III. COMMERCE'S BENEFIT DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

The GOK fully agrees with the arguments raised by Hyundai Steel in its Reply related to Commerce's benefit calculations, which erroneously included deferred charges that KEPCO was unable to charge its customers in 2021 (i.e., **[      ]** for the cost pass-through tariff system). Hyundai Steel Reply at 16-20.  Commerce's benefit calculations contain two distinct, yet related, errors.

First, both Hyundai Steel and the GOK clearly demonstrated that the 2021 deferred amount does not represent actual costs incurred by KEPCO to generate and supply electricity. *Id.* at 16-17; GOK Br. at 16-17.  Rather, it reflects deferred charges that KEPCO could not impose upon customers in prior periods, allowing KEPCO more flexibility to incorporate those

deferred charges in the determination of appropriate electricity rates in subsequent periods. Hyundai Steel Reply at 16-17; GOK Br. at 17. KEPCO merely demonstrates this item in its "Total Comprehensive Cost" to support its proposal to raise electricity prices in the future. GOK Br. at 17. By their very nature, these deferred charges are not a cost. Rather, they function solely as a *regulatory* mechanism that permits KEPCO to accumulate and reflect amounts it was unable to charge customers in its "Total Comprehensive Cost," which then serves as the basis for establishing future electricity tariffs. *See* Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Initial Questionnaire" (Aug. 11, 2023) ("GOK IQR") at Exhibit E-2 at 6 (C.R.124/P.R.119). Consistent with this characterization, the relevant laws and regulations governing the setting of electricity tariffs in Korea make clear that the [      ] amount is irrelevant to costs incurred by KEPCO to generate and supply electricity. For example, Article 2.5 of Attached Table 8 of KEPCO's *General Terms and Conditions for Electricity Supply* provides that KEPCO may reflect the amount subject to [      ] of the Fuel Cost Adjusted Charge ("FCAC") on a cumulative basis to the "Total Comprehensive Cost." GOK IQR at Exhibit E-7 (C.R.124/P.R.119). In accordance with these regulations, KEPCO includes the [      ] amount in its "Total Comprehensive Cost" for purposes of future tariff adjustments; however, as the regulations make clear, this inclusion merely serves *regulatory* purposes of adjusting future tariffs and is unrelated to costs incurred in the production or supply of electricity.

Because the [      ] amount merely serves regulatory purposes of adjusting future tariffs pursuant to the regulations, and does not represent an actual cost associated with generating and supplying electricity, it is irrelevant to the analysis of whether the GOK provided electricity at a price that resulted in cost recovery and profit. By including this [      ]

13

amount in its benefit calculation (which does not reflect costs associated with generating and supplying electricity), Commerce's analysis overstated the amount of costs that KEPCO would need to recover during the POR. Hyundai Steel Reply at 18.

Second, even assuming arguendo that the deferred charges are characterized as costs in accordance with Commerce's erroneous logic, which the GOK disputes, they can only relate to the costs incurred in *2021* that were not fully passed on to customers in *2021*. In this regard, Article 25 of the *Notification on the Power Generating Business Approval Criteria, Electricity Tariff Calculation Standard, Permitted Error of the Electric Consumption Measuring Instrument, and Scope of Electricity Business Operations* provides:

> If the total operating cost and revenue from electricity sales calculated at the time of tariff adjustment for the *relevant fiscal year* considerably varies from the actual value calculated by applying the performance on the balance sheet following the end of the *relevant fiscal year*, such grounds per item may be considered and reflected in the cost for settlement when adjusting the tariff for the *subsequent year*.

GOK IQR at Exhibit E-6 (C.R.124/P.R.119).

Pursuant to this provision, KEPCO calculates the difference between "the total operating cost and revenue from electricity sales … at the time of tariff adjustment for the *relevant fiscal year*" and the "actual value calculated … following the end of the *relevant fiscal year*" (i.e., the deferred charges) and reflects that amount as a "cost for settlement when adjusting the tariff for the *subsequent year*." *Id.* (emphases added). For example, any such difference arising in 2021 is reflected in 2022 as the **[          ]** amount (i.e., deferred charges). Accordingly, the deferred charges bear no relationship to the cost of generating and supplying electricity *during the POR*, regardless of whether those amounts were considered as part of KEPCO's rate-setting methodology. Hyundai Steel Reply at 16; GOK Br. at 17. Given that Commerce has chosen to focus its benefit determination solely on whether the prices charged during the POR were sufficient to recover costs during the POR, the deferred charges attributable to 2021 should not

14

have been included in a benefit determination for 2022. Commerce's inclusion of the 2021 deferred charges in the 2022 benefit calculation would only result in an inappropriate, arbitrary, and irrational double counting. Hyundai Steel Reply at 19-20; GOK Br. at 18. As the 2021 costs were already reflected in KEPCO's 2021 cost recovery rates, Commerce countervailed the amount twice as part of its benefit calculation—once during the 2021 POR, when the amount was not recovered, and another time during the 2022 POR, when it treated the deferred charges again as a cost that had to be recovered in 2022.

## CONCLUSION

For the reasons discussed above, the GOK requests that the Court grant Hyundai Steel's, DSM's, and the GOK's Rule 56.2 Motions for Judgment on the Agency Record and remand to Commerce for further proceedings.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: December 19, 2025              *Counsel for the Government of the Republic of Korea*

**CERTIFICATE OF COMPLIANCE**

      Undersigned counsel hereby certifies that the foregoing brief complies with the word-count limitation set forth in paragraph 2(b)(1) of the Court's Standard Chambers Procedures. The brief contains 4,468 words according to the word-count function of the word-processing software used to prepare this submission.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | /s/ Yujin K. McNamara |
|  | Yujin K. McNamara |
|  | AKIN GUMP STRAUSS HAUER & FELD LLP |
|  | 2001 K Street NW |
|  | Washington, DC 20006 |
|  | Phone: (202) 887-4347 |
|  | E-mail: ymcnamara@akingump.com |
| Dated: December 19, 2025 | *Counsel for the Government of the Republic of Korea* |