Slip Op. 26-90

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **HYUNDAI STEEL COMPANY,**<br><br>**Plaintiff,**<br><br>**and**<br><br>**DONGKUK STEEL MILL CO., LTD.,**<br><br>**Consolidated Plaintiff,**<br><br>**and**<br><br>**GOVERNMENT OF THE REPUBLIC OF KOREA,**<br><br>**Plaintiff-Intervenor,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**NUCOR CORPORATION,**<br><br>**Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge**<br><br>**Consol. Court No. 24-00190**<br>**PUBLIC VERSION** |

**OPINION AND ORDER**

[Granting Plaintiffs' motions for judgment on the agency record and remanding Commerce's determination.]

Dated: August 11, 2026

Brady Warfield Mills, Donald B. Cameron, Jr., Edward J. Thomas, III, Eugene Degnan, Jordan L. Fleischer, Julie Clark Mendoza, Mary Shannon Hodgins, Nicholas C. Duffey, Jr., and Rudi Will Planert, Morris, Manning & Martin, LLP, of Washington D.C., for Plaintiff Hyundai Steel Company.

Jarrod Mark Goldfeder and Kenneth Neal Hammer, Trade Pacific PLLC, of Washington D.C., for Consolidated Plaintiff Dongkuk Steel Mill Co., Ltd.

Yujin Kim McNamara, Daniel Martin Witkowski, Devin Scott Sikes, and Sung Un K. Kim, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington D.C., for Plaintiff-Intervenor Government of the Republic of Korea.

Augustus J. Golden, National Courts Section, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., for Defendant United States. Also on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel was Jack Dunkelman, Attorney, U.S. Department of Commerce.

Alan Hayden Price, Adam Milan Teslik, Christopher Bright Weld, Derick G. Holt, Enbar Toledano, Maureen Elizabeth Thorson, Paul A. Devamithran, and Theodore Paul Brackemyre, Wiley Rein, LLP, of Washington D.C., for Defendant-Intervenor Nucor Corporation.

Kelly, Judge: Before the Court are motions for judgment on the agency record pursuant to United States Court of International Trade Rule ("USCIT R.") 56.2, filed by Plaintiff Hyundai Steel Company ("Hyundai"), Consolidated Plaintiff Dongkuk Steel Mill Co., Ltd. ("DSM") (collectively, "Plaintiffs"), and Plaintiff-Intervenor Government of the Republic of Korea ("Gov't of Korea" or "Plaintiff-Intervenor"). See generally [Hyundai] Mot. J. Agency Rec., Apr. 24, 2025, ECF Nos. 31, 32 ("Hyundai Mot."); [DSM] Mot. J. Agency Rec., Apr. 24, 2025, ECF No. 33 ("DSM Mot."); [Gov't of Korea] Mot. J. Agency Rec., May 29, 2025, ECF Nos. 38, 39 ("Gov't of Korea Mot."); see also USCIT R. 56.2; see also Certain Cut-to-Length Carbon-Quality Steel Plate

From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022, 89 Fed. Reg. 15,825 (Sept. 6, 2024) ("Final Results"), PD 318, bar code 4626807-03 and accompanying Issues & Decision Mem. ("Final Decision Memo."), PD 319, bar code 4626807-02 (Sept. 6, 2024). Plaintiffs and Plaintiff-Intervenor argue that the U.S. Department of Commerce's ("Commerce") determination that KEPCO's provision of electricity (the "Electricity Program") for less than adequate remuneration ("LTAR") is de facto specific under Section 771(5A)(D)(iii) of the Tariff Act of 1930,[1] as amended, 19 U.S.C. § 1677(5A)(D)(iii), is unsupported by substantial evidence and otherwise not in accordance with law. Hyundai Mot. at 11–19; DSM Mot. at 7–11; Gov't of Korea Mot. at 4–14. Hyundai and the Gov't of Korea argue Commerce's decision not to rely on the 2022 Korea Electric Power Corporation ("KEPCO") cost data submitted by the Gov't of Korea in response to a supplemental questionnaire—rather than the 2021 KEPCO data originally submitted by the Gov't of Korea in its initial questionnaire response—is unsupported by substantial evidence and is otherwise not in accordance with law. Hyundai Mot. at 19–22; Gov't of Korea Mot. at 14–16. DSM argues that Commerce's determination that KEPCO's Electricity Program was provided at LTAR is not supported by substantial evidence and is contrary to law. DSM Mot. at 7–8, 11–14. Hyundai and the Gov't of Korea argue that Commerce's calculation of the benefit from the provision of electricity for

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2024 edition.

LTAR under 19 U.S.C. § 1677(5)(E), using KEPCO's cost data carried forward from, and already used in, the countervailing duty analysis for the prior period of review ("POR") is unsupported by substantial evidence and not in accordance with law. Hyundai Mot. at 22–26; Gov't of Korea Mot. at 16–19. For the following reasons, Plaintiffs' and Plaintiff-Intervenor's motions for judgment on the agency record are granted, and Commerce's determination is remanded for further explanation or reconsideration.

## BACKGROUND

On April 11, 2023, Commerce initiated its administrative review of the countervailing duty ("CVD") order on Certain Cut-to-Length Carbon-Quality Steel Plate for the 2022 POR. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 21,609 (Dep't Commerce Apr. 11, 2023). Commerce evaluated many subsidy programs, including the Electricity Program. See generally Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022, 89 Fed. Reg. 15,825 (Mar. 5, 2024) ("Preliminary Results"), PD 248, bar code 4517008-03 and accompanying Prelim. Issues & Decision Mem. ("Prelim. Decision Memo."), PD 243, bar code 4517008-02 (Mar. 5, 2024). On June 14, 2023, Commerce selected DSM and Hyundai as mandatory respondents and issued an initial questionnaire to the Gov't of Korea. See Letter from [Commerce] to

[Gov't of Korea] Pertaining to Initial Questionnaire, CD 28, bar code 4389302-01 (June 14, 2023) ("Initial Questionnaire").

