C-580-837
Remand
Slip Op. 26-90
POR: 1/1/2022 – 12/31/2022
**PUBLIC VERSION** ~~Business Proprietary Document~~
E&C/OIII: KJ

**_Hyundai Steel Company v. United States_,**
**Consol. Court No. 24-00190, Slip Op. 26-90 (CIT August 11, 2026)**
**Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court or CIT) issued on August 11, 2026.[1] These final results of redetermination concern Commerce's final results of administrative review of the countervailing duty (CVD) order on certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea) covering the period of review (POR) January 1, 2022, through December 31, 2022.[2] In the *Final Results*, Commerce determined that: (1) Korea's electricity tariff system was established according to market principles but industrial class electricity tariff rates charged by the Korea Electric Power Corporation (KEPCO) during the POR did not recover costs and a rate of return; (2) the Government of Korea's (GOK) Provision of Electricity for Less Than Adequate Remuneration (LTAR) program (Electricity Program), provided countervailable benefits to Dongkuk Steel Mill Co., Ltd. (DSM) and to Hyundai Steel Company (Hyundai Steel); and (3)

[1] *See Hyundai Steel Company v. United States*, Consol. Court No. 24-00190, Slip Op. 26-90 (CIT August 11, 2026) (*Remand Order*).
[2] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 FR 73626 (September 11, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

the Electricity Program was *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the Act).[3]

In the *Remand Order*, the Court remanded to Commerce for further explanation or reconsideration the following issues: (1) finding that the Electricity Program is *de facto* specific based on disproportionality;[4] (2) grouping of the steel industry with two other large industries for the specificity analysis;[5] (3) decision not to rely on the revised electricity consumption dataset provided by the GOK;[6] (4) finding that, despite KEPCO's price setting methodology being based upon market principles, the cost data showed that benefits were conferred to purchasers of industrial categories of electricity;[7] and (5) calculating the electricity benefit for 2022, by including fuel costs that were reported in KEPCO's 2021 financial statements which appeared to have been countervailed previously.[8]

For these final results of redetermination, Commerce has: (1) reconsidered its specificity analysis for the Electricity Program, (2) further explained its market principles analysis of the Korean electricity tariff system, and (3) provided an explanation for why the inclusion of the 2021 fuel pass-through charges in KEPCO's 2022 cost data, which were used in the electricity benefit calculations, was appropriate.

## II. BACKGROUND

On April 11, 2023, Commerce initiated the 2022 administrative review of the *Order*[9] and subsequently selected DSM and Hyundai Steel as the mandatory respondents.[10] In the *Final*

---

[3] *Id.* at Comments 1, 2, and 4.
[4] *See Remand Order* at 17.
[5] *Id.* at 19.
[6] *Id.* at 24.
[7] *Id.* at 24-25 and 30.
[8] *Id.* at 32.
[9] *See Notice of Amended Final Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders: Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000) (*Order*).
[10] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 21609, 21624 (April 11, 2023); *see also* Memorandum, "Respondent Selection," dated June 14, 2023.

*Results*, Commerce found that the Electricity Program was *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because the steel industry and two other industries combined consumed a disproportionately large amount of the industrial class electricity in Korea during the POR.[11] In making the specificity finding, we relied on the electricity consumption data for the steel industry and the ten largest electricity consuming industries which Commerce requested and the GOK submitted in its initial questionnaire response.[12] Subsequently, in a supplemental questionnaire response, the GOK voluntarily submitted revised electricity consumption data for the ten largest industries.[13] However, we did not use the revised dataset in our specificity analysis because it was compiled using a lower level of industrial classification than Commerce requested in the initial questionnaire for the electricity usage analysis.[14]

Also, in the *Final Results*, Commerce found that, under a Tier 3 analysis, while the Korean electricity tariff system is designed in a way that could allow the recovery of profit plus a rate of return, KEPCO did not ensure that it actually recovered its costs plus a rate of return in setting the prices using the pricing mechanism.[15] Using KEPCO's 2022 cost recovery data, which the GOK submitted on the record, Commerce found that benefits were provided to DSM and Hyundai Steel under the Electricity Program because the industrial class electricity rates charged by KEPCO were insufficient to recover costs plus a rate of return during the POR.[16] In conducting the electricity benefit calculations, we noted that KEPCO's 2021 fuel costs, which were not passed along to consumers in 2021, became the Total Comprehensive Cost in KEPCO's 2022 cost data, and thus, not only reflected the ability of KEPCO to be profitable in 2022, but

---

[11] *See Final Results* IDM at Comment 2.
[12] *Id*. at Comment 3 (citing GOK's Letter, "Response to the Initial Questionnaire," dated August 11, 2023 (GOK IQR) at 42-43).
[13] *See* GOK's Letter, "Response to Supplemental Questionnaire," dated November 1, 2023 (GOK November 1, 2023 SQR) at 2.
[14] *See Final Results* IDM at Comment 3 (citing GOK November 1, 2023 SQR at 2).
[15] *Id*. at Comment 1.
[16] *Id*.

also was an important factor in the GOK establishing the 2022 tariff rates.[17] We, therefore, found it appropriate to use the KEPCO 2022 cost data, inclusive of the 2021 fuel costs in the benefit calculations, because any market price on which we would rely for the benefit analysis would consider the Total Comprehensive Cost within KEPCO's 2022 cost data and whether the tariff rates set during the POR allowed for the recovery of those costs and a profit.[18]

Hyundai Steel, DSM, and the GOK challenged: (1) Commerce's finding that the Electricity Program is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act; (2) Commerce's decision not to rely on the 2022 KEPCO cost data submitted by the GOK in response to a supplemental questionnaire response rather than the 2021 KEPCO cost data originally submitted by the GOK in its initial questionnaire response; and (3) Commerce's calculation of the benefit under the Electricity Program using KEPCO's cost data carried forward from, and already used in, the analysis of the prior POR.

On August 11, 2026, the Court issued its remand for Commerce to provide further explanation or reconsideration of the following issues: (1) finding that the Electricity Subsidy is *de facto* specific based on disproportionality;[19] (2) grouping of the steel industry with two other large industries for the specificity analysis;[20] (3) decision not to rely on the revised electricity consumption dataset provided by the GOK;[21] (4) finding that, despite KEPCO's price setting methodology being based upon market principles, the cost data showed that benefits were conferred to the purchasers of industrial categories of electricity;[22] and (5) calculating the electricity benefit incurred in 2022, by including fuel costs that were reported in KEPCO's 2021 financial statements which appeared to have been countervailed previously.[23]

---

[17] *Id.* at Comment 4.
[18] *Id.*
[19] *See Remand Order* at 17.
[20] *Id.* at 19.
[21] *Id.* at 24.
[22] *Id.* at 24-25 and 30.
[23] *Id.* at 32.

On August 26, 2026, Commerce placed on the record new factual information (NFI) sourced from the Bank of Korea (BOK) and KEPCO regarding Gross Domestic Product (GDP) and electricity consumption in Korea, respectively, and invited interested parties to comment on the data.[24] On August 31, 2026, Commerce received comments on the factual information from the GOK and Hyundai Steel.[25] Within its submission, Hyundai Steel stated that it was adopting and incorporating by reference the GOK's comments.[26]

In the Analysis section, below, Commerce addresses the issues remanded by the Court as outlined above and responds to the comments that were submitted by the GOK on the Data Memorandum with regard to specificity.

## III. ANALYSIS

### A. Specificity

For these final results of redetermination, Commerce continues to find the Electricity Program to be *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

In the *Final Results*, relying on the electricity consumption data provided by the GOK for the steel industry and the ten largest electricity consuming industries, Commerce determined that the steel industry and two other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported.[27] We, therefore, found that a group of three industries, inclusive of the steel industry, received a disproportionately large amount of the subsidy conferred by the purchasing of industrial class

---

[24] *See* Memorandum, "Remand in the Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2022: Placing Factual Information on the Record," dated August 26, 2026 (Data Memorandum).
[25] *See* GOK's Letter, "Rebuttal Comments on the Department's New Factual Information," dated August 31, 2026 (GOK NFI Letter); *see also* Hyundai Steel's Letter, "Comments on the GDP Data," dated August 31, 2026 (Hyundai Steel NFI Letter).
[26] *See* Hyundai Steel NFI Letter.
[27] *See Final Results* IDM at Comment 2 (citing Memorandum, "Final Specificity Analysis of Industrial Electricity Consumption," dated September 5, 2024).

electricity from KEPCO within the meaning of section 771(5A)(D)(iii)(III) of the Act.[28] In light of the Court's remand, Commerce has reconsidered how it conducts its *de facto* specificity analysis for the Electricity Program.

As discussed in the SAA, "{t}he Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy."[29] The specificity test is not intended to function as a loophole through which narrowly focused subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.[30] In particular situations, a generally available subsidy can benefit an industry or sub-sector more than another. In such circumstances, a government's subsidy does not have a neutral, uniform effect on the economy, but rather affects an industry or sub-sector more favorably than would be expected. That is to say, an industry or sub-sector receives more than its fair share (*i.e.*, a disproportionate amount) of the benefits of the generally available subsidy.

In *Hyundai Steel I* and *Hyundai Steel II*, the Court stated that disproportionality exists when something is too large or too small in relation to something else,[31] and thus, ruled that Commerce must consider whether the benefit under the Electricity Program is disproportionately large when compared to an external comparator.[32] In *Hyundai Steel III*, the Court clarified that, in determining disproportionality using an external comparator, "Commerce may compare relative percentages rather than absolute amounts{.}"[33] The Court additionally held that, "{i}n

---

[28] *Id.*
[29] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) (SAA), at 929.
[30] *Id.*
[31] *See Hyundai Steel Company v. United States*, 745 F.Supp.3d 1345, 1351 (CIT 2024) (*Hyundai Steel I*); *see also Hyundai Steel Company v. United States*, 798 F.Supp.3d 1283, 1288 (*Hyundai Steel II*).
[32] *See Hyundai Steel I*, 745 F.Supp.3d 1351; *see also Hyundai Steel II*, 798 F.Supp.3d 1288, 1289-91.
[33] *See Hyundai Steel Company v. United States*, 838 F.Supp.3d 1339, 1347 (CIT 2026) (*Hyundai Steel III*).

general, Commerce may use an economy-wide comparator in assessing *de facto* specificity because the inquiry turns on whether a subsidy 'is broadly available and widely used throughout the economy.'"[34]

In light of the fact that the provision of electricity, a generally available subsidy, may not benefit all industries or sub-sectors the same, even where there is a standard pricing mechanism, we placed on the record NFI regarding GDP and electricity consumption in Korea for the various economic sub-sectors in order to conduct a disproportionality analysis.[35] We find that GDP is a relevant comparator for analyzing specificity because Commerce is examining the provision of electricity, an input good in the production of subject merchandise, for LTAR. GDP measures the "total value of final goods and services produced within a country during a specified time period, such as one year."[36] The reliance on GDP as an output comparator reflects the basic relationship between production inputs and economic scale. Electricity is a key input for manufacturing, and GDP provides a consistent measure of each sector's contribution to national output. Comparing electricity consumption to GDP therefore offers a practical way to assess whether a sector's use of the subsidized input aligns with its relative economic footprint. As such, the use of economy-wide GDP as an external comparator to determine whether electricity consumption is proportionate or, in this case disproportionate, is reasonable; for consumption of an input, such as electricity, which is truly widely used throughout the economy, Commerce expects that consumption by an industry to be related to the output, *i.e.*, contribution to GDP.