In its initial questionnaire for this review, Commerce requested that the Gov't of Korea "provide the amount of electricity provided to the steel industry during the POR and the largest 10 industries consuming electricity during the POR" as well as the "percentage for the steel industry and largest 10 industries consuming electricity for the POR based on total electricity consumed and the total industrial classification consumed." Initial Questionnaire at 20. The Gov't of Korea submitted its initial questionnaire response on August 11, 2023, which included usage data for the steel industry and ten largest electricity-consuming industries. See Gov't of Korea Response to Initial Questionnaire, CD 105–142, PD 104–125, bar codes 4416305-01–38; 4416377-01–22 (Aug. 11, 2023) ("Gov't of Korea IQR"); Hyundai Mot. at 4. After the Gov't of Korea had submitted its initial questionnaire response, and although Commerce did not request it, the Gov't of Korea submitted a second, revised version of usage data for the steel industry and ten largest electricity-consuming industries. Hyundai Mot. at 4. The Gov't of Korea explained that the first dataset was "inaccurate in the sense that each category covers industries that do not match their names; for example, the 'Steel' category covers not only steel but also copper and non-ferrous metal, aluminum, etc." Gov't of Korea Second Supplemental Questionnaire Response at 2, PD 207, CD 285, bar code 445588601 (Nov. 1, 2023) ("Gov't of Korea 2SQR"). The Gov't of Korea also explained that the revised data complied with the

official industry classification scheme in Korea. Id. at 2. Commerce accepted this revised data, discussed it in the Preliminary Results, and then verified it at the Gov't of Korea's verification, but it did not verify the original dataset. Final Decision Memo. at 22; Hyundai Mot. at 14–15; Gov't of Korea Mot. at 6–8. Despite accepting and verifying the revised dataset provided in the supplemental questionnaire response, Commerce continued to rely on the initial dataset in making its specificity determination. Def. Resp. at 21 (citing Final Decision Memo. at 21–22).

On March 5, 2024, Commerce published its preliminary results of the review, in which it determined the Electricity Program provided a financial contribution and benefit to Hyundai and DSM, and that the provision of electricity was de facto specific because the steel industry "received a disproportionately large amount of the subsidy." Prelim. Decision Memo. at 36. Thus, Commerce assigned Hyundai a countervailing duty rate of 1.47 percent ad valorem and DSM a rate of 1.61 percent ad valorem. Id. at 35–36.

The interested parties submitted comments on the Electricity Program that Commerce deemed countervailable. See Final Decision Memo. at 8, cmts. 1–4. The Electricity Program includes a cost pass-through tariff system for electricity which isolates fuel and environmental cost elements in KEPCO's tariffs. Final Decision Memo. at 23 (citing Gov't of Korea IQR at Exhibit E-1). Under this system, KEPCO applies a "fuel cost adjustment charge" ("FCAC") that is revised quarterly to reflect changes in fuel prices, subject to certain regulatory limits. Final Decision Memo. at

22–23 (citing Hyundai Case Br. at 33–34). The FCAC appears as a distinct line item on customers' electricity bills and is part of the total tariff that industrial users pay. Id. at 24. When fuel costs rise and government regulations do not permit full recovery through the quarterly FCAC, KEPCO does not immediately write off the unrecovered portion. Id. at 24–25 (citing Gov't of Korea IQR at Exhibit E-2). Instead, KEPCO explains that it accumulates unrecovered fuel costs and rolls them into its "Total Comprehensive Cost" for the following term. Id. at 24–25 (citing Gov't of Korea IQR at Exhibit E-2). The Total Comprehensive Cost figure is then used to set the base and usage charges for future tariffs, with the stated objective of allowing KEPCO to recover its operating costs and a reasonable return over time. Id. at 24–25 (citing Gov't of Korea IQR at Exhibit E-2).

On July 18, 2024, Hyundai and the Gov't of Korea submitted administrative case briefs. See Letter from Yoon & Yang LLC to Sec'y Commerce, "Case Brief of the Gov't of the Republic of Korea," CD 374, PD 307, bar code 4598797-01 (July 18, 2024) ("Gov't of Korea Case Br."); Letter from Morris, Manning & Martin LLP to Sec'y of Commerce, "Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea," CD 375, PD 308, bar code 4598797-01 (July 18, 2024) ("Hyundai Case Br.").

On September 11, 2024, Commerce published the Final Results. See generally Final Results; Final Decision Memo.[2] In the Final Results, Commerce relies upon the dataset submitted in the Gov't of Korea's initial questionnaire response and does not consider the second, revised dataset submitted in the Gov't of Korea's supplemental questionnaire response. See Final Decision Memo. at 21–22. Commerce verified the revised electricity consumption data, but it determined that the initial questionnaire response data was "more appropriate" to rely upon for the review. See id. at 22.

On April 24, 2025, Hyundai and DSM filed motions for judgment on the agency record, arguing that Commerce's final determinations are unsupported by substantial evidence and otherwise not in accordance with law. See Hyundai Mot. at 1; DSM Mot. at 1. On May 29, 2025, the Gov't of Korea filed a brief in support of Hyundai's motion for judgment on the agency record, arguing the same. See Gov't of Korea Mot. at 1. On October 1, 2025, Defendant filed its response to the motions for judgment on the agency record, arguing Commerce's determination is supported by substantial evidence and should be sustained. See generally Def. Resp. [Hyundai], [DSM] and [Gov't of Korea] Mot., Oct. 1, 2025, ECF Nos. 43, 44 ("Def. Resp."). On October 24, 2025, Defendant-Intervenor Nucor Corporation filed a response

---

[2] On December 20, 2024, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination. See ECF Nos. 25, 26.

supporting Commerce's determination. See generally [Nucor's] Resp. [Hyundai], [DSM] and [Gov't of Korea] Mot., Oct. 24, 2025, ECF Nos. 45, 46 ("Nucor Resp."). On November 20, 2025, Hyundai filed its reply, see generally [Hyundai] Reply Br. Supp'n [Hyundai Mot.], Nov. 20, 2025, ECF Nos. 48, 49 ("Hyundai Reply"), DSM filed its reply, see generally [DSM's] Reply Br. Supp'n [DSM Mot.], Nov. 20, 2025, ECF No. 50 ("DSM Reply"), and Gov't of Korea filed its reply, see generally [Gov't of Korea] Reply Br. Supp'n [Gov't of Korea Mot.], Dec. 19, 2025, ECF Nos. 53, 54 ("Gov't of Korea Reply").