In applying the GDP comparator, we, however, do not assume uniform electricity intensity across industries. Different production technologies may naturally lead some sectors to consume more electricity per unit of output. Instead, the comparison establishes a neutral

[34] *Id.* at 16 (quoting *Gov't of Quebec v. United States*, 105 F.4th 1359, 1375 (Fed. Cir. 2024) (quoting SAA at 929)).
[35] *See* Data Memorandum.
[36] *See* International Monetary Fund, "IMF Glossary," available at http://www.imf.org/en/about/glossary (last accessed October 6, 2026).

reference point. When a sector's share of electricity consumption far exceeds its share of GDP, it indicates disproportionately large electricity use relative to value added.

In the LTAR context, this proportionality analysis is especially relevant because the benefit arises through electricity consumption itself. A sector that uses a disproportionate share of electricity necessarily receives a disproportionate share of the subsidized input. GDP thus serves a meaningful scale metric that allows us to distinguish between high absolute consumption and consumption that is outsized relative to the sector's economic output. Thus, Commerce finds that GDP is an appropriate comparator to electricity consumption in this case as a comparison between input and output.

For a subsidized input used as widely as electricity, Commerce expects *some* level of uniformity between consumption of a subsidized input and output if usage levels are "proportional." To measure this, a comparison of an industry's share of electricity consumption with its share of GDP determines whether its use of the subsidized input aligns with the economic value it generates. A ratio of one indicates proportional use of electricity relative to economic scale. A ratio greater than one shows that the industry draws more electricity per Korean won (KRW) of value added than the economy-wide average. Because the subsidy confers benefits through electricity consumption, a higher ratio also reflects a greater concentration of the subsidy benefit. The size of the ratio therefore helps identify whether consumption of the LTAR subsidy in that sector is disproportionately large.

Within the factual information that Commerce placed on the record, we identified the following data points for the year 2022:

- Total Electricity Consumption: 548,573 in millions of kWh
- Electricity Consumption – Basic Metals: 35,044 in millions of kWh

- Total Production: 2,142,989 in billions of KRW
- Production – Basic Metals: 41,958 in billions of KRW.[37]

We selected the electricity consumption and production data for basic metals because this sub-sector is inclusive of the steel industry to which DSM and Hyundai Steel belong.[38]

Comparing relative usage of electricity and contribution of GDP for the basic metals sub-sector's consumption and output reveal that its electricity consumption and share of GDP are not proportional. The data indicate that the basic metals sub-sector accounts for 6.4 percent of nationwide electricity consumption but only 2.0 percent of GDP, a ratio of 3.3, meaning the basic metals sub-sector's relative consumption of electricity constitutes three times its share of economic activities. *See* Attachment. Comparisons with other relevant manufacturing sectors reinforce that this degree of concentration for the basic metals sub-sector is disproportionately large. For example, Electronic and Electrical Equipment, another manufacturing sub-sector, has a ratio of 0.88 (1.5 percent electricity consumed to 1.7 percent of GDP). *See* Attachment.

Section 771(5A)(D)(iii)(III) of the Act provides there is reason to believe that a subsidy may be specific as a matter of fact where "an enterprise or industry receives a disproportionately large amount of the subsidy." The analysis above demonstrates that provision of the subsidized input for LTAR (*i.e.*, electricity) was *de facto* specific in Korea during the POR because, when the proportion of the input consumed is compared to the proportion of the output production, the basic metals sub-sector consumes three times more of the input good than its contribution to Korea's total GDP. We, thus, determine that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because basic metals, which includes the

[37] *Id.* at Excel tabs "i_RawData(2)" and "i_RawData(3)" (describing electricity consumption and total production under various sub-sectors as classified by the BOK).
[38] For a list of the sub-sector's contained within the KEPCO and BOK data, *see* Excel tabs "i_RawData(2)" and "i_RawData(3)."

steel industry to which DSM and Hyundai Steel belong, received a disproportionately large amount of the electricity subsidy in 2022.

As noted above, the GOK submitted comments on the NFI that Commerce placed on the record of this remand for its disproportionality analysis. The GOK's comments cover three topics: (1) the electricity consumption by industry data reflect all classes of electricity and not just industrial class electricity; (2) the industry classification used in the electricity consumption data is broader than the steel sector; and (3) the KEPCO electricity consumption data and the BOK GDP data are based on different industry classification systems.[39]

Regarding the GOK's first comment on the electricity consumption data reflecting total electricity,[40] Commerce acknowledges that the KEPCO electricity consumption data, placed on the record, reflects total electricity consumption of all classes and not simply consumption of industrial class electricity. As discussed above, because Commerce is using GDP, which is an economy-wide comparator, per the Court's reasoning in *Hyundai Steel III*, it is necessary for our evaluation of consumption to be based on total electricity consumption and not solely industrial class electricity to ensure the comparison is in the same "universe," an economy-wide measure.[41] Specifically, the Court stated that "GDP measures economy-wide output, not output generated by only the relevant class of industrial-class electricity consumers. If the 'industrial-class' limit defines the relevant universe on the electricity side, the comparator on the output side must likewise be tied to that universe."[42] Usage of "total electricity consumption" and "total production" allows a comparison of relevant universes, where the GDP comparator is tied to the consumption of all classes of electricity by the various economic sub-sectors which contribute to Korea's economy.

---

[39] *See* GOK NFI Letter.
[40] *Id*. at 3.
[41] *See Hyundai Steel III* at 15-20.
[42] *Id*. at 20.

Moreover, the GOK did not provide alternate data that would permit Commerce to compare industrial class electricity consumption to a comparator that is tied to a universe of solely industrial class electricity.[43] As such, there are no data on the record that would allow Commerce to make a comparison in the "same universe" when using industrial class electricity consumption as one of the comparators. Additionally, total electricity consumption is diluted by uses which do not directly contribute to GDP data, such as consumption of electricity by households or street lamps.[44] Thus, the use of total electricity consumption allows for a more conservative comparison to GDP as it represents the basic metal sub-sector's consumption of all types of electricity (such as, general) beyond simply the industrial class. This approach, which is more favorable to the basic metals sub-sector, demonstrates that basic metals received a disproportionately large amount of the electricity subsidy in 2022.

The GOK also comments that the industry classification used in the electricity consumption data contained within the Data Memorandum is broader than the steel sector as it includes basic precious and non-ferrous metal.[45] The GOK explains that the steel-related data reported under "Manufacture of Basic Metals" (*i.e.*, column K of "i_RawData(2)" tab) corresponds to the Korean Standard Industrial Classification (KSIC) at the two-digit level. The GOK states that this classification is broader than the "Manufacture of Basic Iron and Steel" category at the three-digit level of the KSIC[46] and that it submitted industry-level electricity consumption data at the KSIC three-digit level in the review.[47] We recognize that the electricity consumption data placed on the record for the basic metals sub-sector may not reflect the electricity usage of the steel industry alone. However, we find that the electricity consumption

---

[43] *See* GOK NFI Letter.
[44] *See* Data Memorandum at Excel tabs "i_RawData(2)" and "i_RawData(3)."
[45] *See* GOK NFI Letter at 3-4.
[46] *Id.*
[47] *See* GOK November 1, 2023 SQR at 2-3.

data reported in the GOK November 1, 2023 SQR are not viable alternate data. Within the GOK's response, there is no qualifier as to whether the data represent the consumption of all classes of electricity or solely the consumption of industrial class electricity by the ten largest industries.[48] As discussed above, when conducting the disproportionality analysis, it is necessary for Commerce's evaluation of consumption to be based on total electricity consumption and not solely industrial class electricity to ensure the comparison is in the same "universe," an economy-wide measure.

Additionally, the GOK states that the KEPCO electricity consumption data and the BOK GDP data are based on different industry classification systems, and thus, the industry groupings do not align on a one-to-one basis.[49] As for the divergent breakdown of the manufacturing sector's sub-groups in the datasets, Commerce acknowledges that the KEPCO breakdown includes 25 sub-sectors of manufacturing, while the BOK data includes 13 manufacturing sub-sectors.[50] The fact that the KEPCO electricity consumption data may be more granular (broken into 25 different sub-sectors) than the GDP data (into 13 sub-sectors) indicates that Commerce is making a conservative comparison, as the electricity consumption by the, potentially, more narrowly defined, basic metals sub-sector, is still more than three times the sector's share of GDP in the potentially broader definition of basic metals in the BOK definition.

An analysis of the manufacturing sub-categories between the two datasets indicates that the majority of the additional sub-categories in the KEPCO data appear to be more detailed breakdowns of other sectors of the economy unrelated to basic metals. For example, the BOK GDP data has a manufacturing sub-sector for "Wood, Paper, Publishing, & Printing," while the KEPCO data has separate categories for "pulp and paper," "printing and media," "wood and

---

[48] *Id.* at 2-3.
[49] *See* GOK NFI Letter at 4-5. The electricity consumption data are organized according to the KSIC. The GDP data are organized based on the BOK's own product and industry classification system.
[50] *See* Data Memorandum at Attachment at tabs "i_RawData(2)" and "i_RawData(3)."

lumber," and "furniture."[51] Further, there is no information on the record indicating that the basic metals sub-sectors in the datasets are mismatched. No interested party has placed on the record any actual information which indicates that the KEPCO and the BOK groupings for basic metals are defined in a way that would not allow for a comparison.

Lastly, as fully discussed above, in response to the Court's remand, Commerce has reconsidered how it conducts its disproportionality analysis for the Electricity Program by applying an external comparator (*i.e.*, GDP) rather than comparing electricity usage among the ten largest industries. Therefore, we need not address the Court's remand instruction regarding (a) Commerce's grouping of the steel industry with two other large industries for the specificity analysis in the *Final Results*[52] and (b) Commerce's decision not to rely on the revised electricity consumption dataset provided by the GOK in the *Final Results*.[53]

**B. Market Principles Analysis**

For these final results of redetermination, Commerce continues to determine that, though the Korean electricity tariff system and its price-setting methodology were established based on laws and regulations, KEPCO did not fully recover its costs and a rate of return for the industrial class electricity category, and thus, a benefit was conferred to the respondents during the POR through the provision of electricity for LTAR.[54]

In the *Remand Order*, the Court stated that if KEPCO's price setting is consistent with market principles, then Commerce has no basis to find that the Electricity Program provided a good or service for LTAR under a Tier 3 benchmark.[55] The Court, therefore, remanded

---

[51] *Id.* at tabs "i_RawData(2)" and "i_RawData(3)." Another example is that the BOK GDP data has one category for "Food, Beverages & Tobacco," while the KEPCO data has separate categories for each of "beverage," "food," and "tobacco."
[52] *See Remand Order* at 19.
[53] *Id.* at 24.
[54] *See Final Results* IDM at Comment 1.
[55] *See Remand Order* at 24-30.