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this action, which contests Commerce's final results in an administrative review of an antidumping duty order, under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The Court will sustain Commerce's determination unless it is unsupported by substantial evidence on the administrative record or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). An abuse of discretion occurs when Commerce bases its determination on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or on an unreasonable judgment in weighing

relevant factors. Consol. Bearings Co. v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005).

## DISCUSSION

Plaintiffs and Plaintiff-Intervenor challenge Commerce's specificity analysis as contrary to law and unsupported by substantial evidence. Specifically, Plaintiffs and Plaintiff-Intervenor argue that the Electricity Program is not specific because it is broadly available throughout the economy, Commerce's grouping of industries it uses to demonstrate that some industries receive a disproportionate amount of a subsidy is arbitrary, and Commerce's interpretation and understanding of "disproportionate" is contrary to law. Hyundai Mot. at 11–19; Gov't of Korea Mot. at 4–12. Plaintiff Hyundai and Plaintiff-Intervenor also argue Commerce abused its discretion by failing to use accurate and verified data. Hyundai Mot. at 19–22; Gov't of Korea Mot. at 14–15. Plaintiff DSM argues that Commerce acted contrary to law in conducting its Tier III analysis and determining that electricity was provided for LTAR. DSM Mot. at 11–16. Finally, Plaintiff Hyundai and Plaintiff-Intervenor challenge Commerce's calculation of benefit, arguing that Commerce included amounts irrelevant to the cost of supplying electricity in the POR. Hyundai Mot. at 22; Gov't of Korea Mot. at 16. For the following reasons, Commerce's determinations are remanded for reconsideration or further explanation.

## I. Specificity

Plaintiffs and Plaintiff-Intervenor argue that Commerce's determination is unsupported by substantial evidence and not in accordance with law because (1) the steel industry did not receive a disproportionately large amount of the subsidy alone, or when grouped together with two other industries; and (2) Commerce's decision to group the steel industry with two other large industries for its specificity determination is not reasonable. Hyundai Mot. at 2–3, 16–17. Defendant contends that Commerce's final determination is supported by substantial evidence and in accordance with law because Commerce reasonably determined that a group of three industries, including the steel industry, received a disproportionately large amount of the Electricity Program subsidy, and accordingly, Plaintiff received a de facto specific countervailable subsidy. Def. Resp. at 8; Final Decision Memo. at 17–18, 19. For the following reasons, Commerce's determination is remanded for further explanation or reconsideration.

A "countervailable subsidy" is a financial contribution by a government authority that confers a benefit on a recipient. 19 U.S.C. § 1677(5)(B). To be countervailable, the subsidy must be "specific;" i.e., the subsidy must be (i) an import substitution subsidy; (ii) an export subsidy; or (iii) a domestic subsidy that is specific to an enterprise or industry within the jurisdiction of the authority providing the subsidy. Id. § 1677(5A)(A)–(D). A domestic subsidy may be specific as a matter of

law ("de jure") or as a matter of fact ("de facto").[3] Id. § 1677(5A)(D). A domestic subsidy is de facto specific where:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.
>
> In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation.

Id. § 1677(5A)(D)(iii). Thus, even where the number of industries receiving a subsidy is not limited, and the authority does not exercise discretion in administering the program, a subsidy may still be de facto specific if an industry is a predominant user or receives a disproportionately large amount of the subsidy. See id. § 1677(5A)(D)(iii)(II)–(III).

Commerce determines whether an entity receives a disproportionately large amount of a subsidy on a case-by-case basis by assessing the amount received "not in

---

[3] A subsidy may be de jure specific under 19 U.S.C. § 1677(5A)(D)(i) where an authority or legislation expressly limits access to a subsidy to a sufficiently small number of enterprises, industries, or groups. Id.

relation to the benefits of others, but in relation to some other comparator depending on the circumstances." Hyundai Steel Co. v. United States, 745 F. Supp. 3d 1345 at 1352–53 (Ct. Int'l Trade 2024) ("Hyundai I") (citing AK Steel Corp. v. United States, 192 F.3d 1367, 1385 (Fed. Cir. 1999); Royal Thai Gov't v. United States, 436 F.3d 1330, 1336 (Fed. Cir. 2006)). The phrase "disproportionately large" requires "an enterprise or industry [be] favored in some way (i.e., it receives more than its fair share [of the subsidy])." Hyundai I, 745 F. Supp. 3d at 1352–53. Thus, the fact that an industry or group of industries receives more—even much more—of an absolute dollar amount from the program than others receive does not, by itself, establish disproportionality. See Hyundai Steel Co. v. United States, 798 F. Supp. 3d 1283, 1288 (Ct. Int'l Trade 2025) ("Hyundai II") (interpreting 19 U.S.C. § 1677(5A)(D)(iii)(III)). Therefore, Commerce must explain "how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." Hyundai I, 745 F. Supp. 3d at 1352–53; see also Samsung Electronics Co. Ltd. v. United States, 973 F. Supp. 2d 1321, 1326 (Ct. Int'l Trade 2014) ("[i]n focusing solely on Samsung's relative share of the total benefit, Commerce failed to consider . . . that [the Gov't of Korea] confers [] tax credits based on usage . . . ").