Commerce to further explain how the regulations provide for a finding that prices set in accordance with market principles can also fail to recover costs, and thus, provide a benefit.

Commerce's market principles analysis in the 2022 administrative review is consistent with the adequate remuneration standard under section 771(5)(E)(iv) of the Act, which states that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided … in the country subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." This statutory standard focuses on "prevailing market conditions" which include actual market-determined prices, world market prices, and where these are not available, whether the government price is consistent with market principles, such as the recovery of costs. Section 351.511(a)(2)(iii) of Commerce's regulations reiterates that "{i}f there is no world market price available to purchasers in the country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles" (*i.e.*, Tier 3). The *1998 CVD Preamble* provides guidance on conducting a Tier 3 analysis stating that when assessing whether the government price is set in accordance with market principles, Commerce will analyze "such factors as the government's price-setting philosophy," and "cost (including the rates of return sufficient to ensure future operations)."[56]

[56] *See Countervailing Duties; Final Rule,* 63 FR 65348, 65378 (November 25, 1998) (*1998 CVD Preamble*) ("Paragraph (a)(2)(iii) provides that, in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles. Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case. In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely.").

Accordingly, to determine whether the Korean electricity pricing was consistent with market principles, Commerce applied a two-prong approach: first, we evaluated the design of the tariff setting mechanism, and second, we assessed how the laws were applied in setting tariffs within the tariff schedule. Commerce's approach is to consider not only the price-setting mechanism but also its implementation is consistent with the statute, regulations, and agency practice.[57]

In the 2022 administrative review, we examined the laws and regulations which established the Korean electricity tariff system, including whether the electricity prices charged were set in accordance with market principles through an analysis of factors such as KEPCO's pricing mechanism (inclusive of the recovery of costs and a rate of return sufficient to ensure future operations) in line with the *1998 CVD Preamble*. In particular, we evaluated the *Electricity Business Law* (EBL), *Notification on the Power Generating Business Approval Criteria, Electricity Tariff Calculation Standard, the Permitted Error of the Electric Consumption Measuring Instrument, and Scope of the Business Operations related to Electricity* (Notification), *Price Stabilization Act* and its enforcement decree, modifications to the Korean electricity tariff system as of January 1, 2021, and subsequent amendments to the operations of the system during 2022.[58] We found that, based on upon the laws and regulations, the Korean electricity tariff system and its pricing mechanism was designed to allow KEPCO to recover costs and a rate of return in accordance with market principles, if applied in a manner consistent with achieving that goal.[59] However, we also found that, in the system's execution during 2022,

---

[57] *See Final Results* IDM at Comment 1 (p. 14); *see also Large Diameter Welded Pipe from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*; 2023, 91 FR 27246 (May 14, 2026), and accompanying IDM at Comment 1 (p. 16).
[58] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022*, dated March 5, 2024 (89 FR 15825) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 26-33; unchanged in the *Final Results* IDM at Comment 1.
[59] *See Final Results* IDM at Comment 1 (p. 12-14).

KEPCO did not fully recover its costs plus a rate of return for the industrial class electricity classification.[60] KEPCO's 2022 cost by classification data, which were submitted on the record by the GOK, reports the following cost recovery rates for the industrial class tariff categories under which the respondents consumed electricity:

[ ]
[ ]
[ ]
[ ][61]

Commerce, therefore, found that while the Korean electricity tariff system was designed in a way that could allow the recovery of costs plus a rate of return, KEPCO did not ensure that it actually recovered its costs plus a reasonable rate of return in the setting the industrial class electricity prices pursuant to Article 7 of the Enforcement Decree of the EBL and Article 11 of the Notification, which "mandate that the tariff rate for each class be set to cover the cost for the corresponding electricity class, which includes a fair rate of return."[62]

Commerce's finding—that the industrial class tariffs did not recover costs and a reasonable rate of return—did not negate the analysis that KEPCO's price-setting methodology is based upon laws, regulations, and processes that allow KEPCO, in theory, to fully recover costs and a rate of return. Rather, as explained in the *Final Results*, Commerce's finding highlights the complexity of evaluating KEPCO's electricity pricing and reflects the fact that an examination of the *actual application* of the laws and regulations (*i.e.*, the second prong of Commerce's analysis), particularly with regard to cost recovery, is necessary to confirm that the Korean electricity market was based on market principles *in both* law and application of the law.[63]

---

[60] *See Preliminary Results* PDM at 31-34; unchanged in the *Final Results* IDM at Comment 1 (p. 13).
[61] *See* GOK's Letter, "Response to Supplemental Questionnaire," dated January 25, 2024 (GOK January 25, 2024 SQR) at Exhibit E-9.1 (Excel tab "Summary").
[62] *See* GOK IQR at 23.
[63] *See Final Results* IDM at Comment 1 (p. 13).

Because KEPCO did not recover costs and a reasonable rate of return for the industrial class electricity rates, Commerce then had to evaluate, under its Tier 3 benchmark methodology, the extent to which a benefit was conferred to the respondents through their purchases of industrial class electricity under section 771(5)(E)(iv) of the Act. Commerce's approach of analyzing electricity tariffs using the standard of cost recovery is appropriate under section 771(5)(E) of the Act, because KEPCO's pricing mechanism is built on cost recovery (*i.e.*, "tariff rate for each class be set to cover the cost for the corresponding electricity class, which includes a fair rate of return").[64] Accordingly, Commerce had to determine whether the GOK provided electricity to the respondents for LTAR (*i.e.*, charged industrial class electricity rates that were insufficient to recover costs plus a reasonable rate of return), pursuant to 19 CFR 351.511(a)(2)(iii). For those industrial class electricity rates that did not satisfy the cost-plus-profit standard, we determined a percentage amount that would enable cost recovery plus a rate of return and used that value to calculate a benchmark price that reflected adequate remuneration.[65] On this basis, we determined that DSM and Hyundai Steel received a countervailable subsidy rate of 1.61 percent *ad valorem* and 1.47 percent *ad valorem*, respectively, under the Electricity Program for the POR.[66]

We note that Commerce's Tier 3 analysis for determining whether the electricity prices charged by KEPCO are consistent with market principles (based on its cost recovery rates) is a methodology that both the CIT and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) have sustained on appeal.[67] Specifically, in *POSCO II,* the Federal Circuit upheld Commerce's market principles analysis for the provision of electricity for LTAR. In that

---

[64] *See* GOK IQR at 23, 30, Exhibit E-4 (EBL at Article 7), and Exhibit E-6 (Notification at Article 11); *see also* GOK January 25, 2024 SQR at 2.
[65] *See Preliminary Results* PDM at 35, unchanged in the *Final Results*.
[66] *See Final Results* IDM at 8.
[67] *See Nucor Corp. v. United States*, 633 F.Supp.3d 1302, 1309-11 (CIT 2023) (*Nucor I*); *see also Nucor Corp. v. United States*, 653 F.Supp.3d 1295, 1302-04 (CIT 2023) (*Nucor II*); and *POSCO v. United States*, Court No. 2022-1525 (Fed. Cir. 2023) (*POSCO II*).

decision, the Federal Circuit opined that the agency considered, "the relationship between KEPCO's standard pricing mechanism and its costs of production of electricity as well as whether the tariff charged to the respondent failed to cover cost of production plus a profitable return on the investment."[68] As discussed above, in the 2022 administrative review, Commerce applied this well-established Tier 3 analysis to ascertain whether the electricity prices charged by KEPCO allowed for the recovery of costs plus a rate of return in accordance with market principles, and where not, determined whether a countervailable benefit was conferred on the respondents through the provision of electricity for LTAR.

In summary, as set forth in 19 CFR 351.511(a)(2)(iii), what Commerce is evaluating is "whether the government price is consistent with market principles." Thus, whether the government establishes a system that could, in theory, result in prices that are consistent with market principles is not sufficient, on its own, to establish that the government price is consistent with market principles as contemplated by Commerce's regulations. As explained above, there are two aspects we consider in determining whether the Korean electricity pricing is consistent with market principles. The first concerns the way in which the tariff setting mechanism is designed, and the second relates to how the laws are applied by KEPCO in setting rates within the tariff schedule. Here, Commerce has found that while the system itself is designed in a way that could allow the recovery of profit plus a rate of return, KEPCO did not ensure that it actually recovered its costs plus a rate of return in setting the prices using the pricing mechanism. In particular, KEPCO did not utilize available avenues under Korean law to go beyond the capped increase for the FCAC to ensure that it recovered its costs plus a rate of return during the POR.[69] In other words, Commerce has found that because the actual prices being charged do not allow

---

[68] *See POSCO II*, Court No. 2022-1525 at 8.
[69] *See* GOK IQR at 23-24, Exhibit E-4 (EBL at Article 7), and Exhibit E-6 (Notification at Article 11); *see also* GOK January 25, 2024 SQR at 1-2.

for the recovery of cost plus a reasonable rate of return, the government price is not consistent with market principles pursuant to 19 CFR 351.511(a)(2)(iii). In determining whether the government electricity price is consistent with market principles, Commerce's consistent practice has been to examine both the methodology behind setting the price, and the actual price charged. This two part methodology is the same LTAR benefit methodology that was sustained by the Federal Circuit in *POSCO II*.[70] As noted above, Commerce has repeatedly examined whether the electricity prices charged by KEPCO are consistent with market principles through an evaluation of both of these aspects (*i.e.*, its price-setting methodology and cost recovery).[71] In instances where those prices did not recover costs plus profit, Commerce evaluated the extent to which a benefit was conferred. The methodology applied in the underlying review has similarly been applied in other CVD proceedings involving Korea, and the CIT and the Federal Circuit have sustained this methodology.[72]

**C. Pass-through 2021 Fuel Costs**

For these final results of redetermination, Commerce continues to rely on KEPCO's 2022 cost data, inclusive of the [ ], as there is no record evidence to show that use of that cost data in the 2022 electricity benefit calculations results in fuel costs from 2021 being countervailed twice.