Commerce may identify "a group of . . . enterprises or industries" to evaluate whether those enterprises or industries receives a disproportionately large amount

of the subsidy. 19 U.S.C. § 1677(5A)(D)(iii)(III); see, e.g., POSCO v. United States, 794 F. Supp. 3d 1402, 1408 (Ct. Int'l Trade 2025). Commerce has "reasonable flexibility" in grouping enterprises or industries. See Mosaic Company v. United States, 160 F.4th 1340, 1347–48 (Fed. Cir. 2025) (applying Commerce's "reasonable flexibility in carrying out the de facto specificity inquiry" to its determinations of comparator groups for purposes of 19 U.S.C. § 1677(5A)(D)(iii)(II)) (citing AK Steel Corp. v. United States, 192 F.3d 1367, 1385 (Fed. Cir. 1999)); 19 C.F.R. § 351.502(b) (Commerce need not consider "whether there are shared characteristics among the enterprises or industries" when grouping); POSCO, 794 F. Supp. 3d at 1408 (Commerce must reasonably exercise the discretion it is granted under 19 U.S.C. § 1677(5A)(D)(iii)(III) to make grouping determinations). Commerce's flexibility is "not unbounded." Mosaic, 160 F.4th at 1348.

Here, Commerce determines that the steel industry and two other industries received a disproportionately large amount of the Electricity Program subsidy because the group of industries "consumed a majority of the industrial class electricity during the POR." Final Decision Memo. at 19. Commerce's determination identifies the raw amount of electricity consumed and the commensurate amount of Electricity Program contribution received as a result of that consumption. Id. at 19. Commerce explains the Gov't of Korea has a "wide diversification of economic activities . . . including 19 industry groupings with a broad range of distinctly different types of economic activities within the groupings," yet the steel industry and

two other industries,[4] received a large amount of the subsidy. Id. at 18–19 (citing Placement of Korea Economic Diversification Memo., PD 30, barcode 438930801 (June 14, 2023)). Commerce also quantifies the steel industry's particular consumption of electricity among industrial consumers.[5] Id. at 19. However, contrary to Defendant's and Defendant-Intervenor's arguments,[6] the use of a larger amount of electricity compared to other consumers does not indicate that the steel industry receives a disproportionately large amount of the subsidy. See Def. Resp. at 19; Def-Int. Resp. at 20 (citing AK Steel Corp. v. United States, 192 F.3d 1367, 1384 (Fed.

---

[4] The other two industries are [[ ]], and [[ ]] and together, the three industries used [[ ]] percent of industrial class electricity. Def. Resp. at 13 (citing Gov't of Korea IQR at 42–43).

[5] Steel consumed [[ ]] percent of the total electricity consumed by industrial consumers in Korea during the POR. Def. Resp. at 13 (citing Gov't of Korea IQR at 42–43).

[6] Defendant's and Defendant-Intervenor's reliance upon AK Steel is misplaced. In AK Steel, Commerce determined that the steel industry, which received revaluation of assets under a Korean revaluation program, did not receive a disproportionately large amount of the benefit. AK Steel Corp. v. United States, 192 F.3d 1367, 1383 (Fed. Cir. 1999). Commerce found that the program was available to a large number of companies across a wide variety of industries, and the company's assets were revalued upwards at the same average rate of increase as all other companies that revalued assets under the program. Id. at 1384–85. Domestic producers argued Commerce unreasonably analyzed disproportionality because it should have looked at the "percentage of the total benefit of a subsidy program" the industry is receiving. Id. at 1385. The Court of Appeals held that Commerce's determination was reasonable because it considered the relative percentage benefit rather than the absolute benefit conferred. Id. at 1385. Unlike Commerce's determination in AK Steel, in which Commerce reasonably compared the proportion of benefit each industry received, here, Commerce compares only the nominal amount of the subsidy each industry received, without taking into account whether that nominal amount is proportionate to the industries' respective use of electricity. See id. at 1384–85; Final Decision Memo. at 19.

Cir. 1999)); Hyundai I, 745 F. Supp. 3d at 1352–53; Hyundai II, 798 F. Supp. 3d at 1289. Commerce's interpretation suggests that each industry should receive the same portion of the subsidy regardless of the amount of electricity use. Such an interpretation of "disproportionately large" under 19 U.S.C. § 1677(5A)(D)(iii)(III) renders the "predominant user" factor under 19 U.S.C. § 1677(5A)(D)(iii)(II) meaningless.

Defendants cannot rely on Mosaic to support Commerce's finding here. See Def. Notice of Supp. Authority at 2–3, Jan. 8, 2026, ECF No. 58 (citing Mosaic, 160 F.4th at 1346–47). In Mosaic, the Court of Appeals rejected the argument that Commerce was limited in its choice of comparator groups for assessing whether a recipient of a subsidy was a predominant user of the subsidy. See Mosaic, 160 F.4th at 1346–47 (Fed. Cir. 2025). Commerce compared the agrochemical industry's subsidy use to other industrial users rather than to all subsidy users. Id. at 1346–47. The Court of Appeals held that Commerce has "flexibility" to identify a comparator group. Id. at 1346–47. Here, the question is not whether Commerce has discretion in identifying a comparator for measuring disproportionality, but whether Commerce has identified a comparator at all. See Hyundai II, 798 F. Supp. 3d at 1289 ("Rather, here Commerce fails to identify a comparator that would measure disproportionality."); Mosaic, 160 F.4th at 1346 (Commerce's discretion is "not unbounded, [and does not] provide Commerce with a loophole for rendering all subsidies de facto specific. Rather, Commerce must engage in reasoned decision

making") (internal citations omitted). Thus, absent additional explanation or evidence that the steel industry received "more than its fair share" of the subsidy, Commerce's determination that the subsidy is de facto specific based on disproportionality is not in accordance with law or supported by substantial evidence. Commerce fails to point to record evidence that indicates the steel industry receives a larger percentage of its subsidized electricity costs than other consumers receive and therefore its determination is remanded for reconsideration.