In the *Final Results*, after finding that KEPCO did not recover costs and a rate of return for the 2022 industrial class electricity tariffs, Commerce determined whether a benefit was conferred to the respondents under the Electricity Program by applying a Tier 3 benchmark.[73] To calculate the benefit, pursuant to 19 CFR 351.511(a)(2)(iii), for the industrial class electricity

---

[70] *See POSCO II*, Court No. 22-1525 at 8.
[71] *See Final Results* IDM at Comment 1 (p. 14); *see also Large Diameter Welded Pipe from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*; 2023, 91 FR 27246 (May 14, 2026), and accompanying IDM at Comment 1 (p. 16).
[72] *See Nucor I,* 633 F.Supp.3d 1309-11; *see also Nucor II,* 653 F.Supp.3d 1302-04; and *POSCO II.*
[73] *See Final Results* IDM at Comment 1 and 4.

tariff rates paid by the respondents, we used KEPCO's reported 2022 cost data to determine a percentage amount that would enable cost recovery and a rate of return for the tariff rates. We then multiplied this percentage amount by the rates assigned to the applicable classification to determine the amount each rate would need to be increased to allow for cost recovery and a rate of return. The applicable rate was then subtracted from this calculated benchmark rate to determine the benefit per-unit rate. This per-unit rate was then multiplied by the electricity volume for each rate on a monthly basis and summed to determine the benefit. The sum of all tariff rate components (*e.g.*, demand, energy, fuel cost adjustment charge and climate/environment-related charge) was the monthly calculated benefit.[74]

In the *Remand Order*, the Court stated "whether Commerce employs a yearly cost of goods sold analysis or a long-term cost recovery analysis, it cannot remedy the same benefit twice and record evidence suggests that Commerce may have done so."[75] The Court further stated that "Commerce included KEPCO's carried forward 2021 fuel costs in its 2022 POR adequacy of remuneration analysis because KEPCO treated the unrecovered fuel costs as part of its 2022 Total Comprehensive Cost and used that figure to set the tariff rates in effect during the POR."[76] The Court finds that Commerce failed to explain why it was reasonable to calculate the benefit incurred in 2022, by including costs that were reported in KEPCO's 2021 financial statements and appeared to have been countervailed.[77] On remand, the Court instructs Commerce to provide an "explanation and evidence to show that the same pass-through charges were not countervailed twice, or reconsider its calculation of benefit to ensure any benefit is not remedied twice."[78]

---

[74] *See Preliminary Results* PDM at 35, unchanged in *Final Results*.
[75] *See Remand Order* at 31.
[76] *Id*. 31-32.
[77] *Id*. at 32.
[78] *Id*.

As an initial matter, it is the responsibility of an interested party to identify issues for Commerce's consideration in a timely manner and to develop the record with supporting documentation. Here, however, the GOK did not raise the issue of the 2021 fuel costs until its case brief filed with Commerce, where it argued that Commerce "should isolate the effect of KEPCO's cost pass-through tariff system … by excluding the [ ], which is the portion of the fuel costs from the prior year (*i.e.*, 2021), when calculating KEPCO's cost recovery rate for the POR."[79] The GOK claimed that "the portion of the fuel costs from the prior year {2021} reflected as the [ ] in KEPCO's 2022 cost data is already reflected in KEPCO's 2021 cost recovery rates and, therefore, in the subsidy rates in the 2021 POR."[80] The GOK, however, did not point to any information on the record to support its claim.[81]

The [ ] reported in KEPCO's 2022 cost data is [ ] KRW million.[82] Nowhere on the record did the GOK provide a reconciliation of the [ ] KRW million to KEPCO's 2021 cost data, which the GOK placed on the record, to illustrate how that amount is a portion of the 2021 fuel costs.[83] For example, the GOK did not provide an explanation of how a portion of KEPCO's 2021 cost data under the item [ ][84] was carried forward fuel costs that became the [ ] within KEPCO's 2022 cost data.[85] Consequently, there is no record support that the [ ] reported in KEPCO's 2022 cost data was in fact pass through charges from 2021 that would be countervailed twice if the [ ] was not excluded from KEPCO's 2022 cost data.

---

[79] *See* GOK's Letter, "Case Brief," dated July 18, 2024 (GOK Case Brief) at 15.
[80] *Id*.
[81] *Id*. at 15-16.
[82] *See* GOK January 25, 2024 SQR at Exhibit E-9.1 (2022 KEPCO Cost Data), "Operating Costs per Function," tab at cell D75.
[83] *See* GOK IQR at Exhibit E-9 (2021 KEPCO Cost Data).
[84] *Id*. at Exhibit E-9, "Operating Costs per Function," tab at D38.
[85] *See* GOK January 25, 2024 SQR at Exhibit E-9.1, "Operating Costs per Function," tab at cell D75.

There is no information on the record to show that Commerce improperly included 2021 fuel costs in the 2022 electricity benefit calculations which resulted in the countervailing of 2021 fuel costs twice. For example, the "Report on Agreed-Upon Procedures on the 2022 KEPCO Electricity Rate Cost Data," which the GOK placed on the record, states:

> [ ].[86]

However, within the report [ ] does not describe or cite to documentation that was examined for the [ ]. In fact, [ ] concluded that it [ ].[87]

Importantly, for the report in general, [ ] stated:

> [ ].[88]

Because [ ] could not verify the accuracy and authenticity of the [ ] to KEPCO's financial statements, we find that the report is not a reliable source for determining whether Commerce's cost-recovery calculation for 2022, resulted in the double-counting of 2021 fuel costs.

The GOK provided two other KEPCO cost-related reports on the record.[89] However, similarly, neither document contains information on whether the inclusion of the [

---

[86] *Id.* at Exhibit E-23.1 (Report on Agreed-Upon Procedures on the 2022 KEPCO Electricity Rate Cost Data), para. 8.
[87] *Id.* at Exhibit E-23.1, para. 8 (emphasis added).
[88] *Id.* at Exhibit E-23.1, para. 24.
[89] *See* GOK IQR at Exhibit E-15 (2021 Settled Overall Cost and 2022 Budget Based Overall Cost) and Exhibit E-23 (Report on Agreed-Upon Procedures on the 2021 KEPCO Electricity Rate Cost Data).

] in KEPCO's 2022 cost data, used in the benefit calculations, resulted in countervailing twice the 2021 fuel costs. In fact, one document, "Report on Agreed-Upon Procedures on the 2021 KEPCO Electricity Rate Cost Data," describes the amount at issue, *i.e.*, the [ ] KRW million, as [ ] and not [ ].[90]

Additionally, within its administrative case brief, the GOK described how Commerce could isolate the effect of the [ ].[91] Specifically, the GOK stated that the [ ].[92] Based on that description, it is unclear whether, within its 2022 cost data, KEPCO is distributing 2021 carried forward fuel costs, or is recognizing revenue that it expects to receive in 2022 through the recovery of fuel charges. Along those lines, we note that KEPCO stated the following in its Form 20-F filed with the U.S. Securities and Exchange Commission (SEC) for 2022 (filed in 2023):

> Due to the likelihood of the Actual Fuel Cost being substantially over the built-in limits of the new tariff system and the Government's discretion not to wholly or partially adjust the quarterly Fuel Cost Adjusted Charge in case of extenuating circumstances, there may be certain portions of the fuel costs that cannot be charged to our customers, even though those portions should have been included in the Fuel Cost Adjusted Charge. In such cases, we may accumulate such portions and reflect them in what is called the total comprehensive cost (the "Total Comprehensive Cost"), which is a variable we use to calculate the Base Charge and the Usage Charge of the tariff. The Total Comprehensive Cost, submitted yearly to the Government for its review by us, is calculated using the relevant costs according to our settled accounts from the previous year and the proposed budget for the

[90] *Id.* at Exhibit E-23 (Report on Agreed-Upon Procedures on the 2021 KEPCO Electricity Rate Cost Data), Appendix 3.

[91] *See* GOK Case Brief at 16 (fn.32).

[92] *Id.* at 16 (fn. 32) (referencing GOK January 25, 2024 SQR) at Exhibit E-9.1 (2022 KEPCO Cost Data), "Operating Costs per Function," tab at cell D21).

> upcoming year. Under the Total Comprehensive Cost approach, the Base Charge and the Usage Charge are established at levels that would enable us to recover fair operating costs as well as fair investment return on the capital used in our operations.[93]

KEPCO further noted that the accumulated fuel costs are considered money owed to it and that its tariff pricing system is the means to recoup that money by 2026.[94]

The 2022 review record, as detailed above, contains no evidence to suggest that Commerce, having relied on KEPCO's 2022 cost data for the 2022 electricity benefit calculations, countervailed twice fuel costs from 2021. Further, based on KEPCO's own reporting within its SEC Form 20-F,[95] it was appropriate for Commerce to use KEPCO's 2022 cost data, inclusive of the [ ], when calculating KEPCO's cost recovery rate to determine the benefit conferred under the Electricity Program during the 2022 POR. As KEPCO stated, under the Total Comprehensive Cost (which includes the [ ]) approach, the base charge and the usage charge for electricity are established at levels that would enable the recovery of operating costs and a reasonable rate of return.[96] Moreover, it was proper for Commerce to use KEPCO's 2022 cost data, inclusive of the [ ], as any market price on which we would rely to perform the calculations, would consider KEPCO's Total Comprehensive Cost within its 2022 cost data and whether the tariff rates set by the GOK, after considering KEPCO's cost information, allowed for the recovery of those costs and a profit.[97]

In summary, for a subsidy program under 19 CFR 351.511, Commerce analyzes whether the government price is market based. Regardless of whether our analysis is based on a benchmark comparison price (Tier 1 or Tier 2) or market principles (Tier 3), we evaluate the

---

[93] *See* GOK IQR at Exhibit E-2 (US SEC 20-F) (p. 6).
[94] *Id*. at Exhibit E-2 (p. 7), where KEPCO stated: "The Government announced in its economic policy direction statement for 2023 that it will work towards normalizing the tariff in stages so that our cumulative deficit is resolved by 2026."
[95] *Id.* at Exhibit E-2 (US SEC 20-F) (p. 6-7).
[96] *Id.* at Exhibit E-2 (US SEC 20-F) (p. 6).
[97] *See Final Results* at Comment 4.

degree to which government pricing during the review period is not market-determined. Specifically, as part of a Tier 3 analysis, we examine costs. Here, a portion of the 2021 fuel costs are incorporated into KEPCO's 2022 costs and, thus, reflects the ability of KEPCO to be profitable in the POR. Any market price on which we rely would consider the Total Comprehensive Cost within KEPCO's 2022 cost data and whether the tariff rates set during the POR allowed for the recovery of those costs and a profit. If Commerce were to exclude the Total Comprehensive Cost, Commerce would need to alter the calculation methodology established by the GOK for establishing tariff rates. This modification would result in Commerce carrying out a market principles analysis of a theoretical pricing mechanism, rather than the pricing mechanism relied on by KEPCO to set rates during the POR. Such an analysis would not appropriately determine whether KEPCO's established rates ensured its ability to recover cost plus a reasonable rate of return during the POR based on its own calculation methodology and books and records.

## IV. INTERESTED PARTY COMMENTS

Commerce released the Draft Results to interested parties on October 14, 2026.[98] On October 26, 2026, Commerce received comments from the GOK, DSM, Hyundai Steel, and Nucor Corporation (Nucor).[99] The arguments submitted are summarized and addressed below.

### Comment 1: Whether GDP Is an Appropriate Comparator

*GOK Comments*

The following is a verbatim summary of an argument submitted by the GOK. For further details, *see* GOK Comments at 4-12.

---

[98] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Consol. Court No. 24-00190, Slip Op. 26-90 (CIT August 11, 2026), Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, released October 14, 2026 (Draft Results).
[99] *See* GOK's Letter, "Comments on Draft First Remand Redetermination," dated October 26, 2026 (GOK Comments); *see also* DSM's Letter, "Comments on Draft Remand Results," dated October 26, 2026 (DSM Comments); Hyundai Steel's Letter, "Comments on the Draft Results of Redetermination," dated October 26, 2026) (Hyundai Steel Comments); and Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated October 26, 2026 (Nucor Comments).