Separately, Plaintiffs and Plaintiff-Intervenor also argue that Commerce's decision to group the steel industry with two other large industries was arbitrary and capricious because Commerce did so without basis or explanation. Hyundai Mot. at 16–17; DSM Mot. at 8; Gov't of Korea Mot. at 10. In the 2021 review, this Court remanded Commerce's decision to use the four "top industrial users of electricity in Korea" as a group because Commerce failed to provide a rational explanation for the grouping.[7] Hyundai I, 745 F. Supp. 3d at 1353. Here, Commerce again finds that "the steel industry and two other industries" consumed a majority of the industrial class electricity during the POR. Final Decision Memo. at 19. Commerce explains that the remaining seven industries in the top ten users of industrial class electricity

---

[7] On remand, Commerce "offer[ed] the same basis for its decision" to group the four industries, and the Court remanded again. Hyundai II, 798 F. Supp. 3d at 1291. On second remand, Commerce abandoned its prior grouping and instead, reconsidered the basis of its determination and abandoned its prior grouping of certain industries. Hyundai Steel Co. v. United States, No. 23-00211, 2026 WL 1558544, at *1 n.1 (Ct. Int'l Trade May 18, 2026).

"accounted for a significantly smaller share" of electricity consumed. Final Decision Memo. at 19 (citing Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Final Specificity Analysis PR 320, CD 378–379 barcode 4626810-02 (Sept. 5, 2024)). As Commerce notes, under 19 C.F.R. § 351.502(b), Commerce is not required to determine whether there are shared characteristics among the grouped enterprises or industries. 19 C.F.R. § 351.502(b); Final Decision Memo. at 19–20. Defendant and Defendant-Intervenor argue that because the statute and regulations do not require Commerce's grouping determinations to "depend on 'whether there are shared characteristics among the enterprises or industries,'" Commerce's decision to group the three largest users of electricity is reasonable. Def. Int. Resp. at 12 (citing 19 C.F.R. § 351.502(b)); Def. Resp. at 14 (citing 19 C.F.R. § 351.502(b)). Though the regulations do not require Commerce to determine grouping based on shared characteristics, Commerce is required to support its formulation of a "group" with reasonably discernable explanation for its decision. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). Commerce provides no explanation for its grouping decision beyond emphasizing its discretion to define groups under 19 U.S.C. § 1677(5A)(D)(iii).[8]

---

[8] Commerce reasons that because three industries consume such a large percentage of the electricity, Commerce is not required to "compare those unique industries within the group to others and their individual energy consumption or relative size." Final Decision Memo. at 20. At oral argument, Defendant again argued that

(footnote continued)

Without reasoned explanation, Commerce's grouping determination is unsupported by substantial evidence and therefore remanded for further explanation or reconsideration.[9]

## II. Commerce's Decision Not to Rely Upon Revised Dataset

Plaintiff and Plaintiff-Intervenor challenge Commerce's reliance on the Gov't of Korea's first industrial electricity consumption dataset submission, rather than on the second, revised submission, as unsupported by substantial evidence, contrary to law, and arbitrary. See Hyundai Mot. at 19–22; Gov't of Korea Mot. at 14–16. Defendant argues that data verification is not mandatory, and Commerce has discretion to choose the data upon which it relies to make its determinations. Def.

---

Commerce need not use an "external metric" to find disproportionality because of the substantially large use of the three industries and explained that the respondent could rebut that conclusion by pointing to an external metric. Oral Argument at 23:20–24:00. Defendant's argument again conflates predominance with disproportionality. To find that an industry received a disproportionately large amount of a subsidy, Commerce must explain to what the receipt of the benefit is disproportionate and explain why the industry's receipt of the benefit was disproportionate to that comparator; a raw comparison of energy consumption alone is insufficient. See Hyundai I, 745 F. Supp. 3d at 1352–53 (citing AK Steel, 192 F.3d at 1385); Hyundai II, 798 F. Supp. 3d at 1288. Further, Defendant cites no authority for the proposition that, just because an industry or group of industries consumes a large amount of an underlying resource, the respondent bears the burden of proving that its use is proportionate. Rather, Commerce must consider the record as a whole, including information that detracts from a finding that the industry received a disproportionate amount of the subsidy. See Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355–56 (Fed. Cir. 2005).

[9] Should Commerce, on remand, find that the Electricity Program is not de facto specific, the remaining issues regarding Commerce's selection of data, determination of LTAR and calculation of benefits are moot. However, in the interest of judicial economy, the Court addresses each issue.

Resp. at 23–24. For the following reasons, Commerce's determination regarding the choice of dataset is remanded for further explanation.

Commerce must make its determinations as "accurate as possible" when administering the trade remedies laws. Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). To meet that obligation, Commerce must consider "the entire record," including evidence that detracts from its final conclusion. Siemens Energy, Inc. v. United States, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). Consistent with the goal of accuracy, parties may submit factual information "to rebut, clarify or correct" previously submitted information within fourteen days after the initial questionnaire response. 19 C.F.R. § 351.301(b)(2), (c)(1)(v). However, Commerce may reject factual information as untimely.[10] Id. Nevertheless, acceptance incorporates information into the administrative record, and Commerce must address that information in its analysis. See Siemens, 806 F.3d at 1369. Although Commerce has discretion to

---

[10] Even where Commerce's rejects information as untimely, the Court of Appeals has explained that Commerce must, in some instances, accept untimely submissions where a party seeks to correct an error. Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353–54 (Fed. Cir. 1993) (finding Commerce's refusal to consider corrective data submitted before the final results an abuse of discretion); see also NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (holding that Commerce abused its discretion by failing to consider "untimely" corrective information submitted before the final determination); Fine Furniture (Shanghai) Ltd. v. United States, 865 F. Supp. 2d 1254, 1267 (Ct. Int'l Trade 2012) (finding an abuse of discretion where Commerce refused to correct an error with accurate, though untimely, information).

choose among sets of information on the record, its discretion is not unlimited, and its choice must be reasonable and adequately explained. The Mosaic Co. v. United States, 589 F. Supp. 3d 1298, 1314 (Ct. Int'l Trade 2022) (citing Timken, 16 C.I.T. at 147).