> {Commerce's} {Draft Results} erroneously concludes that the basic metals sub-sector received a disproportionately large amount of the alleged electricity subsidy. It used {GDP} as an external comparator but failed to explain why it is an appropriate comparative benchmark for evaluating *de facto* specificity, much less why it is reasonable to require an essentially one-to-one ratio between electricity consumption and contribution to GDP for the program to be non-specific. There is no legal or factual basis for assuming that an industry's electricity consumption should correlate with its contribution to GDP. Absent a reasoned explanation, {Commerce's} reliance on GDP as a comparator is unreasonable.
>
> Moreover, {Commerce's} use of total electricity consumption in its comparisons, rather than industrial class electricity consumption, fails to demonstrate that an enterprise or industry "receive{d} a disproportionately large amount of the subsidy," which in this case is industrial class electricity.

*DSM Comments*

The following is a verbatim summary of an argument submitted by DSM. For further details, *see* DSM Comments at 2-6.

> DSM submits that {Commerce's} {Draft Results}—in which it continues to find that the provision of electricity for {LTAR} program is *de facto* specific—do not comply with the CIT's *Remand Order*. In particular, {Commerce's} use of the "basic metals" sub-sector's total electricity consumption does not support its finding of disproportionality. Moreover, directly comparing an industry sub-sector's share of {GDP} (a measure of value-added) with its share of electricity consumption (a usage measure) is an unreasonable and methodologically flawed type of economic analysis. In essence, {Commerce} is comparing two entirely unrelated percentages, which measure different economic factors, to create an illusion of disproportionality when, in reality, these comparisons are not meaningful. {Commerce's} analytical framework is unreasonable and does not satisfy the legal criteria for establishing *de facto* specificity under {section 771(5A)(D)(iii) of the Act}.

*Hyundai Steel Comments*

The following is a verbatim summary of an argument submitted by Hyundai Steel (internal citations omitted).[100] For further details, *see* Hyundai Steel Comments at 4-13.

> The electricity for LTAR program involves allegedly subsidized industrial class electricity. By including the consumption of all classes of electricity as its comparator in the {Draft Results}, Commerce is not actually assessing whether the basic metals sector or Hyundai Steel received a "disproportionately large amount" of the alleged industrial class electricity subsidy. The resulting analysis thus does not support Commerce's conclusion that the basic metals sector is receiving a

[100] This executive summary exceeds 450 words because the issue under discussion has subparts.

> disproportionate amount of the alleged subsidy that is at issue–subsidized industrial electricity.
>
> Commerce's explanation is unreasonable and inconsistent, claiming on one hand that it does not "assume uniform electricity intensity across industries" because some sectors "consume more electricity per unit of output" but also expecting "uniformity between consumption of a subsidized input and output if usage levels are proportional."
>
> Commerce's explanations do not demonstrate how the comparison between relative electricity consumption and relative GDP contribution logically leads to the conclusion that Hyundai Steel or the basic metals sector is "receiving a disproportionately large amount of the subsidy" pursuant to section 771(5A)(D)(iii)(III) of {the Act}.
>
> The Court has rejected Commerce's comparison of relative shares of electricity consumption and GDP contribution for purposes of assessing disproportionality.
>
> There is no correlation between electricity consumption and contribution to GDP. Indeed, as Commerce concedes in the Draft {Results}, "different production technologies may lead some sectors to consume more electricity per unit of output." The use of essentially a one-to-one electricity intensity to economic output ratio for measuring disproportionality does not prove that a company received a disproportionately large amount of the subsidy. The Court has previously held that "receipt of a greater monetary benefit from the program than others is not determinative of disproportionality."
>
> Furthermore, the logic that Commerce applies in the Draft {Results} leads to absurd results. The Court explained in *Carlisle Tire & Rubber Co. v. United States* that regarding all interventions by a government in their economies as countervailable subsidies would produce absurd results and posited that treating public highways and tax credits for expenditures on capital investment as countervailable would be examples of such absurd results. Neither public highways nor tax credits for expenditures on capital investments would "uniformly" affect all industries throughout a given economy even if they are available to all sectors.
>
> Applying a comparison similar to the one proposed by Commerce in the Draft {Results} reveals that Hyundai Steel did not consume a disproportionately large amount of the alleged electricity for LTAR subsidy. The record demonstrates that Hyundai Steel's consumption of industrial electricity and its contribution to GDP are almost the same, about a one-to-one correlation. Accordingly, even assuming that electricity consumption by the basic metals sub-sector is disproportionate (a conclusion which Hyundai Steel contends is not supported by the record or consistent with law), the electricity for LTAR program in Korea is nonetheless not specific to Hyundai Steel.

*Nucor Comments*

The following is a verbatim summary of an argument submitted by Nucor (internal citations omitted). For further details, *see* Nucor Comments at 4-9.

> {Commerce} properly continued to find in its {Draft Results} that the GOK's provision of electricity for LTAR, which provided a benefit to DSM and Hyundai Steel, was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act because "{a}n enterprise or industry receives a disproportionately large amount of the subsidy." According to the {Federal Circuit}, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis…." On remand, {Commerce} reasonably compared the share of subsidized electricity consumed in 2022 by the sub-sector of the Korean economy that includes DSM and Hyundai Steel, *i.e.*, "basic metals," with that sub-sector's share of Korea's {GDP} for the same year. {Commerce} found that the former share of electricity use, *i.e.*, 6.4 percent, was indeed disproportionate (more than triple) to the latter share of Korea's GDP, *i.e.*, 2.0 percent.
>
> This was a reasonable method of determining disproportionality because it illustrates how the sub-sector of the Korean economy to which DSM and Hyundai Steel belong is receiving more of a benefit from the subsidy than its corresponding share of the Korean economy.
>
> {Commerce} could also find, in the alternative, that the provision of electricity for LTAR is *de facto* specific because a group of industries or enterprises is a predominant user of the subsidy. Notably, {Commerce's} finding of specificity for this electricity for LTAR program is itself lawful on either basis.

**Commerce's Position:** Within their comments, the Korean parties argue that Commerce has not explained why GDP is an appropriate comparator to electricity consumption for purposes of determining disproportionality.[101] Specifically, they argue that there is no causal relationship or one-to-one correlation between an industry sub-sector's contribution to GDP and its level of electricity consumption. For example, Hyundai Steel asserts that because GDP is calculated on a value-added basis, the cost of inputs do not factor into the value added by the steel industry, and therefore, the two metrics would not move in tandem.[102] The Korean parties also claim that Commerce's analysis overlooks the fact that the Korean economy is heavily concentrated in high value-added manufacturing, such as steel, semi-conductors, and petrochemicals, which are inherently more energy intensive than other sectors, such as service industries. Thus, the Korean parties assert that Commerce's analysis does not measure the distribution of subsidy benefits, but

[101] *See* GOK Comments at 4-9; *see also* DSM Comments at 3-6; and Hyundai Steel Comments at 7-11.
[102] *See* Hyundai Steel Comments at 11 (citing Data Memorandum at Attachment tab "i_RawData(3)."

rather, captures differences in electricity intensity across the economic sectors. For example, the GOK argues that the basic metals' ratio of 3.3 merely indicates that the sub-sector consumes more electricity per unit of economic output than other sectors, and not that it received "more than its fair share" of the alleged electricity subsidy.[103] The Korean parties add that, under Commerce's approach, the most electricity-intensive sectors in any economy would inevitably be found to receive a disproportionately large amount of the subsidy delivered through electricity no matter how broadly available and widely used electricity may be.

We disagree with the Korean parties' arguments about the use of a GDP comparator. Contrary to their arguments, within the Draft Results, we addressed many of the issues that the Korean parties raised in their comment submissions. As we explained in the Draft Results, we find that GDP is a relevant comparator for analyzing specificity because Commerce is examining the provision of electricity, an input good in the production of subject merchandise, for LTAR.[104] GDP measures the "total value of final goods and services produced within a country during a specified time period, such as one year."[105] The reliance on GDP as an output comparator reflects the basic relationship between production inputs and economic scale. Electricity is a key input for manufacturing, and GDP provides a consistent measure of each sector's contribution to national output. Comparing electricity consumption to GDP therefore offers a practical way to assess whether a sector's use of the subsidized input aligns with its relative economic footprint. As such, the use of economy-wide GDP as an external comparator to determine whether electricity consumption is proportionate or, in this case disproportionate, is reasonable; for consumption of an input, such as electricity, which is truly widely used throughout the economy,

---

[103] *See* GOK Comments at 6 (citing Draft Results at 9 and Attachment; and *Hyundai Steel II*, 798 F.Supp.3d 1288).
[104] *See* Draft Results at 7-8.
[105] *See* International Monetary Fund, "IMF Glossary," available at http://www.imf.org/en/about/glossary (last accessed October 30, 2026).

Commerce expects that consumption by an industry to be related to its output, *i.e.*, contribution to GDP.

Further, we explained that, in applying the GDP comparator, we do not assume uniform electricity intensity across industries.[106] Different production technologies may naturally lead some sectors to consume more electricity per unit of output. Instead, the comparison establishes a neutral reference point. When a sector's share of electricity consumption far exceeds its share of GDP, it indicates disproportionately large electricity use relative to value added. This proportionality analysis is especially relevant in the electricity for LTAR context because the benefit arises through electricity consumption itself. A sector that uses a disproportionate share of electricity necessarily receives a disproportionate share of the subsidized input. GDP thus serves a meaningful scale metric that allows us to distinguish between high absolute consumption and consumption that is outsized relative to the sector's economic output. For a subsidized input used as widely as electricity, Commerce expects *some* level of uniformity between consumption of a subsidized input and output if usage levels are "proportional." To measure this, a comparison of an industry's share of electricity consumption with its share of GDP determines whether its use of the subsidized input aligns with the economic value it generates. A ratio of one indicates proportional use of electricity relative to economic scale. A ratio greater than one shows that the industry draws more electricity per KRW of value added than the economy-wide average. Because the subsidy confers benefits through electricity consumption, a higher ratio also reflects a greater concentration of the subsidy benefit. The size of the ratio therefore helps identify whether consumption of the LTAR subsidy in that sector is disproportionately large.

[106] *See* Draft Results at 7-8.

As detailed in the Draft Results, Commerce's analysis of the basic metals' data for electricity consumption and contribution to the Korean economy for 2022, demonstrates that the sub-sector's electricity consumption and share of GDP were not proportional.[107] The data indicate that the basic metals sub-sector accounts for 6.4 percent of nationwide electricity consumption but only 2.0 percent of GDP, a ratio of 3.3. Contrary to the GOK's arguments,[108] this ratio is significant because it indicates that the basic metals sub-sector's relative consumption of electricity constitutes three times its share of economic activities. *See* Attachment. As explained above, when a sector's share of electricity consumption far exceeds its share of GDP, it indicates disproportionately large electricity use relative to value added.

In making its arguments, the GOK cites *Bethlehem Steel* stating both Commerce and the CIT have recognized that the fact that certain industries consume larger quantities of electricity due to their inherent characteristics does not, by itself, demonstrate that they receive a disproportionate benefit from electricity-related programs.[109] However, we find the GOK's reference to *Bethlehem Steel* to be inapposite, as the GOK analogizes a usage comparison of the relative electricity consumption here to the usage of an energy reduction credit used in that case.[110] These two cases involve entirely different types of programs, and due to the difference in the nature of the two programs (provision of electricity versus electricity reduction), a specificity analysis for an energy reduction credit program is inherently different from a specificity analysis for the provision of a good for LTAR.