Here, though Commerce did not request the Gov't of Korea's revised submission and the Gov't of Korea submitted the dataset beyond the regulation's fourteen-day window for correction, it was submitted on November 1, 2023, before Commerce published the Preliminary Results in February 2024, before Commerce began verification in June 2024, and ten months before Commerce issued the Final Results. See Preliminary Results; Final Decision Memo. at 21; Hyundai Mot. at 7. Commerce may reject untimely corrective submissions, but here, it chose to accept and verify the second corrective submission. See Final Decision Memo. at 22; 19 C.F.R. § 351.301(c)(1)(v). Therefore, when Commerce accepted the revised dataset, it was obligated to consider the data in its analysis. See Siemens, 806 F.3d at 1369.

Defendant argues that by submitting revised data in its supplemental questionnaire response, the Gov't of Korea was "non-responsive" to the questionnaire, which asked the Gov't of Korea to "provide KEPCO's unconsolidated financial statements for 2022 . . . ." Oral Argument at 41:30–42:30, July 9, 2026, ECF No. 77 ("Oral Argument"); Gov't of Korea 2SQR at 1. The Gov't of Korea responded by pointing Commerce to an attached exhibit providing the requested financial statements and stating "[t]he [Gov't of Korea] would like to use this opportunity to

provide the Department with a more detailed and accurate response regarding the amount of electricity consumed by the 10 largest industries during the POR." Gov't of Korea 2SQR at 1. Commerce explains that the first dataset is responsive and therefore "more appropriate," than the revised dataset, however, Commerce fails to explain why it is "more appropriate" or why it relied on a "more appropriate" dataset that appears to be less accurate. See Final Decision Memo. at 22.

Commerce likewise fails to explain why the second, revised dataset, which it accepted as part of the record, is "not usable." See id. The Gov't of Korea, in its second questionnaire response, reasoned that the revised dataset is more "specific" and thus more accurately represented electricity usage as categorized by industry.[11] See Gov't of Korea 2SQR at 2. Commerce concludes that the data is unusable but fails to explain why more "specific" data would not be usable to calculate accurately. Final Decision Memo. at 22. Although Commerce asserts that the revised dataset reports electricity consumption at "a lower level of industrial classification" than requested,[12]

---

[11] Indeed, one of the corrections identified in the Gov't of Korea's revised dataset is a revision of the steel industry's usage category, as previously represented, corrected to reflect usage by exclusively the "steel industry." See Gov't of Korea 2SQR at 2. Specifically, the Gov't of Korea indicated that the initial dataset had erroneously included usage from the steel, copper, non-ferrous metal and aluminum industries under steel, see Gov't of Korea 2SQR at 1–3, which led to an overinflated calculation of the electricity consumed by the steel industry. Hyundai Mot. at 21–22. Hyundai explains that the second, revised dataset provided more detailed and therefore more accurate representation of industry use to determine whether the steel industry received a greater benefit from KEPCO. Id. at 21–22.

[12] The initial questionnaire requested the Gov't of Korea "provide the amount of electricity provided to the steel industry during the POR and to the largest 10

and uses a different format from the initial dataset,[13] it does not explain why the revised dataset lacks sufficient detail, why its alternative format renders it unsuitable for consideration, or why the initial dataset is both "usable" and more accurate than the revised data. Id. at 21–22. Commerce also argues that the Plaintiffs submitted the revised dataset, claiming it is more accurate, but failed to provide "supporting documentation" for that claim. Id. at 21–22. However, neither the regulations nor the questionnaire requires parties to submit supporting documentation for submissions of factual information. See Gov't of Korea IQR. The regulations define "factual information" as "[e]vidence, including statements of fact, documents and data submitted either in response to initial and supplemental questionnaires . . . ." 19 C.F.R. § 351.102(b)(21)(i). Just as the initial dataset constitutes factual information submitted without supporting documentation, the revised dataset is also factual information, which Commerce accepted into the record and is therefore required to provide reasonable explanation as to why it was not

---

industries consuming electricity during the POR." Initial Questionnaire at 20. It did not request that data be provided in accordance with specific standards or "levels of industrial classification." See id. at 20.

[13] Specifically, Defendant explains that the revised dataset conflicts with Commerce's requirements because it provides data for "manufacture of basic iron and steel", which was not an industry listed in the Gov't of Korea's initial questionnaire response, and because the Gov't of Korea did not explain why the steel category named in the first data submission also encompassed "copper and non-ferrous metal, aluminum, etc." Def. Resp. at 22 (citing Gov't of Korea 2SQR), 23.

"usable." Commerce's decision not to rely on the corrective dataset provided by the Gov't of Korea is therefore remanded for further consideration or explanation.

## III. Determination of LTAR

Plaintiff DSM argues that Commerce's finding of LTAR is unsupported by substantial evidence and contrary to law. DSM Mot. at 7–8. DSM argues where an entity sets prices in accordance with market principles, neither Commerce's regulation nor practice requires the entity earn a profit every year. Id. at 7–8. Further, DSM argues Commerce's practice is to ensure that an entity's cost recovery is sufficient to ensure future operations, not to require a specific rate of return. Id. at 11–14.[14] Defendant explains that Commerce examined both whether KEPCO's tariff system was set with market principles, and whether it is applied using market principles. Def. Resp. at 28 (citing Final Decision Memo. at 13–14). Defendant also explains that despite KEPCO's price setting methodology being based upon market principles, including "processes to fully recover costs and a rate of return," the data showed the "implementation of this pricing methodology 'conferred a benefit to the purchasers of industrial categories of electricity.'" Id. As a result, in analyzing KEPCO's tariff system, Commerce determined that KEPCO did not recover its costs

---

[14] Plaintiff-Intervenor Gov't of Korea makes a related argument when it argues that Commerce (1) failed to properly consider KEPCO's FCAC and pass-through system when determining that KEPCO did not recover costs within the POR and therefore, that the system is not based on market principles, and at the same time; (2) included KEPCO's FCAC in its calculation of benefits. See Gov't of Korea Mot. at 16–19.