Commerce's disproportionality analysis under section 771(5A)(D)(iii)(III) of the Act revolves around an enterprise or industry receiving "a disproportionately large amount of the

---

[107] *See* Draft Results at 8-9.
[108] *See* GOK Comments at 6 (citing Draft Results at 9 and Attachment).
[109] *Id.* at 5 (citing *Bethlehem Steel Corp v. United States*, 140 F.Supp.2d 1354, 1369 (CIT 2001) (*Bethlehem Steel*); *see also* Hyundai Steel Comments at 10 (citing *Bethlehem Steel*, 140 F.Supp.2d 1369; and *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (finding that "a benefit conferred on a large company might be disproportionate merely because of the size of {that} company.")).
[110] *See* GOK Comments at 5.

subsidy." Thus, the analysis is intrinsically linked to the benefit companies are receiving, as well as the method through which that benefit is being provided and the context within which said benefit is being provided. This instant case deals with the direct consumption of government-provided electricity, not the use of an electricity rate reduction program which was at issue in *Bethlehem Steel*.[111] As a result, Commerce must consider the facts on the record of the underlying review for the program at issue and come to a determination of whether any enterprise or industry received a disproportionately large amount of the subsidy during the POR.

Similarly, we disagree with the GOK's and Hyundai Steel's reference to the SAA and *Carlisle* in making their arguments that countervailing generally available government benefits "simply defies reason."[112] *Carlisle* considered that public highways and bridges, as well as a tax credit for expenditures on capital investment available to all industries and sectors, should not be considered specific bounties or grants.[113] The Court in *Carlisle* explained that this would lead to "an absurd result" because "almost every product which enters international commerce" would be countervailed and that "measurement of the exact extent of the net subsidy falling on any given product line would be unusually difficult."[114] However, the provision of electricity is a fundamentally different issue, because rather than providing infrastructure which may be disproportionately used but would be near impossible to measure, here the government is providing a good,[115] *i.e.* electricity, which is used as an input for production and can be readily

[111] *See Bethlehem Steel*, 140 F.Supp.2d at 1367.
[112] *See* GOK Comments at 7-8 (citing SAA at 929-31; and *Carlisle Tire and Rubber Co. v. United States*, 564 F.Supp. 834, 838 (CIT 1983) (*Carlisle*); *see also* Hyundai Steel Comments at 10-11 (citing SAA at 929-31; and *Carlisle*, 564 F.Supp. 838).
[113] *See Carlisle*, 564 F.Supp. at 838.
[114] *Id.*; *see also* SAA at 929-30.
[115] *See, e.g., Certain Softwood Lumber Products from Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 FR 50103 (August 1, 2023), and accompanying IDM at 221 ("Commerce has consistently determined that electricity is a good and not a service."); *Certain Softwood Lumber Products from Canada: Final Results of the Countervailing Duty Administrative Review, 2019*, 86 FR 68467 (December 2, 2021), and accompanying IDM at Comment 3 (same); *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001), and accompanying IDM at Comment 10 (finding the same); and *Steel Concrete Reinforcing Bar from the Republic of*

measured, as displayed by the wealth of record information in this case regarding electricity consumption and applicable tariff rates.[116] As such, the Korean parties' appeal to *Carlisle* is inapposite, as the sale of a good such as electricity to producers in various sectors is measurable and will not lead to the "absurd results" contemplated by *Carlisle*.

Likewise, we find unpersuasive the GOK's reliance on *Mosaic Co.*, where the CIT stated "{u}nder the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those . . . that distribute a benefit throughout the entire economy."[117] Similar to *Bethlehem Steel*, *Mosaic Co.* involves a completely different type of program (tax reductions) than this instant case (provision of electricity), and due to the difference in the nature of the two programs, a specificity analysis for a tax program is inherently different from a specificity analysis for the provision of a good for LTAR.

Additionally, DSM argues that the record does not support a *de facto* specificity finding because the GOK does not intentionally favor a particular enterprise or industry over others.[118] DSM states that KEPCO's industrial electricity tariff schedule applies uniformly to all manufacturing industries in Korea, and therefore, basic metals' higher electricity consumption is the natural outcome of the system that is applied generally to all industries. DSM's arguments are without merit. The Court has held that "Commerce may find specificity as a matter of fact even if the subsidy is widely available or set according to a standard pricing mechanism, if an enterprise or industry receives a disproportionately large amount of the subsidy," pursuant to

---

*Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 FR 26907 (June 12, 2007), and accompanying IDM at 25 (finding the same).

[116] *See* GOK IQR at 42-43 and Exhibit E-10 (2022 Tariff Schedules); *see also* DSM's "Letter, "Response of Dongkuk Steel Mill to the Department's March 11 Supplemental Questionnaire," dated March 27, 2024 at Appendix RD-18-B (2022 electricity purchases); Hyundai Steel Letter, "Initial Questionnaire Response," dated August 11, 2023 (Hyundai Steel IQR) at Exhibit E-1 (2022 electricity purchases); and Data Memorandum.

[117] *See* GOK Comments at 8 (citing *Mosaic Co. v. United States*, 774 F.Supp.3d 1362, 1382 (CIT 2025) (*Mosaic Co.*)).

[118] *See* DSM Comments at 5.

section 771(5A)(D)(iii)(III) of the Act.[119] The Court stated that "nothing in the statute directs Commerce to treat the existence of a uniform tariff schedule as sufficient to render a subsidy non-specific."[120] The Court further stated that "the statute requires a fact-based inquiry into how a program operates in practice. Thus, Commerce is required to look beyond the structure of the pricing mechanism and assess the factual circumstances of the subsidy's distribution."[121]

Also, within its comments, DSM states that the basic metals category, which would include non-ferrous metals that are distinct from iron-containing metals, such as steel, raises concerns about whether this classification is appropriate for determining the *de facto* specificity of the electricity program for the steel industry.[122] Within the Draft Results, we addressed this issue which the GOK raised within its comments to the Data Memorandum.[123] There, we acknowledged that the data placed on the record for the basic metals sub-sector may not reflect the steel industry alone, but there was no viable alternate data on the record for use in the disproportionality analysis.[124] Despite being given the opportunity to submit rebuttal factual information, no party submitted any rebuttal data, much less more specific data that Commerce could rely on in determining specificity for this program.

Regarding the electricity consumption data used by Commerce, the GOK and Hyundai Steel argue that by including the consumption all classes of electricity as one of the comparators, Commerce is not assessing whether the basic metals sub-sector or the respondents received a "disproportionately large amount" of the alleged industrial class electricity subsidy.[125] They note that, in the *Final Results*, Commerce explained that its "specificity analysis is based on the disproportionate consumption of industrial class electricity by the steel industry and others" and

---

[119] *See Hyundai Steel III*, 838 F.Supp.3d 1347.
[120] *Id*. at 14.
[121] *Id*. at 14-15.
[122] *See* DSM Comments a 3-4.
[123] *See* Draft Results at 11-13; *see also* GOK NFI Letter.
[124] *See* Draft Results at 11-12.
[125] *See* GOK Comments at 10-12; *see also* Hyundai Steel Comments at 6-7.

that its "benefit calculation is based solely on the cost recovery rate of each industrial tariff classification, not on a comparison to any other tariff classification."[126] Thus, they assert that by relying on total electricity consumption rather than industrial class electricity consumption, Commerce is diluting the connection between the analysis and the alleged subsidy program at issue.

In the Draft Results, we addressed the rationale for Commerce's reliance on total electricity consumption when conducting the disproportionality analysis.[127] There, we explained that because Commerce's analysis uses GDP, which is an economy-wide comparator, per the Court's reasoning in *Hyundai Steel III*, it is necessary for our evaluation of consumption to be based on total electricity consumption and not solely industrial class electricity to ensure the comparison is in the same "universe," an economy-wide measure.[128] Specifically, the Court stated that "GDP measures economy-wide output, not output generated by only the relevant class of industrial-class electricity consumers. If the 'industrial-class' limit defines the relevant universe on the electricity side, the comparator on the output side must likewise be tied to that universe."[129] Within our analysis, usage of "total electricity consumption" and "total production" allows a comparison of relevant universes, where the GDP comparator is tied to the consumption of all classes of electricity by the various economic sub-sectors which contribute to Korea's economy. We also noted that the use of total electricity consumption allows for a more conservative comparison to GDP as it represents the basic metal sub-sector's consumption of all types of electricity (such as, general) beyond simply the industrial class.[130]

[126] *See* GOK Comments at 10-11 (citing *Final Results* IDM at Comment 2); *see also* Hyundai Steel Comments at 6-7 (citing *Final Results* IDM at Comment 2).
[127] *See* Draft Results at 10-11.
[128] *Id*. at 10 (citing *Hyundai Steel III*, 838 F.Supp.3d 1349, 1351).
[129] *Id*. (citing *Hyundai Steel III*, 838 F.Supp.3d 1349, 1351).
[130] *Id*. at 11.

Given the Court's instruction in *Hyundai Steel III* to Commerce regarding the use of a GDP comparator for determining disproportionality,[131] we continue to rely on data that encompasses all classes of electricity consumed by the basic metals sub-sector during 2022. For these final results of redetermination, we, thus, continue to find that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because basic metals, which includes the steel industry to which DSM and Hyundai Steel belong, received a disproportionately large amount of the electricity subsidy in 2022.

Lastly, in their comments, both Hyundai Steel and Nucor present alternate comparisons for Commerce's consideration when conducting its specificity analysis in these final results of redetermination.[132] For the reasons discussed below, Commerce determines that the alternative approaches proposed by the parties are not permissible.

Hyundai Steel suggests that Commerce should apply the comparison from the Draft Results but with Hyundai Steel's industrial class electricity consumption and sales instead of the basic metals sub-sector's data.[133] Hyundai Steel claims the revised comparison shows that Hyundai Steel did not consume a disproportionately large amount of the electricity subsidy as the ratio of the company's electricity consumption to its GDP contribution is approximately one-to-one (*i.e.*, Hyundai Steel's consumption of electricity is [ ] and its contribution to Korean GDP is [ ]).[134]

We disagree with Hyundai Steel's proposed comparison which would result in comparing two different "universes"—industrial class electricity purchases versus economy-wide GDP—which is the same logical error that the Court has previously remanded to Commerce.[135] As

[131] *See Hyundai Steel III*, 838 F.Supp.3d 1349, 1351.
[132] *See* Hyundai Steel Comments at 12-13; *see also* Nucor Comments at 6-9.
[133] *See* Hyundai Steel Comments at 12-13.
[134] *Id.*
[135] *See Hyundai Steel III*, 838 F.Supp.3d 1349, 1351.

discussed above, to comply with the Court's instruction in *Hyundai Steel III*, it is necessary to ensure that the comparators "align logically." Hyundai Steel's proposal to compare industrial class electricity usage to total sales does not result in a logical comparison, as expressed by the Court, because it falls victim to asymmetrical comparators. Without including Hyundai Steel's consumption of all classes of electricity in the first comparator, this comparison falls victim to the exact concerns the Court raised in its remanding opinion in *Hyundai Steel III* by comparing industrial class electricity consumption as a percentage of overall electricity consumption to Hyundai Steel's share of Korea's GDP. As Hyundai Steel's consumption of all classes of electricity during 2022 is not on the record,[136] the comparison proposed by Hyundai Steel is not a viable option for Commerce's consideration.