(inclusive of return) from industrial users during the POR, and therefore, KEPCO provided electricity at LTAR when the tariff system was applied. Final Decision Memo. at 14. For the following reasons, Commerce's determination is remanded for further consideration or explanation.

Commerce determines whether a financial contribution confers a benefit on a recipient by evaluating whether goods and services are provided for less than adequate remuneration. 19 U.S.C. § 1677(5)(E)(iv); see also Nucor Corp. v. United States, 927 F.3d 1243, 1251 (Fed. Cir. 2019). Commerce assesses adequacy of remuneration in relation to prevailing market conditions in the country under investigation or review. 19 U.S.C. § 1677(5)(E)(iv). It evaluates "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." Id. Commerce implements this standard through a three-tier framework to determine whether a recipient is receiving a good or service below fair-market value. See 19 C.F.R. § 351.511(a)(2); Nucor Corp., 927 F.3d at 1246.

Relevant here, the regulation provides:

> (iii) World market price unavailable. If there is no world market price available to purchasers in the country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles. In making an assessment of whether a government price is consistent with market principles under this provision, the Secretary may assess such factors as costs (including rates of return sufficient to ensure future operations), the government's price setting methodology, possible price discrimination, or a government price derived from actual sales from competitively run government auctions . . .

19 C.F.R. § 351.511(a)(2)(iii).[15] If neither a market-determined nor a world market price is available, Commerce evaluates whether the government price was set in accordance with "market principles." 19 C.F.R. § 351.511(a)(2)(iii); see Nucor Corp. v. United States, 927 F.3d 1243, 1254 (Fed. Cir. 2019) (citing Countervailing Duties, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998)).

At Tier III, the regulations allow Commerce to assess whether a company benefits from a subsidy by looking at long term cost recovery. 19 C.F.R. § 351.511(a)(2)(iii). Thus, Commerce examines whether the government price is

---

[15] Tiers I and II provide:

> (i) In general. The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties or actual imports. In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold or imported; and other factors affecting comparability.
>
> (ii) Actual market-determined price unavailable. If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, the Secretary will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(i)–(ii).

consistent with market principles by considering "such factors as" the government supplier's price-setting philosophy, its costs (including rates of return sufficient to ensure future operations), and possible price discrimination. See Countervailing Duties, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) (final rule adopting Commerce's countervailing duty regulations under the Uruguay Round Agreements Act, including the adequacy of remuneration benchmark regulation codified at 19 C.F.R. § 351.511). The rule further explains that the factors are non-hierarchical, and Commerce may consider one or more of the factors as "circumstances of each case vary widely." Id.

Here, Commerce appears to conclude that KEPCO operates within a long-term cost recovery framework. When Commerce examined whether KEPCO's prices were set in accordance with market principles, it analyzed both "KEPCO's price-setting philosophy and costs (including rates of return sufficient to ensure future operations)." Final Decision Memo. at 12; Prelim. Decision Memo. at 34 (examining KEPCO's pricing mechanism that recovers costs and separately examining individual tariff rate cost recovery). Commerce reviewed the 2021 updates to the Gov't of Korea's electricity tariff system and found that the 2021 revisions were adopted through the same process and methodology used for the 2013 tariff revisions, which Commerce had previously determined were consistent with market principles. Final Decision Memo. at 12 (citing Gov't of Korea IQR at 14–18, 43–47, Exs. E-7, E-8, E-8.1, E-8.2, E-8.3, E-10, E-15). Commerce also examined the FCAC added in 2021 and concludes

that—by design and under its price-setting methodology—the charge itself is likewise consistent with market principles. Final Decision Memo. at 12–13.

Nonetheless, Commerce examined KEPCO's cost recovery rates during the POR and explains:

> Finally, we examined KEPCO's cost recovery rates by tariff classification during the POR, which are submitted to the MOTIE each year. As noted in the Preliminary Results, these data demonstrate that no industrial class tariff rate recovered costs (inclusive of a rate of return) during the POR. This finding did not negate our analysis that KEPCO's pricing methodology is based upon "laws, regulations, and processes to fully recover costs and a rate of return;" it merely highlights the complexity of evaluating KEPCO's electricity pricing and reflects the fact that an examination of the actual application of the aforementioned laws and regulations, particularly with regard to cost recovery, is necessary to confirm that the Korean electricity market was based on market principles in both law and application of the law. Commerce must consider not only the mechanism, but also its implementation, and in this regard, we find that KEPCO conferred a benefit to the purchasers of industrial categories of electricity.

Id. at 13.[16] Thus, although Commerce finds that KEPCO's pricing methodology was in accordance with market principles, it concludes that the cost-recovery analysis

[16] In the Final Results, Commerce either misconstrues the regulatory requirements under 19 C.F.R. § 351.511(a)(2)(iii) or attempts to create a hybrid methodology not provided by the regulations to conform the facts to its conclusion. The regulations do not instruct Commerce to first analyze the "mechanism" to find prices were set in accordance with market principles and then separately, analyze the "implementation," as Commerce did here. See Final Decision Memo. at 13. Rather, the regulations instruct Commerce to consider cost recovery, both in the mechanism

(footnote continued)

and in the implementation of government prices, as a part of its determination of whether the government price was set in accordance with market principles, and

showed that no industrial electricity tariff rate recovered costs during the POR, and therefore, the system, as applied, is not in accordance with market principles. Final Decision Memo. at 13. Despite its design based on "laws, regulations, and processes to fully recover costs and a rate of return," the tariff system, in operation, failed to produce cost recovery during the POR; therefore, Commerce concludes that KEPCO nevertheless conferred a benefit on Plaintiffs. Id. at 13.