Nucor suggests that Commerce could rely on the list of the top 100 industrial consumers by facility that was submitted by the GOK in the underlying review to conduct a disproportionality analysis.[137] Nucor claims that the list shows that [ ] accounted for [ ] of total industrial class electricity consumption during the POR.[138]

We disagree with Nucor's proposed alternative. In *Hyundai Steel I*, the Court remanded Commerce to explain how the combined industries that it identified in the 2021 administrative review of this *Order* benefited more than would be expected based on their usage given that the electricity subsidy is designed to confer benefits on usage levels, which necessarily results in larger users receiving a proportionally larger percentage of the subsidy, or in relation to some other comparator.[139] Because Nucor's proposal relies on a usage comparison based on the

---

[136] *See* Hyundai Steel IQR at 44 ("Hyundai Steel notes that it is providing templates and sample bills for electricity purchases made only under the Industrial tariff classification and not other tariff classifications.").
[137] *See* Nucor Comments at 6-7 (citing GOK IQR at Exhibit E-11).
[138] *Id*. at 7.
[139] *See Hyundai Steel I*, 745 F.Supp.3d 1351.

electricity consumption reported for the top 100 industrial facilities without an external comparator, Commerce does not find the approach viable in light of the Court's previous remand orders. In *Hyundai Steel I* and *Hyundai Steel II*, the Court discussed that a disproportionality inquiry involves a case-by-case analysis which assesses benefits, *not in relation to the benefits of others*, but in relation to some external comparator, *i.e.*, disproportionality requires a comparison of the amount of subsidy and an attribute of an industry.[140] As discussed above, Commerce finds that GDP contribution, an attribute measuring an industry's participation in the economy, is a proper comparator to measure whether disproportional usage of the electricity subsidy exists.

Nucor also suggests that Commerce could consider whether a group of industries or enterprises is a predominant user of the subsidy under section 771(5A)(D)(iii)(II) of the Act.[141] Nucor states the Court's holding that Commerce must establish a "baseline of comparison" other than the industry's consumption of an input in relation to others is limited to the disproportionate receipt provision and does not apply to the predominate use provision.[142] Nucor notes that the [ ] consumed [ ] of the total industrial class electricity during the POR and the remaining seven industries of the ten largest electricity consuming industries accounted for just [ ] of the total industrial class electricity consumed during the POR.[143] Nucor adds that the top three industries alone received [ ] more of the subsidy benefits under the program than the seven other industries combined when compared to total industrial class electricity consumption.[144] Nucor thus claims that similar to *Mosaic*, here, a small group of industries "purchased a far greater amount than any other {group of industries}," supporting a finding of predominant use.[145]

---

[140] *Id.*; *see also Hyundai Steel II*, 798 F.Supp.3d at 1288, 1289-91 (emphasis added).
[141] *See* Nucor Comments at 7-9.
[142] *Id.* at 8 (quoting *Hyundai Steel II*, 798 F.Supp.3d at 1288).
[143] *Id.* at 8-9 (citing GOK IQR at 42-43).
[144] *Id.* at 9 (citing GOK IQR at 42-43).
[145] *Id.* at 8-9 (citing *Mosaic Co. v. United States*, 589 F.Supp.3d 1298, 1309-10 (CIT 2022) (*Mosaic*)).

We do not agree with Nucor that Commerce should apply a predominant use analysis for the Electricity Program. First, we find Nucor's reference to *Mosaic* off-point in light of the Court's prior remand orders. In the CVD case at issue in *Mosaic*, Commerce determined that one industry—the agrochemical sector—was the single largest industrial consumer of natural gas, and thus, used a predominant amount of the subsidy when compared to the other industrial users of natural gas.[146] However, here, Nucor suggests that Commerce examine the top three industrial consumers of electricity as a group in a predominant use analysis.[147] The Court ruled in *Hyundai Steel I* regarding similar circumstances in the 2021 POR, that because the "subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping.[148] Nucor did not provide a rational basis other than usage amounts for combing three industries together in a predominant use analysis of the Electricity Program which is widely available.[149] Consequently, Commerce is not adopting Nucor's proposed predominant use approach for these final results of redetermination.

**Comment 2: Whether Commerce's Market Principles Analysis Is Proper**

*DSM Comments*

The following is a verbatim summary of an argument submitted by DSM. For further details, *see* DSM Comments at 6.

> {Commerce's} market principles analysis overlooks the relevance of the extraordinary surge in energy prices that transpired during the 2022 calendar year.

*Nucor Comments*

The following is a verbatim summary of an argument submitted by Nucor (internal citations omitted). For further details, *see* Nucor Comments at 9-12.

---

[146] *See Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 FR 9479 (February 16, 2021), and accompanying IDM at 44.
[147] *See* Nucor Comments at 8-9.
[148] *See Hyundai Steel I*, 745 F.Supp.3d 1353.
[149] *See* Nucor Comments at 7-9.

> {Commerce} properly continued to find in its draft remand results that {KEPCO} did not fully recover its costs and a rate of return for the industrial class electricity category, and thus, a benefit was conferred. {Commerce} applied its now-established practice in precisely the same manner that it has been applied in numerous recent administrative reviews, including the two prior reviews of this order. In each of those prior applications of the methodology, {Commerce} determined that a benefit was conferred but that the amounts were non-measurable. The GOK defended this methodology, which has been sustained by both the Court and the {Federal Circuit}. The fact that fluctuations in market values result in a measurable benefit in this {POR} is not a sufficient justification for departing from that methodology now.

**Commerce Position:** DSM argues that Commerce's market principles analysis overlooks the relevancy of the surge in energy prices during 2022, and that KEPCO's failure to temporarily recover its costs because of those high prices is not evidence of a countervailable benefit.[150] We disagree. We also note that the GOK raised a similar argument in the *Final Results*.[151] We rejected the argument then and continue to do so here.

Though KEPCO may have experienced an energy price spike during 2022, we disagree that Commerce must take into account global market trends for fuel costs when conducting a market principles analysis. As discussed above, the *1998 CVD Preamble*[152] instructs Commerce on the factors to consider under a Tier 3 analysis, which are the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. Nowhere within the regulations does it state that Commerce needs to give weight to any other factors, such as external influences on a government price. As such, our Tier 3 analysis is in compliance with 19 CFR 351.511(a)(2)(iii).

---

[150] *See* DSM Comments at 6.
[151] *See Final Results* IDM at Comment 1 (p. 15).
[152] *See 1998 CVD Preamble*, 63 FR at 65378 ("Paragraph (a)(2)(iii) provides that, in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles. Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case. In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely.").

Further, Commerce's practice recognizes that the benefit amount under a program may change from period to period. Concerning an adequate remuneration analysis, changes in the benefit amount are determined with reference to market values for the input under consideration, which in this review is KEPCO's cost of electricity supply. Thus, based on our established Tier 3 analysis, as detailed above at "Market Principles Analysis," we continue to determine that the GOK provided a countervailable benefit to the respondents through the provision of electricity for LTAR as the prices for industrial class electricity were insufficient for KEPCO to recover costs plus a reasonable rate of return during the POR.

Because Nucor presented affirmative comments on Commerce's market principles analysis, we need not address them.

**Comment 3: Whether 2021 Fuel Costs Were Countervailed Twice**

*GOK Comments*

The following is a verbatim summary of an argument submitted by the GOK. For further details, *see* GOK Comments at 12-18.

> {Commerce} should have excluded the effects from KEPCO's cost pass through tariff system in 2021 because they were not related to KEPCO's cost of production and distribution of electricity during the POR and KEPCO's 2021 fuel costs were already accounted for in assessing countervailing duties in {Commerce's} prior administrative review. Moreover, {Commerce's} {Draft Results do} not address the {CIT's} instructions regarding double counting.

*DSM Comments*

The following is a verbatim summary of an argument submitted by DSM. For further details, *see* DSM Comments at 6-7.

> {W}ith respect to the pass-through of 2021 fuel costs, the evidence that is on the record does not support {Commerce's} denial in view of the Korean parties' conclusive demonstration that the same 2021 pass-through charges were countervailed twice.

*Hyundai Steel Comments*

The following is a verbatim summary of an argument submitted by Hyundai Steel (internal citations omitted). For further details, *see* Hyundai Steel Comments at 13-19.

> The record demonstrates that the GOK carried forward costs from 2021 and reported those amounts in its 2022 cost data. KEPCO incurred the fuel costs at issue for the provision of electricity in 2021 and reported them to Commerce as a component of Exhibit E-9 of the {GOK IQR}. Commerce used KEPCO's cost of goods sold from its 2021 unconsolidated financial statements to calculate the benefit for the 2021 {POR}.
>
> In Exhibit E-9.1 of the {GOK January 25, 2024 SQR}, the GOK reported the amounts that represent the unrecovered fuel costs from 2021 as a separate line item of KEPCO's cost data reported to Commerce for the 2022 {POR}. The line item identifies the 2021 costs separately from the costs that were incurred in 2022. The record thus shows that Commerce double-counted the 2021 amounts by including them in Hyundai Steel's costs for its cost recovery rate in 2021 and again in its cost recovery rate for 2022, contrary to the Court's decision.
>
> Whether the 2021 amounts are part of the price that the GOK charged consumers does not mean that the cost recovery rate that Commerce calculated is relevant to the adequacy of remuneration during the POR. Pursuant to section 771(5)(E)(iv) of {the Act}, a benefit is conferred to the extent "goods or services are provided for {LTAR}." Section 771(5)(E){of the Act} requires that the benefit from the provision of electricity must relate to adequate remuneration during the 2022 {POR}, not 2021. *See* {section 771(5)(E)(iv) of the Act}.

*Nucor Comments*

The following is a verbatim summary of an argument submitted by Nucor. For further details, *see* Nucor Comments at 12-13.

> {Commerce} properly continued to rely on KEPCO's 2022 cost data–including the [ ]. Contrary to plaintiffs' claims, there is no record evidence that use of the 2022 cost data results in double counting and/or countervailing of 2021 fuel costs.