Thus, Commerce appears to either modify the Tier III framework it purports to apply, or it unartfully explains its analysis and application of the Tier III framework. Commerce finds KEPCO's price-setting methodology to be "consistent with market principles." Id. at 13. If KEPCO's price setting is consistent with market principles, then Commerce has no basis to find that the program provided a good or service for LTAR under 19 C.F.R. § 351.511(a)(2)(iii). Alternatively, it may be that Commerce does not conclude that the system is consistent with market principles, because at the same time Commerce finds the price-setting methodology suitable to recover costs, and therefore consistent with market principles, it appears to also doubt whether there will in fact be long-term costs recovery. Final Decision Memo. at 13. The doubt appears to stem from KEPCO's failure to recover costs during this POR. Id. at 14; Oral Argument at 1:18–1:24. Yet, Commerce has explicitly rejected using a single year of charges to customers to undermine the Tier III cost recovery

thus, whether a benefit was conferred. See Countervailing Duties, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) (interpreting 19 C.F.R. § 351.511(a)(2)(iii)).

analysis. See Large Diameter Welded Pipe from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018-2019, 87 Fed. Reg. 5780 (Feb. 2, 2022) and accompanying Issues & Decisions Memo. at cmt. 1 (Feb. 2, 2022) (explaining that Commerce's Tier III analysis consistently evaluates an entity's overall "financial performance . . . rather than the prices actually paid by the respondent" during the POR.) Thus, while Commerce says that KEPCO's prices are consistent with market principles, it seems to ultimately conclude that they are not. See Final Decision Memo. at 13. On remand, Commerce must reconsider its Tier III analysis or further explain how the regulations provide for a finding that prices set in accordance with market principles can also fail to recover costs and therefore confer a benefit.

## IV. Benefit Calculation

Once Commerce determined that KEPCO provided electricity conferring a countervailable benefit under Tier III, Commerce calculated the extent to which a benefit was conferred. See Final Decision Memo. at 13; 19 U.S.C. § 1677(5)(E)(iv). Plaintiffs contend that Commerce improperly included the FCAC and carried-forward 2021 costs in its benefit calculation, arguing the inclusion of those costs is an irrelevant and unreasonable representation of KEPCO's actual 2022 tariff and cost-recovery methodology and results in "double counting." Hyundai Mot. at 24–26; Gov't of Korea Mot. at 16–18. Defendant argues that if the FCAC is built into the tariff customers actually pay, then Commerce properly determined the FCAC is part of the

revenue stream that the Gov't of Korea uses to determine whether KEPCO recovered electricity costs, and therefore, it is necessarily included in the benefit calculation. Def. Resp. at 30–31; Final Decision Memo. at 23–24. For the following reasons, Commerce's calculation of benefit is remanded.

Where Commerce applies the tier-three benchmark criteria and finds that the government-charged price is inconsistent with market principles, it may treat a benefit as conferred and calculate the amount of that benefit using the benchmark it has selected. See 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(iii); POSCO v. United States, 977 F.3d 1369, 1372 (Fed. Cir. 2020). In applying the criteria, Commerce must reasonably explain its selected benchmark and inputs it uses to make the benefit calculation. See, e.g., ArcelorMittal USA LLC v. United States, 337 F. Supp. 3d 1285, 1291 (Ct. Int'l Trade 2018).

Whether Commerce employs a yearly cost of goods sold analysis or a long-term cost recovery analysis, it cannot remedy the same benefit twice and record evidence suggests that Commerce may have done so. In 2022, the 2021 fuel costs that were not charged to customers, by way of the FCAC, were included as a line item that KEPCO used to calculate its base charge. Hyundai Mot. at 23–24 (citing Gov't of Korea IQR at Exhibit E-9). Commerce included KEPCO's carried-forward 2021 fuel costs in its 2022 POR adequacy of remuneration analysis because KEPCO treated the unrecovered fuel costs as part of its 2022 Total Comprehensive Cost and used that figure to set the tariff rates in effect during the POR. Final Decision Memo. at 23–

24. Commerce reasons that because the carried-forward amounts were built into the tariff framework governing 2022 electricity prices, those amounts were relevant to determining whether KEPCO's 2022 rates allowed recovery of costs plus a reasonable return.[17] Id. at 14. Commerce determined that excluding those amounts would distort the Tier III benchmark inquiry by severing the analysis from KEPCO's real-world tariff-setting methodology. Id. at 14, 15. Further, Commerce determined that the carried-through amounts should be included in the benefit calculation because they were paid by consumers as a part of the tariff schedule. Id. at 24.

Yet, KEPCO's financial statement submissions indicate that fuel costs were countervailed in 2021.[18] Hyundai Mot. at 23 (citing Gov't of Korea IQR at Exhibit E-9). Commerce fails to explain why it was reasonable to calculate the benefit incurred in 2022 by including costs that were reported in KEPCO's 2021 financial statements and appeared to have been countervailed. Commerce, on remand, must provide sufficient explanation and evidence to show that the same pass-through charges were not countervailed twice, or reconsider its calculation of benefit to ensure any benefit is not remedied twice.

## CONCLUSION

---

[17] The carried-forward fuel costs from 2021 were not included in the [[ ]] for 2022, but as a [[ ]] amount in the Total Comprehensive Cost. Hyundai Mot. at 23–24 (citing Gov't of Korea IQR at Ex. E-9).

[18] KEPCO's fuel costs were reflected in its [[ ]] in 2021. Gov't of Korea IQR at Ex. E-9.

Commerce's determinations that: (1) the steel industry and two other industries received a disproportionately large amount of the electricity subsidy and therefore the program is specific; (2) the revised dataset provided by Gov't of Korea is unusable; (3) electricity was provided at LTAR; and (4) the fuel cost pass-through charges should be included in the calculation of benefit are remanded for further explanation or reconsideration consistent with this opinion. In light of the foregoing, it is

**ORDERED** that the final results, see ECF No. 25-5, are remanded for further explanation or reconsideration consistent with this opinion; and it is

**ORDERED** that Commerce shall file its remand redetermination with the Court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix, including the entire confidential record, within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing its remand redetermination.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: August 11, 2026
New York, New York