**Commerce's Position:** We disagree with Korean parties' assertion that Commerce did not comply with the Court's instruction regarding the 2021 fuel costs.[153] On remand, the Court instructed Commerce to provide an "explanation and evidence to show that the same {2021} pass-through charges were not countervailed twice, or reconsider its calculation of benefit to

[153] *See* GOK Comments at 12-18; *see also* DSM Comments at 6-7; and Hyundai Steel Comments at 13-19.

ensure any benefit is not remedied twice."[154] In the Draft Results, Commerce demonstrated that there is no information on the record to show that 2021 fuel costs amounting to [ ] KRW million were countervailed a second time in the 2022 electricity benefit calculations.[155]

Most importantly, nowhere on the record did the GOK provide a reconciliation of the 2022 [ ] KRW million, contained within KEPCO's 2022 Total Comprehensive Cost, to KEPCO's 2021 cost data to illustrate how the [ ] KRW million ties back to and is a portion of the 2021 fuel costs.[156] This reconciliation could have been placed on the underlying record when the GOK submitted KEPCO's 2021 and 2022 cost data, and the 2022 cost data included the [ ] KRW million.[157] We, therefore, find no merit to the GOK's argument that its administrative case brief submitted in the 2022 review was the first available opportunity to raise the issue of the 2021 fuel costs.[158]

Further, as discussed in the Draft Results, the [ ] KRW million is mentioned in [ ] "Report on Agreed-Upon Procedures on the 2022 KEPCO Electricity Rate Cost Data," however, [ ] disclaimed that: [ ].[159] If the examiner did not have [ ] with regard to the [ ] and was [ ],[160] then there is no basis for Commerce to have any assurance as to the accuracy and completeness of the financial data for the [

---

[154] *See Remand Order* at 32.
[155] *See* Draft Results at 19-25.
[156] *Id*. at 21.
[157] *See* GOK IQR at Exhibit E-9 (2021 KEPCO Cost Data); see also GOK January 25, 2024 SQR at Exhibit (2022 KEPCO Cost Data).
[158] *See* GOK Comments at 12-13.
[159] *Id*. at 22 (citing GOK January 25, 2024 SQR at Exhibit E-23.1, para. 24).
[160] *Id*. at 22 (citing GOK January 25, 2024 SQR at Exhibit E-23.1, para. 8).

] contained within the "Report on Agreed-Upon Procedures on the 2022 KEPCO Electricity Rate Cost Data" or elsewhere on the record. In its comments, the GOK states that Exhibit E-7, which contains a document entitled "Relevant Sections of General Terms and Conditions for Electric Supply," explains the methodology for calculating the [ ] and that it would be carried forward.[161] Given that the GOK did not provide a reconciliation of the fuel costs and [ ][162] contained within its report, there is no way for Commerce to know if the procedures and policy outlined in the "Relevant Sections of General Terms and Conditions for Electric Supply" were followed.

Within its comments, Hyundai Steel attempts a reconciliation of the [ ].[163] However, Hyundai Steel could not show with reference to record documentation how the amount of [ ] KRW million amount ties back to 2021 fuel costs, reflecting the value of fuel costs that could not be passed through to customers, which were countervailed for a second time in the 2022 electricity benefit calculations.

Additionally, the information that the GOK placed on the record of the underlying review regarding the [ ] is unconvincing that unrecovered 2021 fuel costs were countervailed twice. As detailed in the Draft Results, within its administrative case brief, the GOK described how the [ ] could be removed from KEPCO's 2022 cost by classification data to exclude the alleged accumulated 2021 fuel costs. The GOK's instruction focused on the financial category [ ] and provided no explanation for how that category is related to the [ ] and reconciles back to fuel costs not passed through to customers in 2021.[164] Further, based on the GOK's description, it is unclear

---

[161] *See* GOK Comments at 14 (citing GOK IQR at Exhibit E-7).
[162] *See* GOK January 25, 2024 SQR at Exhibit E-23.1 (para. 24).
[163] *See* Hyundai Steel Comments at 14-15.
[164] *See* Draft Results at 23 (citing GOK Case Brief at 16 (fn. 32)).

whether, within its 2022 cost data, KEPCO is distributing 2021 carried forward fuel costs, or is recognizing revenue that it expects to receive in 2022 through the recovery of fuel charges.

To add to the inconsistencies on the record, the "Report on Agreed-Upon Procedures on the 2021 KEPCO Electricity Rate Cost Data," describes the amount at issue, *i.e.*, the [ ] KRW million, not as an unrecovered fuel cost but rather as an [ ].[165] The GOK states that Commerce's reliance on Appendix 3 of that report is misplaced and that the narrative of the report describes the [ ] KRW million as the [ ].[166] The GOK's statement, however, supports Commerce's position that the information on the underlying record regarding the substance of the [ ] does not establish that 2021 fuel costs were countervailed twice by Commerce. Through an examination of the information on the record, as detailed in the Draft Results,[167] Commerce has explained why its calculation of the 2022 electricity benefit was reasonable because there is no evidence that the amount of [ ] KRW million for fuel pass-through charges was countervailed twice, once in 2021 and then again in 2022.

The GOK further asserts that it has never asked Commerce to completely exclude KEPCO's 2022 Total Comprehensive Cost from its cost-recovery analysis, but rather, just the [ ] because it is not a cost incurred during the POR.[168] The GOK claims that excluding that individual item would not require Commerce to "alter the calculation methodology established by the GOK for establishing tariff rates."[169] We disagree with the GOK's position that the [ ] should be removed from KEPCO's 2022 cost data. KEPCO reported in its SEC filing for 2022 that any fuel costs not passed through to customers is

[165] *See* GOK IQR at Exhibit E-23 (Appendix 3).
[166] *See* GOK Comments at 15 (citing GOK IQR at Exhibit E-23 (para. 19)).
[167] *See* Draft Results at 19-25.
[168] *See* GOK Comments at 17.
[169] *Id*. (citing Draft Results at 25).

reflected in the Total Comprehensive Cost, which is used to establish electricity tariffs.

Specifically, the KEPCO stated:

> In such cases {of fuel costs that cannot be charged to customers}, we may accumulate such portions and reflect them in what is called the total comprehensive cost (the "Total Comprehensive Cost"), which is a variable we use to calculate the Base Charge and the Usage Charge of the tariff. The Total Comprehensive Cost, submitted yearly to the Government for its review by us, is calculated using the relevant costs according to our settled accounts from the previous year and the proposed budget for the upcoming year. Under the Total Comprehensive Cost approach, the Base Charge and the Usage Charge are established at levels that would enable us to recover fair operating costs as well as fair investment return on the capital used in our operations.[170]

The GOK itself reported that it reviews KEPCO's cost data when approving KEPCO's tariff schedules.[171] The GOK stated that: "Regarding {tariff} amendment applied and approved in September 2022 (implemented in the 4th Quarter of 2022), MOTIE {Ministry of Trade, Industry, and Energy} used the 2021 overall cost data and 2022 projected overall cost data that KEPCO submitted to MOTIE in the second half of 2022."[172] Regardless of whether the cost data were budgeted figures or not, the GOK considers KEPCO's cost information in its tariff schedule decision-making process. Given this reality, any market price on which we rely for the benefit calculations (to determine whether electricity prices were sufficient to recover costs and a reasonable rate of return) would consider the Total Comprehensive Cost within KEPCO's cost data. Accordingly for the POR calculations, we relied on KEPCO's 2022 cost by classification data and the electricity prices paid by the respondents during the POR.[173] If Commerce were to exclude a component of the KEPCO's Total Comprehensive Cost, Commerce would need to alter the calculation methodology established by the GOK for establishing tariff rates because as

---

[170] *See* GOK IQR at Exhibit E-2 (US SEC 20-F) (p. 6).
[171] *Id*. at 19 (question 8) and 47 (question 45).
[172] *Id*. at 47 (question 45).
[173] *See* Memorandum, "Preliminary Calculations for Hyundai Steel Company," dated February 28, 2024 at 2-5 (unchanged in the final calculations, *see* Memorandum, "Final Calculations for Hyundai Steel Company," dated September 5, 2024); *see also* Memorandum, "Preliminary Calculations for Dongkuk Steel Mill Co., Ltd," dated February 28, 2024 at 2-4 (unchanged in the final calculations, *see* Memorandum, "Final Calculations for Dongkuk Steel Mill Co., Ltd." dated September 5, 2024); and Memorandum, "KEPCO Data," dated February 29, 2024.

noted, the GOK relies on KEPCO's cost data when determining the tariff schedule. Contrary to the GOK's disagreement,[174] this modification would, in fact, result in Commerce carrying out a market principles analysis of a theoretical pricing mechanism, because our analysis would not be assessing the actual pricing mechanism relied on by the GOK and KEPCO to set electricity rates. Instead of measuring whether the GOK's methodology allows for recovery of cost plus a sufficient profit, Commerce would be altering the tariff price setting methodology to remove a cost that is otherwise accounted for in the GOK's determination when approving the proposed pricing schedules. Such an analysis would not appropriately determine whether KEPCO's established rates ensured its ability to recover cost plus a reasonable rate of return based on its own calculation methodology and books and records.

Additionally, both the GOK and Hyundai Steel contend that the 2021 fuel cost amount is not relevant to the adequacy of remuneration for electricity prices during the POR regardless of whether KEPCO sought to recoup prior period amounts by carrying them forward.[175] For the reasons stated above, we disagree. In conducting our cost recovery calculations, we require cost data that KEPCO compiles in its normal course of business, which is the Total Comprehensive Cost, as stated in its SEC filing, and which is provided to the GOK for its tariff-setting process.[176] Further, under an adequate remuneration analysis, Commerce's practice recognizes that the benefit amounts under a program may change from period to period and those changes in the benefit amount are determined with reference to market values for the input under consideration, which in this review is KEPCO's cost of electricity supply.

---

[174] *See* GOK Comments at 17.
[175] *Id.*
[176] *See* GOK IQR at 19 (question 8), 47 (question 45), and Exhibit E-2 (US SEC 20-F) (p. 6).

## V. FINAL RESULTS OF REDETERMINATION

Based on the analysis above, Commerce continues to: (1) find the Electricity Program to be *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because the basic metals sub-sector, which includes the steel industry to which DSM and Hyundai Steel belong, received a disproportionately large amount of the electricity subsidy in 2022; (2) determine that, though the Korean electricity tariff system and its price-setting methodology were established based on laws and regulations, the application of the tariff system and price-setting methodology did not allow KEPCO to fully recover its costs and a rate of return for the industrial class electricity category, and thus, a countervailable benefit was conferred to the respondents during the POR through the provision of electricity for LTAR; and (3) rely on KEPCO's 2022 cost data as there is no record evidence to show that use of that cost data in the 2022 electricity benefit calculations results in fuel costs from 2021 being countervailed twice.

11/9/2026

X 

Signed by: STEVEN PRESING

Steven Presing
Executive Director
for Policy and Negotiations

**ATTACHMENT**
**Korea's Basic Metals Sub-Sector Is**
**Disproportionally Dependent on Electricity Consumption**
**(2022)**

| Level Data | Economy-Wide | Electronic & Electrical Equipment | Basic Metals |
|---|---|---|---|
| Electricity Consumption *(in millions of kWh)* | 548,573 | 8,219 | 35,044 |
| Total Production *(in billions of Korean Won)* | 2,142,989 | 36,380 | 41,958 |
| | | | |
| As Share of Total in Economy | | | |
| Electricity Consumption *(as share of total electricity consumption)* | 100% | 1.5% | 6.4% |
| Total Production *(as share of GDP)* | 100% | 1.7% | 2.0% |
| | | | |
| Depth of Overreliance on Electricity | | 0.88 | 3.3 |